## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS, | |
| *Plaintiff,* | |
| *v.* | Civil Action No. _____ |
| JEHMAL T. HUDSON, in his INDIVIDUAL CAPACITY and OFFICIAL CAPACITY as a COMMISSIONER of the STATE CORPORATION COMMISSION of the COMMONWEALTH OF VIRGINIA, | |
| MICHAEL ROLBAND, in his INDIVIDUAL CAPACITY and OFFICIAL CAPACITY as the DIRECTOR of the VIRGINIA DEPARTMENT OF ENVIRONMENTAL QUALITY, | |
| STEPHEN C. BIRCH, in his INDIVIDUAL CAPACITY and OFFICIAL CAPACITY as the COMMISSIONER of the VIRGINIA DEPARTMENT OF TRANSPORTATION, | |
| and | |
| JOHN DOE(S), | |
| *Defendants.* | |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff, the Association of American Railroads ("AAR"), brings this Complaint against

Jehmal T. Hudson, in his Individual Capacity and in his Official Capacity as a Commissioner of

the State Corporation Commission of the Commonwealth of Virginia; Michael Rolband, in his

Individual Capacity and in his Official Capacity as the Director of the Virginia Department of

Environmental Quality; and Stephen C. Birch, in his Individual Capacity and in his Official Capacity as the Commissioner of the Virginia Department of Transportation ("Defendants").

## INTRODUCTION

1.      AAR's member railroads own, possess, control, and/or operate real property and facilities on which they conduct railroad operations throughout the Commonwealth of Virginia. Like any other property holder, the railroads have rights in those properties.  But a new Virginia statute treats railroads *unlike* any other landowner, seizing from them and giving to broadband service providers a permanent easement to access and occupy railroad lands.  This encroachment hobbles railroads' ability to ensure the safe conduct of rail operations, and disregards their entitlement to the market-based "just compensation" secured by the U.S. and Virginia Constitutions for takings of valuable property interests.

2.      Historically, an entity desiring to cross a rail line would consult with the railroad as to its particular need and, mindful of the relevant location, geography, geology, and any track-specific idiosyncrasies, would develop a crossing location, project timetable, safety protocols, and cost structure appropriate for that particular crossing.  This approach reflects the simple truth that crossing rail lines is a particularized undertaking with respect to location, engineering, safety, *and* cost.

3.      This new statute, however, skips over all that and empowers a broadband service provider to dictate to railroads when and how the provider will cross railroad land, and at what minimal cost.  To secure any relief, railroads are constrained to seek an order from the State Corporation Commission (SCC), where the railroads—not the condemning broadband service provider—will bear the burden of proving that compensation for a proposed crossing is inadequate,

2

or that a proposed crossing will cause undue hardship for the railroad or poses an imminent likelihood of danger to public health or safety.  This scheme violates the comprehensive federal regulatory regime governing rail transportation, which protects property that is or may be used for rail operations. It also upends long-established constitutional protections for landowners and will predictably burden railroads with seriatim litigation over easement after easement.  In essence, the statute arrogates authority over rail operations to the state, and then uses that authority to vest an extraordinary and unprecedented condemnation and seizure power in private, for-profit broadband companies.

4.     The railroads' property rights are well-known to the Commonwealth of Virginia. Indeed, in contemporaneously vetoing a different bill, which would have allowed broadband service providers to temporarily leave vehicles on private property without the owner's consent, Governor Youngkin noted that the proposal "violates the fundamental rights of property owners" which, as "a cornerstone of our society . . . must not be eroded for convenience or expediency." Press Release, Governor of Va., *Governor Glenn Youngkin Signs 738 Bipartisan Bills into Law* (Mar. 28, 2023), https://www.governor.virginia.gov/newsroom/news-releases/2023/march/name-998566-en.html.

5.     So too here. Plaintiff brings this action pursuant to 28 U.S.C. § 2201, the Declaratory Judgment Act, 42 U.S.C. § 1983, and *Ex Parte Young*, 209 U.S. 123 (1908), to vindicate these same cornerstone federal and state constitutional and statutory rights.

6.     Plaintiff seeks a declaration that Virginia Code Ann. § 56-16.3 is preempted by federal statutes and constitutes a taking without just compensation in violation of federal and Virginia law and is therefore void and unenforceable.

## PARTIES, JURISDICTION, AND VENUE

7.      AAR is a non-profit, voluntary association representing both freight and passenger railroads, including railroads operating within Virginia.  AAR works with its members to enhance the economy, safety, and efficiency of rail service by promoting sound transportation policy and facilitating the exchange of information among railroads, their customers, and the public at large.

8.      AAR regularly represents its member railroads in proceedings before Congress, the courts, and federal and state administrative agencies in matters of common interest to its members, such as the issues that are the subject of this litigation.

9.      AAR's freight members operate 83% of the line haul mileage, employ 95% of the workers, and account for 97% of the freight revenue of all railroads in the United States. AAR's passenger railroads also operate intercity passenger trains and provide commuter rail service. AAR brings this action in its representational capacity to assert the rights of its member railroads who operate in Virginia.  AAR's associational claim is proper because "(1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit."  *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. Inc.*, 528 U.S. 167, 181 (2000)). Specifically, and as noted below, Virginia Code Ann. § 56-16.3 directly imposes obligations on all railroad companies operating in the Commonwealth of Virginia, which includes AAR Members Norfolk Southern Railway Co.  ("NSR") and CSX Transportation, Inc.  ("CSXT").

10.     Defendant Jehmal T. Hudson (the "Commissioner") is the only serving member of the State Corporation Commission of the Commonwealth of Virginia.  The State Corporation

4

Commission is charged with enforcement of Virginia Code Ann. § 56-16.3 in addition to adjudication of any issue raised in a petition by a railroad or broadband service provider under the statute. The SCC has enforcement authority over public service companies, *see* Va. Code Ann. §§ 12.1-13, 12.1-12, 56-1, 56-35, including railroad companies, *see id.* §§ 56-1, 56-99.2, 56-128. The SCC may enforce the laws within its jurisdiction through fines and revocations of licenses when fines go unpaid. *See id.* § 12.1-13. Commissioner Hudson is named in his official capacity and, for purposes of Count IV, his individual capacity and will be served at 1300 East Main Street, Richmond, VA 23219.

11. Defendant Michael Rolband is the Director of the Virginia Department of Environmental Quality ("DEQ"). DEQ is charged with supervising regulations requiring prior review and approval for construction involving land-disturbing activities, such as excavation, and stormwater management, including dewatering—both of which are specifically contemplated in Virginia Code Ann. § 56-16.3(C)(1)(ii). *See id.* § 62.1-44.15:55(A) (requiring submission of an erosion and sediment control plan to a VESCP authority prior to any land-disturbing activity); 9 Va. Admin. Code § 25-840-10 (explaining that "VESCP authority" refers to an authority approved by the DEQ to operate a Virginia Erosion and Sediment Control Program ("VESCP")). These regulations also impose specific requirements on VESCP plans for the installation of underground utility lines. *See id.* § 25-840-40(16) ("Underground utility lines shall be installed in accordance with the following standards . . . ."). DEQ also supervises the Annual Standards and Specifications ("AS&S") process, through which it enters agreements with certain entities that allow certified individuals to approve erosion or stormwater management plans and commence construction through an internal process that follows state-mandated procedures. *See* Va. Code Ann. § 62.1-44.15:55(D). DEQ

reviews program characteristics annually and retains oversight, including inspection and enforce-ment authority, over construction activities undertaken pursuant to the AS&S process.  *See id.* § 62.1-44.15:56(E)–(G).  Mr. Rolband is named in his official capacity and, for purposes of Count IV, his individual capacity and will be served at 1111 East Main Street, Suite 1400, Richmond VA 23219.

12.     Defendant Stephen C. Birch is the Commissioner of the Virginia Department of Transportation ("VDOT").  VDOT is charged with performing "all acts necessary or convenient for constructing, improving, maintaining, and preserving the efficient operation of the highways embraced in the systems of state highways."  Va. Code Ann. § 33.2-223.  VDOT regulations "pro-vide that no work of any nature shall be performed on any real property under the ownership, control, or jurisdiction of VDOT until written permission has been obtained from VDOT," which permission is granted by permit.  24 Va. Admin. Code § 30-151-20.  That "includes, but is not limited to, the right-of-way of any highway in the state highways system."  *Id.*  Broadband service providers undertaking construction in the right-of-way are not exempt from this requirement, and routinely coordinate permitting with VDOT as part of new and ongoing projects.  *See Broadband Coordination*, VDOT, https://www.virginiadot.org/info/broadband_coordination.asp (Jan. 19, 2023) ("Potential providers must operate under a land use permit . . . ").  And Virginia Code Ann. § 56-16.3(K) contemplates broadband crossings of railroad property at existing public rights-of-way.  Mr. Birch is named in his official capacity and, for purposes of Count IV, his individual capacity and will be served at 1401 E. Broad Street, Richmond VA 23219.

13.     To the extent that any other state official is involved in granting any permit or other approval necessary to proceed with construction or any other action that constitutes a condition precedent for the exercise of rights under Virginia Code Ann. § 56-16.3, they are named in their

official capacities and, for purposes of Count IV, their individual capacities as John Doe Defendants.

14.     There is an actual controversy between the parties, as alleged below, arising under federal law.

15.     This Court has jurisdiction over AAR's claims because Plaintiff seeks prospective relief against the enforcement of a state law that violates the Constitution and laws of the United States.  "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 (1983).  Further, the Supreme Court has long recognized an equitable cause of action "to sue to enjoin unconstitutional actions by state and federal officers," including where "state regulatory actions [are] preempted."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

16.     The Court may declare the parties' legal rights and obligations under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, because the action presents an actual controversy within the Court's jurisdiction.

17.     This Court has personal jurisdiction over the Defendants because they are residents and representatives of the Commonwealth of Virginia.

18.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(2) and Local Civil Rule 3 because a substantial portion of the property encumbered and otherwise affected by the legislation is located in the Alexandria Division.  NSR owns and operates 169.2 miles of track in the Alexandria Division with 159 right-of-way crossings, and CSXT owns and operates approximately 79 miles of mainline track in the Alexandria Division with 63 right-of-way crossings.

## BACKGROUND AND FACTUAL ALLEGATIONS

### State Regulation of Railroads and the ICC Termination Act

19.     Rail transportation is an inherently interstate activity.  "Congress recognized 'long ago' that 'a uniform regulatory scheme is necessary to the operation of the national rail system.'" *Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206, 217 (4th Cir. 2021) (citation omitted); *see City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir. 1998) ("[T]he courts long have recognized a need to regulate railroad operations at the federal level."); *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 443 (5th Cir. 2001) ("The regulation of railroad operations has long been a traditionally federal endeavor, to better establish uniformity in such operations and expediency in commerce."); S. Rep.  No. 104-176, at 6 (1995) (emphasizing the need for a "nationally uniform system of economic regulation" of railroads).  Indeed, railroads are subject to one of "the most pervasive and comprehensive of federal regulatory schemes." *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981).

20.     Congress initially created the Interstate Commerce Commission in 1887 to regulate rail transportation. *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 157 (4th Cir. 2010).  In 1995, the ICC Termination Act ("ICCTA") abolished the ICC and gave its successor agency, the Surface Transportation Board ("STB"), "broad jurisdiction over 'transportation by rail carriers.'" *Id.* (citation omitted); 49 U.S.C. § 10501.  ICCTA implemented a "[f]ederal scheme of minimal regulation for this intrinsically interstate form of transportation."  H.R. Rep. No. 104–311, at 96 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 793, 808.

21.     Consistent with this purpose, Congress gave the STB exclusive jurisdiction over (1) "transportation by rail carriers . . . with respect to rates, classifications, rules . . ., practices, routes, services, and facilities of such carriers" and (2) "the construction, acquisition, operation,

abandonment, or discontinuance of [tracks] or facilities." 49 U.S.C. § 10501(b).  Apart from certain narrow statutory exceptions, ICCTA's remedies are "exclusive and preempt the remedies provided under Federal or State law." *Id.*  ICCTA's broad sweep includes any "yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use," plus "the road used by a rail carrier" and any "switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation." *Id.* § 10102(6), (9)(A).  Under this exclusive authority, a rail carrier cannot lawfully "abandon any part of its railroad lines" or "discontinue operation of all rail transportation over any part of its railroad lines" unless the STB "finds that the present or future public convenience and necessity" are satisfied. *Id.* § 10903(d).

22.    ICCTA thus preempts state and local laws that (1) "may reasonably be said to have the effect of 'managing' or 'governing' rail transportation," (2) "discriminate against rail carriers," or (3) "unreasonably burden rail carriage." *City of Alexandria*, 608 F.3d at 157–58, 160 (citations omitted).

### *Federal Takings Law*

23.    The Takings Clause of the Fifth Amendment prohibits the government from taking "private property . . . for public use, without just compensation." U.S. Const. amend. V.  The Takings Clause of the Fifth Amendment "is made applicable to the States by the Fourteenth Amendment." *Kelo v. City of New London*, 545 U.S. 469, 472 (2005) (citing *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226 (1897)).

24.    A *per se* physical taking occurs when the government "physically appropriates property . . . for itself or someone else—by whatever means." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).  And "a permanent physical occupation constitutes a *per se* taking . . . without regard to whether the action achieves an important public benefit or has only minimal

economic impact on the owner." *Id.* at 2073 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35 (1982)).  Any "government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation." *Id.* at 2074.

25.    The "deprivation of the right to use and obtain a profit from property" is also "clearly relevant."  *Loretto*, 458 U.S. at 436.  That an owner "may retain the bare legal right to dispose of the occupied space by transfer or sale" does not negate the fact that "permanent occupation of that space by a stranger will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property."  *Id.*

26.    AAR's members hold and use property for rail transportation according to various property interests including *inter alia* fee simple, leaseholds, and easements. A railroad's right-of-way has "the substantiality of the fee"—regardless of the legal vehicle by which the railroad operates over the land—and therefore has the "attributes of the fee, perpetuity and exclusive use and possession."  *W. Union Tel. Co. v. Pennsylvania R.R. Co.*, 195 U.S. 540, 570 (1904).

27.    "The railroads, though dedicated to a public use, remain the private property of their owners, and their assets may not be taken without just compensation." *ICC v. Oregon-Washington R.R. & Nav. Co.*, 288 U.S. 14, 40–41 (1933) (collecting cases); *see Delaware, Lackawanna & W. R.R. Co. v. Town of Morristown*, 276 U.S. 182, 193 (1928) (Although a railroad uses its property "for the purposes of its business as a common carrier," and "that business is subject to regulation in the public interest," the property still "belongs to" the railroad and cannot be taken by the state "for another public use, without just compensation."); *W. Union Tel. Co.*, 195 U.S. at 570 (A railroad's right-of-way "is private property" that "cannot be appropriated in whole or

part except upon the payment of compensation" and is thus "entitled to the protection of the Constitution").

### *Virginia Takings Law*

28.    The Virginia Constitution is even more protective of rights in private property than the Constitution of the United States.  Virginia law dictates that the General Assembly "shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use."  Va. Const. art. I, § 11; *see* Va. Code Ann. § 1-219.1(A).  The owner of private property taken for public use is entitled to "just compensation," and "[n]o more private property may be taken than necessary to achieve the stated public use."  Va. Const. art. I, § 11.

29.    A condemning party "bears the burden of proving that the use is public, without a presumption that it is."  *Id.*  To establish public use, a public service company or public service corporation can show that the exercise of eminent domain is "for the authorized provision of utility . . . services."  *Id.*  Alternatively, the condemning party may establish the acquisition of property if the taking satisfies one of the six statutory definitions of "public uses" enumerated in Virginia Code Ann. § 1-219.1(A) (none of which bears on this suit).

30.    Under no circumstances will a taking of private property be considered to be for a public use "if the primary use is for private gain, private benefit, private enterprise, increasing jobs, increasing tax revenue, or economic development, except for the elimination of a public nuisance existing on the property."  Va. Const. art. I, § 11.

31.    The Virginia Constitution mandates that just compensation "shall be no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking."  *Id.*  "Lost access," in turn, includes "a change of vehicular or pedestrian access to property that is caused by a public use project for which the eminent domain power has been

exercised against the property and which results in a diminution in the value of the property," Va. Code Ann. § 25.1-100; and "lost profits" means

> a loss of profits or expected profits suffered by a business . . . as a result of a taking or damaging of the property on which the business . . . is operated for a period not to exceed three years from the later of (i) the date of valuation or (ii) the date the state agency or its contractor prevents the owner from using the land or any of the owner's other property rights are taken.

*Id.*  An owner "bears the burden of proving lost profits" and is "entitled to compensation whether part of the property or the entire parcel of property is taken or damaged."  *Id.*

### *Virginia Code Ann. § 56-16.3*

32.    Virginia Code Ann. § 56-16.3 grants broadband service providers a statutory right to take an irrevocable license to cross and permanently occupy railroad works, including "tracks, bridges, facilities, and all . . . rights of way or easements" for a one-time fee of $2,000 and direct expenses not to exceed $5,000.  The statute provides that:

- "If a broadband service provider deems it necessary in the construction of its systems to cross the works of a railroad company, including its tracks, bridges, facilities, and all railroad company rights of way or easements, then the broadband service provider shall submit an application for such crossing to the railroad company," *see id.* § 56-16.3(B);

- "The railroad company shall approve the broadband service provider's crossing application within 35 days after the application is received," *id.* § 56-16.3(C)(4);

- "A broadband service provider that locates its fiber optic broadband line within a railroad right-of-way shall pay the railroad company for the right to make a crossing of the railroad company's works a license fee of $2,000 for each crossing . . . ."  *Id.* § 56-16.3(G).

Notably, the fee is $1,000 if the service provider attempts to cross "a section of track that has been legally abandoned pursuant to an order of a federal or state agency," and "is not being

used for railroad service." *Id.* § 56-16.3(I).  Service providers need not pay any license fee what-soever for "a crossing of the railroad company's works within a public right-of-way." *Id.* § 56-16.3(K).

33.     A broadband service provider seeking to invoke its right to cross is required to pre-sent the railroad with an application disclosing the design and construction plans for its intended crossing—including "bore plans, fraction mitigation plans, dewatering plans, rigging and lifting plans, and any other pertinent plans deemed necessary and prepared by a registered professional engineer." *Id.* § 56-16.3(C)(1).  The application must also include, among other things: (1) the proposed crossing's location, including whether it is located in a public right-of-way; (2) the an-ticipated duration of the work in the crossing; and (3) "the areas in which the project personnel will work." *Id.*

34.     Broadband service providers are responsible for all physical aspects of implement-ing the proposed crossing, including "construction and installation of the fiber optic broadband lines and all related equipment, conduit, wire masts, poles, towers, attachments, and infrastruc-ture." *See id.* § 56-16.3(F).  Nothing in the statute exempts service providers from complying with applicable state statutes and regulations providing for roadway safety, environmental protection, storm or groundwater management, or other similar permitting or approval requirements, in con-structing the crossing and installing any related infrastructure.  Thus, where a proposed crossing calls for (1) construction in the public right of way, (2) a work area that extends into the public right of way, or is (3) itself located within the public right of way, any valid plan or subsequent construction will require VDOT's advance review and approval by permit.  Similarly, where a proposed crossing requires (1) land-disturbing activities, such as excavation or boring, or (2)

13

stormwater management, such as dewatering, any valid plan or subsequent construction will require DEQ's advance review and approval by permit or as effectuated through the AS&S process.

35.     A railroad may request additional information or clarification from the broadband service provider in connection with an application, but must do so within 15 days of receipt.  *Id.* § 56-16.3(C)(3).  A crossing—and thus any needed protective measures, including flagging—shall occur within a mere 30 days of an application's approval, unless the parties mutually agree on another date.  *Id.* § 56-16.3(E).  The broadband service provider is required to maintain "a commercial general liability insurance policy or railroad protective liability insurance policy" only for the "period of time construction is actually occurring."  *Id.* § 56-16.3(L).

36.     Virginia Code Ann. § 56-16.3(C)(2)–(4) provides that a railroad "shall review the application" and "shall approve the broadband service provider's crossing application within 35 days after the application is received," unless the railroad files a petition with the SCC.  As the statute explains, such a petition may assert only three bases for relief—that: (1) the license fee is not "adequate compensation" for a particular crossing, (2) a proposed crossing will impose "undue hardship" on the railroad, or (3) a proposed crossing "will create the imminent likelihood of danger to public health or safety."  *Id.* § 56-16.3(H).  A railroad is not authorized to reject a proposed crossing installation for failure to comply with railroad safety requirements.

37.     The SCC supervises the procedures provided for in the statute.  Although a railroad may petition the SCC for relief, the SCC is not required to take any action on any petition that a railroad submits—it "*may* make any necessary findings of fact and determinations," and only those "related to the adequacy of compensation, the existence of undue hardship on the railroad company, or the imminent likelihood of danger to public health or safety . . . ."  *Id.* (emphasis added).  If the Commission does elect to act, it shall do so and issue a final order "within 90 days of the

14

petition's initial filing." *Id.* The statute nowhere provides that a petition halts or prevents construction, and vests sole jurisdiction "to hear and resolve claims between railroad companies and broadband service providers" under this section in the SCC. *Id.*

38. The SCC also has enforcement authority over the provisions of the statute. The SCC has authority over "the administration and enforcement of all laws within its jurisdiction." *Id.* § 12.1-13. This includes "the power . . . of regulating the rates, charges, services, and facilities of all public service companies as defined in § 56-1" and "the duty of administering the laws made for the regulation and control of corporations doing business in this Commonwealth." *Id.* § 12.1-12(A). Section 56-1 includes "all persons authorized to transport passengers or property as a common carrier" in the definition of a "public service corporation" or a "public service company." *Id.* § 56-1. The SCC's power over public service companies includes "the power . . . of supervising, regulating and controlling all public service companies doing business in this Commonwealth, in all matters relating to the performance of their public duties." *Id.* § 56-35.

39. The SCC also has specific enforcement authority over railroad companies. Railroad companies are defined as a type of public service company. *Id.* § 56-1. The SCC "may examine" a railroad company to ensure that it is "in compliance with the provisions of their charters and the laws of the Commonwealth." *Id.* § 56-128.

40. The SCC's authority includes the "power . . . to impose and collect such fines or other penalties as provided by law." *Id.* § 12.1-13. If "no fine or other penalty is specifically imposed . . . for the failure . . . to comply with any provision of law" within the SCC's jurisdiction, "the Commission may impose and collect . . . a fine . . . not to exceed $10,000" from "a business conducted by any entity other than an individual . . . ." *Id.* The SCC also has "power . . . to issue temporary and permanent injunctions." *Id.* The SCC "is empowered to suspend or revoke any

Commission-issued license, certificate, registration, permit, or any other Commission-issued authority of any person who fails to satisfy any fine or penalty imposed by an order of the Commission." *Id.*

41.     The SCC's authority over railroads remains subject to preemption under 49 U.S.C. § 10501(b), in light of the STB's exclusive jurisdiction over the regulation of rail transportation.

### *Virginia Code Ann. § 56-16.3 Discriminates Against Railroads*

42.     Virginia Code Ann. § 56-16.3 is inapplicable to any form of public or private property that a broadband service provider might need or wish to cross other than railroad property.

43.     On information and belief, no Virginia law imposes fixed fees for broadband service crossings over roadways or other non-railroad property.

44.     On information and belief, no Virginia law imposes restrictive procedural hurdles on non-railroad property owners seeking compensation for broadband service crossings over roadways or other non-railroad property.

45.     Unlike other Virginia statutes of general applicability that may implicate railroads or their rights-of-way incidentally, the very purpose of Virginia Code Ann. § 56-16.3 is to single out railroads.  *See*, *e.g.*, Va. Code Ann. § 56-16 (requiring "[e]very public service corporation whose road, railroad, canal, or works passes through the lands of any person" to provide and maintain adequate crossings for agricultural and forestall machinery and vehicles).

46.     Virginia Code Ann. § 56-16.3 requires railroads to accept a limited fee for broadband crossings and imposes special procedural costs and hurdles to exceed that cap, all of which the statute fails to require of similarly situated entities.

47.     The broadband crossing scheme established by Virginia Code Ann. § 56-16.3 is thus preempted by ICCTA, because it "discriminate[s] against rail carriers." *City of Alexandria*, 608 F.3d at 158, 160.

16

**Virginia Code Ann. § 56-16.3 Empowers Broadband Service Providers To Occupy Railroad Property In Ways That Conflict With Present or Future Rail Operations**

48.     Easements across railroad property that would grant exclusive control to a non-railroad or conflict with present or future rail use of the property by the railroad are categorically preempted by ICCTA.  *See Skidmore*, 1 F.4th at 213–14.

49.     Under Virginia Code Ann. § 56-16.3, broadband service providers may assert and establish permanent easements across and on railroad property—tracks, bridges, facilities, rights-of-way, and existing easements—by merely filing an application with the railroad and waiting the requisite 35 days.  A railroad may within 15 days request additional information from the applicant, which shall be provided within 10 days.  The work shall commence within 30 days of the application unless the broadband provider agrees otherwise.

50.     The statute's strictures apply regardless of the location, nature, or characteristics of the railroad property to be crossed.  For example, the short times and cost caps would apply equally to crossing a 6-foot-wide single-track right-of-way as it would to crossing CSXT's Acca Yard in Richmond, which consists of approximately 36 tracks spanning roughly 80 acres, or NSR's 3600 foot-wide, 212 track Lamberts Point Coal Terminal in Norfolk.

51.     The statute provides no parameters or requirements to govern the ongoing and future use of the crossing easement or the parties' relationship beyond the initial installation, including how to resolve situations where the crossing's presence interferes with or burdens rail operations, including future development and improvement.

52.     The statute absolves broadband service providers of any indemnity or insurance requirements beyond the period of time when construction of the crossing is actually occurring.

53.     The statute provides no carveout for existing contracts between railroads and broadband service providers.

4882-5920-1635v.22

54.     Virginia Code Ann. § 56-16.3 imposes no requirements on broadband service providers to notify or coordinate with railroads for future maintenance, repairs, or relocations of an occupancy.

55.     Railroads routinely modify and upgrade their rail network to accommodate new customers and increased freight traffic to and from existing customers and to conduct regular maintenance on their tracks and facilities.  These modifications and upgrades may include turnouts and industry tracks to reach new customers or additional right-of-way track (*e.g.*, sidings, second mainline) for through traffic.  Constructing these kinds of upgrades often requires removing or relocating crossing installations in the same area, either temporarily or permanently.

56.     The statute provides no mechanism for resolving any conflict between future rail transportation needs and the permanent broadband crossings authorized under the statute.  A railroad's only recourse to prevent a broadband service provider from effecting a crossing under Virginia Code Ann. § 56-16.3 is to petition the State Corporation Commission on the grounds that the proposed crossing will either cause undue hardship or create an imminent likelihood of danger to public health or safety, and that limited right to petition does not apply at all to crossings of public rights-of-way or discontinued rail lines.  And once a broadband crossing is established, Virginia Code Ann. § 56-16.3 provides no authority to remove or relocate a broadband service provider's installation.

57.     The occupations that Virginia Code Ann. § 56-16.3 authorizes would thus conflict with current or potential future rail use of the occupied property.

18

### *Virginia Code Ann. § 56-16.3 Imposes a Higher Burden on Railroads Than Is Required To Establish ICCTA Preemption*

58.     Occupations or intrusions on railroad property that are not categorically preempted as discussed in the prior section are still preempted by ICCTA if they "would unreasonably interfere" with rail transportation in particular cases.  *See City of Ozark v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1171 (8th Cir. 2016) (a "lawsuit or condemnation proceeding must be dismissed or enjoined" when the court "concludes that a proposed crossing easement would unreasonably interfere" with rail transportation); *Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 121 n.12 (4th Cir. 2020).

59.     Virginia Code Ann. § 56-16.3(H) provides that a railroad may file a petition with the SCC when a proposed crossing "will cause undue hardship" to the railroad or "will create the imminent likelihood of danger to public health or safety."

60.     The SCC is empowered to grant relief on a railroad's petition, including awarding "any amount to which the railroad company is entitled in excess of the license fee" and "rejecting, approving, or modifying such [crossing] plans and specifications."  *Id.*

61.     Virginia Code Ann. § 56-16.3 imposes a higher burden on railroads seeking to prevent problematic crossings than is required by ICCTA.

62.     Specifically, ICCTA does not require a railroad to prove "undue hardship" or an "imminent likelihood of danger" to establish preemption under its unreasonable burden prong.  *See City of Alexandria*, 608 F.3d at 160; *see also Norfolk S. Ry. Co. & the Ala. Great S. R.R. Co. Pet. for Declaratory Order*, No. FD 35196, 2010 WL 691256, at *4 (S.T.B. Mar. 1, 2010); *Wichita Terminal Ass'n, BNSF Ry. Co. & Union Pac. R.R. Co. Pet. for Declaratory Order*, No. FD 35765, 2015 WL 3875937, at *6 (S.T.B. June 22, 2015).

63.     Virginia Code Ann. § 56-16.3 would thus allow crossings—and would provide no mechanism for the railroad to seek relief—even where ICCTA preemption would prohibit the easement.

64.     Virginia Code Ann. § 56-16.3 does not specify what remedies the State Corporation Commission may award in the event a crossing is found to cause undue hardship or create an imminent likelihood of danger to public health and safety.

65.     Nothing on the face of the statute appears to prevent the Commission from fashioning a monetary remedy in exchange for allowing a crossing that causes undue hardship or creates an imminent likelihood of danger to public health and safety to proceed.

66.     ICCTA does not authorize a state to usurp the STB's exclusive jurisdiction over the regulation of rail transportation and avoid preemption by providing a method of additional monetary compensation.  *See E. Ala. Ry. LLC Pet. for Declaratory Ord.*, No. FD 35583, 2012 WL 758259, at *5 n.27 (S.T.B. Mar. 9, 2012) (Indeed, "compensation is not relevant to whether [a] proposed condemnation [of a crossing] is preempted.").

### *Virginia Code Ann. § 56-16.3 Unreasonably Burdens Rail Transportation and Poses Undue Safety Risks*

67.     Because the crossing regime established by Virginia Code Ann. § 56-16.3 will necessarily interfere with rail operations and pose undue safety risks, the statute is preempted by ICCTA.  *See Norfolk S. Ry.*, 2010 WL 691256, at *4.

68.     Railroads have implemented standard engineering and safety policies and permitting requirements for proposed broadband installations.

69.     Any proposed broadband installation must be carefully reviewed against these policies and requirements to ensure the construction and ongoing occupation of the installation within

the right-of-way does not undermine track and embankment stability or otherwise interfere with railroad operations.

70.     Crossings that do not conform to a railroad's engineering, safety, and permitting requirements can interfere with rail operations, threaten the integrity of rail infrastructure, and create safety hazards.  For example, unauthorized aerial installations of low hanging wires have caused accidents, delays, and shutdowns to rail operations.  Improperly designed and installed sub-grade installations have caused sink holes beneath railroad tracks and damaged railroad signal facilities and existing utility installations.

71.     In many instances, railroads must schedule flagging services and on-site inspectors to ensure that broadband companies and their contractors comply with any approved design and construction plans and to protect the safety of train crews, the safety of broadband service provider's employees or contractors performing work, and the integrity of railroad operations and infrastructure, including wayside and grade-crossing signal systems.  Flagging crews and inspectors must be scheduled well in advance of any on-track work.

72.     Given its aggressively compressed timeframes, the statute does not provide sufficient time for a railroad to conduct an engineering and design review of the proposed crossing plans, schedule flagging or inspector services, or engage with the broadband service provider about necessary changes to the application.

73.     The statute does not require broadband service providers to comply with the railroad's engineering and safety policies.

74.     The statute provides no mechanism by which railroads can require changes to a crossing application to protect rail operations and guard against safety risks.  The statute provides no clear form of redress from a proposal that includes not only a transverse crossing but some

21

longitudinal occupancy of a railroad right of way, a proposal that includes crossing a bridge or other unique feature, or a proposal that includes crossing multiple, possibly dozens, of parallel tracks. Each of these entails unique considerations and costs.

75. The review and approval of broadband crossing requests imposes on railroads administrative, engineering and design review, and inspection costs.

76. Where a broadband service provider submits a poorly drafted application or an application for a poorly engineered crossing, railroads will be burdened with absorbing the additional cost above the $5,000 direct expense cap associated with reviewing and correcting the application's flaws to avoid safety risks and interference with rail operations. The statute's direct-expenses cap thus incentivizes broadband service providers to shift costs to the railroad.

77. Railroads require entities seeking to cross railroad property to execute standard encroachment agreements with appropriate indemnification and insurance requirements that survive for the life of the crossing.

78. The statute deprives railroads of the ability to impose such indemnification and insurance requirements, thereby shifting these financial burdens and safety risks to the railroads.

79. Virginia Code Ann. § 56-16.3 creates an unworkable process that severely limits railroads' ability to ensure safe and uninterrupted rail service through unrealistic, accelerated timelines and significant restrictions on a railroad's ability to enforce appropriate standards and policies.

80. For each of the reasons enumerated in this section, Virginia Code Ann. § 56-16.3 unreasonably burdens rail transportation and poses undue safety risks.

22

***Virginia Code Ann. § 56-16.3 Effects A Taking Without Providing Just Compensation for Rail-***

***roads***

81.     Virginia Code Ann. § 56-16.3 authorizes broadband service providers to install fi-ber optic broadband lines across a railroad's property and restricts the compensation for these crossings to a one-time license fee of $2,000, which purports to cover "all occupancy or real prop-erty rights."  Va. Code Ann. § 56-16.3(A).

82.     Virginia's authorization of broadband service providers to cross a railroad's rail lines qualifies as a physical taking.  *Cedar Point Nursery*, 141 S. Ct. at 2072.

83.     Virginia Code Ann. § 56-16.3 limits license fees for permanent broadband crossings to a one-time payment of $2,000.

84.     The license fee for permanent broadband crossings of legally abandoned rights-of-way that are not being used for railroad service is limited to a one-time payment of $1,000.

85.     A railroad may not charge or receive any license fee for permanent broadband crossings in public rights-of-way.

86.     Railroads retain fee simple or other property interests above and below their rights-of-way at public crossing locations.  *See Danville & W. Ry. Co. v. Lybrook*, 69 S.E. 1066, 1069 (Va. 1911) ("A railroad corporation holds its station grounds, tracks, and right of way as its private property[.]") (citation omitted).

87.     Just compensation "normally is to be measured by 'the market value of the property at the time of the taking contemporaneously paid in money.'"  *United States v. 8.929 Acres of Land in Arlington Cnty.*, 36 F.4th 240, 253 (4th Cir. 2022) (quoting *United States v. 50 Acres of Land*, 469 U.S. 24, 29 (1984)).  "This sum is typically 'measured by the use that would bring the highest

23

price—the "highest and best" use.'" *Id.* (quoting *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991)).

88.     In Virginia, just compensation "shall be no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking."  Va. Const. art. I, § 11.

89.     Generally, neither the market value nor the highest and best use of any crossing easement of railroad property is valued at $2,000 or less today.

90.     Generally, neither the market value nor the highest and best use of any crossing easement of legally abandoned railroad property is valued at $1,000 or less today.

91.     Generally, neither the market value nor the highest and best use of any crossing easement at a public right-of-way is valued at $0 today.

92.     Virginia Code Ann. § 56-16.3 therefore deprives railroads of just compensation for broadband crossings in violation of the U.S. and Virginia Constitutions.

### *Takings Under Virginia Code Ann.  § 56-16.3 Are Not for Public Use*

93.     Federal law requires a taking to be "rationally related to a conceivable public purpose." *Presley v. City of Charlottesville*, 464 F.3d 480, 486 (4th Cir. 2006) (quoting *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 241 (1984)); *Kelo v. City of New London*, 545 U.S. 469, 480 (2005) (equating public use with "serv[ing] a 'public purpose'").

94.     The Virginia Constitution imposes a much higher bar:  the taking of private property is not for public use "if the primary use is for private gain, private benefit, private enterprise, increasing jobs, increasing tax revenue, or economic development, except for the elimination of a public nuisance existing on the property."  Va. Const. art. I, § 11.

24

95.     The General Assembly intended the "license fee cap" to be "an exercise of its stated policy to promote the rapid deployment of broadband throughout the Commonwealth."  Va. Code Ann. § 56-16.3(G).

96.     Virginia's stated policy concerning the deployment of broadband services is not sufficient to establish public use.

97.     Virginia citizens generally pay for broadband services.

98.     On information or belief, many broadband service providers empowered by the legislation to exercise this form of eminent domain are for-profit, private entities that are expressly disqualified from exercising the state's eminent domain authority under Article I, § 11 of the Virginia Constitution.

99.     On information or belief, the primary purposes of installing crossings for broadband services throughout Commonwealth is economic development and the private gain, private benefit, and private enterprise of broadband service providers.

100.    Therefore, Virginia Code Ann. § 56-16.3 permits the taking of private property for a private use in violation of the Takings Clause of the United States Constitution and Section 11 of Article I of the Virginia Constitution concerning the taking or damaging of private property.

### *Virginia Code Ann. § 56-16.3 Impermissibly Shifts the Burden of Proving Public Use*

101.    The Virginia Constitution places the "burden of proving that the use is public" squarely on the condemning party, "without a presumption that [the use] is" public.  Va. Const. art. I, § 11.

102.    The General Assembly outsourced its power of eminent domain to broadband service providers in Virginia Code Ann. § 56-16.3.

103.    Virginia Code Ann. § 56-16.3 does not require broadband service providers to establish that a proposed crossing is for a public use.

4882-5920-1635v.22

104.     Instead, a broadband service provider must merely "deem[] it necessary" to cross the works of a railroad company in a location of its choosing and submit an application to do so. Va. Code Ann. § 56-16.3(B).

105.     The statute then shifts the burden to the railroads, requiring them to file a petition with the Commission proving the *absence* of a public use under Virginia Code Ann. § 56-16.3(H).

106.     Virginia Code Ann. § 56-16.3 thus impermissibly end-runs the constitutional burden placed on condemnors to prove that a taking is for a public use.  *Compare* Va. Code Ann. § 56-16.1(A) (placing the burden of proving "necessity" of a crossing on telephone, telegraph, and electric power companies effecting a taking) *with id.* § 56-16.3 (placing burden on railroads whose property is being taken).

107.     Virginia Code Ann. § 56-16.3 also does not provide any mechanism for judicial review of whether a crossing is in fact for a public use.  *See id.* § 56-16.3(H) (restricting bases for a railroad's petition to the SCC); *see also Hamer v. Sch. Bd. of City of Chesapeake*, 393 S.E.2d 623, 625 (Va. 1990) ("The question whether a taking is for a public purpose is a judicial question, reviewable by the courts[.]"); *AGCS Marine Ins. Co. v. Arlington Cnty.*, 800 S.E.2d 159, 165–66 (Va. 2017) (same, collecting cases).

### *Virginia Code Ann. § 56-16.3 Does Not Provide An Adequate Remedy At Law*

108.     A railroad may petition the SCC to obtain "adequate compensation" above and beyond the $2,000 license fee cap established in Subsection G.  Va. Code Ann. § 56-16.3(H).

109.     Crossings of legally abandoned track are subject to a $1,000 license fee cap "Notwithstanding the provisions of subsection G . . . ."  *Id.* § 56-16.3(I).

110.     Crossings of public rights-of-way are subject to a $0 license fee cap "[n]otwithstanding the provisions of subsection G . . . ."  *Id.* § 56-16.3(K).

111.    Therefore, the legislation does not extend the right to petition the Commission for additional compensation to crossings of legally abandoned track or public rights-of-way.

112.    Because the license fee cap for each type of right-of-way crossing is substantially less than the highest and best use of the property, it is foreseeable that railroads will be required to petition for just compensation after each and every instance a broadband service provider effects any type of fiber optic broadband line crossing of a rail line.

113.    And for crossings of legally abandoned rights-of-way and public rights-of-way, Virginia Code Ann. § 56-16.3 provides no procedural remedy for railroads to obtain just compensation.

114.    Railroads will thus be forced to engage in *seriatim* litigation to protect their constitutional rights to just compensation for the takings perpetuated under Virginia Code Ann. § 56-16.3.

115.    "Forcing a party to engage in repetitive lawsuits indefinitely" in order to obtain just compensation for a taking "seems to be precisely the sort of legal inadequacy that would make equitable relief an available and preferred method of redress.  'An inadequacy of legal remedy exists where one is bound to litigate a multiplicity of suits having a community of facts and issues.'"  *Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 942 (8th Cir. 2023) (citations omitted); *see also Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc.*, 677 F. Supp. 2d 852, 857 (E.D. Va. 2016) (Under Virginia law, "a court may enjoin a party's action in order to . . . prevent multiplicity of suits.") (citation omitted).

4882-5920-1635v.22

116.    Because Virginia Code Ann. § 56-16.3 will necessitate a multiplicity of suits to remedy the constitutional violation of failing to provide railroads with just compensation for broadband crossings, the statute should be declared unlawful and defendants permanently enjoined from taking any action effectuating it, for lack of an adequate remedy under federal or state law.

## DECLARATORY RELIEF

117.    Virginia Code Ann. § 56-16.3's grant of a statutory right to cross Plaintiff's member railroads' property, and any permit, permission, or approval issued or implicitly granted by any state officer in furtherance of that statutory right—including specifically by the Commissioner of the SCC, the Commissioner of the VDOT, and the Director of the DEQ—immediately: (1) takes a portion of Plaintiff's member railroads' right to exclude, (2) deprives them of bargaining power vis-à-vis broadband service providers, and (3) subjects them to a regulatory scheme that conflicts with their rights under federal and state law.  The threat of injury from parties with adverse legal interests is therefore immediate, concrete, non-contingent, and directly redressable via declaratory relief.  *See Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 199 (4th Cir. 2019) (noting that a claimant that seeks declaratory relief must allege a "concrete injury that is actual or imminent, not conjectural or hypothetical") (citation omitted).  An actual controversy therefore exists.

## INJUNCTIVE RELIEF

118.    *Ex Parte Young* allows Plaintiff to seek prospective relief in this Court restraining all Defendants from enforcing Virginia Code Ann. § 56-16.3 against Plaintiff and its railroad members.

119.    "If a statute is expressly preempted," that fact "fulfills the remaining requirements" for permanent injunctive relief.  *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010).

120.    Virginia Code Ann. § 56-16.3 is preempted by federal law and violates the Takings Clause of the United States Constitution and Section 11 of Article I of the Virginia Constitution concerning the taking or damaging of private property.  Virginia Code Ann. § 56-16.3 is thus void and unenforceable.

121.    Plaintiff's members will continue to suffer irreparable injury.  They will need to petition the SCC to obtain just compensation each and every time a broadband service provider invokes Virginia Code Ann. § 56-16.3 to cross railroad property.  This multiplicity of lawsuits deprives Plaintiff's members of an adequate remedy at law.

122.    Plaintiff's members will suffer irreparable injury because Virginia Code Ann. § 56-16.3 does not require the State Corporation Commission to award any additional compensation to railroads—let alone *just* compensation—for a proposed crossing and the statute imposes an extremely limited timeframe for a railroad to evaluate the adequacy of each crossing's design to ensure that the crossing will not unduly burden rail transportation or create an undue safety risk.

123.    Plaintiff's members will also suffer irreparable injury because monetary relief is not adequate compensation for harm caused by Virginia Code Ann. § 56-16.3 to railroads' interests in their real property.  *See O'Hagan v. United States*, 86 F.3d 776, 783 (8th Cir. 1996) ("More fundamentally, monetary relief fails to provide adequate compensation for an interest in real property, which by its very nature is considered unique."); *Pelfresne v. Vill. Of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989) ("As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute."); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) ("Real estate has long been thought unique, and thus, injuries to real estate interests frequently come within the ken of the chancellor."); *Bean v. Indep. Am. Sav. Ass'n*, 838 F.2d 739,

743 (5th Cir. 1988) (noting that because "[appellant] stands to lose interests in real property, which

we presume are unique, there is no adequate . . . remedy that could substitute for injunctive relief");

*Fairfield Resorts, Inc. v. Fairfield Mountains Prop. Owners Ass'n, Inc.*, No. 1:06-CV-191, 2006

WL 1889152, at *4 (W.D.N.C. July 7, 2006) ("noting that "significant interference with the pos-

session of real property" constitutes an irreparable harm).

124.    The balance of the equities also favors an injunction.  When "Congress [has] ex-

pressly preempted [an] area of regulation," "there is no injury to the states to weigh against that

which they threaten to inflict" on regulated parties.  *Trans World Airlines, Inc. v. Mattox*, 897

F.2d 773, 784 (5th Cir. 1990).

125.    Plaintiff is therefore entitled to permanent injunctive relief restraining all Defend-

ants from issuing and enforcing Virginia Code Ann. § 56-16.3 against Plaintiff's members.

## COUNT I

## VIRGINIA CODE ANN. § 56-16.3 IS PREEMPTED BY ICCTA

126.    Plaintiff realleges and incorporates the paragraphs above.

127.    Virginia Code Ann. § 56-16.3 discriminates against railroads by imposing an arti-

ficial cap on the fees and costs railroads may charge broadband service providers in exchange for

the right to cross rail property and special procedural costs and hurdles to obtain adequate com-

pensation above those limits.  The statute also significantly restricts a railroad's right to evaluate

adequately whether crossing applications are in conformity with engineering and safety policies

and whether such crossings will unreasonably interfere with rail operations or cause undue safety

risks.  Because Virginia Code Ann. § 56-16.3 imposes restrictions on railroads that are not required

of similarly situated entities, it is preempted by 49 U.S.C. § 10501(b).  *See City of Alexandria*, 608

F.3d at 160.

128.    Virginia Code Ann. § 56-16.3 allows broadband service providers to occupy rail-road property permanently without any mechanism for railroads to address future conflicts between installed broadband crossings and rail operations.  Because Virginia Code Ann. § 56-16.3 authorizes uses of railroad property that would conflict with present or future rail uses, it is preempted by ICCTA.  *See Skidmore*, 1 F.4th at 213–14.

129.    Virginia Code Ann. § 56-16.3 unreasonably burdens rail transportation by imposing a heavier burden to protect against a harmful crossing—"undue hardship" or "imminent likelihood of danger to public health or safety"—than is required under ICCTA, thereby allowing crossings that should be preempted.  Virginia Code Ann. § 56-16.3 also unreasonably burdens rail transportation by allowing the State Corporation Commission to fashion a monetary remedy for a crossing that will, under state law, allow an undue hardship or an imminent likelihood of danger to public health and safety to proceed.  Virginia Code Ann. § 56-16.3 further unreasonably burdens rail transportation and poses undue safety risks by severely restricting railroads' ability to ensure that broadband crossings are designed and installed in accordance with engineering and safety policies, procedures, and practices.  Virginia Code Ann. § 56-16.3 is thus preempted by 49 U.S.C. § 10501(b).  *See E. Ala. Ry.*, 2012 WL 758259, at *5 n.27.

130.    The Court should enter a judgment under 28 U.S.C. § 2201 declaring that Virginia Code Ann. § 56-16.3 is preempted by ICCTA and is therefore void and unenforceable.

## COUNT II

**VIRGINIA CODE ANN. § 56-16.3 VIOLATES THE FEDERAL TAKINGS CLAUSE BY RESTRICTING THE AVAILABILITY OF JUST COMPENSATION**

131.    Plaintiff realleges and incorporates the paragraphs above.

132.    Virginia Code Ann. § 56-16.3 impermissibly authorizes broadband service providers to install fiber optic broadband lines across railroad property—including public rights-of-way

31

where railroads retain property interests—without providing a mechanism for providing just compensation, as measured by the market value of the property's highest and best use.

133.    Pursuant to 28 U.S.C. § 2201, the Plaintiff is entitled to a judgment declaring that Virginia Code Ann. § 56-16.3 violates the Federal Takings Clause, and is therefore unconstitutional.

## COUNT III

### VIRGINIA CODE ANN. § 56-16.3 VIOLATES THE FEDERAL TAKINGS CLAUSE BY ALLOWING A TAKING OF PRIVATE PROPERTY FOR PRIVATE USE

134.    Plaintiff realleges and incorporates the paragraphs above.

135.    Virginia Code Ann. § 56-16.3 permits broadband service providers to take the property of Plaintiff's members for the private enterprise and private benefit of broadband providers rather than public use.  Accordingly, Virginia Code Ann. § 56-16.3 contravenes the Takings Clause of the Fifth Amendment.

136.    Pursuant to 28 U.S.C. § 2201, the Plaintiff is entitled to a judgment declaring that Virginia Code Ann. § 56-16.3 violates the Federal Takings Clause, and is therefore unconstitutional.

## COUNT IV

### VIRGINIA CODE ANN. § 56-16.3 VIOLATES 42 U.S.C. § 1983 AND THE XIV AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES BY SHIFTING THE BURDEN FROM THE CONDEMNOR TO THE LANDOWNER THEREBY DEPRIVING RAILROADS OF THEIR RIGHT TO DUE PROCESS OF LAW

137.    Plaintiff realleges and incorporates the paragraphs above.

138.    42 U.S.C. § 1983 authorizes suit against any person depriving another of a right secured by federal law while acting under color of law.

139.    The due process clause of the XIV Amendment entitles plaintiff and its members to the full enjoyment of the procedures provided for and required by state law.

140.     Virginia Code Ann. § 56-16.3 shifts the burden of proof regarding public use from the condemning party, broadband service providers, to the party whose property is to be condemned.  The statute thus deprives plaintiff and its members of the procedures provided for under the Virginia Constitution.

141.     In giving effect to Virginia Code Ann. § 56-16.3, defendants therefore act to deprive Plaintiff of its rights under color of state law.

142.     Pursuant to 28 U.S.C. § 2201, 42 U.S.C. § 1983, and 42 U.S.C. § 1988,  the Plaintiff is entitled to a judgment declaring that Virginia Code Ann. § 56-16.3 violates the XIV Amendment to the United States Constitution, along with attorney fees.

## COUNT V

**VIRGINIA CODE ANN. § 56-16.3 VIOLATES ART. I, SECTION 11 OF THE VIRGINIA CONSTITUTION BY SHIFTING THE  BURDEN FROM THE CONDEMNOR TO THE LANDOWNER**

143.     Plaintiff realleges and incorporates the paragraphs above.

144.     Virginia Code Ann. § 56-16.3 shifts the burden of proof regarding public use from the condemning party, broadband service providers, to the party whose property is to be condemned.  The statute thus contravenes the Virginia Constitution's express language placing the burden to prove that a use is public on condemnors.

145.     Pursuant to 28 U.S.C. § 2201, the Plaintiff is entitled to a judgment declaring that Virginia Code Ann. § 56-16.3 violates Section 11 of Article I of the Virginia Constitution concerning the taking or damaging of private property, and is therefore unconstitutional.

## COUNT VI

**VIRGINIA CODE § 56-16.3 VIOLATES ART. I, SECTION 11 OF THE VIRGINIA CONSTITUTION BY ALLOWING A TAKING OF PRIVATE PROPERTY FOR PRIVATE USE**

146.     Plaintiff realleges and incorporates the paragraphs above.

33

147.    Virginia Code Ann. § 56-16.3 permits broadband service providers to take the property of Plaintiff's members for the private enterprise and private benefit of broadband providers rather than public use.  Accordingly, Virginia Code Ann. § 56-16.3 contravenes the Virginia Constitution's express language forbidding the taking of private property for private use.

148.    Pursuant to 28 U.S.C. § 2201, the Plaintiff is entitled to a judgment declaring that Virginia Code Ann. § 56-16.3 violates Section 11 of Article I of the Virginia Constitution concerning the taking or damaging of private property, and is therefore unconstitutional.

<u>COUNT VII</u>

**VIRGINIA CODE ANN. § 56-16.3 VIOLATES ART. I, SECTION 11 OF THE VIRGINIA CONSTITUTION AND VIRGINIA CODE ANN. § 1-219.1 BY RESTRICTING THE AVAILABILITY OF JUST COMPENSATION**

149.    Plaintiff realleges and incorporates the paragraphs above.

150.    In capping the compensation for a taking under Virginia Code Ann. § 56-16.3 at $2000, $1000, or nothing at all, as the case may be, the statute contravenes the Virginia Constitution's requirement that just compensation "shall be no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking."  Va. Const. art. I, § 11.

151.    Pursuant to 28 U.S.C. § 2201, the Plaintiff is entitled to a judgment declaring that Virginia Code Ann. § 56-16.3 violates Section 11 of Article I of the Virginia Constitution concerning the taking or damaging of private property, as well as Virginia Code Ann. § 1-219.1.

34

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests the following relief:

a.  On Count I, a judgment against all Defendants declaring that Virginia Code Ann. § 56-16.3 is preempted by 49 U.S.C. § 10501(b), is therefore void and unenforceable.

b.  On Counts II through III, a judgment against all Defendants declaring that Virginia Code Ann. § 56-16.3 violates the Takings Clause of the Fifth Amendment to the United States Constitution, and is therefore unconstitutional.

c.  On Counts V, VI, and VII, a judgment against all Defendants declaring that Virginia Code Ann. § 56-16.3 violates Section 11 of Article I of the Virginia Constitution concerning the taking or damaging of private property, and is therefore unconstitutional.

d.  On Count IV, a judgment against all Defendants declaring that Virginia Code Ann. § 56-16.3 violates the XIV Amendment to the United States Constitution, and is therefore unconstitutional, and that the deprivation of such violates 42 U.S.C. § 1983.

e.  Permanent injunctive relief restraining all Defendants, and their employees or agents, from prospectively taking any action to give effect to Virginia Code Ann. § 56-16.3 against Plaintiff and its members;

f.  An award of attorney's fees, for Count V and as otherwise permitted by law;

g.  Its other costs expended in this matter; and

h.  Any other relief to which it may be entitled.

4882-5920-1635v.22

Respectfully Submitted,

/s/ Lucas W.E. Croslow
Lucas W.E. Croslow VA Bar No. 97517
Gordon D. Todd
Raymond A. Atkins
Chike B. Croslin
Stephen S. Laudone
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C.  20005
(202) 736-8000
(202) 736-8711 (facsimile)
gtodd@sidley.com
ratkins@sidley.com
ccroslin@sidley.com
lcroslow@sidley.com
slaudone@sidley.com

*Counsel for the Association of American Railroads*

4882-5920-1635v.22