## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

### Richmond Division

| | |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS, <br><br>    *Plaintiff,* <br><br>   *v.* <br><br> JEHMAL T. HUDSON, in his INDIVIDUAL CAPACITY and OFFICIAL CAPACITY as a COMMISSIONER of the STATE CORPORATION COMMISSION of the COMMONWEALTH OF VIRGINIA, <br><br> MICHAEL ROLBAND, in his INDIVIDUAL CAPACITY and OFFICIAL CAPACITY as the DIRECTOR of the VIRGINIA DEPARTMENT OF ENVIRONMENTAL QUALITY, <br><br> STEPHEN C. BRICH, in his INDIVIDUAL CAPACITY and OFFICIAL CAPACITY as the COMMISSIONER of the VIRGINIA DEPARTMENT OF TRANSPORTATION, <br><br> and <br><br> JOHN DOE(S), <br><br>    *Defendants.* | Civil Action No.  1:23-cv-815-DJN |

### <u>AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff, the Association of American Railroads ("AAR"), brings this Amended Complaint against Jehmal T. Hudson, in his Individual Capacity and in his Official Capacity as a Commissioner of the State Corporation Commission of the Commonwealth of Virginia; Michael Rolband, in his Individual Capacity and in his Official Capacity as the Director of the Virginia Department

of Environmental Quality; and Stephen C. Brich, in his Individual Capacity and in his Official

Capacity as the Commissioner of the Virginia Department of Transportation ("Defendants").

## **INTRODUCTION**

1.     AAR's member railroads own, possess, control, and operate real property and fa-

cilities on which they conduct railroad operations throughout the Commonwealth of Virginia.  Like

any other property holder, the railroads have rights in those properties.  But a new Virginia statute

treats railroads *unlike* any other landowner, seizing from them and giving to broadband service

providers a permanent easement to access and occupy railroad lands.  This encroachment intrudes

on the exclusive federal regulatory scheme for rail transportation, impairs railroads' responsibility

to ensure the safe conduct of rail operations and to manage current and future rail operations, and

disregards their entitlement to the market-based "just compensation" secured by the U.S. and Vir-

ginia Constitutions for takings of valuable property interests.

2.     Historically, an entity desiring to cross a rail line would consult with the railroad as

to its particular need and, mindful of the relevant location, geography, geology, and any track-

specific idiosyncrasies, would develop a crossing location, project timetable, safety protocols, and

cost structure appropriate for that particular crossing.  This approach reflects the simple truth that

crossing rail lines is a particularized undertaking with respect to location, engineering, safety, *and*

cost.

3.     This new statute, however, skips over all that and empowers a broadband service

provider to dictate to railroads when and how the provider will cross railroad land, and at what

minimal cost.  To secure any relief, railroads are constrained to seek an order from the State Cor-

poration Commission (SCC), where the railroads—not the broadband service provider or the Com-

monwealth—will bear the burden of proving that a proposed crossing will cause undue hardship

for the railroad, or that it poses an imminent likelihood of danger to public health or safety, or that compensation for a proposed crossing is inadequate. This scheme violates the comprehensive federal regulatory regime governing rail transportation, which protects property that is or may be used for rail operations. It also upends long-established constitutional protections for landowners and will predictably burden railroads with *seriatim* litigation over easement after easement. In stark contrast to Virginia's existing eminent domain procedures, *see* Va. Code Ann. § 25.1-200, *et seq.*, the new statute grants broadband companies the unilateral right to take and permanently occupy railroad property—a right exceeding the eminent domain authority of the Commonwealth. In essence, the statute arrogates authority over rail operations to the state, and then uses that authority to vest an extraordinary and unprecedented condemnation and seizure power in private, for-profit broadband companies.

4. The railroads' property rights are well-known to the Commonwealth of Virginia. Indeed, in contemporaneously vetoing a different bill, which would have allowed broadband service providers to temporarily leave vehicles on private property without the owner's consent, Governor Youngkin noted that the proposal "violates the fundamental rights of property owners" which, as "a cornerstone of our society . . . must not be eroded for convenience or expediency." Press Release, Governor of Va., *Governor Glenn Youngkin Signs 738 Bipartisan Bills into Law* (Mar. 28, 2023), https://www.governor.virginia.gov/newsroom/news-releases/2023/march/name-998566-en.html.

5. So too here. Plaintiff brings this action pursuant to 28 U.S.C. § 2201, the Declaratory Judgment Act, 42 U.S.C. § 1983, *Ex Parte Young*, 209 U.S. 123 (1908), and Virginia common law to vindicate these same cornerstone federal and Virginia constitutional and statutory rights.

6.     Plaintiff seeks a declaration that Virginia Code Ann. § 56-16.3 is preempted by federal statutes and constitutes a taking without just compensation in violation of federal and Virginia law and is therefore void and unenforceable.

## PARTIES, JURISDICTION, AND VENUE

7.     AAR is a non-profit, voluntary association representing both freight and passenger railroads, including railroads operating within Virginia.  AAR works with its members to enhance the economy, safety, and efficiency of rail service by promoting sound transportation policy and facilitating the exchange of information among railroads, their customers, and the public at large.

8.     AAR regularly represents its member railroads in proceedings before Congress, the courts, and federal and state administrative agencies in matters of common interest to its members, such as the issues that are the subject of this litigation.

9.     AAR's freight members operate 83 percent of the line haul mileage, employ 95 percent of the workers, and account for 97 percent of the freight revenue of all railroads in the United States. AAR's passenger railroads also operate intercity passenger trains and provide commuter rail service.  AAR brings this action in its representational capacity to assert the rights of its member railroads who operate in Virginia.  AAR's associational claim is proper because "(1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. Inc.*, 528 U.S. 167, 181 (2000)).  Specifically, and as noted below, Virginia Code Ann. § 56-16.3 directly imposes burdens and obligations on all railroad companies operating in the Commonwealth of

Virginia, which includes AAR Members Norfolk Southern Railway Co. ("NSR") and CSX Transportation, Inc. ("CSXT").

10.     Defendant Jehmal T. Hudson (the "Commissioner") is the only serving member of the SCC.  The SCC is charged with enforcing Virginia Code Ann. § 56-16.3 and disposing of issues raised in a petition by a railroad or broadband service provider under the statute.  The SCC has enforcement authority over public service companies, *see* Va. Code Ann. §§ 12.1-13, 12.1-12, 56-1, 56-35, including railroad companies, *see id.* §§ 56-1, 56-99.2, 56-128.  The SCC may enforce the laws within its jurisdiction through fines and revocations of licenses when fines go unpaid.  *See id.* § 12.1-13.  Commissioner Hudson is named in his official capacity and, for purposes of Counts IV, V, and VI, his individual capacity, and will be served at 1300 East Main Street, Richmond, VA 23219.

11.     Defendant Michael Rolband is the Director of the Virginia Department of Environmental Quality ("DEQ").  DEQ is charged with supervising regulations requiring prior review and approval for construction involving land-disturbing activities, such as excavation, and stormwater management, including dewatering—both of which are specifically contemplated in Virginia Code Ann. § 56-16.3(C)(1)(ii).  *See id.* § 62.1-44.15:55(A) (requiring submission of an erosion and sediment control plan to a VESCP authority prior to any land-disturbing activity); 9 Va. Admin. Code § 25-840-10 (explaining that "VESCP authority" refers to an authority approved by the DEQ to operate a Virginia Erosion and Sediment Control Program ("VESCP")).  These regulations also impose specific requirements on VESCP plans for the installation of underground utility lines.  *See id.* § 25-840-40(16) ("Underground utility lines shall be installed in accordance with the following standards . . . .").  DEQ also supervises the Annual Standards and Specifications ("AS&S") process, through which it enters agreements with certain entities that allow certified individuals to

approve erosion or stormwater management plans and commence construction through an internal process that follows state-mandated procedures. *See* Va. Code Ann. § 62.1-44.15:55(D). DEQ reviews program characteristics annually and retains oversight, including inspection and enforcement authority, over construction activities undertaken pursuant to the AS&S process. *See id.* § 62.1-44.15:56(E)–(G). Mr. Rolband is named in his official capacity and, for purposes of Counts IV, V, and VI, his individual capacity, and will be served at 1111 East Main Street, Suite 1400, Richmond VA 23219.

12.     Defendant Stephen C. Brich is the Commissioner of the Virginia Department of Transportation ("VDOT"). VDOT is charged with performing "all acts necessary or convenient for constructing, improving, maintaining, and preserving the efficient operation of the highways embraced in the systems of state highways . . . ." Va. Code Ann. § 33.2-223. VDOT regulations "provide that no work of any nature shall be performed on any real property under the ownership, control, or jurisdiction of VDOT until written permission has been obtained from VDOT," which permission is granted by permit. 24 Va. Admin. Code § 30-151-20. That "includes, but is not limited to, the right-of-way of any highway in the state highways system." *Id.* Broadband service providers undertaking construction in the right-of-way are not exempt from this requirement, and routinely coordinate permitting with VDOT as part of new and ongoing projects. *See Broadband Coordination*, VDOT (Jan. 19, 2023), https://www.virginiadot.org/info/broadband_coordination.asp ("Potential providers must operate under a land use permit . . . ."). And Virginia Code Ann. § 56-16.3(K) contemplates broadband crossings of railroad property at existing public rights-of-way. Mr. Brich is named in his official capacity and, for purposes of Counts IV, V, and VI, his individual capacity, and will be served at 1401 E. Broad Street, Richmond VA 23219.

13.     To the extent that any other state official is involved in granting any permit or other approval necessary to proceed with construction or any other action that constitutes a condition precedent for the exercise of rights under Virginia Code Ann. § 56-16.3, they are named as John Doe Defendants in their official capacities and, for purposes of Counts IV, V, and VI, their individual capacities.

14.     There is an actual controversy between the parties, as alleged below, arising in part under federal law and in part under state law.

15.     This Court has jurisdiction over AAR's federal claims because Plaintiff seeks prospective relief against the enforcement of a state law that violates the Constitution and laws of the United States.  "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 (1983).  Further, the Supreme Court has long recognized an equitable cause of action "to sue to enjoin unconstitutional actions by state and federal officers," including where "state regulatory actions [are] preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

16.     The Court has jurisdiction over AAR's claims under Virginia law under 28 U.S.C. § 1367.

17.     The Court may declare the parties' legal rights and obligations under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, because the action presents an actual controversy within the Court's jurisdiction.

18.     This Court has personal jurisdiction over the Defendants because they are residents and representatives of the Commonwealth of Virginia.

19.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(2) and Local Civil Rule 3 because a substantial portion of the property encumbered and otherwise affected by the legislation is located in the Alexandria Division.[1]   NSR owns and operates 169.2 miles of track in the Alexandria Division with 159 right-of-way crossings, and CSXT owns and operates approximately 79 miles of mainline track in the Alexandria Division with 63 right-of-way crossings.

## BACKGROUND AND FACTUAL ALLEGATIONS

### *Railroads' Existing Processes Facilitating Broadband Deployment in Virginia*

20.     AAR's federally-regulated railroad members have the right and obligation to control their real property and railroad operations and to impose reasonable requirements to ensure the continuity and safety of railroad operations and to protect their employees and the public.

21.     Consistent with those rights and obligations, AAR's railroad members have invested significant time and resources in developing policies and permitting procedures to facilitate broadband installations while ensuring the safety of rail operations and the public.  Both of AAR's "Class I" members in Virginia (NSR and CSXT) maintain a streamlined online portal to facilitate the submission and processing of broadband installation applications.[2]

22.     To ensure that each proposed installation meets the railroad's engineering and safety requirements, the railroad or its outside contractors must conduct an engineering and design review of the proposed plans.  The railroads often require a flagger or inspector to be onsite during

---

[1] This case was transferred from the Alexandria Division to the Richmond Division by order of Chief Judge Davis on August 31, 2023, in accordance with 28 U.S.C. § 137(a). *See* Dkt. No. 31.
[2] *Utility Permits*, CSX, https://www.csx.com/index.cfm/customers/value-added-services/property-real-estate/permitting-utility-wireless-infrastructure-installations-and-rights-of-entry/utility-permits/ (last visited Sept. 1, 2023); *Wire, Pipeline, and Fiber Optics Projects*, Norfolk Southern, http://www.nscorp.com/content/nscorp/en/real-estate/norfolk-southern-services/wire-pipeline-fiber-optic-projects.html (last visited Sept. 1, 2023).

the installation to protect the work crew and railroad property and operations, including their way-side and grade crossing signal systems. To reimburse the railroads for their time and professional expenses, the railroads require payment of certain reasonable charges to offset those administrative, engineering review, and inspection costs.  Many railroads also require that applicants agree to standard contractual terms providing for appropriate maintenance, relocation of crossings, indemnification, and insurance coverage.

23.    AAR's railroad members work cooperatively with utilities, broadband companies, and state and local agencies to timely process broadband applications across their networks in the Commonwealth of Virginia. AAR's two Class I members in Virginia have reviewed and approved hundreds of broadband installation applications since 2021.

24.    Review of these applications takes time. Many applications are not properly completed by the applicant.  Among other items, applications often fail to include appropriate engineering and design plans, proof of acceptable insurance coverage, and other requirements necessary to ensure rail safety.  These omissions can result in significant processing delays while the railroad waits to receive all of the documentation required to properly evaluate an application.

25.    One crossing application submitted by a Virginia electric cooperative to one of AAR's Virginia members has been pending for more than four months—because the initial application was incomplete, and the applicant has taken more than three and a half months (and counting) to provide required information.  And that example is not an outlier.  For one of AAR's Virginia members, aerial wireline crossing applications spend an average of 28 days in the railroad's hands, compared to an average of 71 days that the railroad spends waiting for the applicant to provide all required information.  That same railroad takes an average of 35 days to process an

underground wireline crossing applications, compared to 104 days for applicants to provide the information needed by the railroad.

26.     Railroads also need time from approval of an application to scheduling the installation of the crossing.  For one of AAR's Virginia members this period averages approximately 60 to 90 days, during which time the railroad arranges flaggers, inspection of the crossing site, and marking of utility lines, and attends to other logistical issues.  A crossing can be effectuated only with proper safety methods, including trained personnel using the appropriate form of track protection to safeguard the work crew, railroad personnel, and the public.

27.     Some of AAR's members are also constrained from hiring outside contractors to provide inspection and flagging services due to existing collective bargaining agreements.  As a result, AAR's members often must use their own personnel to inspect and flag broadband installations, requiring the redirection of limited resources from rail-related projects and services that may require flaggers and inspection services.

28.     Railroads' crossing approvals are typically contingent on the applicant's agreement to contractual terms that ensure the safety of railroad operations, fiber optic contractors, and the public, both at present and in the future.  For instance, two AAR members in Virginia require applicants to agree that the railroad can request that crossings be modified or moved if necessary to accommodate railroad operations in the future.  That provision protects the railroads' ability to prioritize safe rail operations along their rights-of-way for as long as the crossing exists, as well as to develop property for rail operations as they see fit.  Recognizing that these installations often remain on railroad property in perpetuity, these agreements also often include ongoing notice, indemnification, and insurance requirements to ensure that future maintenance or relocation of an installation is properly and safely coordinated with the railroad.

29.     Crossings that do not conform to a railroad's engineering, safety, and permitting requirements can interfere with rail operations, threaten the integrity of rail infrastructure, and create safety hazards.  For example, unauthorized or improperly installed aerial wires, hung too low or insufficiently spaced, have caused accidents, delays, and shutdowns to rail operations.  Improperly designed and installed sub-grade installations have caused sink holes beneath roads and railroad tracks and damaged railroad signal facilities and existing utility installations.  Damaged roadways and signals in particular pose a threat to the public.

### State Regulation of Railroads and the ICC Termination Act

30.     Rail transportation is an inherently interstate activity.  "Congress recognized 'long ago' that 'a uniform regulatory scheme is necessary to the operation of the national rail system.'" *Skidmore v. Norfolk S. Ry.*, 1 F.4th 206, 217 (4th Cir. 2021) (citation omitted); *see City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir. 1998) ("[T]he courts long have recognized a need to regulate railroad operations at the federal level."); *Friberg v. Kan. City S. Ry.*, 267 F.3d 439, 443 (5th Cir. 2001) ("The regulation of railroad operations has long been a traditionally federal endeavor, to better establish uniformity in such operations and expediency in commerce."); S. Rep. No. 104-176, at 6 (1995) (emphasizing the need for a "nationally uniform system of economic regulation" of railroads).  Indeed, railroads are subject to one of "the most pervasive and comprehensive of federal regulatory schemes."  *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981).

31.     Congress initially created the Interstate Commerce Commission in 1887 to regulate rail transportation.  *Norfolk S. Ry. v. City of Alexandria*, 608 F.3d 150, 157 (4th Cir. 2010).  In 1995, the ICC Termination Act ("ICCTA") abolished the ICC and gave its successor agency, the Surface Transportation Board ("STB"), "broad jurisdiction over 'transportation by rail carriers.'" *Id.* (citation omitted); 49 U.S.C. § 10501.  ICCTA implemented a "[f]ederal scheme of minimal

regulation for this intrinsically interstate form of transportation."  H.R. Rep. No. 104–311, at 96 (1995).

32.     Consistent with this purpose, Congress gave the STB exclusive jurisdiction over (1) "transportation by rail carriers . . . with respect to rates, classifications, rules . . ., practices, routes, services, and facilities of such carriers" and (2) "the construction, acquisition, operation, abandonment, or discontinuance of [tracks] or facilities."  49 U.S.C. § 10501(b).  Apart from certain narrow statutory exceptions, ICCTA's remedies are "exclusive and preempt the remedies provided under Federal or State law."  *Id.*  ICCTA's broad sweep includes any "yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use," plus "the road used by a rail carrier" and any "switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation . . . ."  *Id.* § 10102(6), (9)(A).  Under this exclusive authority, a rail carrier cannot lawfully "abandon any part of its railroad lines" or "discontinue operation of all rail transportation over any part of its railroad lines" unless the STB "finds that the present or future public convenience and necessity" are satisfied.  *Id.* § 10903(d).

33.     ICCTA thus preempts state and local laws that (1) "may reasonably be said to have the effect of 'managing' or 'governing' rail transportation," (2) "discriminate against rail carriers," or (3) "unreasonably burden rail carriage."  *City of Alexandria*, 608 F.3d at 157–58, 160 (citations omitted).

### *Federal Takings Law*

34.     The Takings Clause of the Fifth Amendment prohibits the government from taking "private property . . . for public use, without just compensation."  U.S. Const. amend. V.  The Takings Clause of the Fifth Amendment "is made applicable to the States by the Fourteenth

Amendment." *Kelo v. City of New London*, 545 U.S. 469, 472 n.1 (2005) (citing *Chi., B. & Q.R. Co. v. City of Chi.*, 166 U.S. 226 (1897)).

35.     A *per se* physical taking occurs when the government "physically appropriates property . . . for itself or someone else—by whatever means." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021).  And "a permanent physical occupation constitutes a *per se* taking . . . without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 2073 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35 (1982)).  Any "government-authorized invasions of property— whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation." *Id.* at 2074.

36.     The "deprivation of the right to use and obtain a profit from property" is also "clearly relevant." *Loretto*, 458 U.S. at 436.  That an owner "may retain the bare legal right to dispose of the occupied space by transfer or sale" does not negate the fact that "permanent occu-pation of that space by a stranger will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property." *Id.*

37.     AAR's members hold and use property for rail transportation according to various property interests including *inter alia* fee simple, leaseholds, and easements.  As the Supreme Court recognized more than a century ago, a railroad's right-of-way has "the substantiality of the fee"—regardless of the legal vehicle by which the railroad operates over the land—and therefore has the "attributes of the fee, perpetuity and exclusive use and possession." *W. Union Tel. Co. v. Pa. R.R.*, 195 U.S. 540, 570 (1904).

38.     "The railroads, though dedicated to a public use, remain the private property of their owners, and their assets may not be taken without just compensation." *ICC v. Or.-Wash.*

13

*R.R. & Navigation Co.*, 288 U.S. 14, 40–41 (1933) (collecting cases); *see Del., Lackawanna & W. R.R. v. Town of Morristown*, 276 U.S. 182, 193 (1928) (Although a railroad uses its property "for the purposes of its business as a common carrier," and "that business is subject to regulation in the public interest," the property still "belongs to" the railroad and cannot be taken by the state "for another public use, without just compensation."); *W. Union Tel. Co.*, 195 U.S. at 570 (A railroad's right-of-way "is private property" that "cannot be appropriated in whole or part except upon the payment of compensation" and is thus "entitled to the protection of the Constitution").

### *Virginia Takings Law*

39.    The Virginia Constitution is even more protective of rights in private property than the Constitution of the United States.  Strengthened in the wake of the United States Supreme Court's decision in *Kelo*, Virginia law dictates that the General Assembly "shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use." Va. Const. art. I, § 11; *see* Va. Code Ann. § 1-219.1(A).  The owner of private property taken for public use is entitled to "just compensation," and "[n]o more private property may be taken than necessary to achieve the stated public use."  Va. Const. art. I, § 11.

40.    A condemning party "bears the burden of proving that the use is public, without a presumption that it is."  *Id.*  To establish public use, a public service company or public service corporation can show that the exercise of eminent domain is "for the authorized provision of utility . . . services."  *Id.*  Alternatively, the condemning party may establish the acquisition of property if the taking satisfies one of the six statutory definitions of "public uses" enumerated in Virginia Code Ann. § 1-219.1(A) (none of which bears on this suit).

41.    Under no circumstances will a taking of private property be considered to be for a public use "if the primary use is for private gain, private benefit, private enterprise, increasing jobs,

increasing tax revenue, or economic development, except for the elimination of a public nuisance existing on the property." Va. Const. art. I, § 11.

42.     The Virginia Constitution mandates that just compensation "shall be no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking." *Id.* "Lost access," in turn, includes "a change of vehicular or pedestrian access to property that is caused by a public use project for which the eminent domain power has been exercised against the property and which results in a diminution in the value of the property," Va. Code Ann. § 25.1-100; and "lost profits" means

> a loss of profits or expected profits suffered by a business . . . as a result of a taking or damaging of the property on which the business . . . is operated for a period not to exceed three years from the later of (i) the date of valuation or (ii) the date the state agency or its contractor prevents the owner from using the land or any of the owner's other property rights are taken.

*Id.* An owner "bears the burden of proving lost profits" and is "entitled to compensation whether part of the property or the entire parcel of property is taken or damaged . . . ." *Id.*

### *Virginia Code Ann. § 56-16.3*

43.     Virginia Code Ann. § 56-16.3 grants broadband service providers a statutory right to take an irrevocable license to cross and permanently occupy railroad works, including "tracks, bridges, facilities, and all . . . rights of way or easements" for a one-time fee of $2,000 and direct expenses not to exceed $5,000.  The statute provides that:

- "If a broadband service provider deems it necessary in the construction of its systems to cross the works of a railroad company, including its tracks, bridges, facilities, and all railroad company rights of way or easements, then the broadband service provider shall submit an application for such crossing to the railroad company," *see id.* § 56-16.3(B);

- "The railroad company shall approve the broadband service provider's crossing application within 35 days after the application is received," *id.* § 56-16.3(C)(4);

- "A broadband service provider that locates its fiber optic broadband line within a railroad right-of-way shall pay the railroad company for the right to make a crossing of the railroad company's works a license fee of $2,000 for each crossing . . . ." *Id.* § 56-16.3(G).

Notably, the fee is $1,000 if the service provider attempts to cross "a section of track that has been legally abandoned pursuant to an order of a federal or state agency," and "is not being used for railroad service . . . ." *Id.* § 56-16.3(I). Service providers need not pay any license fee whatsoever for "a crossing of the railroad company's works within a public right-of-way." *Id.* § 56-16.3(K).

44. A broadband service provider seeking to invoke its right to cross is required to present the railroad with an application disclosing the design and construction plans for its intended crossing—including "bore plans, fraction mitigation plans, dewatering plans, rigging and lifting plans, and any other pertinent plans deemed necessary and prepared by a registered professional engineer . . . ." *Id.* § 56-16.3(C)(1). The application must also include, among other things: (1) the proposed crossing's location, including whether it is located in a public right-of-way; (2) the anticipated duration of the work in the crossing; and (3) "the areas in which the project personnel will work . . . ." *Id.*

45. Broadband service providers are responsible for all physical aspects of implementing the proposed crossing, including "construction and installation of the fiber optic broadband lines and all related equipment, conduit, wire masts, poles, towers, attachments, and infrastructure." *See id.* § 56-16.3(F). Nothing in the statute exempts service providers from complying with applicable state statutes and regulations providing for roadway safety, environmental protection, storm or groundwater management, or other similar permitting or approval requirements, in constructing the crossing and installing any related infrastructure.

16

46.     Thus, where a proposed crossing calls for (1) construction in the public right of way, (2) a work area that extends into the public right of way, or is (3) itself located within the public right of way, any valid plan or subsequent construction will require VDOT's advance review and approval by permit.  Similarly, where a proposed crossing requires (1) land-disturbing activities, such as excavation or boring, or (2) stormwater management, such as dewatering, any valid plan or subsequent construction will require DEQ's advance review and approval by permit or as effectuated through the AS&S process.

47.     A railroad may request additional information or clarification from the broadband service provider in connection with an application, but must do so within 15 days of receipt.  *Id.* § 56-16.3(C)(3).  A crossing—and thus any needed protective measures, including flagging—shall occur within a mere 30 days of an application's approval, unless the parties mutually agree on another date.  *Id.* § 56-16.3(E).  The broadband service provider is required to maintain "a commercial general liability insurance policy or railroad protective liability insurance policy" only for the "period of time construction is actually occurring."  *Id.* § 56-16.3(L).

48.     Virginia Code Ann. § 56-16.3(C)(2)–(4) provides that a railroad "shall review the application" and "shall approve the broadband service provider's crossing application within 35 days after the application is received," unless the railroad files a petition with the SCC.  As the statute explains, such a petition may assert only three bases for relief—that: (1) the license fee is not "adequate compensation" for a particular crossing, (2) a proposed crossing will impose "undue hardship" on the railroad, or (3) a proposed crossing "will create the imminent likelihood of danger to public health or safety . . . ."  *Id.* § 56-16.3(H).  A railroad is not authorized to reject a proposed crossing installation for failure to comply with railroad safety requirements or to for failure to

agree to the railroads' other standard conditions, such as preserving the right to relocate crossings in the future as needed.

49.     The SCC supervises the procedures provided for in the statute.  When a railroad submits a petition, the SCC "*may* make any necessary findings of fact and determinations," but only as "related to the adequacy of compensation, the existence of undue hardship on the railroad company, or the imminent likelihood of danger to public health or safety . . . ."  *Id.* (emphasis added).  The Commission shall issue a final order "within 90 days of the petition's initial filing." *Id.*  The statute nowhere provides that a petition halts or prevents construction, and vests sole jurisdiction "to hear and resolve claims between railroad companies and broadband service providers" under this section in the SCC.  *Id.*

50.     The SCC also has enforcement authority over the provisions of the statute.  The SCC has authority over "the administration and enforcement of all laws within its jurisdiction." *Id.* § 12.1-13.  This includes "the power . . . of regulating the rates, charges, services, and facilities of all public service companies as defined in § 56-1" and "the duty of administering the laws made for the regulation and control of corporations doing business in this Commonwealth."  *Id.* § 12.1-12(A).  Section 56-1 includes "all persons authorized to transport passengers or property as a common carrier" in the definition of a "public service corporation" or a "public service company."  *Id.* § 56-1.  The SCC's power over public service companies includes "the power . . . of supervising, regulating and controlling all public service companies doing business in this Commonwealth, in all matters relating to the performance of their public duties . . . ."  *Id.* § 56-35.

51.     The SCC also has specific enforcement authority over railroad companies.  Railroad companies are defined as a type of public service company.  *Id.* § 56-1.  The SCC "may

examine" a railroad company to ensure that it is "in compliance with the provisions of their charters and the laws of the Commonwealth." *Id.* § 56-128.

52.     The SCC's authority includes the "power . . . to impose and collect such fines or other penalties as are provided by law . . . ." *Id.* § 12.1-13.  If "no fine or other penalty is specifically imposed . . . for the failure . . . to comply with any provision of law" within the SCC's jurisdiction, "the Commission may impose and collect . . . a fine . . . not to exceed $10,000" from "a business conducted by any entity other than an individual . . . ." *Id.*  The SCC also has "power . . . to issue temporary and permanent injunctions." *Id.*  The SCC "is empowered to suspend or revoke any Commission-issued license, certificate, registration, permit, or any other Commission-issued authority of any person who fails to satisfy any fine or penalty imposed by an order of the Commission." *Id.*

53.     These SCC enforcement authorities operate independently of the SCC's role in resolving a limited subset of disputes when a railroad or broadband company files a petition. Any railroad that fails to comply with the Virginia Code Ann. § 56-16.3 would face potential fines and license revocation from the SCC even in the absence of any petition invoking its role under Virginia Code Ann. § 56-16.3.

54.     The SCC's authority over railroads remains subject to preemption under 49 U.S.C. § 10501(b), in light of the STB's exclusive jurisdiction over the regulation of rail transportation.

### *Virginia Code Ann. § 56-16.3 Discriminates Against Railroads*

55.     Virginia Code Ann. § 56-16.3 does not apply to any form of public or private property that a broadband service provider might need or wish to cross other than railroad property.

56.     Virginia Code Ann. § 56-16.3 requires railroads to accept a limited fee (or no fee) for broadband crossings and imposes special procedural costs and hurdles to exceed that cap, all of which the statute fails to require of similarly situated entities.

19

57.     On information and belief, no Virginia law imposes fixed fees for broadband service crossings over roadways or other non-railroad property.

58.     On information and belief, no Virginia law imposes restrictive procedural hurdles like those mandated by § 56-16.3 on non-railroad property owners seeking compensation for broadband service crossings over roadways or other non-railroad property.

59.     On information and belief, no Virginia law subjects any other class of property owners to the kind of quick-take easement that § 56-16.3 contemplates, let alone with such limited grounds to resist the taking and the burden shifted to the property owner.

60.     Unlike other Virginia statutes of general applicability that may implicate railroads or their rights-of-way incidentally, the purpose and effect of Virginia Code Ann. § 56-16.3 is to single out railroads.  *See*, *e.g.*, Va. Code Ann. § 56-16 (requiring "[e]very public service corporation whose road, railroad, canal, or works passes through the lands of any person" to provide and maintain adequate crossings for agricultural and forestall machinery and vehicles).

61.     All of this is true even though broadband lines need to cross non-railroad property too, crossing railroad property poses *more* engineering and safety challenges (and thus imposes greater costs) than crossing other kinds of property, and—unlike most other property owners—the railroads have established procedures to ensure that crossings can be completed timely and safely.

62.     The broadband crossing scheme established by Virginia Code Ann. § 56-16.3 is thus preempted by ICCTA, because it targets and "discriminate[s] against rail carriers."  *City of Alexandria*, 608 F.3d at 158, 160.

### *Virginia Code Ann. § 56-16.3 Empowers Broadband Service Providers To Occupy Railroad Property In Ways That Conflict With Present or Future Rail Operations*

63.      Easements across railroad property that would grant exclusive control to a non-railroad or conflict with present or future rail use of the property by the railroad are categorically preempted by ICCTA.  *See Skidmore*, 1 F.4th at 213–14.

64.      Railroads in Virginia, including AAR's members, have long relied on contracts with crossing applicants to ensure the ability to modify or relocate crossings if necessary for the safe operation of the railroad, both at the time of crossing installation and as railroad operations may evolve in the future.  Virginia Code Ann. § 56-16.3 thwarts such efforts to manage the Virginia portion of the national rail system by stripping the railroads of the ability to negotiate such contractual provisions with broadband providers.

65.      Under Virginia Code Ann. § 56-16.3, broadband service providers may assert and establish permanent easements (including the wires, conduits, and necessary buffer spaces from surrounding wires, utility lines, and so forth) across and on railroad property—tracks, bridges, facilities, rights-of-way, and existing easements—by merely filing an application with the railroad and waiting the requisite 35 days.  A railroad may within 15 days request additional information from the applicant, which shall be provided within 10 days.  The work shall commence within 30 days of the application unless the broadband provider agrees otherwise.

66.      The statute's strictures apply regardless of the location, nature, or characteristics of the railroad property to be crossed.  For example, the short times and cost caps would apply equally to crossing a 6-foot-wide single-track right-of-way as they would to crossing CSXT's Acca Yard in Richmond, which consists of approximately 36 tracks spanning roughly 80 acres, or NSR's 3,600-foot-wide, 212-track Lamberts Point Coal Terminal in Norfolk.

67.     The statute provides no parameters or requirements to govern the ongoing and future use of the crossing easement or the parties' relationship beyond the initial installation, including how to resolve situations where the crossing's presence interferes with or burdens rail operations, including future development and improvement.

68.     Railroads in Virginia, including AAR's members, have long relied on contracts with crossing applicants to provide insurance and indemnification relating to the crossing for its duration.  The statute absolves broadband service providers of any indemnity or insurance requirements beyond the period of time when construction of the crossing is actually occurring.

69.     The statute provides no carveout for existing contracts between railroads and broadband service providers.

70.     Virginia Code Ann. § 56-16.3 imposes no requirements on broadband service providers to notify or coordinate with railroads for future maintenance, repairs, or relocations of an occupancy.

71.     Railroads routinely modify and upgrade their rail network to accommodate new customers and increased freight traffic to and from existing customers and to conduct regular maintenance on their tracks and facilities.  These modifications and upgrades may include turnouts and industry tracks to reach new customers or additional right-of-way track (*e.g.*, sidings, second mainline) for through traffic.  Constructing these kinds of upgrades often requires removing or relocating crossing installations in the same area, either temporarily or permanently.

72.     The statute provides no mechanism for resolving any conflict between future rail transportation needs and the permanent broadband crossings authorized under the statute.  A railroad's only recourse to prevent a broadband service provider from effecting a crossing under Virginia Code Ann. § 56-16.3 is to petition the State Corporation Commission on the grounds that the

proposed crossing will either cause undue hardship or create an imminent likelihood of danger to public health or safety, and that limited right to petition does not apply at all to crossings of public rights-of-way or discontinued rail lines.  And once a broadband crossing is established, Virginia Code Ann. § 56-16.3 provides no authority to remove or relocate a broadband service provider's installation.

73.   The occupations that Virginia Code Ann. § 56-16.3 authorizes would thus conflict with current or potential future rail use of the occupied property.

### Virginia Code Ann. § 56-16.3 Imposes a Higher Burden on Railroads Than Is Required To Establish ICCTA Preemption

74.   Occupations or intrusions on railroad property that are not categorically preempted as discussed in the prior section are still preempted by ICCTA if they "would unreasonably interfere" with rail transportation in particular cases.  *See City of Ozark v. Union Pac. R.R.*, 843 F.3d 1167, 1171 (8th Cir. 2016) (a "lawsuit or condemnation proceeding must be dismissed or enjoined" when the court "concludes that a proposed crossing easement would unreasonably interfere" with rail transportation); *Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 121 n.12 (4th Cir. 2020).

75.   Virginia Code Ann. § 56-16.3(H) provides that a railroad may file a petition with the SCC when a proposed crossing "will cause undue hardship" to the railroad or "will create the imminent likelihood of danger to public health or safety . . . ."

76.   The SCC is empowered to grant relief on a railroad's petition, including awarding "any amount to which the railroad company is entitled in excess of the license fee" and "rejecting, approving, or modifying such [crossing] plans and specifications."  *Id.*

77.   Virginia Code Ann. § 56-16.3 imposes a higher burden on railroads seeking to prevent problematic crossings than is required by ICCTA.

23

78.     Specifically, ICCTA does not require a railroad to prove "undue hardship" or an "imminent likelihood of danger" to establish preemption under its unreasonable burden prong.  *See City of Alexandria*, 608 F.3d at 160; *see also Norfolk S. Ry. & the Ala. Great S. R.R. Pet. for Declaratory Order*, No. FD 35196, 2010 WL 691256, at *4 (S.T.B. Mar. 1, 2010); *Wichita Terminal Ass'n, BNSF Ry. & Union Pac. R.R. Pet. for Declaratory Order*, No. FD 35765, 2015 WL 3875937, at *6 (S.T.B. June 23, 2015).

79.     Virginia Code Ann. § 56-16.3 would thus allow crossings—and would provide no mechanism for the railroad to seek relief—even where ICCTA preemption would prohibit the easement.

80.     Virginia Code Ann. § 56-16.3 does not specify what remedies the State Corporation Commission may award in the event a crossing is found to cause undue hardship or create an imminent likelihood of danger to public health and safety.

81.     Nothing on the face of the statute appears to prevent the Commission from fashioning a monetary remedy in exchange for allowing a crossing that causes undue hardship or creates an imminent likelihood of danger to public health and safety to proceed.

82.     ICCTA does not authorize a state to usurp the STB's exclusive jurisdiction over the regulation of rail transportation and avoid preemption by providing a method of additional monetary compensation.  *See E. Ala. Ry. LLC—Pet. for Declaratory Order*, No. FD 35583, 2012 WL 758259, at *5 n.27 (S.T.B. Mar. 9, 2012) (Indeed, "compensation is not relevant to whether [a] proposed condemnation [of a crossing] is preempted.").

*Virginia Code Ann. § 56-16.3 Unreasonably Burdens*
*Rail Transportation and Poses Undue Safety Risks*

83.     Because the crossing regime established by Virginia Code Ann. § 56-16.3 will necessarily interfere with rail operations and pose undue safety risks, the statute is preempted by ICTA.  *See Norfolk S. Ry.*, 2010 WL 691256, at *4.

84.     Railroads have implemented standard engineering and safety policies and permitting requirements for proposed broadband installations.

85.     Any proposed broadband installation must be carefully reviewed against these policies and requirements to ensure the construction and ongoing occupation of the installation within the right-of-way does not undermine track and embankment stability or otherwise interfere with railroad operations.

86.     In many instances, railroads must schedule flagging services and on-site inspectors to ensure that broadband companies and their contractors comply with any approved design and construction plans and to protect the safety of train crews, the safety of broadband service provider's employees or contractors performing work, and the integrity of railroad operations and infrastructure, including wayside and grade-crossing signal systems.  Flagging crews and inspectors must be scheduled well in advance of any on-track work.

87.     Given its aggressively compressed timeframes, the statute does not provide sufficient time for a railroad to conduct an engineering and design review of the proposed crossing plans, schedule flagging or inspector services, or engage with the broadband service provider about necessary changes to the application. Section 56-16.3's strict thirty-day deadline to schedule flaggers and inspection services effectively prioritizes broadband installations over rail-related projects that may require the railroads' limited flagging resources.

88.     The statute does not require broadband service providers to comply with the railroad's engineering and safety policies.

89.     The statute provides no mechanism by which railroads can require changes to a crossing application to protect rail operations and guard against safety risks.  The statute provides no clear form of redress from a proposal that includes not only a transverse crossing but some longitudinal occupancy of a railroad right of way, a proposal that includes crossing a bridge or other unique feature, or a proposal that includes crossing multiple, possibly dozens, of parallel tracks.  Each of these entails unique considerations and costs.

90.     The review and approval of broadband crossing requests imposes on railroads administrative, engineering and design review, and inspection costs.

91.     Where a broadband service provider submits a poorly drafted application or an application for a poorly engineered crossing, railroads will be burdened with absorbing the additional cost above the $5,000 direct expense cap associated with reviewing and correcting the application's flaws to avoid safety risks and interference with rail operations.  The statute's direct-expenses cap thus incentivizes broadband service providers to shift costs to the railroad.

92.     For both of AAR's Class I Virginia members, their administrative fees—which compensate the railroad only for its review, flagging, inspection, and related administrative expenses in connection with the crossing, not for the value of its property— on average exceeded the $5,000 presumptive cap on direct expenses set by Virginia Code Ann. § 56-16.3 per fiber crossing installed between 2020 and 2023.

93.     Railroads require entities seeking to cross railroad property to execute standard encroachment agreements with appropriate indemnification and insurance requirements that survive for the life of the crossing.

94.     The statute deprives railroads of the ability to impose such indemnification and insurance requirements, thereby curtailing their ability to enter into such contracts and shifting these financial burdens and safety risks to the railroads.

95.     Virginia Code Ann. § 56-16.3 creates an unworkable process that severely limits railroads' ability to ensure safe and uninterrupted rail service through unrealistic, accelerated time-lines and significant restrictions on a railroad's ability to enforce appropriate standards and poli-cies.

96.     For each of the reasons enumerated in this section, Virginia Code Ann. § 56-16.3 unreasonably burdens rail transportation and poses undue safety risks.

### Virginia Code Ann. § 56-16.3 Effects A Taking Without Providing Just Compensation for Railroads

97.     Virginia Code Ann. § 56-16.3 authorizes broadband service providers to install fi-ber optic broadband lines and "all related equipment, conduit, wire masts, poles, towers, attach-ments, and infrastructure" across a railroad's property and restricts the compensation for these crossings to a one-time license fee of $2,000, which purports to cover "all occupancy or real prop-erty rights."  Va. Code Ann. § 56-16.3(A).

98.     Virginia's authorization of broadband service providers to cross a railroad's rail lines qualifies as a physical taking.  *Cedar Point Nursery*, 141 S. Ct. at 2072.

99.     Virginia Code Ann. § 56-16.3 limits license fees for permanent broadband crossings to a one-time payment of $2,000.

100.     The license fee for permanent broadband crossings of legally abandoned rights-of-way that are not being used for railroad service is limited to a one-time payment of $1,000.

101.     A railroad may not charge or receive any license fee for permanent broadband crossings in public rights-of-way.  Section 56-16.3 encourages broadband providers to place their

27

crossings at public rights-of-way by setting the compensation for railroads at those locations at $0. This will likely result in more of these more complicated and costly crossings, at significant expense to AAR's members and dangers to the public.

102.    Railroads retain fee simple or other property interests above and below their rights-of-way at public crossing locations.  *See Danville & W. Ry. v. Lybrook*, 69 S.E. 1066, 1069 (Va. 1911) ("A railroad corporation holds its station grounds, tracks, and right of way as its private property[.]") (citation omitted).

103.    Just compensation "normally is to be measured by 'the market value of the property at the time of the taking contemporaneously paid in money.'"  *United States v. 8.929 Acres of Land in Arlington Cnty.*, 36 F.4th 240, 253 (4th Cir. 2022) (quoting *United States v. 50 Acres of Land*, 469 U.S. 24, 29 (1984)).  "This sum is typically 'measured by the use that would bring the highest price—the "highest and best" use.'"  *Id.* (quoting *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991)).

104.    In Virginia, just compensation "shall be no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking."  Va. Const. art. I, § 11.

105.    Generally speaking, neither the market value nor the highest and best use of any crossing easement of railroad property is valued at $2,000 or less today.

106.    Generally speaking, neither the market value nor the highest and best use of any crossing easement of legally abandoned railroad property is valued at $1,000 or less today.

107.    Generally speaking, neither the market value nor the highest and best use of any crossing easement at a public right-of-way is valued at $0 today.

108.   AAR's member railroads determine the value of a crossing using a variety of factors, including in some instances economic models of fair market value and the highest and best use of the railroad property devoted to the crossing.  The "across the fence" methodology is well established for establishing the fair market value of rail corridor land.

109.   For both of AAR's Class I Virginia members, the fair market value of occupancy on average exceeded the presumptive caps on license fees set by Virginia Code Ann. § 56-16.3 per fiber crossing installed between 2020 and 2023.

110.   Virginia Code Ann. § 56-16.3 therefore deprives railroads of just compensation for broadband crossings in violation of the U.S. and Virginia Constitutions.

### Takings Under Virginia Code Ann.  § 56-16.3 Are Not for Public Use

111.   Federal law requires a taking to be "rationally related to a conceivable public purpose." *Presley v. City of Charlottesville*, 464 F.3d 480, 486 (4th Cir. 2006) (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984)); *Kelo*, 545 U.S. at 480 (equating public use with "serv[ing] a 'public purpose'").

112.   The Virginia Constitution imposes a much higher bar:  the taking of private property is not for public use "if the primary use is for private gain, private benefit, private enterprise, increasing jobs, increasing tax revenue, or economic development, except for the elimination of a public nuisance existing on the property."  Va. Const. art. I, § 11.

113.   The General Assembly intended the "license fee cap" to be "an exercise of its stated policy to promote the rapid deployment of broadband throughout the Commonwealth."  Va. Code Ann. § 56-16.3(G).

114.   Virginia's stated policy concerning the deployment of broadband services is not sufficient to establish public use.

115.    Virginia citizens generally pay for broadband services.

116.    On information or belief, many broadband service providers empowered by the legislation to exercise this form of eminent domain are for-profit, private entities that are expressly disqualified from exercising the state's eminent domain authority under Article I, § 11 of the Virginia Constitution.

117.    On information or belief, the primary purposes of installing crossings for broadband services throughout the Commonwealth is economic development and the private gain, private benefit, and private enterprise of broadband service providers.

118.    Therefore, Virginia Code Ann. § 56-16.3 permits the taking of private property for a private use in violation of the Takings Clause of the United States Constitution and Section 11 of Article I of the Virginia Constitution concerning the taking or damaging of private property.

### *Virginia Code Ann. § 56-16.3 Impermissibly Shifts the Burden of Proving Public Use*

119.    The Virginia Constitution places the "burden of proving that the use is public" squarely on the condemning party, "without a presumption that [the use] is" public.  Va. Const. art. I, § 11.

120.    The General Assembly outsourced its power of eminent domain to broadband service providers in Virginia Code Ann. § 56-16.3.

121.    Virginia Code Ann. § 56-16.3 does not require broadband service providers to establish that a proposed crossing is for a public use.

122.    Instead, a broadband service provider must merely "deem[] it necessary" to cross the works of a railroad company in a location of its choosing and submit an application to do so. Va. Code Ann. § 56-16.3(B).

123.    The statute then shifts the burden to the railroads, requiring them to file a petition with the Commission proving the *absence* of a public use under Virginia Code Ann. § 56-16.3(H).

124.    Virginia Code Ann. § 56-16.3 thus impermissibly end-runs the constitutional burden placed on condemnors to prove that a taking is for a public use.  *Compare* Va. Code Ann. § 56-16.1(A) (placing the burden of proving "necessity" of a crossing on telephone, telegraph, and electric power companies effecting a taking) *with id.* § 56-16.3 (placing burden on railroads whose property is being taken).

125.    Virginia Code Ann. § 56-16.3 also does not provide any mechanism for judicial review of whether a crossing is in fact for a public use.  *See id.* § 56-16.3(H) (restricting bases for a railroad's petition to the SCC); *see also Hamer v. Sch. Bd. of Chesapeake*, 393 S.E.2d 623, 625 (Va. 1990) ("The question whether a taking is for a public purpose is a judicial question, reviewable by the courts[.]"); *AGCS Marine Ins. Co. v. Arlington Cnty.*, 800 S.E.2d 159, 165–66 (Va. 2017) (same, collecting cases).

### *Virginia Code Ann. § 56-16.3 Does Not Provide An Adequate Remedy At Law*

126.    A railroad may petition the SCC to obtain "adequate compensation" above and beyond the $2,000 license fee cap established in Subsection G.  Va. Code Ann. § 56-16.3(H).

127.    Crossings of legally abandoned track are subject to a $1,000 license fee cap "Notwithstanding the provisions of subsection G . . . ."  *Id.* § 56-16.3(I).

128.    Crossings of public rights-of-way are subject to a $0 license fee cap "[n]otwithstanding the provisions of subsection G . . . ."  *Id.* § 56-16.3(K).

129.    Therefore, the legislation does not extend the right to petition the Commission for additional compensation to crossings of legally abandoned track or public rights-of-way.

130.    Because the license fee cap for each type of right-of-way crossing is substantially less than the highest and best use of the property, it is foreseeable that railroads will be required

to petition for just compensation after each and every instance a broadband service provider effects any type of fiber optic broadband line crossing of a rail line.

131.    And for crossings of legally abandoned rights-of-way and public rights-of-way, Virginia Code Ann. § 56-16.3 provides no procedural remedy for railroads to obtain just compensation.

132.    Railroads will thus be forced to engage in *seriatim* litigation to protect their constitutional rights to just compensation for the takings perpetuated under Virginia Code Ann. § 56-16.3.

133.    "Forcing a party to engage in repetitive lawsuits indefinitely" in order to obtain just compensation for a taking "seems to be precisely the sort of legal inadequacy that would make equitable relief an available and preferred method of redress. 'An inadequacy of legal remedy exists where one is bound to litigate a multiplicity of suits having a community of facts and issues.'" *Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 942 (8th Cir. 2023) (citations omitted); *see also Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc.*, 677 F. Supp. 2d 852, 857 (E.D. Va. 2009) (Under Virginia law, "a court may enjoin a party's action in order to . . . prevent multiplicity of suits.") (citation omitted).

134.    Because Virginia Code Ann. § 56-16.3 will necessitate a multiplicity of suits to remedy the constitutional violation of failing to provide railroads with just compensation for broadband crossings, the statute should be declared unlawful and Defendants permanently enjoined from taking any action effectuating it, for lack of an adequate remedy under federal or state law.

***Defendants Brich and Rolband Are Essential
to the Operation of Virginia Code Ann. § 56-16.3***

135.    Without the active participation of Defendants Brich and Rolband, Virginia Code

Ann. § 56-16.3 could not operate, and AAR's members would not suffer the injuries described in

this Complaint.

136.    Internal VDOT documents, obtained by counsel for AAR under the Virginia Free-

dom of Information Act, demonstrate that VDOT, under Defendant Brich's leadership, reviews

and approves land use permit ("LUP") applications from broadband companies that lay broadband

fiber cables and seek to cross railroads.

137.    Applications reviewed by VDOT include both aerial and underground fiber cross-

ings, both within public rights of way and elsewhere. LUP applications provided by VDOT contain

narrative descriptions of fiber railroad crossings.

138.    Each LUP application and each granted permit includes "engineering design plans"

and "other pertinent plans deemed necessary and prepared by a registered professional engineer"

as contemplated in Virginia Code Ann. § 56-16.3(C)(1)(ii).

139.    Other VDOT documents show that VDOT also reviews and approves traffic man-

agement plans associated with broadband crossings of railroads within public rights of way.

140.    VDOT personnel are in frequent contact with broadband providers regarding broad-

band railroad crossings, and VDOT sometimes expressly acknowledges a broadband crossing in

relation to a traffic management plan.

141.    Internal DEQ documents, obtained by counsel for AAR under the Virginia Freedom

of Information Act, similarly demonstrate that DEQ, under the leadership of Defendant Rolband,

reviews and approves erosion and sediment control plans for railroad crossings, including in public

rights of way.

142.    VDOT's approvals of land use permits and traffic management plans, among other regulatory requirements, and DEQ's approvals of erosion and sediment control plans, among other regulatory requirements, are all preconditions of fiber railroad crossings under Section 56-16.3. Without these approvals, Plaintiff's members' property would not be taken and their rights would not be violated.

### DECLARATORY RELIEF

143.    Virginia Code Ann. § 56-16.3's grant of a statutory right to cross Plaintiff's member railroads' property, and any permit, permission, or approval issued or implicitly granted by any state officer in furtherance of that statutory right—including specifically by the Commissioner of the SCC, the Commissioner of the VDOT, and the Director of the DEQ—immediately: (1) takes a portion of Plaintiff's member railroads' right to exclude, (2) deprives them of bargaining power and the ability to enter into certain contractual arrangements vis-à-vis broadband service providers, and (3) subjects them to a regulatory scheme that conflicts with their rights under federal and state law.  The threat of injury from parties with adverse legal interests is therefore immediate, concrete, non-contingent, and directly redressable via declaratory relief.  *See Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 199 (4th Cir. 2019) (noting that a claimant that seeks declaratory relief must allege a "concrete injury that is actual or imminent, not conjectural or hypothetical") (citation omitted). An actual controversy therefore exists.

### INJUNCTIVE RELIEF

144.    *Ex Parte Young* allows Plaintiff to seek prospective relief in this Court restraining all Defendants from enforcing Virginia Code Ann. § 56-16.3 against Plaintiff and its railroad members.

145.    "If a statute is expressly preempted," that fact "fulfills the remaining require-ments" for permanent injunctive relief. *Tex. Midstream Gas Servs., LLC v. City of Grand Prai-rie*, 608 F.3d 200, 206 (5th Cir. 2010).

146.    Virginia Code Ann. § 56-16.3 is preempted by federal law and violates the Takings Clause of the United States Constitution and Section 11 of Article I of the Virginia Constitution concerning the taking or damaging of private property.  Virginia Code Ann. § 56-16.3 is thus void and unenforceable.

147.    Plaintiff's members will continue to suffer irreparable injury.  They will need to petition the SCC to obtain just compensation each and every time a broadband service provider invokes Virginia Code Ann. § 56-16.3 to cross railroad property. This multiplicity of lawsuits deprives Plaintiff's members of an adequate remedy at law.

148.    Plaintiff's members will suffer irreparable injury because Virginia Code Ann. § 56-16.3 does not require the SCC to award any additional compensation to railroads—let alone *just* compensation—for a proposed crossing and the statute imposes an extremely limited timeframe for a railroad to evaluate the adequacy of each crossing's design to ensure that the crossing will not unduly burden rail transportation or create an undue safety risk.

149.    Plaintiff's members will also suffer irreparable injury because monetary relief is not adequate compensation for harm caused by Virginia Code Ann. § 56-16.3 to railroads' inter-ests in their real property.  *See O'Hagan v. United States*, 86 F.3d 776, 783 (8th Cir. 1996) ("More fundamentally, monetary relief fails to provide adequate compensation for an interest in real prop-erty, which by its very nature is considered unique."); *Pelfresne v. Vill. Of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989) ("As a general rule, interference with the enjoyment or possession of land

is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute."); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) ("Real estate has long been thought unique, and thus, injuries to real estate interests frequently come within the ken of the chancellor."); *Bean v. Indep. Am. Sav. Ass'n*, 838 F.2d 739, 743 (5th Cir. 1988) (noting that because "[appellant] stands to lose interests in real property, which we presume are unique, there is no adequate . . . remedy that could substitute for injunctive relief"); *Fairfield Resorts, Inc. v. Fairfield Mountains Prop. Owners Ass'n*, No. 1:06-CV-191, 2006 WL 1889152, at *4 (W.D.N.C. July 7, 2006) ("noting that "significant interference with the possession of real property" constitutes an irreparable harm).

150.    The balance of the equities also favors an injunction.  When "Congress [has] expressly preempted [an] area of regulation," "there is no injury to the states to weigh against that which they threaten to inflict" on regulated parties.  *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990).

151.    Plaintiff is therefore entitled to permanent injunctive relief restraining all Defendants from issuing permits or approvals for construction under, or otherwise enforcing, Virginia Code Ann. § 56-16.3 against Plaintiff's members.

## <u>COUNT I</u>

### VIRGINIA CODE ANN. § 56-16.3 IS PREEMPTED BY ICCTA

152.    Plaintiff realleges and incorporates the paragraphs above.

153.    Virginia Code Ann. § 56-16.3 discriminates against railroads by imposing an artificial cap on the fees and costs railroads may charge broadband service providers in exchange for the right to cross rail property and special procedural costs and hurdles to obtain adequate compensation above those limits.  The statute also significantly restricts a railroad's right to evaluate adequately whether crossing applications are in conformity with engineering and safety policies

and whether such crossings will unreasonably interfere with rail operations or cause undue safety risks.  Because Virginia Code Ann. § 56-16.3 imposes restrictions on railroads that are not required of similarly situated entities, it is preempted by 49 U.S.C. § 10501(b).  *See City of Alexandria*, 608 F.3d at 160.

154.    Virginia Code Ann. § 56-16.3 allows broadband service providers to occupy railroad property permanently without any mechanism for railroads to address future conflicts between installed broadband crossings and rail operations.  Because Virginia Code Ann. § 56-16.3 authorizes uses of railroad property that would conflict with present or future rail uses, it is preempted by ICCTA.  *See Skidmore*, 1 F.4th at 213–14.

155.    Virginia Code Ann. § 56-16.3 unreasonably burdens rail transportation by imposing a heavier burden to protect against a harmful crossing—"undue hardship" or "imminent likelihood of danger to public health or safety"—than is required under ICCTA, thereby allowing crossings that should be preempted. Virginia Code Ann. § 56-16.3 also unreasonably burdens rail transportation by allowing the State Corporation Commission to fashion a monetary remedy for a crossing that will, under state law, allow an undue hardship or an imminent likelihood of danger to public health and safety to proceed. Virginia Code Ann. § 56-16.3 further unreasonably burdens rail transportation and poses undue safety risks by severely restricting railroads' ability to ensure that broadband crossings are designed and installed in accordance with engineering and safety policies, procedures, and practices. Virginia Code Ann. § 56-16.3 is thus preempted by 49 U.S.C. § 10501(b). *See E.  Ala. Ry.*, 2012 WL 758259, at *5 n.27.

156.    The Court should enter a judgment under 28 U.S.C. § 2201 declaring that Virginia Code Ann. § 56-16.3 is preempted by ICCTA and is therefore void and unenforceable.

## COUNT II

**VIRGINIA CODE ANN. § 56-16.3 VIOLATES THE FEDERAL TAKINGS CLAUSE BY RESTRICTING THE AVAILABILITY OF JUST COMPENSATION**

157.    Plaintiff realleges and incorporates the paragraphs above.

158.    Virginia Code Ann. § 56-16.3 impermissibly authorizes broadband service providers to install fiber optic broadband lines across railroad property—including in public rights-of-way where railroads retain property interests—without providing a mechanism for providing just compensation, as measured by the market value of the property's highest and best use.

159.    Pursuant to 28 U.S.C. § 2201, the Plaintiff is entitled to a judgment declaring that Virginia Code Ann. § 56-16.3 violates the Federal Takings Clause and is therefore unconstitutional.

## COUNT III

**VIRGINIA CODE ANN. § 56-16.3 VIOLATES THE FEDERAL TAKINGS CLAUSE BY ALLOWING A TAKING OF PRIVATE PROPERTY FOR PRIVATE USE**

160.    Plaintiff realleges and incorporates the paragraphs above.

161.    Virginia Code Ann. § 56-16.3 permits broadband service providers to take the property of Plaintiff's members for the private enterprise and private benefit of broadband providers rather than public use.  Accordingly, Virginia Code Ann. § 56-16.3 contravenes the Takings Clause of the Fifth Amendment.

162.    Pursuant to 28 U.S.C. § 2201, the Plaintiff is entitled to a judgment declaring that Virginia Code Ann. § 56-16.3 violates the Federal Takings Clause and is therefore unconstitutional.

## COUNT IV

**DEFENDANTS ERRONEOUSLY DEPRIVED PLAINTIFFS' MEMBERS OF A PROTECTED PROPERTY INTEREST IN VIOLATION OF 42 U.S.C. § 1983 AND THE FOURTEENTH AMENDMENT**

163.    Plaintiff realleges and incorporates the paragraphs above.

164.    42 U.S.C. § 1983 authorizes suit against any person depriving another of a right secured by federal law while acting under color of law.

165.    The due process clause of the Fourteenth Amendment entitles Plaintiff and its members to adequate notice and an opportunity to challenge a deprivation of property interests secured by state law.

166.    Virginia law specifically recognizes that a party to a contract possesses a property right in the performance of that contract.

167.    The provisions of Art. I, § 11 establish a contractual relationship between the Commonwealth of Virginia and AAR's members as property owners, and that contract is valid and enforceable under Virginia law.

168.    Virginia Code Ann. § 56-16.3 contains multiple provisions that abridge the terms of that contract, including Art. I, § 11's restrictions on the taking of private property for private use, the requirement that just compensation "shall be no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking," and express language placing the burden to prove that a use is public on condemnors.

169.    Defendants' actions in openly offering or making available review and approval processes for crossings effected under Virginia Code Ann. § 56-16.3, or in the case of Defendant Hudson, assuming the administrative role contemplated in the same, give practical effect to the statute's terms and deprive Plaintiff's members of their property right in the performance of Art. I, § 11.

170.     Virginia Code Ann. § 56-16.3 provides no notice or opportunity to challenge the fairness or legality of that deprivation.

171.     In giving effect to Virginia Code Ann. § 56-16.3, Defendants therefore act to deprive Plaintiff of its due process rights under color of state law.

172.     Pursuant to 28 U.S.C. § 2201, 42 U.S.C. § 1983, and 42 U.S.C. § 1988,   Plaintiff is entitled to a judgment declaring that Virginia Code Ann. § 56-16.3 violates the Fourteenth Amendment to the United States Constitution, nominal damages, and attorney fees.

## COUNT V

**DEFENDANTS TORTIOUSLY INTERFERED WITH PLAINTIFF'S MEMBERS' EXISTING CONTRACT WITH THE COMMONWEALTH OF VIRGINIA, AS DETAILED IN ART. I, SECTION 11 OF THE VIRGINIA CONSTITUTION**

173.     Plaintiff realleges and incorporates the paragraphs above.

174.     The provisions of Art. I, § 11 establish a contractual relationship between the Commonwealth of Virginia and AAR's members as property owners, and that contract is valid and enforceable under Virginia law.

175.     Defendants were and are aware of the restrictions that Art. I, § 11 places on the Commonwealth of Virginia for the benefit of property owners, including AAR's members.

176.     Defendants Brich, Rolband, and affiliated John Doe persons did and do knowingly, intentionally, and openly offer or make available review and approval processes for crossings effected under § 56-16.3 despite, without regard for, and for the purpose of abridging the rights and obligations described in Art. I, § 11—including restrictions on the taking of private property for private use, the requirement that just compensation "shall be no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking," and express language placing the burden to prove that a use is public on condemnors.  Defendants' actions

40

brought the provisions of § 56-16.3, which contravene these contractual terms, into practical effect, thus inducing or causing a breach of Art. I, § 11.

177.    Defendant Hudson did knowingly and intentionally assume the administrative role contemplated in § 56-16.3, despite, without regard for, and for the purpose of abridging the aforementioned obligations of Art. I, § 11.  His actions brought the terms of § 56-16.3 into practical effect, thus inducing or causing a breach of Art. I, § 11.

178.    That breach of Art. I, § 11 caused damages to Plaintiff's members in the form of ongoing and uncompensated interference with AAR's members' property—including their right to exclude—and an associated increase in costs deriving from the process of reviewing, approving, and managing the construction of crossings.

179.    Plaintiff is entitled to a judgment declaring that Defendants' actions tortiously interfered with Plaintiff's members' contract with the Commonwealth of Virginia, an injunction against that ongoing interference, and nominal damages.

## COUNT VI

### DEFENDANTS TORTIOUSLY INTERFERED WITH PLAINTIFF'S MEMBERS' CONTRACT EXPECTANCY, PROSPECTIVE BUSINESS RELATIONSHIP, OR PROSPECTIVE ECONOMIC ADVANTAGE

180.    Plaintiff realleges and incorporates the paragraphs above.

181.    Plaintiff's members possessed a valid contract expectancy, prospective business relationship, or prospective economic advantage deriving from its longstanding practice of entering into contracts with broadband service providers regarding crossings of railroad rights-of-way in Virginia.

182.    Defendants were and are aware of this longstanding practice.

183.   Defendants' intentional actions in bringing the provisions of § 56-16.3 into practical effect were intended to induce or cause broadband service providers to curtail or abandon entirely this longstanding practice, thereby depriving Plaintiff's members of the aforementioned contract expectancy, prospective business relationship, or prospective economic advantage that they would have otherwise realized.

184.   Defendants' actions were at all times in violation of state and federal law, or otherwise constituted improper means or methods.

185.   Plaintiff's members' suffered damage in the form of loss of the contract expectancy, prospective business relationship, or prospective economic advantage that produced revenues, offset costs, and contributed to the safety and efficacy of Plaintiff's members' ongoing rail-transportation business.

186.   Plaintiff is entitled to a judgment declaring that Defendants' actions tortiously interfered with Plaintiff's members' contract expectancy, prospective business relationship, or prospective economic advantage; an injunction against that ongoing interference; and to nominal damages.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff requests the following relief:

a.      On Count I, a judgment against all Defendants declaring that Virginia Code Ann.

§ 56-16.3 is preempted by 49 U.S.C. § 10501(b), is therefore void and unenforceable.

b.      On Counts II through III, a judgment against all Defendants declaring that Virginia Code Ann. § 56-16.3 violates the Takings Clause of the Fifth Amendment to the United States Constitution, and is therefore unconstitutional.

c.      On Count IV, a judgment against all Defendants awarding nominal damages and declaring that Virginia Code Ann. § 56-16.3 violates the Fourteenth Amendment to the

42

United States Constitution, and is therefore unconstitutional, and that the deprivation of such violates 42 U.S.C. § 1983.

d.   On Counts V and VI a judgment against all Defendants awarding nominal damages and declaring that Virginia Code Ann. § 56-16.3 violates Section 11 of Article I of the Virginia Constitution concerning the taking or damaging of private property, and is therefore unconstitutional.

e.   Permanent injunctive relief restraining all Defendants, and their employees or agents, from prospectively taking any action to give effect to Virginia Code Ann. § 56-16.3 against Plaintiff and its members;

f.   An award of attorney's fees, for Count V and as otherwise permitted by law;

g.   Its other costs expended in this matter; and

h.   Any other relief to which it may be entitled.

Respectfully Submitted,

Dated: September 1, 2023

/s/ Lucas W.E. Croslow
Gordon D. Todd (VA Bar No. 45934)
Raymond A. Atkins (*pro hac vice* pending)
Tobias S. Loss-Eaton (*pro hac vice* forthcoming)
Chike B. Croslin (*pro hac vice* pending)
Lucas W.E. Croslow (VA Bar No. 97517)
Stephen S. Laudone (*pro hac vice* forthcoming)
Sidley Austin LLP
1501 K Street, NW
Washington, D.C.  20005
(202) 736-8000
(202) 736-8711 (facsimile)
gtodd@sidley.com
ratkins@sidley.com
tlosseaton@sidley.com
ccroslin@sidley.com
lcroslow@sidley.com
slaudone@sidley.com

*Counsel for the Association of American Railroads*

43