## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS, <br><br>     *Plaintiff,* <br><br>   *v.* <br><br> JEHMAL T. HUDSON, *et al.*, <br><br>     *Defendants.* | Civil Action No. 1:23-cv-815-DJN |

## <u>MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT</u>

Gordon D. Todd, VA Bar No. 45934
Raymond A. Atkins
Tobias S. Loss-Eaton
Chike B. Croslin
Lucas W.E. Croslow
Stephen S. Laudone
Lakeisha F. Mays
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (facsimile)
gtodd@sidley.com
ratkins@sidley.com
tlosseaton@sidley.com
ccroslin@sidley.com
lcroslow@sidley.com
slaudone@sidley.com
lakeisha.mays@sidley.com

*Counsel for Plaintiff Association of American Railroads*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ....................................................................................................................... 7

I.      THIS COURT HAS JURISDICTION OVER AAR'S CLAIMS. ................................. 7

      A.      Sovereign Immunity Does Not Bar AAR's Claims. ................................. 7

            1.      *Ex Parte Young* allows the official-capacity claims against Commissioner Hudson ................................................................... 8

                  a.      *The Commission has both specific and general authority to implement and enforce § 56-16.3.* .............................. 8

                  b.      *The Commission's role under § 56-16.3 is not judicial, let alone* solely *judicial.* .................................................... 11

                  c.      *AAR sufficiently pleads a threat of enforcement.* .......... 14

            2.      *Ex Parte Young* allows the official-capacity claims against Commissioner Brich and Director Rolband. ............................. 15

      B.      The Court Has Jurisdiction To Enter A Declaratory Judgment. ........... 17

      C.      AAR Has Standing And Its Claims Are Ripe. ....................................... 19

            1.      AAR alleges multiple injuries in fact, and its claims are ripe. ................ 19

            2.      AAR's claims do not require the participation of individual members. ........................................................................................ 21

II.     THE COMPLAINT STATES CLAIMS FOR RELIEF ................................... 22

      A.      The Complaint Plausibly Alleges ICC Termination Act Preemption. ................ 22

            1.      Section 56-16.3 discriminates against railroads. ....................... 23

            2.      Section 56-16.3 effectively manages or governs rail facilities. ............... 27

            3.      Section 56-16.3 would unreasonably burden rail transportation. ............. 31

B.     AAR Has Stated A Claim For Injunctive Relief Against The
       Uncompensated Taking Of Its Members' Property In Violation Of The
       Fifth And Fourteenth Amendments. ........................................................ 33

       1.     Broadband expansion is not a "public use." ............................... 34

       2.     The statutory license fees do not provide just compensation. .................. 35

       3.     Enjoining § 56-16.3 is proper because countless after-the-fact
              compensation actions are not an adequate legal remedy. ........................ 36

C.     The Complaint Properly Pleads A § 1983 Claim For Deprivation Of State
       Property Rights Without Due Process. ................................................... 37

       1.     AAR plausibly alleges a constitutionally protected property right in
              the performance of the implied contract created by the Virginia
              Constitution's takings provision. ........................................... 38

       2.     AAR plausibly alleges a deprivation of its property rights and
              constitutionally inadequate procedures to safeguard those rights............ 40

       3.     AAR properly sued each Defendant in his personal capacity.................. 41

D.     AAR Properly Alleges Its Tortious Interference Claims. ...................................... 46

III.   THE COURT SHOULD NOT ABSTAIN OR DECLINE SUPPLEMENTAL
       JURISDICTION  ................................................................................ 47

CONCLUSION ................................................................................................ 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAR v. S. Coast Air Quality Mgmt. Dist.*,
   622 F.3d 1094 (9th Cir. 2010) ............................................................24

*Adrian & Blissfield R.R. v. Vill. of Blissfield*,
   550 F.3d 533 (6th Cir. 2008) ..............................................................25

*AES Sparrows Point LNG, LLC v. Smith*,
   470 F. Supp. 2d 586 (D. Md. 2007) .....................................................22

*AGCS Marine Ins. Co. v. Arlington Cnty.*,
   800 S.E.2d 159 (Va. 2017) ..................................................................39

*Am. Rocky Mountaineer v. Grand Cnty.*,
   568 F. Supp. 3d 1231 (D. Utah 2021) ..................................................25

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ...........................................................................17

*AT&T Commc'ns of Va., Inc. v. Bell Atl.-Va., Inc.*,
   197 F.3d 663 (4th Cir. 1999) ............................................................8, 9

*Baggett v. Bullitt*,
   377 U.S. 360 (1964) ...........................................................................47

*BNSF Ry. v. Cal. Dep't of Tax & Fee Admin.*,
   904 F.3d 755 (9th Cir. 2018) .........................................................24, 26

*BNSF Ry. v. Dep't of Transp.*,
   206 P.3d 261 (Or. Ct. App. 2009) .......................................................24

*Bostic v. Schaefer*,
   760 F.3d 352 (4th Cir. 2014) ..............................................................16

*Brown v. Montoya*,
   662 F.3d 1152 (10th Cir. 2011) ..........................................................43

*Burns v. Bd. of Sup'rs of Fairfax Cnty.*,
   238 S.E.2d 823 (Va. 1977) ..................................................................38

*CareFirst, Inc. v. Taylor*,
   235 F. Supp. 3d 724 (D. Md. 2017) .....................................................18

*Cedar Point Nursery v. Hassid*,
    141 S. Ct. 2063 (2021) .................................................................................19

*City of Cayce v. Norfolk S. Ry.*,
    706 S.E.2d 6 (S.C. 2011) .............................................................................31

*Clajon Prod. Corp. v. Petera*,
    70 F.3d 1566 (10th Cir. 1995) ...............................................................42, 43

*Clinton v. City of New York*,
    524 U.S. 417 (1998)....................................................................................19

*Club Madonna Inc. v. City of Miami Beach*,
    42 F.4th 1231 (11th Cir. 2022) ............................................................22, 23

*Coakley v. Welch*,
    877 F.2d 304 (4th Cir. 1989) .....................................................................14

*Coeur D'Alene Tribe of Idaho v. Idaho*,
    42 F.3d 1244 (9th Cir. 1994), *rev'd in part on other grounds*, 521 U.S. 261
    (1997)..........................................................................................................42

*Courthouse News Serv. v. Gilmer*,
    48 F.4th 908 (8th Cir. 2022) ................................................................12, 13

*Croatan Books, Inc. v. Virginia*,
    574 F. Supp. 880 (E.D. Va. 1983) ..............................................................12

*CSX Transp., Inc. v. City of Sebree*,
    924 F.3d 276 (6th Cir. 2019) .....................................................................22

*CSX Transp., Inc. v. Williams*,
    406 F.3d 667 (D.C. Cir. 2005)....................................................................31

*Degen v. United States*,
    517 U.S. 820 (1996)....................................................................................14

*Delaware v. STB*,
    859 F.3d 16 (D.C. Cir. 2017)................................................22, 24, 25, 31

*Doe v. Va. Polytechnic Inst.*,
    77 F.4th 231 (4th Cir. 2023) ................................................................37, 40

*Doyle v. Hogan*,
    1 F.4th 249 (4th Cir. 2021) .......................................................................9, 16

*Duggin v. Adams*,
    360 S.E.2d 832 (Va. 1987)..........................................................................46

*Dunlap v. Cottman Transmission Sys., LLC*,
    754 S.E.2d 313 (Va. 2014)............................................................................37, 41

*DurretteBradshaw, P.C. v. MRC Consulting, L.C.*,
    670 S.E.2d 704 (Va. 2009)..................................................................................46

*Edwards v. CSX Transp., Inc.*,
    983 F.3d 112 (4th Cir. 2020) ........................................................... *passim*

*Ezell v. Kan. City S. Ry.*,
    866 F.3d 294 (5th Cir. 2017) ..............................................................................29

*Fox v. Deese*,
    362 S.E.2d 699 (Va. 1987)............................................................................45, 46

*Franks Inv. Co. v. Union Pac. R.R.*,
    593 F.3d 404 (5th Cir. 2010) .......................................................................28, 29

*Garraghty v. Va. Dep't of Corr.*,
    52 F.3d 1274 (4th Cir. 1995) .............................................................................37

*Goldman v. Northam*,
    566 F. Supp. 3d 490 (E.D. Va. 2021) ...............................................................16

*Gordon v. New England Cent. R.R.*,
    No. 2:17-cv-154, 2019 WL 5084160 (D. Vt. Oct. 10, 2019).............................25

*Grabarczyk v. Stein*,
    No. 5:19-cv-48, 2020 WL 2441418 (E.D.N.C. May 12, 2020), *vacated on*
    *other grounds*, No. 20-1647, 2020 WL 13227390 (4th Cir. Aug. 14, 2020)...........17

*Gray v. Va. Sec'y of Transp.*,
    662 S.E.2d 66 (Va. 2008)...................................................................................39

*Green Mountain R.R. v. Vermont*,
    404 F.3d 638 (2d Cir. 2005)........................................................................22, 32

*Green Valley Special Util. Dist. v. City of Schertz*,
    969 F.3d 460 (5th Cir. 2020) ............................................................................17

*Greenawalt v. Ind. Dep't of Corr.*,
    397 F.3d 587 (7th Cir. 2005) ............................................................................43

*Guild v. Kan. City S. Ry.*,
    541 F. App'x 362 (5th Cir. 2013) ......................................................................29

*Hafer v. Melo*,
    502 U.S. 21 (1991)......................................................................................41, 43

*Hamlin v. Warren*,
    664 F.2d 29 (4th Cir. 1981) ...........................................................................42

*Hendrickson v. Meredith*,
    170 S.E. 602 (Va. 1933)..................................................................................38

*Howell v. McAuliffe*,
    788 S.E.2d 706 (Va. 2016)..............................................................................45

*Huminski v. Corsones*,
    396 F.3d 53 (2d Cir. 2005)..............................................................................41

*Jackson v. Va. Dep't of Soc. Servs.*,
    10 Va. Cir. 294 (1987)....................................................................................46

*Jones v. Coleman*,
    848 F.3d 744 (6th Cir. 2017) ..........................................................................47

*Just Puppies, Inc. v. Frosh*,
    438 F. Supp. 3d 448 (D. Md. 2020), *vacated on other grounds*, No. 20-1631,
    2021 WL 4452349 (4th Cir. Apr. 29, 2021) ..................................................18

*Kelo v. City of New London*,
    545 U.S. 469 (2005)........................................................................................34

*Kerns v. United States*,
    585 F.3d 187 (4th Cir. 2009) ............................................................................7

*Kirby v. City of Elizabeth City*,
    388 F.3d 440 (4th Cir. 2004) ..........................................................................42

*Kitchen v. City of Newport News*,
    657 S.E.2d 132 (Va. 2008)..............................................................................38

*Knick v. Twp. of Scott*,
    139 S. Ct. 2162 (2019)..............................................................................35, 36

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949)........................................................................................45

*Lefemine v. Wideman*,
    672 F.3d 292 (4th Cir.), *vacated on other grounds*, 568 U.S. 1 (2012)..................42

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)........................................................................................33

*Lozano v. City of Hazleton*,
    724 F.3d 297 (3d Cir. 2013)............................................................................23

*Lytle v. Griffith*,
   240 F.3d 404 (4th Cir. 2001) ...................................................................................10

*Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*,
   493 S.E.2d 375 (Va. 1997) .......................................................................................47

*Mays v. Sprinkle*,
   992 F.3d 295 (4th Cir. 2021) .....................................................................................7

*McBurney v. Cuccinelli*,
   616 F.3d 393 (4th Cir. 2010) ...................................................................................16

*MCI Telecomms. Corp. v. Bell Atl.-Va. Inc.*,
   No. 3:97-cv-629, 1997 WL 1133714 (E.D. Va. Dec. 24, 1997).....................8, 9, 12

*Meredith v. Stein*,
   355 F. Supp. 3d 355 (E.D.N.C. 2018).....................................................................14

*Mobil Oil Corp. v. Att'y Gen. of Va.*,
   940 F.2d 73 (4th Cir. 1991) .....................................................................................10

*Moore v. Urquhart*,
   899 F.3d 1094 (9th Cir. 2018) ..................................................................................17

*Muhammad v. Jarrett*,
   No. 1:19-cv-746, 2020 WL 7647635 (E.D. Va. Dec. 23, 2020)...............................43

*Nat'l Home Ins. Co. v. State Corp. Comm'n*,
   838 F. Supp. 1104 (E.D. Va. 1993) .........................................................................13

*Nelson Cnty. v. Coleman*,
   101 S.E. 413 (Va. 1919)......................................................................................38, 39

*Nelson v. Miller*,
   570 F.3d 868 (7th Cir. 2009), *abrogated on other grounds by Bey v. Haines*,
   802 F. App'x 194 (7th Cir. 2020) ......................................................................42, 43

*Neufeld v. City of Baltimore*,
   964 F.2d 347 (4th Cir. 1992) ...................................................................................48

*New Orleans & Gulf Coast Ry. v. Barrois*,
   533 F.3d 321 (5th Cir. 2008) ...................................................................................28

*Norfolk S. Ry. v. City of Alexandria*,
   608 F.3d 150 (4th Cir. 2010) ..............................................................................22, 27

*Pac. Rivers Council v. Brown*,
   No. 02-cv-243, 2002 WL 32356431 (D. Or. Dec. 23, 2002).................................16

*Paulinus Chidi Njoku v. Unknown Special Unit Staff*,
   No. 99-7644, 2000 U.S. App. LEXIS 15695 (4th Cir. July 7, 2000) ....................................16

*Pearson v. Callahan*,
   555 U.S. 223 (2009)..........................................................................................................42

*Pennhurst State Sch. Hosp. v. Halderman*,
   465 U.S. 89 (1984)..............................................................................................................7

*PETA, Inc. v. N.C. Farm Bureau Fed'n, Inc.*,
   60 F.4th 815 (4th Cir. 2023), *cert. denied*, No. 22-1148, 2023 WL 6797724
   (U.S. Oct. 16, 2023) ..........................................................................................................22

*PhRMA v. Williams*,
   64 F.4th 932 (8th Cir. 2023) .......................................................................................35, 36

*Pope v. Chew*,
   521 F.2d 400 (4th Cir. 1975) ..............................................................................................42

*Prairie Band Potawatomi Nation v. Wagnon*,
   476 F.3d 818 (10th Cir. 2007) ............................................................................................15

*Prendergast v. N. Va. Reg'l Park Auth.*,
   313 S.E.2d 399 (Va. 1984)..................................................................................................39

*Prentis v. Atl. Coast Line*,
   211 U.S. 210 (1908)............................................................................................................12

*In re Qwest Corp.*,
   918 N.W.2d 578 (Minn. Ct. App. 2018)..............................................................................32

*Richmeade, L.P. v. City of Richmond*,
   594 S.E.2d 606 (Va. 2004)..................................................................................................39

*Richmond, Fredericksburg & Potomac R.R. v. MWAA*,
   468 S.E.2d 90 (Va. 1996)....................................................................................................39

*S.C. Wildlife Fed'n v. Limehouse*,
   549 F.3d 324 (4th Cir. 2008) ..............................................................................................10

*Schiff v. Kennedy*,
   691 F.2d 196 (4th Cir. 1982) ..............................................................................................16

*Skidmore v. Norfolk S. Ry.*,
   No. 2:18-cv-1308, 2019 WL 1748533 (S.D.W. Va. Apr. 18, 2019), *aff'd,* 1
   F.4th 206 (4th Cir. 2021) ....................................................................................................27

*Skidmore v. Norfolk S. Ry.*,
   1 F.4th 206 (4th Cir. 2021) .......................................................................28, 29, 30

*Skull Valley Band of Goshute Indians v. Nielson*,
   376 F.3d 1223 (10th Cir. 2004) ..........................................................................20

*Soo Line R.R. v. City of Saint Paul*,
   827 F. Supp. 2d 1017 (D. Minn. 2010)................................................................28

*South Carolina v. United States*,
   907 F.3d 742 (4th Cir. 2018) ...............................................................................41

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)......................................................................................18, 19

*State v. BNSF Ry.*,
   432 P.3d 77 (Kan. Ct. App. 2018) .......................................................................24

*Suarez Corp. Indus. v. McGraw*,
   125 F.3d 222 (4th Cir. 1997) .................................................................................7

*Super Tire Eng'g Co. v. McCorkle*,
   416 U.S. 115 (1974)..............................................................................................18

*Tafas v. Dudas*,
   511 F. Supp. 2d 652 (E.D. Va. 2007) ..................................................................48

*Union Pac. R.R. v. Chi. Transit Auth.*,
   647 F.3d 675 (7th Cir. 2011) ...............................................................................27

*United States v. 564.54 Acres of Land*,
   441 U.S. 506 (1979)..............................................................................................34

*United States v. Salerno*,
   481 U.S. 739 (1987)..............................................................................................22

*Va. Nat'l Bank v. Va. ex rel. SCC*,
   320 F. Supp. 260 (E.D. Va. 1970) .......................................................................13

*Verizon Md. Inc. v. Pub. Serv. Comm'n*,
   535 U.S. 635 (2002)...................................................................................... *passim*

*Vt. Ry. v. Town of Shelburne*,
   287 F. Supp. 3d 493 (D. Vt. 2017), *aff'd*, 918 F.3d 82 (2d Cir. 2019)..................24

*W. Union Tel. Co. v. Penn. R.R.*,
   195 U.S. 540 (1904)..............................................................................................27

*Whole Woman's Health v. Jackson*,
  142 S. Ct. 522 (2021) ................................................................10, 12, 14

*Wild Va. v. Council on Envtl. Quality*,
  56 F.4th 281 (4th Cir. 2022) ..................................................................18

*Williamson v. Stirling*,
  912 F.3d 154 (4th Cir. 2018) ................................................................43

*Wis. Cent. Ltd. v. City of Marshfield*,
  160 F. Supp. 2d 1009 (W.D. Wis. 2000) ........................................27, 28

*Wise v. Circosta*,
  978 F.3d 93 (4th Cir. 2020) ..................................................................47

*Ex Parte Young*,
  209 U.S. 123 (1908) ..........................................................7, 8, 15, 16

*Zayo Grp. LLC v. Norfolk S. Ry.*,
  No. 1:21-cv-1300, 2022 WL 3273906 (E.D. Va. Mar. 22, 2022), *appeal docketed*, No. 22-1837 (4th Cir. Aug. 10, 2022) ...................................13

**Constitution and Statutes**

U.S. Const. amend. V ..............................................................................33, 34

Va. Const. art. I, § 11 ..............................................................23, 33, 34, 38, 40

42 U.S.C. § 1983 ......................................................................................6, 37, 41

49 U.S.C. § 10102(9)(A) ..........................................................................27

49 U.S.C. § 10501(b) ..............................................................................21

Va. Code  § 1-219.1(A) ............................................................................34

Va. Code  § 1-219.1(H) ............................................................................34

Va. Code  § 12.1-12(A) ............................................................................9

Va. Code  § 12.1-13 ..................................................................................9

Va. Code  § 25.1-100 ................................................................................40

Va. Code  § 25.1-102 ................................................................................23

Va. Code  § 25.1-201 ................................................................................23

Va. Code  § 25.1-206(2)(a)–(c) ..............................................................23

Va. Code  § 25.1-213 ................................................................................................23

Va. Code  § 25.1-228 ................................................................................................23

Va. Code  § 25.1-230(A) ..........................................................................................23

Va. Code  § 55.1-306.1(B)(2), (6) ...........................................................................33

Va. Code  § 56-16.3(B) ......................................................................................24, 27

Va. Code  § 56-16.3(C)(1) ........................................................................................17

Va. Code  § 56-16.3(C)(4), (G)–(H) ..........................................................................8

Va. Code  § 56-16.3(D) .............................................................................................30

Va. Code  § 56-16.3(G), (I) .......................................................................................24

Va. Code  § 56-16.3(H) .................................................................................11, 19, 30

Va. Code  § 56-16.3(K) .............................................................................................24

Va. Code  § 56-1 .........................................................................................................9

Va. Code  § 56-35 .......................................................................................................9

Va. Code  § 56-99.2 ....................................................................................................9

Va. Code  § 56-128 .....................................................................................................9

Va. Code  § 56-16.3(G), (I), (K) ...............................................................................34

**Administrative Decisions**

*14500 Ltd. LLC—Pet. for Decl. Order*,
   No. FD 35788, 2014 WL 2608812 (S.T.B. served June 5, 2014) ..........................29

*E. Ala. Ry. LLC—Pet. for Decl. Order*,
   No. FD 35583, 2012 WL 758259 (S.T.B. served Mar. 9, 2012) ......................28, 30

*Jie Ao & Xin Zhou—Pet. for Decl. Order*,
   No. FD 35539, 2012 WL 2047726 (S.T.B. served June 6, 2012) ...................29, 30

*Maumee & W. R.R.—Pet. for Decl. Order*,
   No. 34354, 2004 WL 395835 (S.T.B. served Mar. 3, 2004) ................................28

*Bos. & Me. Corp. & Town of Ayer— Pet. for Decl. Order,*
   5 S.T.B. 500 (2001).............................................................................................25

*Thomas Tubbs—Pet. for Decl. Order*,
    No. FD 35792, 2014 WL 5508153 (S.T.B. served Oct. 31, 2014) ........................................31

**Legislative Materials**

H.R. Rep. No. 104–311 (1995) ........................................................................................21

**Other Authorities**

Black's Law Dictionary (11th ed. 2019)........................................................................39

Restatement (Second) of Torts (1979) .........................................................................46

## INTRODUCTION

The Association of American Railroads (AAR) represents freight and passenger railroads across Virginia. AAR member railroads own, possess, control, and operate rights-of-way and facilities to provide rail transportation to shippers and the traveling public. Railroads must ensure safe and cost-effective rail operations and be prepared to meet present and future demand for rail transportation. And as the backbone of American commerce, railroads are subject to an exclusive federal regulatory scheme that protects against interference by state law.

Virginia Code § 56-16.3 undercuts these important interests. It discriminates against and unreasonably burdens railroads by allowing broadband providers to permanently occupy their railroad property without any of the protections enjoyed by every other Virginia landowner. It ignores the railroads' right to just compensation by mandating either minimal fees that apply regardless of actual values or expenses or no fees at all. And it takes property for a purpose that the Commonwealth itself deems not to be a public use. AAR thus filed suit to vindicate its members' rights.

This Court has jurisdiction to resolve these claims. Defendants—State Corporation Commissioner Jehmal T. Hudson, VaDEQ Director Michael Rolband, and VDOT Commissioner Stephen C. Brich—are each subject to suit in their official capacities under *Ex Parte Young* because of their key roles in implementing and enforcing § 56-16.3. Sovereign immunity is thus irrelevant. And AAR's members have standing to sue because they have already suffered injury from the statute's enactment, from losing the right to exclude broadband service providers from their property to the imposition of costly regulatory obligations and the deprivation of just compensation.

AAR likewise has stated plausible claims on the merits. It properly alleges that § 56-16.3 is preempted, effects unconstitutional takings, violates procedural due process, and tortiously interferes with an existing contract and related business expectancy. The ICC Termination Act

preempts this law because it discriminates against, regulates, and unreasonably burdens rail transportation. Section 56-16.3 authorizes permanent, exclusive physical invasions of railroad property for a non-public use and fails to provide just compensation, all in violation of federal- and state-law takings protections. In turn, § 56-16.3 deprives AAR's members of their property right in performance of the implied contract arising from Virginia's takings protections and fails to provide adequate process with respect to that deprivation. And by administering and enforcing the statute, Defendants have tortiously interfered with that implied contract and with AAR's members' expectation that they would be able to use their property for prospective economic advantage in their ongoing rail transportation business. Defendants are thus properly sued in their individual capacities with respect to the procedural due process claim and the related Virginia tort claims.

## BACKGROUND

AAR represents freight and passenger railroads, including two of the nation's largest Class I railroads, CSX Transportation, Inc. and Norfolk Southern Railway Company. Compl. ¶¶ 7, 21 (Doc. 35).[1] Together, these two railroads operate nearly 250 miles of mainline track in the Commonwealth of Virginia, with more than 220 right-of-way crossings in the Alexandria Division alone. *Id.* ¶ 19. Class I railroads are subject to the exclusive federal jurisdiction of the Surface Transportation Board. *Id.* ¶¶ 31–32. Federal and state laws protect railroads' rights as landowners, and federal law protects railroad property to ensure its ongoing availability and use for rail transportation. *See id.* ¶¶ 1, 30, 33, 37–42. In providing freight and passenger rail service to the public, AAR's federally regulated members must "impose reasonable requirements to ensure the continuity and safety of railroad operations and to protect their employees and the public." *Id.* ¶ 20.

---

[1] For convenience, this brief refers to the operative amended complaint (Doc. 35) simply as the "Complaint."

Administration of track crossings is an important aspect of that responsibility. AAR's members have "invested significant time and resources in developing policies and permitting procedures to facilitate broadband installations while ensuring the safety of rail operations and the public." *Id.* ¶ 21. These policies and procedures ensure that each proposed installation conforms to the railroad's engineering and safety requirements and that installation work is conducted with proper safety precautions, such as flaggers or other controls for worker safety and railroad personnel to ensure the integrity of railroad property is maintained. *Id.* ¶ 22. Crossing applications are reviewed scrupulously, and incomplete applications, inappropriate engineering and design plans, and other omissions can cause delays in the process. *Id.* ¶ 24. Independent of the railroads' processes, crossing applications often languish because of utility applicants' delay in providing missing information requested by the railroads. *Id.* ¶¶ 24–25.

Once an application is approved, railroads also need time to schedule the work, which entails coordinating a crossing site inspection, marking of existing utility lines, arranging safety controls, and other logistical issues. *Id.* ¶ 26. Each step ensures that crossings do not "interfere with rail operations, threaten the integrity of rail infrastructure, and create safety hazards." *Id.* ¶ 29. Additionally, AAR's members typically require entities seeking to cross rail property to agree to "contractual terms that ensure the safety of railroad operations, fiber optic contractors, and the public, both at present and in the future." *Id.* ¶ 28. One of the most important contractual terms is the railroad's right to "request that crossings be modified or moved if necessary to accommodate railroad operations in the future." *Id.* This provision allows railroads to take actions they deem necessary "to prioritize safe rail operations" and "to develop property for rail operations." *Id.*

Virginia Code § 56-16.3 circumvents these important, longstanding processes and "empowers a broadband service provider to dictate to railroads when and how the provider will cross

railroad land, and at what minimal cost." *Id.* ¶ 3. The statute authorizes broadband service providers to cross and permanently occupy railroad tracks, bridges, facilities, rights of way, and easements, and requires railroads to approve crossing applications within 35 days of receipt. *Id.* ¶ 43 (quoting Va. Code § 56-16.3(B), (C)(4)). During this narrow window, railroads must review the "application disclosing the design and construction plans for its intended crossing—including 'bore plans, fraction mitigation plans, dewatering plans, rigging and lifting plans, and any other pertinent plans deemed necessary and prepared by a registered professional engineer[.]'" *Id.* ¶ 44 (quoting Va. Code § 56-16.3(C)(1)). Railroads have just 15 days from receipt to discern whether an application is incomplete or problematic and to seek additional information. *Id.* ¶ 47 (quoting Va. Code § 56-16.3(C)(3)). After an application is approved, a railroad has just 30 days to arrange protective measures, including flagging, so construction can begin. *Id.* (quoting Va. Code § 56-16.3(E)). These aggressively compressed timeframes deprive railroads of sufficient time to review applications, assess the engineering, ensure technical and legal soundness, confirm permitting, and arrange the necessary safety measures prior to installation. And, the financial and resource costs necessary to meet this expedited process fall almost entirely on the railroads. *Id.* ¶¶ 87–96. Moreover, by depriving railroads of the ability to contract for indemnification and insurance coverage, the statute saddles railroads with significant legal risk. *Id.* ¶ 94.

Broadband crossings remain subject to other applicable state statutes and regulations. *Id.* ¶ 45. If a proposed crossing will be installed in or impact a public right-of-way, a broadband service provider must submit a valid plan for review to, and obtain a permit from, VDOT. *Id.* ¶ 46. Commissioner Brich oversees and is responsible for administering this permit process. *Id.* ¶ 12. Similarly, for any proposed crossing that requires excavation, boring, or other land-disturbing ac-

tivities, or that implicates stormwater management issues such as dewatering, the broadband service provider must submit a valid plan for review to, and obtain a permit from, DEQ. *Id.* ¶ 46. Director Rolband oversees and is responsible for administering this permit process, including management of the Virginia Erosion and Sediment Control Program (VESCP), which receives erosion and sediment control plans. *Id.* ¶ 11.

Section 56-16.3 severely curtails railroads' rights. Railroads are restricted to only three objections: "(1) the license fee is not 'adequate compensation' for a particular crossing, (2) a proposed crossing will impose 'undue hardship' on the railroad, or (3) a proposed crossing 'will create the imminent likelihood of danger to public health or safety,'" *id.* ¶ 48 (quoting Va. Code § 56-16.3(H)). And these limited objections may be raised only before the State Corporation Commission ("Commission" or "SCC"), which supervises the procedures provided for in the statute. *Id.* ¶ 49. As the SCC's sole commissioner, Commissioner Hudson is responsible for enforcing Virginia Code § 56-16.3 and has assumed that administrative role. *Id.* ¶¶ 10, 169.

A railroad's petition does not halt or prevent the crossing's construction, and railroads are not authorized to reject or prevent "a proposed crossing installation for failure to comply with railroad safety requirements or . . . for failure to agree to the railroads' other standard conditions, such as preserving the right to relocate crossings in the future as needed." *Id.* ¶¶ 48–49. The statute provides no framework or process for managing the ongoing and future use of the crossing easement or the parties' relationship beyond the initial installation, including how to resolve situations where the crossing's presence interferes with or burdens rail operations, including future development and improvement. *Id.* ¶ 67. Indeed, while the SCC must dispose of petitions within 90 days, it may inquire into only "the adequacy of compensation, the existence of undue hardship on the railroad company, or the imminent likelihood of danger to public health or safety," and it is not

required to make any factfinding at all. *Id.* ¶ 49 (quoting Va. Code § 56-16.3(H)). Conversely, a railroad's refusal to comply with § 56-16.3—e.g., by utilizing its railroad police authorized under VA Code § 56-353 to physically stop any installation that does not comply with the railroad's safety procedures—would subject it to the SCC's general enforcement authority. *See id.* ¶¶ 50–54.

Section 56-16.3 imposes a unique process for the condemnation of permanent, exclusive easements across railroad rights-of-way, which lacks many of the constitutional and legal protections afforded to other landowners. *See id.* ¶¶ 55–62. The statute end-runs constitutional public purpose and just compensation protections set forth in Article I, Section 11 of the Virginia Constitution. The railroad must bear all direct expenses for a crossing in excess of $5,000, regardless of its location or complexity. *Id.* ¶ 43. Moreover, compensation for these easements is arbitrarily capped at $2,000, except for crossings of legally abandoned railroad property which may be taken for $1,000, and easements in public rights-of-way, which may be taken with no compensation at all. *Id.* (quoting Virginia Code § 56-16.3(G), (I), (K)). These random caps and restrictions will force railroads to petition the SCC for just compensation on a crossing-by-crossing basis; except for crossings of abandoned rail lines or in public rights-of-way, for which there is no right to seek just compensation at all. *Id.* ¶¶ 105–107, 126–130. Moreover, the statute shifts the burden to railroads to prove the *absence* of a public use. *Id.* ¶¶ 121–123. No other landowner is subject to this hostile and discriminatory takings regime, which exceeds even the condemnation authority granted to the agencies of the Commonwealth.

AAR's Complaint asserts official-capacity claims under the ICC Termination Act (Count I) and the Fifth Amendment's Takings Clause (Counts II and III). It also asserts personal-capacity claims under the Fourteenth Amendment's Due Process Clause and 42 U.S.C. § 1983 (Count IV); for tortious interference with existing contract under Virginia common law (Count V); and for

6

tortious interference with contract expectancy, prospective business relationship, or prospective economic advantage, also under Virginia common law (Count VI). All counts seek a declaration that Virginia Code § 56-16.3 is unlawful and an injunction against Defendants giving effect to the statute, and the personal-capacity claims also seek nominal damages and fees. Compl. at 42–43.

## LEGAL STANDARD

On a Rule 12(b)(1) motion, if a defendant asserts that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," then "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). Likewise, on a Rule 12(b)(6) motion, "the district court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in plaintiff's favor. To survive, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021) (cleaned up).

## ARGUMENT

## I.   THIS COURT HAS JURISDICTION OVER AAR'S CLAIMS

Seeking to avoid the merits, Defendants challenge the Court's jurisdiction under sovereign-immunity, declaratory-relief, standing, and ripeness principles. None is a real obstacle.

### A.   Sovereign Immunity Does Not Bar AAR's Claims.

All Defendants invoke Virginia's sovereign immunity. Doc. 48 at 6; Doc. 50 at 8. The federal-law, official-capacity claims in Counts I–III, however, fall squarely under the immunity exception recognized in *Ex Parte Young*, 209 U.S. 123 (1908). And sovereign immunity is irrelevant to the remaining claims: Count IV is a § 1983 personal-capacity claim under federal law, *see*

*infra* § II.C.3, and the state-law claims in Counts V and VI are also personal-capacity claims, subject to the Court's supplemental jurisdiction. *See Pennhurst State Sch. Hosp. v. Halderman,* 465 U.S. 89, 111 n.21 (1984); *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 229 (4th Cir. 1997).

### 1.   *Ex Parte Young* allows the official-capacity claims against Commissioner Hudson.

*Ex Parte Young* requires "only … a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (cleaned up). These requirements are met, and Commissioner Hudson has "some connection with the enforcement of" § 56-16.3, which makes him a proper official-capacity defendant. *See Young*, 209 U.S. at 149–59. His contrary arguments—that the Commission's role under § 56-16.3 is solely judicial, and that no threat of enforcement exists—lack merit.

### a.   *The Commission has both specific and general authority to implement and enforce § 56-16.3.*

The Commission, of which Commissioner Hudson is the sole current member, has a direct connection with § 56-16.3's enforcement.

*First*, the Commission plays a central role in § 56-16.3's scheme, which references the SCC at least 15 times. *See* Va. Code § 56-16.3(C)(4), (G)–(H). The SCC's connection with the statute's implementation is thus "created by the act itself." *See Young*, 209 U.S. at 157.

Both this Court and the Supreme Court have applied *Young* to allow suits against state public-service commissioners—including the SCC's members—based on their roles under similar schemes. In *MCI Telecommunications Corp. v. Bell Atlantic-Virginia Inc.*, two national phone companies sought access to the Virginia market. No. 3:97-cv-629, 1997 WL 1133714, at *1–2 (E.D. Va. Dec. 24, 1997). When they "were unsuccessful in negotiating" with the local carrier, they "went to arbitration before" the SCC. *AT&T Commc'ns of Va., Inc. v. Bell Atl.-Va., Inc.*, 197

F.3d 663, 666–68 (4th Cir. 1999). "After the SCC's arbitration decisions were incorporated into" inter-carrier contracts, the national companies sued "the SCC commissioners in district court." *Id.* at 668. This Court held that the Commissioners were "proper [d]efendants … because *Young* authorizes suits against state officers in their official capacity" for prospective relief under federal law. *MCI*, 1997 WL 1133714, at *2.[2] A few years later, the Supreme Court similarly applied *Young* to allow a phone carrier to sue to enjoin enforcement of Maryland public service commission orders ruling on a pair of inter-carrier complaints under the same scheme. *See Verizon Md.*, 535 U.S. at 645–46. Applying *Young* on those facts was "straightforward." *Id.* at 645. So too here.

*Second*, the Commission's general authority independently supplies the necessary connection to § 56-16.3. *See Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021) (the requisite link can also come from "a more general law providing enforcement authority, or 'the general duties of the officer'"). The Commission's powers include the "enforcement of all laws within its jurisdiction." Va. Code  § 12.1-13. Section 56-16.3 is "within [the Commission's] jurisdiction"—both because the statute explicitly assigns tasks to the Commission and because the agency's authority includes "the power … of regulating the … facilities of all public service companies" and "the duty of administering the laws made for the regulation and control of corporations doing business in this Commonwealth." *Id.* § 12.1-12(A). Likewise, the Commission's jurisdiction includes "supervising, regulating and controlling all public service companies doing business in this Commonwealth, in all matters relating to the performance of their public duties." *Id.* § 56-35. Railroads are public service companies. *See id.* § 56-1. So the Commission has (to the extent not preempted by federal law) "authority to administer and prescribe the rates, rules, classifications and practices of railroad

---

[2] On appeal, the Fourth Circuit resolved the case on the merits without addressing *Young*. *See* 197 F.3d 663.

companies," *id.* § 56-99.2, and "may examine all the railroads … and the works and equipment thereof" to ensure "compliance" with Virginia law, *id.* § 56-128. And the Commission's enforcement powers include the ability "to impose and collect . . . fines or other penalties" and the "power . . . to issue temporary and permanent injunctions." *Id.* § 12.1-13.

The Commission thus has general authority to enforce *all* of § 56-16.3's provisions. For example, if a railroad  took steps to prevent a broadband crossing within § 56-16.3's scope, or otherwise refused to comply with the statute's provisions, the Commission would be charged with investigating and taking enforcement action in response to the purported violation— even if the impacted broadband provider elected not to file a petition under § 56-16.3(H). Likewise, if a broadband provider violated any of the statute's provisions, it would fall to the Commission to remedy those violations. Again, that would be true even if the railroad did not file a petition challenging the provider's violation under§ 56-16.3(H). And if any party failed to comply with a Commission order resolving a petition under § 56-16.3(H), the Commission would be responsible for enforcing the order, presumably through fines.

This general enforcement power shows "some connection" under *Young*. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535–36 (2021) (plurality) (*Young* applied because other provisions of state law "impose[d] on the licensing-official defendants a duty to enforce" the challenged law); *cf. Mobil Oil Corp. v. Att'y Gen. of Va.*, 940 F.2d 73, 75 (4th Cir. 1991) (official who could "investigate and bring an action" to address "any violation" of certain laws was a proper defendant in a declaratory-judgment suit challenging those laws). That is, enjoining Commissioner Hudson would provide proper relief under *Young* because it would prevent the operation of the provisions AAR alleges are invalid. For example, an injunction barring the SCC from fining railroads for failing to allow broadband crossings would allow them to reject crossings the state lacks

authority to mandate. *See Verizon Md.*, 535 U.S. at 645 (a prayer "that state officials be restrained from enforcing an order in contravention of controlling federal law … clearly satisfies" *Young*).[3]

  **b.**  ***The Commission's role under § 56-16.3 is not judicial, let alone solely judicial.***

  Commissioner Hudson attempts to evade *Young* principally on the grounds that *Young* "does not apply to state courts," and that the Commission supposedly "acts as a court, and only as a court," under § 56-16.3(H). Doc. 50 at 10, 13. This argument fails for two reasons.

  *First*, whether the SCC plays a "judicial" role under subsection (H) is irrelevant. As just explained, the SCC *also* has general enforcement authority over the entire statute, which extends beyond resolving petitions under subsection (H). Commissioner Hudson does not and cannot contend that this general enforcement authority is judicial. Instead, he simply ignores it. So even accepting his view would not justify dismissal, because the SCC does *not* act "only as a court" in relation to the statute as a whole. *Cf. Schlegel v. Bebout*, 841 F.2d 937, 944 (9th Cir. 1988) (where public utilities officials "were authorized by law to inspect and regulate," and thus functioned as "regulators of a utility, investigating companies and ensuring compliance," their "actions are not quasi-judicial in nature because they are regulatory").

  *Second*, and in any event, this argument fails on its own terms. The SCC's role under subsection (H) is not judicial, but *administrative. See id.* at 3 (noting that "the Commission has 'administrative, judicial, and legislative functions'"). In response to a petition under subsection (H), the SCC does not "investigate[], declare[] and enforce[] liabilities" by applying law to fact, *see id.*

---

[3] While some cases describe *Ex Parte Young*'s required link between defendant and statute as a "special relation," *see* Doc. 48 at 9, that is a difference only in phrasing, not doctrine. *See Lytle v. Griffith*, 240 F.3d 404, 412 (4th Cir. 2001) (Wilson, J., dissenting) (explaining the "special relation" by pointing to *Young*'s "some connection" language); *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008) (similar, noting the relationship "need not be *qualitatively* special").

at 13 (citation omitted); rather, it exercises freewheeling discretion to resolve questions of compensation, design, and specification. *Cf. City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 304–05 n.4 (2013) ("Agencies make rules ('Private cattle may be grazed on public lands X, Y, and Z subject to certain conditions') and conduct adjudications ('This rancher's grazing permit is revoked for violation of the conditions') and have done so since the beginning of the Republic. These activities take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they must be exercises of—the executive Power.")

Upon a broadband provider's petition, the SCC "may, in its discretion, employ expert engineers" "to advise the Commission" in "(a) examining the location, plans, specifications, and descriptions of appliances and the methods proposed to be employed; (b) hearing any objections and considering any modifications that the railroad company desires to offer; and (c) … rejecting, approving, or modifying such plans and specifications." Va. Code  § 56-16.3(H). That is, if a railroad objects to a proposed crossing, the SCC works with technical experts and both parties to assess and potentially modify the "plans and specifications" for the project and determine the proper compensation. This is the work of an administrative agency, not a court. That this process involves "adverse parties" and "procedural rights" does not make it adjudicatory. *Contra* Doc. 50 at 14–15. What matters is that the *substance* is not judicial in nature. *See Prentis v. Atl. Coast Line*, 211 U.S. 210, 226–27 (1908) (a state cannot avoid federal injunctive relief by declaring proceedings judicial if "the character of the proceedings" is non-judicial, no matter what "hearings and investigations" are involved).

As explained, the most relevant precedent applies *Young* on similar facts. In *MCI*, the SCC arbitrated an inter-carrier dispute, *see* 1997 WL 1133714, at *2, and in *Verizon Maryland*, the Maryland agency resolved a pair of inter-carrier complaints, *see* 535 U.S. at 639–40. Either could

have been described as "adjudicatory," under Commissioner Hudson's construction, but neither this Court nor the Supreme Court had any trouble applying *Young* there.

Commissioner Hudson, by contrast, offers no on-point authority. He cites no case refusing to apply *Young* in a suit against the Commissioners in any context, and research reveals none.[4] Nor does he identify any sovereign-immunity case dealing with an analogous state entity or a similar state statute. He relies mainly on *Jackson*, where the plaintiff sought to enjoin "all state-court judges from hearing" certain "civil actions" between private parties, brought in the state's general-jurisdiction trial courts, which would "culminat[e] in injunctions and statutory damages awards." 142 S. Ct. at 530, 532. This case patently is not that case. Nor is Commissioner Hudson helped by *Courthouse News Service v. Gilmer*, which *allowed* a suit against officers "squarely within the [state] judicial branch" based on their administrative functions, emphasizing that *Young*'s bar on suits against state courts is "qualifie[d]." 48 F.4th 908, 911–12 (8th Cir. 2022).

Commissioner Hudson misleadingly cites a 1970 district court decision to declare that, "[w]hen exercising its judicial function, the Commission 'is undeniably a court' and is entitled to Eleventh Amendment protection here." *See* Doc. 50 at 11 (quoting *Va. Nat'l Bank v. Va. ex rel. SCC*, 320 F. Supp. 260, 262 (E.D. Va. 1970)). But that case was not about Eleventh Amendment immunity, and the quoted snippet is *dicta*; the court was merely discussing how much weight to give the Commission's views on a banking-law question, since it was "a party litigant." *See* 320 F. Supp. at 262, 264, 266. Anyway, the question here is *whether* the Commission exercises its

---

[4] *Croatan Books, Inc. v. Virginia* appears to be most pertinent, but that case is inapposite as the plaintiff there sued the Commission, not the Commissioners, so neither *Young* nor § 1983 applied. *See* 574 F. Supp. 880, 884 (E.D. Va. 1983).

judicial function under subsection (H), or any other part of § 56-16.3. As explained, it does not (solely or otherwise).[5]

### c.    *AAR sufficiently pleads a threat of enforcement.*

Commissioner Hudson argues lastly that *Young* does not apply because he has not threatened to enforce § 56-16.3. Doc. 50 at 15–16. But this depends on the same "judicial capacity" claim just discussed, *see id.* at 16, and thus fails for the same reasons. And if Commissioner Hudson means that *Young* only ever applies to state executive officials, *see id.*, he is mistaken, *see, e.g.*, *Gilmer*, 48 F.4th at 911–12 (state judicial officers based on administrative role).

In any event, Commissioner Hudson misunderstands *Young*'s threatened-enforcement prong. While he protests that "there is no allegation of an *ongoing or imminent* threat of enforcement," he admits in the next breath that *Young* applies "even if the threat is not yet imminent." Doc. 50 at 15 (emphasis added) (citation omitted). Indeed, "few, if any, suits are barred for failure to allege an 'ongoing violation[.]'" *Coakley v. Welch*, 877 F.2d 304, 307 n.2 (4th Cir. 1989). That is because "the issue of whether a violation is 'ongoing' [is] related to the issues of whether prospective relief is appropriate, or whether the requested relief would operate instead as an illegitimate award of retroactive damages." *Id.* And AAR's official-capacity claims are not retrospective—they concern Commissioner Hudson's future enforcement of a state law he is charged with implementing and seek no monetary relief. *See* Compl. ¶¶ 156, 159, 162.

---

[5] Looking beyond the sovereign-immunity context, Commissioner Hudson cites two cases treating the Commission as a "court" under specific federal statutes for certain purposes. *See Zayo Grp. LLC v. Norfolk S. Ry.*, No. 1:21-cv-1300, 2022 WL 3273906, at *4 (E.D. Va. Mar. 22, 2022) (removal jurisdiction), *appeal docketed*, No. 22-1837 (4th Cir. Aug. 10, 2022); *Nat'l Home Ins. Co. v. State Corp. Comm'n*, 838 F. Supp. 1104, 1106, 1114 (E.D. Va. 1993) (injunctive relief under the federal Risk Retention Act). But these cases, interpreting specific statutory language to discern Congress's intent in particular contexts, reveal nothing about the scope of *Young*'s equitable immunity exception.

Accordingly, it matters not whether Commissioner Hudson "has [addressed any petitions] under the statute" yet. *See* Doc. 50 at 16. He does not dispute that he *will* do so. *See id.* ("Commissioner Hudson will be called upon" to resolve any petitions). Nor does he disclaim his broader authority to enforce the statute. *See Meredith v. Stein*, 355 F. Supp. 3d 355, 363 (E.D.N.C. 2018) (injury was "ongoing" where "[n]one of the defendants have disclaimed the authority" to enforce the challenged law against the plaintiff). In other words, Commissioner Hudson "may or must take enforcement actions" under the statute against AAR's members. *See Jackson*, 142 S. Ct. at 535 (plurality). *Young* thus allows the claims against him.[6]

> ### 2.   *Ex Parte Young* allows the official-capacity claims against Commissioner Brich and Director Rolband.

Defendants Brich and Rolband also have "some connection with the enforcement of" the statute under *Young*, 209 U.S. at 157. As noted, that connection can be articulated in "general law." *See id.* And here, by their own admission, Defendants Brich and Rolband's general authority is essential to fully effectuating § 56-16.3.

As described in their declarations, general law charges Defendants Brich and Rolband with reviewing and issuing permits for wireline construction on and off public rights-of-way. *See* Doc. 48-1 ¶¶ 7–8, 11; Doc. 48-2 ¶¶ 3–4, 14–15. They do not contest that this includes reviewing and approving construction of railroad crossings that broadband providers will initiate under § 56-16.3. *See* Doc. 48 at 10–11 (acknowledging that broadband providers must obtain permits or approvals to construct crossings on VDOT property (the public right-of-way), require traffic-management

---

[6] Commissioner Hudson attempts to bootstrap his way into an adjudicatory role by canvassing the full panoply of background SCC authority and procedure. Doc. 50 at 11–12. But the procedural protections he highlights apply only in the event that the SCC is already acting judicially.  To beg the question is not to answer it.  His invocation of the SCC's broad background powers does, however, confirm his enforcement authority. In embracing the Commission's general authority, he "must take the bitter with the sweet." *Degen v. United States*, 517 U.S. 820, 829 (1996).

plans, involve land-disturbing activities, or require stormwater management). And they do not contest that, without these permits or approvals, crossings cannot be built. Thus, general law gives Defendants and—by virtue of their office—their agencies and John Doe subordinates a direct role as gatekeeper in virtually any attempt to invoke § 56-16.3. If Defendants and their agencies were barred from reviewing and approving these crossings, § 56-16.3 would be a dead letter in most, if not all, of its applications. They thus play a key role in implementing the statute. And for the same reasons, an injunction against them would be effective. *Contra* Doc. 48 at 11–12. It does not matter whether their permits and approvals are independently unlawful, *see id.*; what matters is whether they "assist in giving effect to the law" challenged. *See Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007); *id.* ("Defendants are not required to have a 'special connection' to the unconstitutional act or conduct.").[7]

Defendants Brich and Rolband note that their authority in relation to § 56-16.3 is no different from their authority respecting many other circumstances not implicating railway crossings. *Contra* Doc. 48 at 10–11. That contention is irrelevant. What matters is that their general duty *includes* a direct role in effectuating this law. *See Bostic v. Schaefer*, 760 F.3d 352, 371 & n.3 (4th Cir. 2014) (clerk "responsible for issuing marriage licenses" was a proper defendant in challenge to statutory same-sex marriage ban); *Goldman v. Northam*, 566 F. Supp. 3d 490, 506–07 (E.D. Va. 2021) (allowing claims under *Young* based on outdated electoral maps, even though defendants

---

[7] Defendants Brich and Rolband dismiss AAR's naming of John Doe defendants because (1) the Complaint does not identify those defendants or include allegations to support an inference that they actually exist, and (2) those defendants would not have any more authority than Defendants Brich and Rolband themselves. Doc. 48 at 12. But the Complaint's allegations specifically identify the kind of person contemplated, along with the sort of authority and/or role in the statutory scheme they are alleged to have. That suffices to allow discovery to reveal their identities. *See Paulinus Chidi Njoku v. Unknown Special Unit Staff*, No. 99-7644, 2000 U.S. App. LEXIS 15695, at *2 (4th Cir. July 7, 2000) (per curiam); *Schiff v. Kennedy*, 691 F.2d 196, 198 (4th Cir. 1982). If those people have authority like Defendants', they will be proper *Young* defendants.

neither created those maps nor regulated election timing, because they otherwise "facilitate[d] the state's elections"); *Pac. Rivers Council v. Brown*, No. 02-cv-243, 2002 WL 32356431, at *1 (D. Or. Dec. 23, 2002) (official's duty to "review and approve clearcut logging operations" as "a pre-requisite to such operations" supported claims under *Young* challenging the standards for those operations).

Defendants cite *McBurney v. Cuccinelli*, 616 F.3d 393 (4th Cir. 2010), to suggest that *Young* requires a "specific statutory duty to enforce" § 56-16.3. *See* Doc. 48 at 11. But *Young* itself says no specific duty is required, 209 U.S. at 157, and Fourth Circuit precedent reiterates that an officer's duties under general law are sufficient, *Doyle*, 1 F.4th at 255. *McBurney* merely rejected the *argument* that a specific duty existed there. *See* 616 F.3d at 399–400.

In any event, a broadband provider's first step under § 56-16.3 is to submit to the railroad plans detailing anticipated construction activities—activities subject to Defendants' regulatory authority. *See* Va. Code  § 56-16.3(C)(1). The statute thus anticipates that broadband providers will need to complete those regulated activities in order to cross the railroad, meaning they will need to seek Defendants' review and approval. In other words, the statutory text specifically recognizes Defendants' role as gatekeepers.[8]

### B.    The Court Has Jurisdiction To Enter A Declaratory Judgment.

Defendants say the preemption and takings claims in Counts I–III should be dismissed

---

[8] Also irrelevant is the fact that some crossings may not require VDOT or VDEQ approval. Doc. 48 at 12. A defendant need not participate in *every* application of an unlawful statute to be a proper *Young* defendant. *See Grabarczyk v. Stein*, No. 5:19-cv-48, 2020 WL 2441418, at *2 (E.D.N.C. May 12, 2020) (fact that district attorney could prosecute only some people subject to allegedly unlawful law "does not strip this Court of jurisdiction over him"), *vacated on other grounds,* No. 20-1647, 2020 WL 13227390 (4th Cir. Aug. 14, 2020). In any event, Defendants' own documents, obtained through FOIA, reveal that the agencies regularly review and issue permits for aerial crossings. *See* Decl. of G. Todd and accompanying exhibits.

because AAR "has not identified any separate causes of action" supporting a declaratory judgment. Doc. 48 at 12–13 (citing *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 905 (6th Cir. 2014)). But parties seeking "declaratory and injunctive relief against [a defendant] in his official capacity … do not need a statutory cause of action. They can rely on the judge-made cause of action recognized in *Ex parte Young*, which permits courts of equity to enjoin enforcement of state statutes that violate the Constitution or conflict with other federal laws." *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) (citation omitted); *accord Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 & n.27 (5th Cir. 2020) (en banc). Indeed, "the Supreme Court has told us that this equitable cause of action is 'beyond dispute.'" 969 F.3d at 496–97 (Oldham, J., concurring) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983)); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015); *Verizon Md.*, 535 U.S. at 642–43. In other words, this kind of "pre-enforcement challenge is merely a claim in equity for injunctive relief, precisely the cause of action that the Supreme Court recognized in *Ex parte Young*." *Just Puppies, Inc. v. Frosh*, 438 F. Supp. 3d 448, 498 (D. Md. 2020), *vacated on other grounds*, No. 20-1631, 2021 WL 4452349 (4th Cir. Apr. 29, 2021).[9]

Nor does it matter whether Defendants Brich and Rolband could "bring a cause of action against [AAR's] members." Doc. 48 at 13. A party seeking a declaratory judgment need only "show the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest." *See Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 125–26 (1974). Indeed, there is "no doubt that federal courts have jurisdiction" to hear

---

[9] Defendants' "reliance on *Michigan Corrections* is misplaced." *CareFirst, Inc. v. Taylor*, 235 F. Supp. 3d 724, 740 (D. Md. 2017). That case "is not the law of this circuit," and in any event, it recognizes that "private parties who act in compliance with federal law may use *Ex parte Young* as a shield against the enforcement of contrary (and thus preempted) state laws." *Id.* at 740–41 (cleaned up).

claims for declaratory and injunctive relief "on the ground that [state] regulation is pre-empted by a federal statute" or unconstitutional. *Verizon Md.*, 535 U.S. at 642.

### C.   AAR Has Standing And Its Claims Are Ripe.

Defendants question Article III standing and ripeness because no crossing or proceeding has yet arisen under § 56-16.3, and they say AAR lacks associational standing because its claims require individual member participation. Doc. 48 at 15–16; Doc. 50 at 21–23. They are mistaken.

### 1.   AAR alleges multiple injuries in fact, and its claims are ripe.

An injury-in-fact is a concrete, particularized, and imminent invasion of a legally protected interest. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). A case is unripe if the plaintiff "has not yet suffered injury and any future impact 'remains wholly speculative.'" *Wild Va. v. Council on Envtl. Quality*, 56 F.4th 281, 294 (4th Cir. 2022) (citation omitted). AAR has shown standing and ripeness.

To start, the statute *already* curtails AAR members' right to exclude others from their property. *See* Compl. ¶¶ 143, 178. Before § 56-16.3, Plaintiff's members—like any other landowner—retained the unqualified right to exclude broadband providers from entering or occupying their property. Upon enactment, that right became qualified. Broadband providers, with VDOT and VDEQ permits in hand, may physically enter and occupy railroad rights-of-way as they see fit unless the railroad convinces Commissioner Hudson, in his discretion, that the occupation works an "undue hardship" or "imminent likelihood of danger to public health or safety." *See* Va. Code § 56-16.3(H). The "right to exclude is 'one of the most treasured' rights of property ownership," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) (citation omitted), and limiting that right is "an invasion of a legally protected interest," *Spokeo*, 578 U.S. at 339. That invasion here is particularized to railroads, and it is concrete, not speculative or conjectural. *See id.* at 339–40.

Nor is that all. Loss of the right to exclude—combined with the statutory provisions setting

19

fixed license fees—has radically altered AAR members' bargaining position. Compl. ¶ 143. Before § 56-16.3, railroads' right to exclude afforded them a powerful bargaining chip in negotiations over the metes and bounds of potential occupancies. Now, that bargaining chip is no more. That is an actual injury. *See Clinton v. City of New York*, 524 U.S. 417, 432–33 & n.22 (1998) (loss of a "bargaining chip" altered market conditions and "inflicted a sufficient likelihood of economic injury to establish standing").

Finally, § 56-16.3 specifically burdens AAR's members with an additional set of costly regulatory obligations that conflict with existing federal obligations and endanger rail transportation. Before § 56-16.3, AAR's members relied on an established design review procedure to ensure that construction activity conformed to engineering and safety requirements, did not disrupt rail operations, and met federal obligations. *See* Compl. ¶¶ 85–87. Railroads would also require indemnity and insurance requirements for the life of the crossing. *See id.* ¶ 93. After enactment, AAR's members lost that procedure and authority—exposing them to new safety risks and administrative costs. *See id.* ¶¶ 68, 84–96. That increased exposure to risk and cost constitutes actual injury. *See Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1235 (10th Cir. 2004) (noting that "obligations and burdens imposed by" allegedly preempted state regulatory scheme sufficed to demonstrate injury for standing purposes).

These injuries also confirm ripeness. None is hypothetical or contingent; each derives directly from the statute, is ongoing, and will continue without intervention. And even if these or other harms depended on a future occurrence, that future is but one crossing away—and is therefore sufficiently imminent to create a justiciable controversy. The broadband industry's full-court press to enact § 56-16.3, and its breathless *amicus* briefs, amply confirm the imminence of crossing demands.

### 2.     AAR's claims do not require the participation of individual members.

Defendants say AAR lacks associational standing for its preemption and takings claims because they "require[] the participation of individual members." Doc. 48 at 16–17. Not so.

Regarding preemption, Defendants claim the analysis "requir[es] an evaluation of each individual crossing," so AAR's preemption claims "cannot be adjudicated without the participation of individual member[s]." *See id.* That is incorrect. As explained below, AAR's preemption claims challenge § 56-16.3 on its face—they go to the statute's validity, not to whether any particular crossing is appropriate. *Infra* § II.A. No individual railroad's participation is required.

Likewise, Defendants say AAR's takings claims require details about particular crossings, "including whether the value of the specific property at issue exceeds the statute's default compensation." Doc. 48 at 17; Doc. 50 at 18–20 (arguing that takings analysis requires "an actual factual setting" and "[w]hether compensation is adequate depends on the factual particularities of each taking"). But again, AAR's takings claims do not depend on the specifics of any individual crossing. First, AAR alleges that *none* of these takings is for a public use under Virginia law. That is not a question of compensation. *See infra* § II.B.1.  Second, AAR alleges that the market value or highest and best use of the relevant perpetual crossing easements generally exceeds $2,000—let alone $1,000 or $0. *See* Compl. ¶¶ 105–107.  Third, AAR alleges that § 56-16.3 does not allow just compensation in the countless instances where the property taken is worth more than these minimal fee caps, thus requiring indefinite, seriatim litigation—and justifying invalidating the entire program prospectively. *See infra* § II.B.2–3. All these points go to the validity of the statute itself, not the details of any particular crossing, so the participation of individual members is not needed.

*             *             *

Sovereign immunity does not bar the official-capacity claims (Counts I–III) under *Young*

and does not apply at all to the individual-capacity claims (Counts IV–VI); a federal court can always issue a declaratory judgment against the enforcement of preempted or unconstitutional state laws; and AAR has standing and its claims are ripe. The Court thus has jurisdiction over all claims.

## II.   THE COMPLAINT STATES CLAIMS FOR RELIEF

AAR has plausibly alleged claims for relief, so dismissal under Rule 12(b)(6) is improper.

### A.   The Complaint Plausibly Alleges ICC Termination Act Preemption.

Count I alleges preemption under the ICC Termination Act.  Compl. ¶¶ 152–156.  Congress enacted ICCTA in 1995 to establish a "[f]ederal scheme of minimal regulation for [the] intrinsically interstate" railroad industry. H.R. Rep. No. 104-311, at 96 (1995). ICCTA gives the Surface Transportation Board (STB) exclusive jurisdiction over (1) "transportation by rail carriers" and (2) "the construction, acquisition, operation, abandonment, or discontinuance of [tracks] or facilities." 49 U.S.C. § 10501(b). ICCTA's remedies "are exclusive and preempt the remedies provided under Federal or State law." *Id.* "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 283 (6th Cir. 2019) (cleaned up).

ICCTA thus preempts state laws that (1) "have the effect of 'managing' or 'governing' rail transportation," (2) "discriminate against rail carriers," or (3) "unreasonably burden rail carriage." *Norfolk S. Ry. v. City of Alexandria*, 608 F.3d 150, 157, 160 (4th Cir. 2010); *see Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 121 (4th Cir. 2020). The first prong of this test is generally called "express" or "categorical" preemption because it invalidates all regulations that intrude on the STB's exclusive jurisdiction. The other two categories invoke "implied" or "as applied" preemption because they reach state laws that do not directly regulate rail transportation but still impermissibly burden it. *See Delaware v. STB*, 859 F.3d 16, 19 (D.C. Cir. 2017). The Complaint plausibly alleges ICCTA preemption on each of these grounds.

Invoking *United States v. Salerno*, 481 U.S. 739 (1987), Defendants claim AAR must show that § 56-16.3 is invalid in *every* application. *See* Doc. 48 at 18; Doc. 57 at 12–14. That is wrong. As the Fourth Circuit recently observed, "if courts have ever articulated a clear standard for facial challenges, it is not the *Salerno* formulation." *PETA, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 834 (4th Cir. 2023) (cleaned up), *cert. denied*, No. 22-1148, 2023 WL 6797724 (U.S. Oct. 16, 2023). "*Salerno* is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge …." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022).

And even if *Salerno* governed facial *constitutional* challenges, "most courts do not invoke [*Salerno*] in the context of preemption." *AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 600–01 (D. Md. 2007). Indeed, Defendants cite no case applying *Salerno* to a facial ICCTA preemption challenge; research reveals none; and many of the cases discussed below facially invalidate state regulations without applying *Salerno*. *E.g.*, *Green Mountain R.R. v. Vermont*, 404 F.3d 638, 643–44 (2d Cir. 2005) (rejecting state's argument that a permitting statute could not be "preempted on its face unless there is 'no possible set of [permit] conditions'" that would comport with ICCTA) (citation omitted). So Defendants cannot avoid preemption by "conjur[ing] up just one hypothetical factual scenario" that "would not directly interfere" with federal law. *Lozano v. City of Hazleton*, 724 F.3d 297, 313 n.22 (3d Cir. 2013); *Club Madonna*, 42 F.4th at 1256 (similar); *contra* Doc. 48 at 20; Doc. 57 at 12–14, 16–17. But even if *Salerno* applied, § 56-16.3 would still be preempted.

### 1.    Section 56-16.3 discriminates against railroads.

Section 56-16.3 creates a curated and expedited condemnation procedure that applies exclusively—as its title says—to "[f]iber optic broadband lines crossing railroads." When a public utility wants to cross *any other* kind of property in Virginia, it must follow the Commonwealth's

generally applicable eminent-domain laws, which require a suit in circuit court. Va. Code § 25.1-201. The would-be condemnor must establish legal authority, necessity, and public use for the taking, *id.* § 25.1-206(2)(a)–(c)—under a strict definition of public use, *see* Va. Const. art. I, § 11. "No more private property may be taken than necessary to achieve the stated public use." *Id.* The landowner may demand a jury trial, with jurors who are local property owners. Va. Code §§ 25.1-213, -228. The landowner is entitled to compensation for "the value of the property to be taken," which is determined based on "everything a buyer and seller in the marketplace would reasonably consider," *id.* § 25.1-230(A), and which must include "lost profits and lost access, and damages to the residue caused by the taking," *see* Va. Const. art. I, § 11. And when the landowner also enjoys eminent-domain power (such as another public utility), the condemnor cannot even begin this process until it secures the SCC's certification that a "public necessity" or "essential public convenience" requires the taking. Va. Code § 25.1-102.

None of that is true under § 56-16.3: no circuit-court suit; no jury; no proof of public use or public necessity. A broadband company may take railroad property whenever it "deems it necessary" to do so, *id.* § 56-16.3(B), and a lack of necessity is not grounds for relief from the SCC. There are no apparent limits on the extent of the property taken. And compensation is fixed at an arbitrary amount, not only for the taking itself but also for the railroad's direct expenses. *Id.* § 56-16.3(G), (I). For some crossings, no compensation is allowed at all. *Id.* § 56-16.3(K). All of this represents power that the Commonwealth itself does not have as a condemnor.

By singling out railroads for this special scheme, § 56-16.3 discriminates against them. That is improper. To survive ICCTA preemption, state laws must have only an "incidental" impact on railroads, and must "address state concerns generally, *without targeting the railroad industry*." *Delaware*, 859 F.3d at 19 (citations omitted) (emphasis added); *see Edwards*, 983 F.3d at 121

24

(laws of "general applicability" with a "remote or incidental impact" are not preempted). There is nothing generally applicable about § 56-16.3. It specifically targets the rail industry, stripping away generally applicable eminent domain protections and imposing burdens that no other property owners face. It is therefore preempted as discriminatory. Ample case law shows as much.[10]

Defendants resist this conclusion on two grounds. *First*, they argue that ICCTA's anti-discrimination prong does not apply because § 56-16.3 "is not a 'regulation' of rail transportation." *See* Doc. 48 at 21; *id.* at 21–22. That statement represents a fundamental misunderstanding of ICCTA preemption. State laws that effectively regulate rail transportation are always preempted, whether or not they are discriminatory. *E.g.*, *Edwards*, 983 F.3d at 121. The anti-discrimination prong is a *separate* bar that applies to any state law that "touches on railway transportation." *Am. Rocky Mountaineer v. Grand Cnty.*, 568 F. Supp. 3d 1231, 1238 (D. Utah 2021); *Gordon v. New England Cent. R.R.*, No. 2:17-cv-154, 2019 WL 5084160, at *9 (D. Vt. Oct. 10, 2019). For example, local "building and electrical codes" typically do not regulate rail transportation, so they "generally are not preempted" categorically. *Bos. & Me. Corp. & Town of Ayer—Pet. for Decl. Order*, 5 S.T.B. 500, 508 (2001). But they must still be "non-discriminatory," or they will be preempted. *Id.*; *see Delaware*, 859 F.3d at 19 (states may enforce "generally applicable, non-discriminatory regulations" like "electrical, plumbing and fire codes"). Defendants cite no contrary authority.

---

[10] *See, e.g.*, *BNSF Ry. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 761, 768 (9th Cir. 2018) (state law that "impose[d] fees on shippers of hazardous materials … but only if they ship by rail" was "preempted by the ICCTA" because it "'target[ed]' the railroad industry"); *AAR v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1098 (9th Cir. 2010) (state-law emissions and reporting requirements were preempted because they applied "exclusively and directly to railroad activity"); *Vt. Ry. v. Town of Shelburne*, 287 F. Supp. 3d 493, 501 (D. Vt. 2017) (facially neutral hazmat-storage ordinance was preempted because it "target[ed] and discriminate[d] against the Railway's facility"), *aff'd*, 918 F.3d 82 (2d Cir. 2019); *State v. BNSF Ry.*, 432 P.3d 77, 84 (Kan. Ct. App. 2018) (state law governing road crossings was invalid because it "targets the railroad industry"); *BNSF Ry. v. Dep't of Transp.*, 206 P.3d 261, 264–65 (Or. Ct. App. 2009) (same: "because [the state regulation] specifically targets rail transportation, it is preempted").

*Second*, Defendants say AAR must identify "similarly situated entities" who are treated differently. Doc. 48 at 22. But neither the cases discussed above, nor Defendants' authorities, mandate such a showing.[11] It is enough that a state law targets and burdens the rail industry. In *BNSF*, for example, the Ninth Circuit held that ICCTA preempted a state law that "'target[ed]' the railroad industry" without analyzing whether similarly situated parties were treated better—even though it *did* consider that question under a separate federal law. *See* 904 F.3d at 761, 767.

In any event, AAR *does* plausibly allege disparate treatment. As Defendants emphasize, broadband lines must run all over the state, not merely across railroad tracks. *See* Doc. 48 at 1. And as the easements contemplated are most likely transverse, not longitudinal (*i.e.*, across, not along, a right-of-way), railroad property is no differently situated than any other landowner's property that must be crossed. Yet as the Complaint pleads, § 56-16.3 "does not apply to any form of public or private property that a broadband service provider might need or wish to cross other than railroad property"; "no Virginia law imposes fixed fees for broadband service crossings over roadways or other non-railroad property"; "no Virginia law imposes restrictive procedural hurdles … on non-railroad property owners seeking compensation for broadband service crossings over roadways or other non-railroad property"; and "no Virginia law subjects any other class of property

---

[11] *Adrian & Blissfield Railroad v. Village of Blissfield* identified disparate treatment of similarly situated entities as one of several ways to show discrimination. 550 F.3d 533, 541-42 (6th Cir. 2008) (cited at Doc. 48 at 22). That case also concerned sidewalks at grade crossings, which are "peculiarly within the police power of the states," *id.* at 540, with the court holding that sidewalks are not ICCTA "facilities" at all, *id.* at 541 & n.6, and the dispute concerned only who should pay for the already-completed sidewalk, *id.* at 536. Here, the crossings involve fiber optic lines tunneling under or stringing over rail lines (of no limited number), which poses significantly more risk than a grade crossing, and the dispute concerns whether, when, and how crossings can be effectuated. Section 56-16.3 takes the state's generally applicable eminent domain scheme, strips out important property protections, and applies it exclusively to railroads. Thus, while the law in *Adrian Blissfield* "did not discriminate [because it] it addressed a general state concern and imposed no special requirement on railroad[s]," *Gordon*, 2019 WL 5084160, at *9 (cleaned up), the opposite is true here.

owners to the kind of quick-take easement that § 56-16.3 contemplates, let alone with such limited grounds to resist the taking and the burden shifted to the property owner." Compl. ¶¶ 55–59.

Drawing all reasonable inferences in AAR's favor, the Complaint alleges that § 56-16.3 treats railroads less favorably than other property owners whose land broadband providers must cross, all of whom are subject to normal eminent domain law,[12] with its attendant protections. By subjecting railroads alone to an ersatz eminent-domain scheme, § 56-16.3 disfavors them. Virginia thus "fails to require of similarly situated entities" what it requires of railroads. *Id.* ¶ 56.

### 2.  Section 56-16.3 effectively manages or governs rail facilities.

In any event, ICCTA categorically preempts § 56-16.3 because it *is* a regulation that effectively manages or governs railroad facilities. *See Alexandria*, 608 F.3d at 157. And even if the anti-discrimination prong were limited to "regulations," *see* Doc. 48 at 21–22, § 56-16.3 would also be preempted for the reasons above.

To start, the statute targets rail facilities subject to the STB's exclusive jurisdiction—"the works of a railroad company, including its tracks, bridges, facilities, and all railroad company rights of way or easements." Va. Code § 56-16.3(B). This all falls within ICCTA's broad definition of "transportation," which includes any "yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail." 49 U.S.C. § 10102(9)(A). Section 56-16.3 thus targets "property that Congress specifically put out of reach" of state law. *Wis. Cent. Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1014 (W.D. Wis. 2000). Defendants do not claim otherwise.[13]

---

[12]  Strangely, the broadband lobby did not simply seek to have all of its members designated as public utilities and thus imbued with the power of eminent domain under Title 25 of the Virginia Code and subject to proper constitutional constraints.  In other words, non-railroad property owners are not even subjected to this violative form of taking by many broadband providers in the first place.

[13] While *amici* emphasize that railroads do not always own their rights-of-way through fee simple

And § 56-16.3 regulates these railroad facilities. ICCTA "regulation" includes the "act or process of controlling by rule or restriction." *Union Pac. R.R. v. Chi. Transit Auth.*, 647 F.3d 675, 679 n.2 (7th Cir. 2011); *accord Skidmore v. Norfolk S. Ry.*, No. 2:18-cv-1308, 2019 WL 1748533, at *3 (S.D.W. Va. Apr. 18, 2019), *aff'd,* 1 F.4th 206 (4th Cir. 2021); *Marshfield*, 160 F. Supp. 2d at 1014. Section 56-16.3 controls rail facilities by giving a third party a right to permanently occupy them and restricting the railroads' right to exclude. In addition to these permanent occupations, Section 56-16.3 also requires flagging and construction on railroad property on a fixed timeline and at a location selected by the broadband company, notwithstanding that these timelines may conflict with union bargaining agreements. Va. Code § 56-16.3(C)(1), (E)-(F). Section 56-16.3 thus has "the effect of 'managing' or 'governing'" these facilities—that is, it has "the effect of regulating" them. *See Skidmore*, 1 F.4th at 214, 216 (state quiet-title claims "effectively regulate rail transportation when brought against railroads"); *Soo Line R.R. v. City of Saint Paul*, 827 F. Supp. 2d 1017, 1021–22 (D. Minn. 2010) ("Because the City's proposed condemnation seeking a permanent easement would be an act seeking to control [railroad] property, it is a form of regulation."); *Marshfield*, 160 F. Supp. 2d at 1013 (same).

Defendants, however, try to shift the focus to individual crossings. *See* Doc. 48 at 19–20. As they observe, the STB and some courts have held that "routine," "nonexclusive" utility easements do not "necessarily interfer[e]" with rail operations; thus, whether ICCTA preempts such claims is "typically" evaluated on a case-by-case basis. *Id.* (citations omitted); Doc. 52-1 at 13, 15. But none of those authorities concerned a law such as § 56-16.3, aimed solely and directly at

---

title, Doc. 52-1 at 6–7, that is irrelevant—ICCTA preemption applies "regardless of ownership." 49 U.S.C. § 10102(9)(A). And even a non-fee "railroad right of way is … more than a mere right of passage"; it still has "the attributes of the fee, perpetuity and exclusive use and possession." *W. Union Tel. Co. v. Penn. R.R.*, 195 U.S. 540, 570 (1904).

railroad facilities. *See* Doc. 48 at 19. Defendants' lead authority, *New Orleans Gulf & Coast Railway v. Barrois*, addressed whether neighboring landowners could "install[] or us[e] private, at-grade railroad crossings" under "a generally applicable state property law that does not specifically apply to railroad crossings" but rather allowed any land-locked owner to cross neighboring land to access public roads. 533 F.3d 321, 325, 335 (5th Cir. 2008). So too *Franks Investment Co. v. Union Pacific Railroad*, which addressed "a state law possessory action filed by a landowner to preserve a long-existing [grade] crossing," governed by "Louisiana property laws … that have nothing to do with railroad crossings." 593 F.3d 404, 406, 411 (5th Cir. 2010) (en banc).[14] At most, these cases reflect the principle that ICCTA usually does not expressly preempt laws of "general applicability" with a merely "remote or incidental impact" on railroads. *See Edwards*, 983 F.3d at 121.

But § 56-16.3 is not generally applicable, and its impact on railroads is neither incidental nor remote. Because this law directly controls the circumstances under which third parties may access and occupy railroad facilities covered by ICCTA, it is a preempted "regulation." In turn, it does not matter whether any individual crossing under § 56-16.3 will necessarily impede rail transportation. *Contra* Doc. 19 at 20. This novel, railroad-specific regime *itself* regulates rail facilities within the ICCTA's scope, so the statute is expressly preempted.

In any event, Defendants' Fifth Circuit citations do not reflect the Fourth Circuit's approach to express ICCTA preemption. While the Fifth Circuit has (inconsistently) suggested that claims under generally applicable state law are *never* expressly preempted,[15] the Fourth Circuit

---

[14] Defendants' cited STB decisions similarly involved individual condemnations under generally applicable state law. *See E. Ala. Ry. LLC—Pet. for Decl. Order*, No. FD 35583, 2012 WL 758259, at *1 (S.T.B. served Mar. 9, 2012); *Maumee & W. R.R.—Pet. for Decl. Order*, No. 34354, 2004 WL 395835, at *1 (S.T.B. served Mar. 3, 2004).

[15] *See Franks*, 593 F.3d at 411 ("tort suit" about blocked crossings is expressly preempted, but

has been unequivocal: State law is "expressly preempted" whenever it "attempts to 'regulate' railroading." *See Edwards*, 983 F.3d at 122 (holding tort claims preempted). That includes claims under state property law, which can "effectively regulate rail transportation." *Skidmore*, 1 F.4th at 214. ICCTA thus "preempts any 'application of state law … that would take rail property for another, conflicting use,'" *i.e.*, "that would interfere with rail use, *present or future*." *Id.* (quoting *14500 Ltd. LLC—Pet. for Decl. Order*, No. FD 35788, 2014 WL 2608812, at *4 (S.T.B. served June 5, 2014)). This is categorical, express preemption. *See id.*; *14500*, 2014 WL 2608812, at *4.

And § 56-16.3 guarantees future conflicts between rail operations and broadband installations. ICCTA preempts state law easements that will "unduly interfere with property that is, *or may later be*, needed for railroad purposes." *See Jie Ao & Xin Zhou—Pet. for Decl. Order*, No. FD 35539, 2012 WL 2047726, at *7 (S.T.B. served June 6, 2012) (emphasis added). AAR's members typically preserve their future rights and interests by drafting easements that allow them to relocate an installation, temporarily or permanently, if required for future rail operations. *Cf.* Compl. ¶ 71. Section 56-16.3, however, sweeps that aside. It allows objections based solely on "undue hardship" or an "imminent likelihood of danger to public health or safety," Va. Code  § 56-16.3(H); it does not require the SCC to provide any specific relief based on these showings, *see id.*; and it makes no provision for the future removal or relocation of broadband installations that come in conflict with future rail operations.

But as the STB and the Fourth Circuit recognize, even if an easement has "little actual, practical effect on current plans for active railroad operations, circumstances can change." *Ao–Zhou*, 2012 WL 2047726, at *7. That an easement would "interfere with potential [rail operations]

---

"property action" about closing crossings is not); *compare Guild v. Kan. City S. Ry.*, 541 F. App'x 362, 367 (5th Cir. 2013) (per curiam), *with Ezell v. Kan. City S. Ry.*, 866 F.3d 294, 299–300 (5th Cir. 2017).

in the future," *id.* at *6, "is enough to hold that [it] constitute[s] an attempt to govern or manage rail transportation," *Skidmore*, 1 F.4th at 214. That is true even if the railroad has "no immediate plans" that would conflict with the installation. *See id.* Yet § 56-16.3 creates permanent, exclusive easements without regard to future rail operations or uses.

The statute's instruction that crossings should "not … impair, impede, or obstruct" railroad operations, Va. Code  § 56-16.3(D), does nothing to address *future* conflicts—especially unforeseeable ones. *Contra* Doc. 48 at 20. The same is true for the "undue hardship" standard, *see id.*; however the SCC interprets this language, a railroad cannot prove "hardship" based on facts that have not yet arisen. And by failing to cabin the "relief" the SCC may provide, § 56-16.3 allows the SCC to fashion a monetary remedy for an unduly burdensome crossing. But "compensation is not relevant to whether [a] proposed condemnation [for a crossing] is preempted" by ICCTA. *E. Ala. Ry.*, 2012 WL 758259, at *5 n.27. Thus, even if this case were governed by the precedent addressing individual property claims under generally applicable state law, *but see supra* p. 29, express preemption would apply.

### 3.      Section 56-16.3 would unreasonably burden rail transportation.

Section 56-16.3 separately contravenes ICCTA because it "would have the effect of unreasonably burdening or interfering with rail transportation." *Delaware*, 859 F.3d at 19; *see Edwards*, 983 F.3d at 121. The statute mandates a process too rushed and cursory to ensure that broadband crossings are properly engineered, safely installed, and adequately maintained. Thus, in the aggregate, the crossings it authorizes will create an unreasonable burden.

Defendants again insist these issues must be addressed on a crossing-by-crossing basis. Doc. 48 at 20. To the contrary, the STB's unreasonable-burden test considers not only a specific claim or intrusion, but also the effect of similar activities on "rail transportation operations throughout the national rail network." *City of Cayce v. Norfolk S. Ry.*, 706 S.E.2d 6, 11–12 (S.C.

2011); *cf. CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673 (D.C. Cir. 2005) (per curiam) (assessing whether a state law unreasonably burdens interstate commerce requires a court "to consider the practical and cumulative impact were other States to enact [similar] legislation"). The STB, for example, ruled that tort claims alleging that a railroad's embankment design caused flooding "would unduly burden interstate commerce," not because the particular claims would adversely affect rail operations, but because allowing *this kind of claim* would "interfer[e] with the railroad's ability to uniformly design, construct, maintain, and repair its railroad line[s]" across the country. *Thomas Tubbs—Pet. for Decl. Order*, No. FD 35792, 2014 WL 5508153, at *5 (S.T.B. served Oct. 31, 2014).

Likewise here, considering § 56-16.3's *cumulative* effect on the rail network is proper. And the Complaint plausibly alleges that § 56-16.3 will, in the aggregate, unreasonably burden rail transportation. Poorly planned or executed crossings can interfere with rail operations, threaten the integrity of rail infrastructure, and create safety hazards. Low-hanging, unauthorized wires have caused accidents, delays, and operational shutdowns. Improperly designed and installed underground installations have caused sink holes beneath railroad tracks and roads and have damaged railroad signal facilities and existing utility installations. Compl. ¶ 29. Accordingly, railroads have carefully developed engineering standards, safety policies, and permitting requirements. *Id.* ¶¶ 84–85. And railroads must arrange flagging, inspectors, and other forms of line control to ensure the proper and safe installation of wire crossings consistent with approved plans. *Id.* ¶ 86.

To cut through these perceived inconveniences, § 56-16.3 does not require broadband providers to comply with a railroad's engineering and safety policies. In fact, it incentivizes the opposite, by forcing the railroads to bear all costs in excess of $5,000, no matter how poorly drafted the application or complex the project. *See id.* ¶ 91. And the statute's aggressively compressed

timeframes pretermit necessary pre-approval and pre-construction activities. *See id.* ¶ 87. The statute's strictures also apply regardless of the location, nature, or characteristics of the railroad "works" to be crossed. For example, § 56-16.3's expedited deadlines and strict cost caps would apply equally to crossing a 6-foot-wide single-track right-of-way as to crossing NSR's 3,600 foot-wide, 212-track terminal in Norfolk. *See id.* ¶ 66.

In short, the statutory process itself is inadequate. Thus, the Complaint plausibly alleges that § 56-16.3 will cumulatively impose an unreasonable burden on rail transportation. *See Green Mountain*, 404 F.3d at 643–44 ("what is preempted … is the permitting process itself, not the length or outcome of that process in particular cases").[16]

\* \* \*

The Complaint plausibly alleges that § 56-16.3 is preempted by the ICCTA because it discriminates against, regulates, and unduly burdens railroad transportation.

**B.    AAR Has Stated A Claim For Injunctive Relief Against The Uncompensated Taking Of Its Members' Property In Violation Of The Fifth And Fourteenth Amendments.**

"[A] permanent physical occupation authorized by government is a taking," *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982), and § 56-16.3 authorizes broadband providers to permanently occupy railroad property. AAR thus alleges that these takings are unconstitutional because they are not for public use (Count III) and the statutory fees are too low to allow just compensation (Count II). Compl. ¶¶ 157–162. Defendants rejoin that broadband expansion is

---

[16] *Amici* cite *In re Qwest Corp.*, holding that the ICCTA did not "per se" preempt a similar Minnesota law. 918 N.W.2d 578, 585–86 (Minn. App. 2018) (cited at Doc. 52-1 at 5). But *Qwest* relied on precedents dealing with generally applicable state property laws; did not consider whether the law at issue discriminated against railroads; and did not apply the "managing or governing" test required by Fourth Circuit precedent. *See id.* The railroad there also made no factual showing of an unreasonable burden. *See id.* at 586. *Qwest* thus lacks persuasive force.

a public use, and railroads will ultimately be able to secure just compensation through a combination of the statute's default fees and the SCC's ability to resolve compensation disputes. Doc. 48 at 22–26. But (1) Virginia's own legislature says these takings are *not* for a public use; (2) the Takings Clause is violated the moment an undercompensated or uncompensated taking occurs, whether or not additional compensation is available later; and (3) under settled equitable principles, countless after-the-fact SCC petitions are not adequate relief for these violations.

### 1.      Broadband expansion is not a "public use."

Private property may be taken only "for public use." U.S. Const. amend. V; Va. Const. art. I, § 11. And the Virginia General Assembly has declared that broadband expansion is not a "public use" for eminent-domain purposes. Virginia Code § 55.1-306.1 provides that it is "in the public interest" to use existing utility easements "to provide or expand broadband or other communications services"— but "[n]othing in this section shall be deemed to make the use of an easement for broadband … a public use for the purposes of § 1-219.1, or other applicable law." Va. Code § 55.1-306.1(B)(2), (6). Section 1.219.1, in turn, imposes "[l]imitations on eminent domain" consistent with the Virginia Constitution, and defines "[t]he term 'public uses' mentioned in Article I, Section 11 of the Constitution of Virginia … to embrace *only* the acquisition of property" for six specified purposes, none of which applies here. *Id.* § 1-219.1(A) (emphasis added). That section also provides that "[t]he provisions of this section shall control to the extent there are any inconsistencies between this section and any other general or special law." *Id.* § 1-219.1(H).

Ignoring § 1-219.1's definition of "public use," Defendants Brich and Rolband oddly invoke cases applying other states' public-use standards. Doc. 48 at 23–24; *see also* Doc. 57 at 19 ("even the most die-hard anti-takings crank would have to acknowledge that such a crossing was for a public use"). But Virginia has chosen to define public use narrowly, and "when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive." Doc. 48 at 24

(quoting *Berman v. Parker*, 348 U.S. 26, 32 (1954)); *cf. Kelo v. City of New London*, 545 U.S. 469, 483 (2005). Because § 56-16.3 takings are not for public use, Count III states a claim for relief.

### 2.  The statutory license fees do not provide just compensation.

A taking requires just compensation, U.S. Const. amend. V; Va. Const. art. I, § 11, meaning fair market value—"'what a willing buyer would pay in cash to a willing seller' at the time of the taking." *United States v. 564.54 Acres of Land*, 441 U.S. 506, 511 (1979) (citation omitted). Section 56-16.3, however, mandates a fixed $2,000 license fee for some crossings, reduced to $1,000 for crossings of "legally abandoned" track, and no fee at all for crossings in a public right-of-way. Va. Code § 56-16.3(G), (I), (K). It also caps the railroad's "direct expenses" at $5,000, regardless of the actual costs. *Id.* § 56-16.3(G). Railroads may petition the SCC for reimbursement of expenses in excess of $5,000, or for a fee in excess of $2,000 for some crossings, but never for crossings of legally abandoned track or in a public right-of-way. *Id.*

These fees are badly deficient. Once a broadband provider obtains a § 56-16.3 easement, it seemingly enjoys a *permanent* physical occupation of the railroad's property for a small, one-time payment. The Complaint alleges—so it must be taken as true—that the fair market value of such a perpetual entitlement is almost always more than $2,000. Compl. ¶¶ 105–107. Indeed, the railroads' license fees for *fixed-term* leases are nearly always higher than the statutory fees for a *permanent* occupation. And the railroads' direct expenses routinely exceed $5,000.[17]

Because the § 56-16.3 fees are too low to provide just compensation in almost every case, and because "a property owner has a claim for a violation of the Takings Clause as soon as a

---

[17] Defendants repeatedly mischaracterize § 56-16.3 easements as "nonexclusive," a term not used in § 56-16.3. No other equipment can occupy the same physical space as the broadband provider's fiberoptic cable, or the poles, junction boxes, conduits, or other equipment necessary for a crossing—*only* the broadband equipment can do so. Regardless, the complaint's allegations that the fee caps are lower than fair market value must be taken as true.

government takes [its] property … without paying [just compensation] for it," *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2170 (2019), Count II states a claim for Takings Clause violations.

### 3. Enjoining § 56-16.3 is proper because countless after-the-fact compensation actions are not an adequate legal remedy.

Because the statutory fees do not provide just compensation, the only question is what remedy is required for these Takings Clause violations. Defendants observe that, under *Knick*, "even where a plaintiff has a Takings Clause claim"—as AAR does—"equitable relief is generally unavailable so long as the property owner has some way to obtain compensation after the fact." Doc. 48 at 22 (cleaned up). Since a railroad may "petition the SCC 'for additional reimbursement'" for any crossing, Defendants say, enjoining the statute is improper. *Id.* at 22–23.

Defendants misunderstand the law. "*Knick* does not hold that *every* state's compensation remedy is adequate in a particular situation"; rather, "equitable relief is generally unavailable to property owners who have suffered a taking as long as an *adequate* provision for obtaining just compensation exists." *PhRMA v. Williams*, 64 F.4th 932, 941 (8th Cir. 2023) (cleaned up). That is because *Knick* merely applied the ancient equitable principle that injunctions are not available *if* the plaintiff has "an adequate remedy at law." 139 S. Ct. at 2176. And an "adequate" legal remedy "must be as complete, practical and efficient as that which equity could afford." *PhRMA*, 64 F.4th at 942. Thus, if "effective legal relief can be secured only by a multiplicity of actions"—for example, if the "plaintiff would be required to pursue damages each time plaintiff was injured"—then "equitable relief will be deemed appropriate." *Id.* (quoting 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2944 (3d ed. 2013)). In *PhRMA*, for example, a state law required manufacturers to periodically and indefinitely provide free insulin. The court held that "[a]n inverse condemnation action to reimburse a manufacturer for each discrete alleged taking is incapable of compensating the manufacturers for the repetitive, future takings that will occur …. By contrast,

36

equitable relief would protect manufacturers from those future harms." *Id.* at 945.

So too here. Given the minimal statutory fees, railroads will have to petition the SCC for additional compensation for almost every crossing—and there will be many. In Virginia, "it is hard to travel any significant distance without crossing one or more railroad rights-of-way." Doc. 57, at 4. Thus, the "[d]eployment of broadband to currently unserved areas necessarily entails hundreds of [railroad] crossings." *Id.* In turn, securing just compensation under § 56-16.3 will require hundreds of individual SCC petitions. And "[f]orcing a party to engage in repetitive lawsuits indefinitely" makes "equitable relief an available and preferred method of redress." *PhRMA*, 64 F.4th at 942. Equitable relief is thus warranted for Count II. *See* Compl. ¶¶ 126–134.

*     *     *

Counts III states a claim that § 56-16.3 violates the Takings Clause in every instance because none of these takings is for a public use.  Independently, Count II states a Takings Clause claim because the statutory fees are almost always too low to provide just compensation, and the availability of later compensation does not avoid a Takings Clause violation.  And equitable relief is proper to remedy these violations because forcing railroads to file countless SCC petitions for additional, after-the-fact compensation is not an adequate legal remedy.

### C.   The Complaint Properly Pleads A § 1983 Claim For Deprivation Of State Property Rights Without Due Process.

Count IV asserts a claim under 42 U.S.C. § 1983 against each Defendant in his individual capacity. *See* Compl. ¶¶ 10–12. It alleges that Defendants have deprived AAR's members of protected property interests without due process, violating the Fourteenth Amendment. *Id.* ¶¶ 163–172. This claim requires a "constitutionally cognizable … property interest," a deprivation of that interest by state action, and "that the procedures employed were constitutionally inadequate." *Doe v. Va. Polytechnic Inst.*, 77 F.4th 231, 236 (4th Cir. 2023). Defendants assert that (1) AAR "has

37

not identified a property interest"; (2) "Virginia law provides sufficient process"; and (3) relief under § 1983 is not available from Defendants in their individual capacities. Doc. 48 at 26, 7 n.6; Doc. 50 at 24–25. Each claim is mistaken.

> **1.** **AAR plausibly alleges a constitutionally protected property right in the performance of the implied contract created by the Virginia Constitution's takings provision.**

The existence of "a constitutionally protected property right is a question of state law." *Garraghty v. Va. Dep't of Corr.*, 52 F.3d 1274, 1279 (4th Cir. 1995). Virginia law recognizes that "the right to performance of a contract" is a judicially cognizable property right. *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 320 (Va. 2014) (citations omitted). This right includes "the right to performance of a contract and to reap profits and benefits not only from the contract but also from expected future contracts or otherwise advantageous business relationships." *Id.* at 321. Therefore, if Article I, Section 11 of the Virginia Constitution is a contract enforceable by private property owners, then AAR's members have a property interest not only in the ongoing performance of that contract, but also in expected future contracts with broadband service providers seeking to cross railroad rights-of-way. *See* Compl. ¶¶ 42, 104, 169, 178, 181, 185; *contra* Doc. 50 at 26–27. And Section 11 is such a contract.

For more than a century, the Virginia Supreme Court has held that the Virginia Constitution's takings protections form an "implied contract" between the Commonwealth and its property owners. *Nelson Cnty. v. Coleman*, 101 S.E. 413, 414 (Va. 1919). Implied contracts do not require "an express agreement" between the parties. *Hendrickson v. Meredith*, 170 S.E. 602, 605 (Va. 1933); *contra* Doc. 48 at 26 (claiming a contract always requires express offer and acceptance); Doc. 50 at 26 (claiming a Commonwealth agent must agree to contract). Rather, under Section 11, the sovereign assumes the legal duty to "pass no law whereby private property … shall be damaged

or taken except for public use." Va. Const. art. I, § 11. And if a proper public use exists, the government promises not to take property without "just compensation." *Id.* The property owner consents to transfer property rights in exchange for just compensation and the guarantee that the property will be put to public use. Thus, a property owner whose property is "taken or damaged for public use has a right … to sue upon an implied contract" established by Section 11. *Burns v. Bd. of Supervisors of Fairfax Cnty.*, 238 S.E.2d 823, 825 (Va. 1977); *see Kitchen v. City of Newport News*, 657 S.E.2d 132, 140 (Va. 2008) (collecting cases). As a result, Virginia property owners, including AAR's members, have constitutionally protected property interests in the performance of the contract implied in Section 11 and the attendant right to benefit from that contract by entering into advantageous business relationships.

Defendants offer two responses. *First*, they deny that state constitutions form contracts. Doc. 48 at 26–27; Doc. 50 at 26–27. Perhaps not elsewhere, but the Virginia Supreme Court has been quite clear on this point. *Second*, they dismiss the Virginia Supreme Court's use of the term "implied contract" as merely a "characterization" of a landowner's right to bring an inverse condemnation claim. Doc. 48 at 27 (quoting *AGCS Marine Ins. Co. v. Arlington Cnty.*, 800 S.E.2d 159, 163–64 (Va. 2017)). But an action for "inverse condemnation," or any other breach of Section 11, "is *based on* an implied contract." *Richmeade, L.P. v. City of Richmond*, 594 S.E.2d 606, 608 (Va. 2004) (emphasis added); *see AGCS Marine Ins.*, 800 S.E.2d at 163 (taking private property "bestow[s] on the owner a right to 'sue upon an *implied* contract'") (citation omitted). And the Virginia Supreme Court treats this implied contract the same as any other contract in key ways.

Article I, Section 11 "is self-executing and permits the landowner to enforce its constitutional right to compensation in a common law action based upon implied contract." *Richmond, Fredericksburg & Potomac R.R. v. MWAA*, 468 S.E.2d 90, 96 (Va. 1996); *see Nelson Cnty.*, 101

S.E. at 414 (permitting a suit "upon an implied contract"). In other words, like any other contract, the implied contract is "effective immediately without the need of any type of implementing action," *Self-executing*, Black's Law Dictionary (11th ed. 2019), because "it supplies a sufficient rule by means of which the right given may be employed and protected, or the duty imposed may be enforced," *Gray v. Va. Sec'y of Transp.*, 662 S.E.2d 66, 72 (Va. 2008). A landowner's claim for breach of the implied contract is subject to the same statute of limitations that governs any other Virginia contract. *See Prendergast v. N. Va. Reg'l Park Auth.*, 313 S.E.2d 399, 402 (Va. 1984). And "the object of" an action for breach of the implied contract "is not injury to property" but the "injury suffered by [the property owner] because the [government] breached its implied contract." *Richmeade*, 594 S.E.2d at 609. In short,  this contract is valid and enforceable and gives rise to a protected property interest under state law.

### 2.     AAR plausibly alleges a deprivation of its property rights and constitutionally inadequate procedures to safeguard those rights.

AAR also adequately alleges that its members suffered a deprivation of their contractual property interests. As already explained, § 56-16.3 deprives AAR's members of their right to "just compensation," which the contract guarantees will be "no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking." Va. Const. art. I, § 11; *see* Va. Code  § 25.1-100 (defining "lost access" and "lost profits"); *see supra* § II.B.2. The contract also includes the Commonwealth's promise not to take private property "except for public use." *See* Va. Const. art. I, § 11. While Defendants say promoting "the rapid deployment of broadband" is "clearly a 'conceivable public purpose.'" Doc. 48 at 25, Virginia's legislature says otherwise, as explained above. *Supra* § II.B.1. And even if broadband deployment were generally a public use, § 56-16.3 still breaches the implied contract by dispensing with the condemnor's burden to *prove* public use. *See* Compl. ¶¶ 40, 168. Public use must be established for each taking,

but the statute allows a broadband provider to take railroad property simply whenever it "deems it necessary." *Id.* ¶¶ 43.

The statutory regime thus breaches each of the contractual promises secured by Article I, § 11, independent of any specific taking that might occur in the future. In approving construction under § 56-16.3 and supervising the regime it creates without requiring a showing of public use (without presumption) or a guarantee of just compensation, Defendants threaten to deprive AAR's members of a property interest secured by the Virginia Constitution. AAR thus alleges a deprivation of its members' property interest in performance of the implied contract. *Contra* Doc. 48 at 27; Doc. 50 at 27.

In turn, AAR's members are entitled to constitutionally adequate procedures. *Va. Polytechnic*, 77 F.4th at 236. Defendants say § 56-16.3's procedures are adequate because AAR's members receive notice of each crossing and an opportunity to obtain just compensation in an SCC proceeding. Doc. 48 at 28; Doc. 50 at 27. But this misunderstands the property right being deprived. As noted, Virginia recognizes the right to performance of a contract as property. *See Dunlap*, 754 S.E.2d at 320. The protection afforded to parties for intentional interference with the right to performance under a contract is a suit for tortious interference with contract or business expectancy. *See id.* at 321. Nothing in § 56-16.3 affords AAR's members the right to sue for tortious interference in a proceeding before the SCC. Therefore, the statute deprives AAR members of their procedural protections entirely.

### 3.   AAR properly sued each Defendant in his personal capacity.

AAR's § 1983 claim seeks a declaratory judgment, nominal damages, and attorney fees from Defendants in their personal capacities. Compl. ¶¶ 10–12, 172. Defendants respond that (1) individual-capacity § 1983 claims cannot seek injunctive or declaratory relief, only damages, and (2) AAR fails to allege their personal involvement in the property deprivation. Doc. 48 at 7 n.6;

Doc. 50 at 24–25. Neither position is correct.

*First*, declaratory and injunctive relief are plainly available in individual-capacity § 1983 cases. The statute itself makes this clear: "*Every person* who [violates a federal right] … shall be liable to the party injured in an action at law, [or] *suit in equity*." 42 U.S.C. § 1983 (emphasis added). "[S]tate officials sued in their individual capacities are 'persons' for purposes of § 1983," *Hafer v. Melo*, 502 U.S. 21, 23 (1991), so "[e]very" such defendant is subject to a "suit in equity"— meaning a suit for equitable relief. And "injunctive and declaratory judgment remedies are equitable in nature." *South Carolina v. United States*, 907 F.3d 742, 761 (4th Cir. 2018) (cleaned up).

Many cases thus hold that state officials may be sued "under section 1983 in their individual capacities for both prospective and retrospective relief." *Huminski v. Corsones*, 396 F.3d 53, 70 (2d Cir. 2005). "Injunctive relief is available against state officials in their individual capacities under section 1983." *Coeur D'Alene Tribe of Idaho v. Idaho*, 42 F.3d 1244, 1255 (9th Cir. 1994), *rev'd in part on other grounds*, 521 U.S. 261 (1997). Likewise, "declaratory relief" is available "against [a defendant] in his individual capacity under Section 1983." *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009), *abrogated on other grounds by Bey v. Haines*, 802 F. App'x 194 (7th Cir. 2020); *see also Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1569, 1571 n.9 (10th Cir. 1995) (rejecting argument that § 1983 prohibits individual capacity suits against officials executing statutory duties, and noting that "state officials can be sued in their individual capacities … for injunctive and declaratory relief.").

The Supreme Court and the Fourth Circuit have both applied this rule (though without stating it in so many words). *Pearson v. Callahan* made clear that qualified immunity is "not available" in "§ 1983 cases against individuals where injunctive relief is sought instead of or in addition to damages"—which would make no sense if such relief were never available in the first place.

555 U.S. 223, 242–43 (2009). Likewise, the Fourth Circuit has ordered a district court to "enter a declaratory judgment" in an individual-capacity suit "under § 1983." *Pope v. Chew*, 521 F.2d 400, 406 & n.8 (4th Cir. 1975). A "declaratory judgment is always appropriate as a predicate to an award of damages," and while the plaintiff could not actually recover damages because of the defendants' personal immunity, that fact did "not … affect the availability of the declaratory judgment." *Id.* at 406 n.8; *accord Hamlin v. Warren*, 664 F.2d 29, 31 (4th Cir. 1981); *see also Lefemine v. Wideman*, 672 F.3d 292, 303–04 (4th Cir.) (affirming declaratory and injunctive relief under § 1983 against defendants in both "official [and] individual capacities"), *vacated on other grounds*, 568 U.S. 1 (2012).

Defendants misread *Kirby v. City of Elizabeth City*, 388 F.3d 440 (4th Cir. 2004) (cited at Doc. 48 at 7 n.6). Declaratory relief was unavailable there for lack of standing, and the specific injunctive relief the plaintiff sought (record expungement or reinstatement) "could only be awarded against the [defendants] in their official capacities." *Id.* at 452 n.10. Defendants' out-of-circuit cases, from the Seventh and Tenth Circuits, are simply wrong. For one thing, both courts had previously recognized that prospective relief *is* available in such cases. *Nelson*, 570 F.3d at 882; *Clajon*, 70 F.3d at 1571 n.9. For another, Defendants' lead authority is a single sentence of *dicta* in a footnote noting the limited scope of a *pro se* plaintiff's claims. *See Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011). *Brown*'s sole support for the notion that § 1983 plaintiffs "may sue individual-capacity defendants only for money damages" was an unexplained citation to *Hafer*—which says no such thing. *See* 502 U.S. at 30. And again, if damages can always be sought from individual § 1983 defendants (as everyone agrees, Doc. 48 at 7 n.6), and a declaratory judgment is always an appropriate predicate for a potential damages award (as the Fourth Circuit

holds), then declaratory relief is always available.[18]

*Second*, AAR has plausibly alleged that each Defendant "acted personally in the deprivation of the plaintiff's [member's] rights." *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (citation omitted). Commissioner Brich is personally involved in this deprivation, at a minimum with respect to crossings at public rights-of-way. He runs VDOT, which includes issuing permits for work impacting public roadways, which broadband service providers must secure before commencing crossing installations. Compl. ¶ 12. "[U]nder Defendant Brich's leadership, [VDOT] reviews and approves land use permit ("LUP") applications from broadband companies that lay broadband fiber cables and seek to cross railroads" as well as "traffic management plans associated with broadband crossings of railroads within public rights of way." *Id.* ¶¶ 136, 139. And the LUP applications and permits include "engineering design plans" and "other pertinent plans deemed necessary and prepared by a registered professional engineer" as required by § 56-16.3(C)(1)(ii). *Id.* ¶ 138. Moreover, Director Brich acknowledges that VDOT will continue to receive applications from and issue permits to broadband service for crossings "irrespective of whether that work involves a railroad." Doc. 48-1 ¶ 13. Director Brich is personally involved in, approves of, and oversees the implementation of the LUP process required by Virginia law.

Director Rolband is similarly personally involved. He oversees DEQ's review and approval of "erosion and sediment control plans for railroad crossings, including in public rights of way." Compl. ¶ 141. This review and approval process occurs pursuant to regulations Director Rolband administers, and these regulations apply to "construction involving land-disturbing activities, such

---

[18] For its part, the Seventh Circuit case misread *dicta* about the scope of Fair Labor Standards Act relief in a case that does not even mention § 1983. *See Greenawalt v. Ind. Dep't of Corr.*, 397 F.3d 587, 589 (7th Cir. 2005) (citing *Luder v. Endicott*, 253 F.3d 1020, 1021, 1024–25 (7th Cir. 2001)); Doc. 50 at 24. And *Muhammad v. Jarrett* relied solely on these out-of-circuit cases. *See* No. 1:19-cv-746, 2020 WL 7647635, at *5 (E.D. Va. Dec. 23, 2020).

as excavation, and stormwater management, including dewatering—both of which are specifically contemplated in Virginia Code § 56-16.3(C)(1)(ii)." *Id.* ¶ 11. DEQ approves and oversees authorities to operate a Virginia Erosion and Sediment Control Program (VESCP), which is the means by which DEQ implements regulations concerning (among other things) the installation of underground utility lines. *Id.* Director Rolband explains that the "broadband and telecommunications industry" has been "grant[ed] … VESCP authority status." Doc. 48-2 ¶ 15. These VESCP entities, including *amicus* VCTA, "certify compliance with minimum requirements … for land-disturbing activities conducted by … well-known broadband companies" "regardless of whether they involve a railroad crossing." *Id.* ¶¶ 18–19. Director Rolband acknowledges that DEQ will continue to review and issue these and other permits, both directly and through VESCP authorities, to broadband service providers seeking to cross railroad property. *See*, *e.g.*, *id.* ¶¶ 19–20.

Director Rolband and Commissioner Brich are personally involved in providing regulatory approvals necessary for broadband service providers to construct and install fiber crossings of railroad property under § 56-16.3. Compl. ¶ 142. "Without these approvals," which Commissioner Brich and Director Rolband "knowingly, intentionally, and openly" provide, AAR's members would not be deprived of their property interest in performance of the implied contract under Article I, Section 11 and related business expectancy interests. *Id.* ¶¶ 142, 176.

Commissioner Hudson, as the SCC's sole member, is charged with enforcing and administering the statutory regime that deprives AAR's members' of their rights. Compl. ¶ 10; *supra* § I.A.1.a. By "assuming the administrative role contemplated" in the statute, Commissioner Hudson is "giv[ing] practical effect to the statute's terms." *Id.* ¶ 169. The statute disregards the public use, burden, and just compensation requirements of Article I, Section 11, and it eliminates AAR members' expected ability to enter into business relationships with broadband service providers

for fiber crossings. Therefore, Commissioner Hudson's administration of this statutory regime satisfies the requisite personal involvement in the deprivation of AAR's members' property right in performance of the contract. *Id.*

**D.     AAR Properly Alleges Its Tortious Interference Claims.**

Defendants contend that Count V—tortious interference with existing contract—fails to state a claim because (1) the Virginia Constitution does not give rise to a contract, and (2) under *Fox v. Deese*, 362 S.E.2d 699 (Va. 1987), Defendants acted within their scope of employment and are thus inseparable from the Commonwealth, which cannot interfere with its own contract. Doc. 48 at 29. But as already explained, Article I, Section 11 does give rise to an enforceable contract. *See supra* § II.C.1.

And *Fox* does not apply. AAR alleges that Defendants' actions in bringing about a breach of contract violate the Virginia Constitution. That means those actions are *ultra vires*, and thus unattributable to the Commonwealth. An unconstitutional act is "beyond the officer's powers and is, therefore, not the conduct of the sovereign," *Larson v. Domestic & Foreign Com. Corp.,* 337 U.S. 682, 689–90 (1949), a principle that applies equally in Virginia, *see Howell v. McAuliffe*, 788 S.E.2d 706, 724 (Va. 2016) (declaring executive orders to be "an ultra vires assertion of the suspending power" that was "forbidden" by the Virginia Constitution, and noting that "no election official in the Commonwealth ha[d] the discretion to enforce them"); *Jackson v. Va. Dep't of Soc. Servs.*, 10 Va. Cir. 294 (1987) (adopting and applying *Larson*'s reasoning to Virginia statutory violation). *Fox* turned on whether actions the Commonwealth *could* authorize were in fact taken within the ambit of its agency relationship with the officials sued. 362 S.E.2d at 708. Defendants here cannot claim to be agents of the Commonwealth in respect of actions that the Commonwealth is incapable of authorizing. But even if *Fox* did apply, this issue could not be resolved at the pleading stage. *Fox* itself noted that the scope-of-employment inquiry is a question of fact, requiring

46

evidentiary development (for instance, of motive and knowledge). *Id.*.[19]

Defendants also contend that AAR cannot support Count VI—tortious interference with contract expectancy, prospective business relationship, or prospective economic advantage—because it fails to allege improper means. Doc. 48 at 29. That is incorrect. "Improper means" embraces "means that are illegal," *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987), and as the Complaint alleges, Defendants' actions were unlawful under federal and state law. Defendant Hudson also appears to suggest that his interference with AAR's members' expectancies was incidental, rather than intentional. Doc. 50 at 30. But he does not and could not suggest that he was unaware that his actions would interfere with railroads' expectancies. Intent in this context includes interferences incidental to an actor's purpose but known to be a likely or necessary consequence. *See DurretteBradshaw, P.C. v. MRC Consulting, L.C.,* 670 S.E.2d 704, 706 (Va. 2009); *see also* Restatement (Second) of Torts § 766B cmt. d (1979) (noting that rule is the same between expectancy and existing contract contexts); *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493 S.E.2d 375, 378–79 (Va. 1997) (recognizing tort of interference with expectancy as explained in § 766B).

## III.   THE COURT SHOULD NOT ABSTAIN OR DECLINE SUPPLEMENTAL JURISDICTION.

Finally, Defendants ask the Court to decline supplemental jurisdiction over Counts V and VI, the tortious interference claims, because they raise "a novel or complex issue of State law." Doc. 48 at 30 (quoting 28 U.S.C. § 1367(c)). Defendants say "Count V depends on the novel theory of treating the Constitution of Virginia as a contract." *Id.* But this theory is not novel—decades of

---

[19] Defendant Hudson also suggests that he has not taken any action that could be called interference. Doc. 50 at 28–29. But he nowhere denies that he is already exercising his supervisory function under the statute, or that the administrative process his ongoing supervision makes available is an integral part of the alleged breach of contract.

Virginia case law recognize it. *Supra* §§ II.C.1, II.D. Defendants also say "both Counts V and VI require interpreting a newly enacted statute that no court of the Commonwealth has yet addressed." Doc. 48 at 30. But novelty alone is not grounds to decline jurisdiction. "[T]he Supreme Court has called on federal courts to exercise their jurisdiction in cases in which the statute is not ambiguous, even if the statute has never been interpreted by a state court." *Jones v. Coleman*, 848 F.3d 744, 752 (6th Cir. 2017); *see also Baggett v. Bullitt*, 377 U.S. 360, 375 n.11 (1964) (collecting cases). And Defendants identify no respect in which § 56-16.3 is ambiguous that bears on the proper resolution of these counts.

For similar reasons, *Pullman* abstention—which "applies where 'there is (1) an unclear issue of state law presented for decision (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive,'" *Wise v. Circosta*, 978 F.3d 93, 101 (4th Cir. 2020)—would be improper. *Contra* Doc. 48 at 30. Counts V and VI involve no federal issues; these are state-law claims. And again, Defendants identify no "unclear issue of state law" that bears on the proper resolution of these claims *or* the federal takings claim. The too-small statutory fee caps are hardly ambiguous, and Virginia law is clear that these takings are not for a public purpose. There is no basis to abstain.[20]

---

[20] *Amici*—but not Defendants—invoke *Burford* abstention, which applies when resolving "difficult questions of state law bearing on policy problems of substantial public import" would disrupt "state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Neufeld v. City of Baltimore*, 964 F.2d 347, 349 (4th Cir. 1992); Doc. 57 at 22–25. But when an "amicus raises issues or make arguments that exceed those properly raised by the parties, the Court may not consider such issues." *Tafas v. Dudas*, 511 F. Supp. 2d 652, 660–61 (E.D. Va. 2007) (cleaned up). That rule has special force here, where *amici* purport to defend the state's policy efforts, but the Commonwealth's Attorney General has not raised the same concerns. In any event, "*Burford* abstention is particularly inappropriate when preemption issues are present." *Neufeld*, 964 F.2d at 350 (collecting cases).

## CONCLUSION

For these reasons, the motions to dismiss should be denied.


November 20, 2023                                    Respectfully submitted,

                                                    /s/ Lucas W.E. Croslow
                                                    Lucas W.E. Croslow, VA Bar No. 97517
                                                    Gordon D. Todd
                                                    Raymond A. Atkins
                                                    Tobias S. Loss-Eaton
                                                    Chike B. Croslin
                                                    Stephen S. Laudone
                                                    Lakeisha F. Mays
                                                    SIDLEY AUSTIN LLP
                                                    1501 K Street, NW
                                                    Washington, D.C. 20005
                                                    (202) 736-8000
                                                    (202) 736-8711 (facsimile)
                                                    gtodd@sidley.com
                                                    ratkins@sidley.com
                                                    tlosseaton@sidley.com
                                                    ccroslin@sidley.com
                                                    lcroslow@sidley.com
                                                    slaudone@sidley.com

                                                    *Counsel for the Association
                                                    of American Railroads*