UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION


```
* * * * * * * * * * * * * *
ASSOCIATION OF AMERICAN      *
RAILROADS,                   * CIVIL ACTION 1:23-CV-00815
                             * MARCH 21, 2024   10:00 A.M.
           Plaintiff,        * MOTION HEARING
                             * VOLUME I OF I
vs.                          *
                             *
JEHMAL T. HUDSON, ET AL.,    * Before:
                             * HONORABLE DAVID J. NOVAK
           Defendant.        * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * *   EASTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiff:          GORDON D. TODD, ESQUIRE
                            TOBIAS LOSS-EATON, ESQUIRE
                            Sidley Austin LLP
                            1501 K Street, N.W.
                            Washington, DC 20005


For Defendants Michael Rolband and Stephen C. Brich:

                            ANDREW N. FERGUSON, ESQUIRE
                            STEVEN G. POPPS, ESQUIRE
                            Office of the Attorney General
                            202 North Ninth Street
                            Richmond, VA 23219


Court Reporter:             Melissa H. Custis, RPR
                            701 East Broad Street
                            Richmond, Virginia 23219
                            (804)916-2278

            Proceedings recorded by mechanical stenography.
Transcript produced by computer.

AAR v. Hudson, et al. - 3/21/2024

1    APPEARANCES (Continued):

2    For Defendant Jehmal T. Hudson:

3                              JOHN P. O'HERRON, ESQUIRE
                              ThompsonMcMullan, P.C.
4                              100 Shockoe Slip
                              3rd Floor
5                              Richmond, VA 23219

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AAR v. Hudson, et al. - 3/21/2024

```
 1          (Court convened at 10:00 a.m.)

 2          THE CLERK:  Civil action 1:23-CV-815, Association of

 3   American Railroads versus Jehmal T. Hudson, et al.

 4          If counsel would please stand, identify themselves

 5   and their client.

 6          MR. TODD:  Good morning, Your Honor.  Gordon Todd for

 7   the American Association of Railroads.

 8          MR. LOSS-EATON:  Good morning, Your Honor.  Tobias

 9   Loss-Eaton for the Association of American Railroads.

10          THE COURT:  Very good.  Okay.

11          MR. FERGUSON:  Good morning, Judge.  Andrew Ferguson

12   for Commissioner Brich and Director Rolband.

13          MR. POPPS:  Good morning, Your Honor.  Steven Popps

14   for Commissioner Brich and Director Rolband.

15          MR. O'HERRON:  Good morning, Your Honor.  John

16   O'Herron for Commissioner Hudson.

17          THE COURT:  You can all sit down.

18          So we are obviously here on the motions to dismiss.

19   Before we get started, I wanted to tell you all, the briefing

20   in this case is exceptional.  In fact, it's some of the best

21   briefing I've seen since I've been on the bench, and I say

22   that for all sides.  You ought to be really proud of

23   yourselves.  It helps me.  I think there's some really -- kind

24   of a couple tough issues.  I think we flagged those for you

25   here.
```

AAR v. Hudson, et al. - 3/21/2024

1         But now, in light of that, I'm going to tell you

2    where I'm at on this a little bit so we can kind of define

3    what the argument is, because I need you-all to help me a

4    little bit.

5         So I'm going to dismiss Counts I, IV, V, and VI.  I'm

6    going to also find that sovereign immunity applies to

7    Defendant Rolband and Defendant Brich.

8         So, Mr. Ferguson, you're so good at argument, you're

9    winning before you even stand up so I think you can go out in

10   a blaze of glory here, as I understand it.  Having said that,

11   I still want to pick your brain just a little bit on one of

12   the points here in a minute, if that's okay with you.

13        Now, here's what I'm kind of struggling with a little

14   bit.  Mr. O'Herron, I think you're going to be the first one

15   up.  One, I'm not so sure sovereign immunity covers your

16   client.  I'm going to give you a chance to address it.

17        And I'm really struggling with the standing issue on

18   Counts II and III from both sides.  I'm going back and forth.

19   I think, Mr. Ferguson, even though you won the day, I think I

20   want to pick your brain about that a little bit, if that's

21   okay with you.

22        And, of course, then, Mr. Todd, you know, you're

23   going to have to carry the day on that, so we'll see.

24        Why don't we start with Mr. O'Herron.  I'm just going

25   to really focus with you on this sovereign immunity thing,

AAR v. Hudson, et al. - 3/21/2024

 1   because it seems to me, having looked at this a lot, a lot of

 2   briefing on this but really good briefing, it is clear to me

 3   that the SCC wears many hats.

 4        MR. O'HERRON:  Right.

 5        THE COURT:  It has its executive branch function.  It

 6   has judicial function on some occasions.  It has a legislative

 7   type of function.  I think you relied heavily on my former

 8   colleague, Judge Hoffman's opinion from 1970.  I think

 9   Mr. Todd is -- he eviscerated that.  And I think he's 100

10   percent right about that.  You know, those of us that are

11   humble district court judges, sometimes we say things a little

12   stronger than what we really mean.  I think that's what kind

13   of happened there.  And our former chief judge, I think did

14   it -- you know, certainly a great judge, but I just think

15   that's taken out of context.

16        So, to me, it's all about this issue for you turns on

17   what the character of the proceedings are.

18        MR. O'HERRON:  Right.

19        THE COURT:  And it seems to me that what the General

20   Assembly did with this statute is saying, first of all, we

21   want to get rural broadband.  The way to do it is with the

22   help of the railroads, right?  We're going to set a baseline

23   for how we're going to do this in terms of the amount of

24   money, right?  But we're going to have three -- there's three

25   other things that we can't really know in every instance,

 1  because -- somebody in their briefs made this point -- that

 2  railroad crossings in Northern Virginia is a totally different

 3  duck than it is down in Staunton or down in Tidewater or

 4  something like that, right?  And so there has to be a little

 5  bit of flexibility for implementation, and that flexibility is

 6  given to the SCC to use their agency expertise to address

 7  that, right?

 8          And, to me, if you look at the three points that they

 9  can appeal on, one is whether or not the money is enough in

10  the context of that particular crossing; two, whether it's an

11  undue hardship to the railroad just because of that particular

12  crossing; but the big one to me is three, that the proposed

13  crossing will create the imminent likelihood of danger to

14  public health and safety.  And that seems to me to be

15  quintessential executive branch agency work, that you take

16  your expertise in this area, maybe you draw in some opinions

17  from other experts, and you say, "How is this going to affect

18  the public?"  That's not a judicial function in my view.  Am I

19  wrong?

20          MR. O'HERRON:  I think you are, Your Honor.  And I

21  think --

22          THE COURT:  Well, you're not the first person to say

23  I'm wrong, by the way.

24          MR. O'HERRON:  Yeah.  So I think the distinction is

25  that even though the commission is authorized and indeed

1  should be using its expertise and can indeed in the context of

2  an H petition proceeding employ experts and do things that

3  strike as administrative enforcement work, the context in

4  which those things are being done is a judicial proceeding.

5  The only way that any case comes to the commission to do any

6  of those things is from a petition from one party, a response

7  from the other party, and the commission is now in the place

8  of a judge or a court adjudicating the dispute between these

9  two parties.

10      THE COURT:  Yeah, but adjudicating and implementing

11  could be the same thing.  I think what would be judicial would

12  be the railroad says, "Listen, we're not going to do it.  We

13  don't care what the statute says, we're not going to do it,"

14  and then the SCC fines them, right?  To me, that would be a

15  judicial type of action.  But I just think this is an

16  implementation issue as opposed to an enforcement judicial

17  type of action.

18      MR. O'HERRON:  Well, I think the difference, Your

19  Honor, is that unlike many statutes where the SCC is acting

20  and wearing many hats throughout their process, under this

21  statute, they only wear one hat.  The hat is under Subsection

22  H when somebody files a petition in front of them and they

23  have to decide it.  So even though they're doing things that

24  substantively look the same that they're doing in other agency

25  or rule-making procedures and under similar statutes that have

1   that authority given to them, this statute doesn't give that

2   authority.  They are not making rules.  They are not hearing

3   expert evidence and figuring out how to address this problem

4   in a rule-making capacity and, therefore, it's not an

5   administrative capacity.  It's like a court when somebody

6   comes in and says, "Here's my problem."  You, the SCC, have

7   this expertise.  We, the General Assembly, know you have this

8   expertise.  We're going to let you bring in experts.  We're

9   going to let you employ that expertise that you have, but the

10  thing that you're doing, the character of these proceedings is

11  judicial because the thing in front of you is a pleading

12  making a legal claim and you're deciding facts and resolving

13  law, and then you're issuing a final order.

14          Subsection H has legal language as to what the SCC is

15  doing.  Once they employ their experts, they make findings of

16  fact and determinations.  After a petition is filed, they are

17  adjudicating the petition.  They are issuing a final order.

18  They are hearing and resolving claims.  So they're doing those

19  things --

20          THE COURT:  And there's a direct appeal to the

21  Supreme Court of Virginia.

22          MR. O'HERRON:  There's a direct appeal to the Supreme

23  Court of Virginia.

24          THE COURT:  Let me ask you this:  Are there other

25  executive branch agencies that when they make decisions,

AAR v. Hudson, et al. - 3/21/2024

1  there's an allotment for a direct appeal to the Supreme Court?

2  Because I think the SCC is a unique duck, so to speak, right?

3  You would agree with that, right?

4        MR. O'HERRON:  Yes, 100 percent.

5        THE COURT:  You would agree that they wear different

6  hats?

7        MR. O'HERRON:  Correct.

8        THE COURT:  So that in one context it could be

9  judicial, another context it could be legislative, another it

10  could be executive.  Do you agree with that?

11        MR. O'HERRON:  Yes.  Agree.

12        THE COURT:  So I just walked you back from that

13  Hoffman opinion, then; is that right?

14        MR. O'HERRON:  If I must.

15        THE COURT:  Okay.  All right.  Good.  I feel good

16  about that now.  All right.

17        So the question, then, that I have to answer really

18  is in this particular context, in this statute, what hat are

19  they wearing, right?

20        MR. O'HERRON:  Yeah.

21        THE COURT:  I'm not so sure I'm agreeing with you.

22        MR. O'HERRON:  Yeah.  And I think, you know, the most

23  that I can say -- so the statute as a whole, you know, the

24  plaintiff raises the problem of how are they supposed to --

25  you know, they have to sue Commissioner Hudson and

AAR v. Hudson, et al. - 3/21/2024

1  Commissioner Hudson is a proper ex parte defendant because

2  he's the one enforcing this statute.

3       THE COURT:  Which is what I did in the *Goldman* case

4  in the voting -- Mr. Ferguson came in and saved the day on

5  that case.  It took me awhile to convince him how to do it,

6  but that's what I did.  I struck sovereign immunity as to

7  whoever the implementer was for the voting, upheld it as to

8  others.  It seems to me I'm in the same situation.  The only

9  difference is you're saying -- what you have said to me is

10 that the SCC is different and you put a lot of stock into my

11 former colleague's --

12      MR. O'HERRON:  Well, I think as a general principle,

13 yes, the SCC is a different animal, and that context of them

14 being a different, unique entity shapes the particular

15 statute, which is what we turn to.  The question for Ex Parte

16 Young is the nature of these proceedings under the statute

17 that the plaintiff says is unconstitutional and that the

18 plaintiff says we are enforcing.  The plain language of this

19 statute does not have the commission enforcing anything.  It

20 has the commission deciding facts and issuing final orders

21 that can be appealed to the Supreme Court of Virginia.  It's

22 adjudicating a dispute.  It's hearing claims, it's taking on

23 evidence, it's unusual from a normal court because it employs

24 its own experts, but that doesn't take it out of the realm of

25 wearing -- our position, distilled to its most simple, is they

1    are only wearing a judicial hat in this statute.

2            THE COURT:  Okay.  Now, if I were to disagree with

3    you, though, you could still prevail either because of the

4    standing issue too, right?

5            MR. O'HERRON:  Right.

6            THE COURT:  I want to talk about that.  Or on the

7    merits, you could still win it on that; is that right?

8            MR. O'HERRON:  Yes.  At this point we have not taken

9    a position on the merits and there's sort of a basic reason

10   for that, which is the plaintiff has brought to this Court

11   arguments that under this statute are coming before my client.

12   There are petitions that are going to be filed under this

13   statute and parties like AAR are going to be able to raise all

14   of these arguments and Commissioner Hudson is going to have to

15   rule on them.

16           THE COURT:  Well, part of that feeds into standing,

17   right?

18           MR. O'HERRON:  Right.

19           THE COURT:  I mean, one of their problems I think

20   that they have on the standing point is, look, Mr. Todd is

21   right, in a practical sense, like, look, we could have a flood

22   of these challenges, you know, so why don't we just deal with

23   this right now because there's going to be thousands of these

24   challenges, right?  But, to me, that's perspective.  It's not

25   imminent harm.  We have a tough road to go.

AAR v. Hudson, et al. - 3/21/2024

1    So what I have focused on here, and I'm going to ask

2  you to help me on this and this is where I'm going to solicit

3  Mr. Ferguson's views as well, which is, to me, for them to

4  prevail on standing, it's going to have to be on this right to

5  exclude.  And it seems to me that the right to exclude is a

6  subset of the general property rights.  And if you look at the

7  Supreme Court's opinion, Justice Thomas's opinion in the

8  *Uzuegbunam* case, where it allows nominal damages for any

9  interference with a right.

10    So, to me, we're taking three steps here, right?

11  Step Number 1 is, is there a right?  To me, the right to

12  exclude is a part of the bundle of the property rights.  Has

13  there been interference, I think you might dispute that.  I

14  want to hear about that.  But then the next question is, is

15  there damage, right?  Is there an injury, right?  To me,

16  reading that *Uzuegbunam* case again last night, you have

17  nominal damages.  I don't know how familiar you are with that

18  case.

19    MR. O'HERRON:  Not very.

20    THE COURT:  So tell me what you think on standing.  I

21  mean --

22    MR. O'HERRON:  Yeah.

23    THE COURT:  -- if I believe that the right to exclude

24  is part of the bundle of property rights, do they not have

25  standing?

AAR v. Hudson, et al. - 3/21/2024

1  MR. O'HERRON:  I don't think they do.  I think

2  Mr. Ferguson is going to be able to help you navigate this

3  better than I am.  The thing that strikes me first on that

4  question is the extent to which anybody's right to exclude has

5  been impacted, first.  And, second, the extent to which any

6  person whose right has been impacted has then been damaged is

7  not a thing that you can litigate at the associational

8  standing level.  They have to have their members.

9  THE COURT:  Okay.

10  MR. O'HERRON:  So you mentioned the point that we

11  made in our brief of the railroad crossing and rural being

12  different from Northern Virginia, the same is true of two

13  railroad crossings in a rural area that are next to each

14  other.  If your right to exclude is impacted, it's not AAR's

15  right, it's an individual member's right whose right to

16  exclude has been denied or impacted in a way that is different

17  from the one down the street.  So I think the -- that's my

18  first response, is that they don't get to bring that claim.

19  And if that's the only hook to get their standing, I don't

20  think they can bring it at the associational level.

21  THE COURT:  Well, I'll pick Mr. Ferguson's brain

22  about that.  But is there anything else, then, you -- I mean,

23  these are the two issues I'm left to resolve here.  I want to

24  kind of get this done soon, but is there anything else you

25  wanted to say?

AAR v. Hudson, et al. - 3/21/2024

1      MR. O'HERRON:  No.  The only other thing I planned to

2  say on standing was just that Commissioner Hudson because of

3  his role writ large, but more specifically within this

4  statute, he's not an adverse party and so he's not a proper

5  subject of a declaration or injunction as against AAR.  Thank

6  you, Your Honor.

7      THE COURT:  All right.  Mr. Ferguson, can I pick your

8  brain?  I need you to do some work before you go up to the big

9  city on us.

10     Tell me what you think about the standing thing.  I

11 know you know about the *Uzuegbunam* case, so tell me about

12 that.

13     MR. FERGUSON:  I do, Judge.  So let's set *Uzuegbunam*

14 aside for a minute on the following proposition.  *Uzuegbunam*

15 stands for the proposition that injury for purposes of

16 standing is satisfied just by nominal damages.

17     THE COURT:  Right.

18     MR. FERGUSON:  I think when we're talking about

19 associational standing to maintain a facial challenge to a

20 statute like this, we need to take a step back, if you'll

21 indulge me.

22     THE COURT:  I do.  I want to hear about this.

23     MR. FERGUSON:  We'll go back to the very beginning.

24 There's a strong presumption in the law against facial

25 challenges generally.  The Supreme Court has said they're

1   antidemocratic.  They create separation of powers problems.

2   We have a strong preference for as-applied challenges, which

3   makes sense.  It's particularly true in takings cases and the

4   reason is that whether a taking has taken place, whether

5   compensation was just, turns on highly specific facts about

6   the physical terrain, the potential invasion, and the legal

7   arrangements that govern the property owner's possession of

8   the property.  And I think that's super important for this

9   case.  Let me explain.

10          The complaint that my friends on the other side have

11  filed makes references to the sort of property holdings that

12  they have, and they say, "We hold in fee simple and pursuant

13  to other legal arrangements."  That last part is doing a lot

14  of work, because, you know, the way that the railroads acquire

15  their property, as we discussed in our brief and as some of

16  the amici do as well, was largely through --

17          THE COURT:  Eminent domain.

18          MR. FERGUSON:  -- eminent domain in the 19th century,

19  which means that there's going to be all sorts of diverse ways

20  that this property is held.  That also means that the right to

21  exclude will not be uniform property by property by property.

22  It could be very different.  For example, a nonexclusive

23  easement over a, you know, public right-of-way might have in

24  the deed that gave them the easement very limited rights to

25  exclude or might have exceptions to the right to exclude for

AAR v. Hudson, et al. - 3/21/2024

1    certain public uses.

2            In circumstances like that, you know, tunneling

3    either under the easement or passing over it, might not

4    infringe on their right to exclude at all because the legal

5    arrangements, pursuant to which they hold the property, didn't

6    give them that right in the first instance.  And I think that

7    this associational standing problem is infected along the same

8    lines that they have a facial challenge problem.  It's very

9    difficult in the ordinary circumstance to bring facial

10   challenges in takings cases because whether the taking took

11   place at all -- in other words, whether the right to exclude

12   has been impacted -- turns very heavily on the physical

13   property itself, which, as Your Honor correctly said, will

14   vary place to place.

15           The big junction here in Richmond and a tiny crossing

16   in the corner of Southwest Virginia will look very

17   differently, Number 1; Number 2, the legal arrangements

18   governing the possession that the railroad has will vary

19   wildly from property to property; Number 3, whether the act

20   that they claim is the taking will vary wildly from place to

21   place as well.  I mean, their amicus was extremely helpful to

22   our position on pages 5 and 6 of RailPros' amicus brief.  They

23   point out that lots of these are going to be broadband cables

24   passing on existing infrastructure over the top of railroads.

25           It isn't obvious at all that that will constitute a

1    taking and whether it does constitute a taking will depend
2    heavily on the legal arrangements governing the railroad's
3    easement in the first instance, which makes it very difficult
4    to do this in a facial way.

5         I think bringing in an associational standing theory
6    here compounds the facial problem.  The facial problem would
7    apply no matter what, but we are even further removed from the
8    on-the-ground facts that one needs to litigate a takings claim
9    by not having any of the property owners in the case.

10        My understanding from their complaint and from their
11   amici is that several railroads own the bulk of the property
12   that could potentially be affected by broadband crossings in
13   Virginia, but that property will just vary wildly because
14   Virginia's terrain varies wildly, because the grant of
15   possession and easements and, you know, in some cases probably
16   fee simple arrangements will have happened over a long course
17   of time, will be governed by different legal rules, and then
18   the crossings themselves will be very different.  I think it's
19   just very -- it's always difficult to litigate facial
20   challenges.  It's doubly difficult to litigate facial
21   challenges in takings cases because takings are so fact
22   specific.  And, third, trying to do it on the basis of
23   associational standing, where the property owners who are
24   potentially affected aren't in the courtroom at all, were not
25   able to actually litigate the on-the-ground questions that

AAR v. Hudson, et al. - 3/21/2024

1   every takings claim necessarily presents means that this is

2   just not the way to do this.

3          THE COURT:  Let's say I accept all that.  I'm not

4   sure I do, but let's say I do, all right?  Would you not agree

5   with me that the Supreme Court's jurisprudence on standing,

6   it's starting to grow?  *Uzuegbunam* is a good example of that.

7   They're being much more lenient on that.  If I have a close

8   call on this, and I think this is a really close call, this is

9   something I'm really grappling with, which is why I said let's

10  just focus on these two things.

11         MR. FERGUSON:  Sure.

12         THE COURT:  Why don't I just give them the standing

13  and go to the merits and get this over with?

14         MR. FERGUSON:  So a couple of responses.  On the

15  first, I will resist gently the premise that the Supreme Court

16  standing doctrine is kind of all growing.  Just last term, in

17  *United States* against *Texas*, the Supreme Court dramatically

18  narrowed the scope of standing for states to bring challenges

19  to federal government action.  So I agree *Uzuegbunam* -- I

20  think Justice Thomas would argue *Uzuegbunam* didn't represent a

21  departure from what came before and that the Commonwealth had

22  always encompassed claims for nominal damages, but you're

23  right, since *Lujan* in 1992, the Supreme Court's doctrine has

24  not been fixed.  I agree with that.

25         And I don't disagree that we would be fine if the

AAR v. Hudson, et al. - 3/21/2024

1    Court said, "No standing.  Proceed to the merits."

2         THE COURT:  You would be fine with that?

3         MR. FERGUSON:  The state always prefers to win on

4    standing.  If you want to grant the 12(b)(1) and grant the

5    12(b)(6), that would be great with us.  The more good

6    precedent the better.

7         THE COURT:  You already won your guys.  I mean, don't

8    be greedy here.

9         MR. FERGUSON:  That's right.  Yeah.  You know, like

10   any good litigant, I'll take what I can get.  But, you know, I

11   think the problem with the facial challenge, which is --

12   you're correct, is a 12(b)(6) issue, about whether you can

13   litigate a taking claim like this, doesn't fully collapse but

14   dovetails quite closely with the problem of doing this on the

15   basis of associational standing, which is just for the same

16   reason that it is difficult in every case to do a facial

17   takings claim, because takings claims turn so specifically on

18   the on-the-ground facts, not just of the property terrain but

19   of the legal arrangements governing the property and what's

20   actually going to happen on the ground that constitutes the

21   putative taking, it's difficult to do this facially.  It's

22   even more difficult to do it when you're doing facial and

23   associational standing.

24        THE COURT:  Let me respond to that because I'm going

25   to keep pushing back, because I'm thinking this through.  The

1  way that I interpret their assertion as to the right to

2  exclude, and I don't agree with them on the rest of it, so

3  standing here is going to rise and fall on how this right to

4  exclude plays out.  I'm still trying to figure that out.

5          So would you agree that the right to exclude, though,

6  is a subset of the general property rights?  I mean, that's

7  been well recognized in our jurisprudence, don't you think?

8          MR. FERGUSON:  So the answer is yes, but -- if you'll

9  let me get the but out -- it is undoubtedly true.  It's black

10 letter law; we all learned it our first year of law school,

11 that one of the most fundamental rights in the classic bundle

12 of sticks that comprise our property rights is the right to

13 exclude.  But railroad property is unique because it was

14 almost all acquired through the use of eminent domain and

15 often passes over in the form of an easement that was granted

16 by the government, which means that the easement terms govern

17 their right to exclude and the right to exclude might not be

18 universal.

19         In other words, when they acquired the property in

20 the first instance, it's entirely possible, and it will vary

21 case by case which is why it's difficult to do this as a

22 facial matter, but it's entirely possible that the right to

23 exclude was cabined and doesn't apply in certain

24 circumstances.

25         THE COURT:  But no matter what, though, it is still a

1  property right.  So whether it's an easement or eminent

2  domain, whatever it is, for them to operate their railroad,

3  they have to have some level of a basic property right.  If

4  you have a basic property right, then you have a right to

5  exclude.  The question is, how much of a right you have.

6  That's kind of what you're saying, isn't it?

7          MR. FERGUSON:  I absolutely agree with that, Judge

8  Novak, and, importantly, for a takings claim, it's not just

9  how extensive is that right, whom are you permitted to exclude

10 and why, it's whether the act that is claimed to constitute

11 the taking breaches that right to --

12         THE COURT:  Well, it's an interference.

13         MR. FERGUSON:  That's right.

14         THE COURT:  All right.  Because that's where I'm at,

15 right?  To me, I think they have it on prong one.  Prong two

16 is what's the level of interference.  If I take *Uzuegbunam*, or

17 however you say it, which would be the injury, you know,

18 Justice Thomas is saying, "Hey, any violation of that right,

19 even if it's de minimis, nominal damages, that's enough."

20         So now the question is what the interference is.  It

21 seems to me that -- as I make Mr. Todd's argument, he'll do a

22 better job than me, I hope -- is that the statute strips away

23 their bargaining power, that normally what would happen is, is

24 that the broadband companies would have to come to them and

25 say, "Look, whatever level of property right you have, we

AAR v. Hudson, et al. - 3/21/2024

1   would like to use that."  And they then would have the right

2   to say, okay, you can use it or not use it.  Sometimes they

3   might say not use it at all, but if you do want to use it,

4   you're going to have to pay us $10,000 as opposed to 1,000 or

5   2,000, whatever the number is.  So that right has been

6   interfered with because it's been undermined, their bargaining

7   power as that particular right has been undermined.

8   Hopefully, I'm summarizing his argument properly.  He'll make

9   it better than me.  But isn't that an interference?

10          MR. FERGUSON:  I don't think so, Judge, for two

11   reasons.  Number 1, the rights to exclude even for someone who

12   owns, for example, their home in fee simple and owns it from

13   the sky to the center of the earth, as the old common law rule

14   was, that right to exclude is always cabined by eminent

15   domain.  The government always has the authority to take

16   property for public use with just compensation.  So the right

17   to exclude never includes the right to exclude the government

18   when it's lawfully exercising its eminent domain authority,

19   Number 1.  Number 2, even in the scenario that you're

20   outlining about whether, you know, their bargaining power is

21   basically diminished, the Constitution doesn't forbid the

22   diminution of bargaining power.  It forbids either physical

23   invasions or regulatory takings, and I understand them only to

24   be making a physical, a per se physical invasion claim.

25   Although, I'll let Mr. Todd clarify its complaint.

AAR v. Hudson, et al. - 3/21/2024

1          But whether physical invasions are going to take

2    place or have taken place at this point is hypothetical,

3    because, for example, as their amicus explains from pages 5 to

4    6, lots of these might not involve physical invasions at all.

5    It might just be a wire passing on existing wire

6    infrastructure that's been there the whole time.  That

7    wouldn't be a physical invasion.  And I think the point is, in

8    order to determine whether there are physical invasions of the

9    type that the due process clause requires just compensation

10   for, will turn property by property, legal arrangement by

11   legal arrangement, and particular act by the broadband

12   provider by particular act by the broadband provider, which

13   makes this very difficult to do associationally.  We would

14   need the property owners in the courtroom explaining why the

15   individual pieces of property that they claim are being taken

16   without just compensation are, in fact, being taken without

17   just compensation.

18          THE COURT:  Okay.  All right.  That's very helpful.

19   Thank you.

20          MR. FERGUSON:  Thank you, Judge.

21          THE COURT:  All right, Mr. Todd, what do you have to

22   say to that?  That's kind of where I'm stuck.

23          MR. TODD:  Good morning, Your Honor.

24          THE COURT:  Good morning.

25          MR. TODD:  Let me just jump right back in where you

AAR v. Hudson, et al. - 3/21/2024

1   are, Your Honor, on standing.

2           THE COURT:  Sure.

3           MR. TODD:  And I think it's helpful, at least from my

4   way of thinking, to back up and talk about what the particular

5   claims are, what we've pled because, obviously, we would have

6   to have standing to prevail on the claims we've pled.

7           THE COURT:  Ignore I, IV, V, and VI, because those

8   are gone.

9           MR. TODD:  I will, Your Honor.  What I want to go to

10  first is bring II back in because II is the public use piece,

11  and that claim clearly goes to each and every standing --

12  excuse me, each and every crossing that you could conceivably

13  have under this statute because they are all approved for the

14  same purpose.  I don't want to get into the merits of that

15  claim.  I assume the merits are not relevant here, but the

16  claim in brief is that Virginia, by statute, post *Kelo*

17  specifically define what constitutes a public use for purposes

18  of its constitution and that governs here the public --

19  federal courts will look to state law as part of understanding

20  what the property right is, because the state gets to define

21  the property but also what the public use is.

22           If you look at *Kelo* itself, if you look at the

23  *Ruckelshaus* opinion, there's a strong sense of deference to

24  the state to define what that use is.  So here you're in the

25  peculiar position, I suppose, where you have a state statute

1  which defines six specific public uses, permissible public

2  uses and no more.  There's no suggestion on this side of the

3  quorum that this statute fits with any of them.  Rather, the

4  argument is, "Well, gosh, broadband is really important and

5  it's a lot of money and a lot of people we got to get on the

6  Internet, and so it's really important."  But important

7  doesn't mean public use.

8          If you look at the other statute -- I'm trying to

9  find the citation -- but the statute that specifically speaks

10  to broadband, it distinguishes public use from public

11  interest.  It says broadband is an important public interest,

12  but it specifically declines to amend the public use statute.

13  It doesn't add broadband expansion as a permissible public

14  use.  So we have a right about all that, and that's the

15  merits.  Then every single crossing you could have under the

16  statute is implicated and, by our theory, violates public use.

17          THE COURT:  Let's talk about right to exclude,

18  because if you're going to prevail, that's where it's going to

19  be.

20          MR. TODD:  So the right to exclude, Your Honor,

21  again, we look to Virginia law.  And if you look through the

22  cases, which I guess Your Honor was unpersuaded about with

23  regard to the private -- the contract theory that we had in

24  Counts V and VI, but if you look through those cases, what you

25  will see is that Virginia defines a property right in the

AAR v. Hudson, et al. - 3/21/2024

1  takings context as physical occupation or a diminishment of

2  the landowner's rights, ability to exercise his or her

3  property rights in that property.  I would direct you in

4  particular to the *Kitchen* case, *Kitchen versus City of Newport*

5  *News*, but that same formulation occurs throughout those cases.

6  And I think Your Honor did a good job of articulating it.

7          THE COURT:  You're the only person who thinks I do a

8  good job, I can assure you of that.

9          MR. TODD:  I'm sure that's not right, Your Honor.

10         THE COURT:  Go ahead.

11         MR. TODD:  Whatever right the railroads do have,

12  whether it's an easement or a contractural right or a fee

13  simple, and I would note that the Supreme Court has ruled that

14  whatever the underlying property rights are, that railroad

15  property rights generally are akin to fee simple.  We cited

16  that case in the complaint.  I'm forgetting as I stand here

17  right now --

18         THE COURT:  It's all right.

19         MR. TODD:  -- what exactly the cite is.  But whatever

20  right we have is necessarily diminished by granting a right of

21  entry and by loading the dice for the other side.  We did set

22  out the bargaining theory in the complaint and in our briefs,

23  but I think it goes beyond that whether we talk about

24  bargaining or not.  Whatever right we have is necessarily

25  being diminished.

AAR v. Hudson, et al. - 3/21/2024

1          Now, Mr. Ferguson posits a case where there's no

2    taking at all, where we have no right.  Well, then it's simply

3    not implicated by the statute or by our challenge.  But where

4    we do have a right to exclude of sort, it has been diminished.

5          THE COURT:  How has it been diminished?

6          MR. TODD:  It's been diminished because the day

7    before the statute is enacted, we have an ability to say no.

8    You can't come on at all or you can't come on here.  You've

9    gotta go over there or use some other crossing or whatever.

10   We have -- I say "we," our client's members have the right to

11   exclude completely.  And, of course, they don't exclude

12   completely.

13         THE COURT:  But isn't that harm somewhat nebulous?  I

14   mean, you know, I've reached for the *Uzuegbunam* case to say

15   that nominal damages still give you standing, but even this

16   right to exclude seems to me like how do you quantify -- how

17   do you describe what that injury is?  I mean, I thought

18   Mr. Ferguson pushed back appropriately, saying, "Look, it's

19   even different because of the way that railroads acquire the

20   interest in the first place due to eminent domain or

21   whatever."

22         MR. TODD:  Well, the harm, I don't know that it's so

23   nebulous, Your Honor.  I mean, what we're talking about here

24   by their own amici admission are hundreds of crossings of

25   railroads to roll out broadband.  The RailPros' brief points

AAR v. Hudson, et al. - 3/21/2024

1  out that they had I think between 300 and 400 crossings that

2  they handled just in the past year in Virginia.  So this is

3  something that will happen again and again and again and

4  again.  So it's very concrete and very real.  It's

5  prospective, sure.  It's coming.  It's coming to the tune of

6  $1.5 billion in federal money, apparently.  That tells me it's

7  going to happen.

8         THE COURT:  But why not wait until the SCC rules

9  against one of your clients, and then come back to me and show

10 the individual harm to that particular railroad?  Why not do

11 that?  I mean, I understand you don't want to have 2,500

12 lawsuits, and I can assure you under the related case doctrine

13 because I would get all 2,500 cases, I don't want to have

14 2,500 cases, right?  But I think that's what their --

15 Mr. Ferguson's well-taken point is, this has to be analyzed on

16 an individual basis.  Why don't we take a look at one, and

17 then we can extrapolate that, you know, going forward as it

18 relates to that statute.

19        MR. TODD:  It's far from clear to us, Your Honor,

20 that we actually can raise many of these arguments in that

21 context.  And I appreciate Commissioner Hudson's counsel

22 suggesting that these arguments could be raised there, but the

23 statute doesn't necessarily leave that room to make all of

24 these sorts of arguments, that we're constrained as to what

25 arguments we could raise.

AAR v. Hudson, et al. - 3/21/2024

1        THE COURT:  Well, you have three arguments you can

2   make, right?

3        MR. TODD:  Sure.

4        THE COURT:  To the SCC you can say, "Hey, that's not

5   enough money, undue hardship, or it's going to hurt the

6   public."  Now, that last one to me is why they lose on

7   sovereign immunity for Commissioner Hudson.  But that's three

8   arguments you can make.

9        MR. TODD:  Sure.  It's far from clear to me, Your

10  Honor, the argument that we need more money, that this

11  particular crossing costs more money lets us make all the

12  constitutional arguments that we're raising here.

13        THE COURT:  That's fair.  I mean, that's a fair

14  point.

15        MR. TODD:  We're hearing maybe a different story

16  today, but not that clearly a different story.  And I wouldn't

17  be surprised if it turns out that we can't make that argument

18  there, at least that's our conservative and concerned reading

19  of the statute.

20        But the way the system is set up, it allows the

21  broadband company to basically -- to tell us where they want

22  to cross.  And I suppose they'll take their -- you know, their

23  least timed path to wherever they want to go and the

24  railroad's contrary interest in safety, in properly locating

25  and properly implementing and managing these crossings, are

1   very much diminished.  Can we negotiate about them?  Sure, we

2   can try to.  But if we can't convince a broadband company to

3   do something different, then we're thrown to the

4   commissioner's discretion, very broad discretion as to whether

5   to deviate from a statute that otherwise gives the broadband

6   company basically the ability to dictate where the crossing

7   will occur.  And that happens potentially in every crossing.

8   And so that's why we think it makes much more sense to resolve

9   these issues in this forum at a macro level.  And then, you

10  know, these crossings will happen.  They'll be negotiated on a

11  one-off basis, but on a much more sensible and level playing

12  field between the railroads and the broadband companies, Your

13  Honor.

14        Let me touch on one other thing that Mr. Ferguson

15  said on the standing context, and that was he referenced the

16  preference for takings to be adjudicated on an individual

17  basis.  He didn't mention the case, but what he's talking

18  about there is the *Hodel* case.

19        THE COURT:  Right.

20        MR. FERGUSON:  *Hodel* was a regulatory taking case.

21  It applied Penn Central.  And the test there, as Your Honor

22  knows, is, has the property, the value of the property at

23  issue been so diminished that it has no functional purpose.

24  It's just been destroyed by the regulation.  That clearly

25  requires a potential piece of property to be at issue.  When

AAR v. Hudson, et al. - 3/21/2024

1  you're talking about the kind of issues we've raised, public

2  use, diminishment of property rights, those go to crossings

3  generally.  Those are not context specific, which is why we

4  believe we can raise them here.

5           Happy to address anything else you have on standing.

6  Otherwise, I'll go back to sovereign immunity.

7           THE COURT:  Look, you can say whatever you want about

8  sovereign immunity.  I think the wind is blowing in your

9  direction, so you can do whatever you want.

10           This standing issue, though, to me, I'm really

11  tortured by.  Here's what my thought is, what if we did this,

12  I mean, you-all have done great briefing.  What if I give

13  you -- today's Thursday.  What if I give you a chance to do a

14  supplemental by next Wednesday on just the standing issue as

15  it relates to the right to exclude?  All three of you.  You

16  don't really have a dog in the hunt anymore, Mr. Ferguson,

17  because you've already won.  Maybe Mr. O'Herron wants to hire

18  you to do this, but --

19           MR. TODD:  Commissioner Kahn is eager to get

20  Mr. Ferguson up to D.C.

21           THE COURT:  Do you want to take -- I would limit it

22  to 10 pages.

23           MR. TODD:  Sure.

24           THE COURT:  I gather you want the transcript here.

25  Do you want to order the transcript, because that way you can

AAR v. Hudson, et al. - 3/21/2024

 1   reference it?

 2            Do you want the transcript, Mr. Ferguson?

 3            MR. FERGUSON:  Please, Your Honor.

 4            THE COURT:  Do you want it, Mr. O'Herron?

 5            MR. O'HERRON:  Yes, Your Honor.

 6            THE COURT:  That way she can bill all three of you.

 7            To the extent that you -- limit it only to standing

 8   and this issue about right to exclude, because I think you

 9   lose on all other aspects of standing.  I'm just being honest

10   with you, right?  So I just want -- and maybe address this

11   *Uzuegbunam* thing too and what I think is a growth in the

12   Supreme Court, and I'll take one more look at it.  I want to

13   get a decision out to you soon, but I want to make sure I get

14   the right decision out to you.  So I'll give you 10 pages, you

15   give it to me by next Wednesday.  Are you good?

16            MR. TODD:  Thank you, Your Honor.

17            THE COURT:  Mr. Ferguson, are you good with that?

18            MR. FERGUSON:  Yes, Your Honor.

19            THE COURT:  Mr. O'Herron, are you good with that?

20            MR. O'HERRON:  Yes, Your Honor.

21            THE COURT:  Did you-all want to say anything in

22   response?

23            MR. O'HERRON:  Very briefly.

24            THE COURT:  Come on up.  I don't want to hear any

25   more briefing on sovereign immunity, though.

AAR v. Hudson, et al. - 3/21/2024

1          MR. O'HERRON:  Understood.

2          THE COURT:  You can argue it right now.

3          MR. O'HERRON:  I just have one point to make on --

4    well, maybe two.  On the sovereign immunity, they can raise

5    these constitutional questions in the commission under either

6    one, two, or three, all of their constitutional arguments can

7    be raised as one among others of reasons why those three

8    things are met.  The commission adjudicates constitutional

9    questions all the time.

10          THE COURT:  Well, no, I think he's saying the

11    statute, though, says there's only three specific bases for

12    petition.  So how -- adequate compensation -- I guess there's

13    a constitutional level to that, right?

14          MR. O'HERRON:  Yeah.  That's what I'm saying, Your

15    Honor, is under one, two, and three, even preemption.  I mean,

16    they can raise the undue hardship against them because of

17    insert constitutional argument that they've raised --

18          THE COURT:  Yeah, that makes sense.

19          MR. O'HERRON:  That's my first point.  The second

20    point on Subsection 3, which Your Honor has said hopefully

21    that you're sort of hung up on, the finding of danger to

22    public health or safety, courts make decisions on that all the

23    time.  And they don't, again, they don't employ their own

24    experts in the way that the SCC is authorized to do here

25    perhaps, but answering that sort of question doesn't take it

AAR v. Hudson, et al. - 3/21/2024

1   out of the realm of being a judicial question.

2           As to standing, we will take Your Honor's invitation

3   to provide supplemental briefing.  My only additional point

4   was if they've already been harmed, and we'll make this part

5   of our brief, if they've already been harmed because their

6   right to exclude has been damaged, then they have a suit for

7   damages.  They don't have a suit for declaratory relief.

8           THE COURT:  You better read *Uzuegbunam*, because I

9   think that would -- you would say something different if you

10  knew that opinion, okay?

11          MR. O'HERRON:  Okay.  Thank you, Your Honor.

12          THE COURT:  Having spent the night reading that, I

13  think I disagree with you on that point.  But I want to give

14  you -- look, I want to do a good job for you.  I would rather

15  have you look at it and write and we'll kind of go from there,

16  okay?

17          MR. O'HERRON:  Will do.  Thank you, Your Honor.

18          THE COURT:  Are we all good on that?

19          So we're going off the record.

20      (Court adjourned at 10:39 a.m.)

21

22

23

24

25

AAR v. Hudson, et al. - 3/21/2024

```
 1                        CERTIFICATE

 2   I, Melissa H. Custis, certify that the foregoing is

 3   a correct transcript from the record of proceedings

 4   in the above-entitled matter.

 5

 6   /s/  Melissa H. Custis, RPR         Date:  3/25/2024

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```