UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS, *Plaintiff,* v. JEHMAL T. HUDSON, *et al.*, *Defendants.* | Civil Action No. 1:23-cv-815-DJN-WEF |

**ASSOCIATION OF AMERICAN RAILROADS'**
**SUPPLEMENTAL BRIEF ON STANDING**

Gordon D. Todd, VA Bar No. 45934
Raymond A. Atkins
Tobias S. Loss-Eaton
Chike B. Croslin
Lucas W.E. Croslow
Stephen S. Laudone
Lakeisha F. Mays
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (facsimile)
gtodd@sidley.com
ratkins@sidley.com
tlosseaton@sidley.com
ccroslin@sidley.com
lcroslow@sidley.com
slaudone@sidley.com
lakeisha.mays@sidley.com

*Counsel for Plaintiff Association of American Railroads*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

I.   A pre-enforcement challenge requires only plausible allegations of an "identifiable trifle" of harm that is ongoing or imminent. ...................................................................... 1

II.  AAR has plausibly alleged associational standing to bring Counts II and III. ................... 2

    A.   AAR's members would have standing to sue in their own right. ........................... 3

        1.   Section 56-16.3's enactment and enforcement have already restricted the railroads' property rights, depriving them of their right to exclude. ................................................................................................... 3

        2.   Section 56-16.3's enactment and enforcement will imminently cause actual, permanent physical takings of the railroads' property. ......... 7

    B.   AAR's claims do not require the participation of individual members. ................. 8

CONCLUSION ............................................................................................................... 10

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Chem. Council v. DOT*,
    468 F.3d 810 (D.C. Cir. 2006) ...................................................................................................6

*Bruni v. Pittsburgh*,
    824 F.3d 353 (3d Cir. 2016) ....................................................................................................10

*Cedar Point Nursery v. Hassid*,
    594 U.S. 139 (2021) ..............................................................................................................4, 7

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ................................................................................................................10

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ..................................................................................................................5

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013) ....................................................................................................2

*Doe v. Albuquerque*,
    667 F.3d 1111 (10th Cir. 2012) ..............................................................................................10

*Equitable Life Assur. Soc. v. Wert*,
    102 F.2d 10 (8th Cir. 1939) ....................................................................................................10

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
    204 F.3d 149 (4th Cir. 2000) (en banc) .........................................................................1, 5, 7

*Holder v. Human. Law Project*,
    561 U.S. 1 (2010) ......................................................................................................................1

*Kenny v. Wilson*,
    885 F.3d 280 (4th Cir. 2018) ....................................................................................................2

*Kerns v. United States*,
    585 F.3d 187 (4th Cir. 2009) ....................................................................................................2

*Kitchen v. City of Newport News*,
    657 S.E.2d 132 (Va. 2008) ........................................................................................................5

*Loretto v. Tel. Manhattan CATV Corp.*,
    458 U.S. 419 (1982) ..................................................................................................................8

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..............................................................................................................1, 2

*Matthews v. Codd*,
    142 S.E. 383 (Va. 1928) ............................................................................................................6

*PETA, Inc. v. N.C. Farm Bureau Fed'n*,
  60 F.4th 815 (4th Cir. 2023) ...........................................................................................10

*PhRMA v. Williams*,
  64 F.4th 932 (8th Cir. 2023) ...........................................................................................10

*R.R. Ventures, Inc. v. STB*,
  299 F.3d 523 (6th Cir. 2002) ............................................................................................9

*Siemens USA Holdings Inc. v. Geisenberger*,
  17 F.4th 393 (3d Cir. 2021) ..............................................................................................2

*Solem v. Commonwealth*,
  No. 0884-22-2, 2023 WL 8192303 (Va. App. Nov. 28, 2023) ........................................3

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ......................................................................................................1, 7

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ..........................................................................................................1

*United States v. SCRAP*,
  412 U.S. 669 (1973) ..........................................................................................................1

*Uzuegbunam v. Preczewski*,
  141 S. Ct. 792 (2021) ...........................................................................................1, 5, 7, 9

*Valley Forge Coll. v. Am. United for Separation*,
  454 U.S. 464 (1982) ..........................................................................................................2

*Virginia v. Am. Booksellers Ass'n*,
  484 U.S. 383 (1988) ..........................................................................................................8

*Warth v. Seldin*,
  422 U.S. 490 (1975) ..........................................................................................................2

*White Tail Park, Inc. v. Stroube*,
  413 F.3d 451 (4th Cir. 2005) ............................................................................................2

*Wintergreen Homestead, LLC v. Pennington*,
  108 Va. Cir. 514 (2021), *aff'd*, 880 S.E.2d 30 (Va. App. 2022) ......................................5

*Wisc. Cent. Ltd. v. STB*,
  112 F.3d 881 (7th Cir. 1997) ............................................................................................9

**Statutes**

Va. Code § 56-16.3 ................................................................................................... *passim*

  § 56-16.3(B) ......................................................................................................................3

  § 56-16.3(H) ......................................................................................................................7

  § 56-16.3(K) ......................................................................................................................9

I.  **A pre-enforcement challenge requires only plausible allegations of an "identifiable trifle" of harm that is ongoing or imminent.**

At the pleading stage, standing is not a high bar. A plaintiff need only offer "general factual allegations" that (1) it has suffered or will suffer an "injury in fact" that (2) is "fairly traceable to the challenged action of the defendant" and (3) "likely … will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

An injury-in-fact is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). "[I]ntangible injuries" are sufficiently concrete if they closely resemble "a harm that has traditionally been regarded as providing a basis for a lawsuit." *Id.* at 340–41. That includes hard-to-value violations of legal rights. At common law, "every violation of a right imports damage," so a cognizable injury exists "even if [the plaintiff] cannot or chooses not to quantify that harm in economic terms." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 799, 802 (2021) (cleaned up). "Indeed, the claimed injury 'need not be large[;] an identifiable trifle will suffice.'" *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000) (en banc).

And "threatened rather than actual injury can satisfy Article III," so "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Id.* at 160. The Supreme Court has thus "permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent," meaning there is "a credible threat of enforcement." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). This does not require a literal "threat" against the plaintiff; plausible allegations of future enforcement suffice. *E.g.*, *Holder v. Human. Law Project*, 561 U.S. 1, 15–16 (2010) (government enforced the law against others and did not disclaim prosecuting plaintiffs). At bottom, a plaintiff need only "allege that he has been or will in fact be perceptibly harmed." *See United*

*States v. SCRAP*, 412 U.S. 669, 688, 690 (1973). There is "ordinarily little question" that a party who is an "object of" challenged "government action" can do so. *Lujan*, 504 U.S. at 561–62.

Standing is also independent of the merits, so "the court must … assume that on the merits the plaintiffs would be successful in their claims." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (citation omitted). And because standing "focuses on the [plaintiff] and not on the issues he wishes to have adjudicated," the reason a plaintiff will be injured can be different from the reason the challenged action is unlawful. *See Valley Forge Coll. v. Am. United for Separation*, 454 U.S. 464, 484 (1982). That is, a plaintiff need not show any "conceptual nexus between [its merits] argument and [the] injury" that creates standing. *Siemens USA Holdings Inc. v. Geisenberger*, 17 F.4th 393, 414–15 n.28 (3d Cir. 2021) (quoting 13B Wright & Miller, Fed. Prac. & Proc. Juris. § 3531.16 (3d ed. 2020)).

Finally, if (as here) the defendants do not dispute the jurisdictional facts alleged, the Court "must accept as true all material allegations" and "construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018). "Thus, when the jurisdictional facts and the facts central to a [plaintiff's] claim are inextricably intertwined, the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).

**II.     AAR has plausibly alleged associational standing to bring Counts II and III.**

If an organization sues "on behalf of its members," it must plausibly allege that (1) at least one member "would otherwise have standing"; (2) the interests "are germane to the group's purpose"; and (3) neither the claim nor the relief requires "participation of individual members." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005). No one disputes these claims are germane to AAR's purpose, Compl. ¶¶ 7–9, so we address the first and third elements.

2

### A.  AAR's members would have standing to sue in their own right.

AAR plausibly alleges two types of injury to its member railroads, each creating standing: (1) the *immediate and ongoing* diminution of their property rights, stripping away their right to exclude and gutting their bargaining power, and (2) the *imminent*, permanent physical taking and occupation of their property.[1]

#### 1.  Section 56-16.3's enactment and enforcement have already restricted the railroads' property rights, depriving them of their right to exclude.

a.  *Injury-in-fact.* A pre- and post-enactment comparison shows how AAR's members already suffer ongoing injury. Before § 56-16.3, the railroads had the full bundle of sticks that property ownership confers in Virginia, including "the right to control who enters [their] property." *E.g.*, *Solem v. Commonwealth*, No. 0884-22-2, 2023 WL 8192303, at *3 (Va. App. Nov. 28, 2023); Compl. ¶¶ 143, 178. If a broadband provider wanted to install a crossing on their property, they could say no for any reason—including concerns about safety, traffic volumes, operational interference, or future expansion plans. *See* Compl. ¶¶ 22, 28–29. Thus, they could and did rely on their right to exclude to strike bargains with broadband providers that accommodated new crossings while addressing these concerns. *Id.* ¶¶ 22, 28. They also spent significant time and money developing uniform engineering and safety policies and application procedures for crossings. *Id.* ¶ 21.

But they no longer have this right to exclude. Now, when a provider demands a new crossing, a railroad can try to negotiate or require compliance with its established procedures, but it has no leverage. The provider can invoke the statute whenever it "deems it necessary," Va. Code § 56-16.3(B)—and it knows that, even if it rejects all the railroad's concerns, the railroad can no longer exclude it. *See* Hr'g Tr. 21–22 (the Court making this point).

---

[1] AAR recognizes the Court intends to dismiss counts I and IV–VI. Because standing is independent of the merits, *supra* p. 2, this standing analysis applies to every claim in the complaint. So if the Court means to dismiss any claims for lack of standing, AAR submits that doing so would be erroneous for the reasons explained in this brief.

3

A timely example illustrates this change. Just after the March 21 motion hearing, AAR's counsel learned that CSX had received a notice "[p]ursuant to … § 56-16.3" from Cox Communications for a new crossing in Chesapeake, Virginia. *See* Saar Decl. Ex. 1 at 1 (filed with this brief). The notice declares Cox's "intent" to enter and permanently occupy CSX's property: "Our purpose in contacting you is to provide notice that Cox *will be crossing* the CSX corridor …." *Id.* at 1 (emphasis added); *see id.* at 2 (Cox "intends to cross your railway"). It also asserts that the installation work may take up to three days and that Cox—not CSX—will "use flagmen or spotters as appropriate" while working in the active rail corridor. *Id.* at 2. And it asserts that "Cox is entitled to commence the installation" in mid-April, after the statutory 35-day period. *Id.* at 3.

Before § 56-16.3, Cox could not simply declare its intent to enter and occupy CSX's land, which CSX owns in fee simple. Saar Decl. ¶ 4. It would have had to follow CSX's permitting process and negotiate appropriate terms, including to address any safety issues and avoid current or future operational interference. *See* Compl. ¶¶ 21–22, 24, 28–29. If Cox had rejected the permitting process or insisted on unreasonable terms, CSX could have fallen back on its right to exclude. But now, Cox can just announce it "will be crossing the CSX corridor," and CSX's only recourse is a petition addressed to the SCC's discretion that can raise only a narrow set of issues.

This is a concrete invasion of a legally protected interest. As the Court noted, "the right to exclude is a subset of the general property rights," so "[i]f you have a basic property right, then you have a right to exclude." Hr'g Tr. 12, 21. Indeed, "the right to exclude is universally held to be a fundamental element of the property right"—"one of the most essential sticks in the bundle." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021) (cleaned up). State action that strips away this power, in whole or in part, thus violates property rights. Virginia itself recognizes that "governmental action [that] adversely affects the landowner's ability to exercise a right connected

4

to the property" is actionable. *Kitchen v. City of Newport News*, 657 S.E.2d 132, 136 (Va. 2008). And again, "every violation of a right imports damage," whether or not the harm is quantifiable. *Uzuegbunam*, 141 S. Ct. at 802 (cleaned up); *see Wintergreen Homestead, LLC v. Pennington*, 108 Va. Cir. 514 (2021) ("entering and seizing" another's property gives rise "at a minimum" to nominal damages, even if the "invasion … produced no actual, present loss of any kind"), *aff'd*, 880 S.E.2d 30 (Va. App. 2022). No more is required to support standing. The effect on the railroads' bargaining position simply confirms the real injury they are already suffering. *See* Doc. 58 at 20; *Clinton v. City of New York*, 524 U.S. 417, 432–33 & n.22 (1998) (loss of a "bargaining chip" altered "market conditions" and "inflicted a sufficient likelihood of economic injury to establish standing").[2]

Defendants' arguments confirm these injuries. In their telling, Virginia passed this law precisely because, "prior to Va. Code § 56-16.3, railroads in Virginia used their 'right to exclude' as a 'powerful bargaining chip'" in negotiations. Doc. 72 at 13. The statute thus "prevents railroads from exploiting" their "right to exclude" in bargaining with the broadband providers. *Id.* at 1, 7. Having declared that the statute serves to strip away the railroads' right to exclude, which they previously relied on, Defendants cannot now claim it causes no injury by doing so.

Defendants cannot avoid this problem by noting that "[p]rivate property is always subject to … eminent domain." Doc. 72 at 7; Hr'g Tr. 22. This statute adopts a novel, streamlined takings regime that empowers private parties to permanently occupy railroad property whenever they deem it necessary. *See* Doc. 58 at 23–25. That Virginia could previously have exercised its general eminent domain power over railroad property—subject to all the attendant procedural protections and substantive restrictions—says nothing about how *this statute* has altered the status quo.

---

[2] Defendants say "the Constitution doesn't forbid the diminution of bargaining power," Hr'g Tr. 22, but what the law allows or forbids is a merits question; standing requires only an identifiable trifle of harm. *Friends*, 204 F.3d at 156.

5

Defendants also cannot wave away the right to exclude by asserting that railroads often acquired property through eminent domain or hold less than a fee-simple interest, so "the right to exclude will not be uniform." *See* Hr'g Tr. 15–17. Even if that were true, it would make no difference: The statute is relevant only if a railroad could otherwise exclude a broadband provider from crossing. If a railroad lacks that right, its permission to cross is not required and the statute never comes into play. But wherever a railroad *does* have a right to exclude, the statute strips it away. For that matter, AAR need not allege that every application of the statute will cause an Article III injury. To satisfy the first prong of associational standing, it need only offer allegations plausibly showing that the statute's enactment and enforcement will cause "at least one of its members an injury." *Am. Chem. Council v. DOT*, 468 F.3d 810, 818 (D.C. Cir. 2006).

Anyway, Defendants' premise is wrong. The operative complaint alleges that, while "AAR's members hold and use property" through "various property interests," a railroad right-of-way has the "attributes of the fee[:] perpetuity and exclusive use and possession." Compl. ¶ 37 (quoting *W. Union Tel. Co. v. Pa. R.R.*, 195 U.S. 540, 570 (1904)). Defendants' motions do not contest this allegation. And even when railroads acquired property in Virginia through eminent domain, they generally received "absolute fee simple titles," which of course includes the right to exclude. *E.g.*, *Matthews v. Codd*, 142 S.E. 383, 384 (Va. 1928). Defendants' contrary assertions skip over the pleadings in favor of books, treatises, and *amici* briefs. That is improper.

Nor does it matter whether AAR's members could potentially avoid or modify some crossings under the statute by seeking relief from the SCC. Again, before the statute's enactment, railroads could exclude broadband providers for any or no reason. Now, they can exclude broadband providers only if they persuade the SCC, in its discretion, that a narrow statutory ground for relief

6

applies. Va. Code § 56-16.3(H). By itself, that shift in their property rights is at least "an identifiable trifle." *Friends*, 204 F.3d at 156. And again, broadband providers' ability to invoke the statute has already dramatically shifted the parties' bargaining positions, as the Cox application shows.

      b.      *Causation*. These injuries are also "fairly traceable." *Spokeo*, 578 U.S. at 338. But for broadband providers' ability to invoke § 56-16.3, the railroads would retain their preexisting right to exclude and their bargaining power. Indeed, Commissioner Hudson does not dispute that the statute has already caused these injuries—he argues merely that prospective relief cannot redress "wrongs [that] have already been suffered." *See* Doc. 73 at 7–8. But that wrongly assumes a completed, *past* injury; this harm is ongoing as long as the statute is enforceable.

      c.      *Redressability*. These harms will be redressed by prospective relief barring the statute's enforcement. If the SCC will not enforce the statute, railroads need not accept forced occupations like Cox's, and they will regain their right to exclude and their bargaining power. That is true even if the SCC is not necessarily involved in every invocation of the statute, or if *Ex Parte Young* applies to only some of the SCC's actions under the statute. Under *Uzuegbunam*, "the ability 'to effectuate a partial remedy' satisfies the redressability requirement." 141 S. Ct. at 801.

      **2.**      **Section 56-16.3's enactment and enforcement will imminently cause actual, permanent physical takings of the railroads' property.**

      a.      *Injury-in-fact*. "[A]ppropriations of a right to invade are *per se* physical takings," *Cedar Point*, 594 U.S. at 158, and there is no dispute that such an "actual taking" causes an Article III injury, *see* Doc. 72 at 7. Still, Defendants say AAR "does not allege an actual or imminent crossing under Va. Code § 56-16.3." Doc. 48 at 15. But crossings *will* occur under the statute unless (i) broadband providers never invoke it or (ii) the railroads petition for relief from, and the SCC rejects, every single crossing. As to the first possibility, the Cox notice to CSX already disproves it—and the broadband industry's *amici* briefs, together with the billions of dollars of federal

7

funding for broadband expansion, confirm that more crossings will soon follow. As Commissioner Hudson's counsel said, "petitions … are going to be filed under this statute." Hr'g Tr. 11. As for the second possibility, "[t]he State has not suggested that the newly enacted law will not be enforced, and [there is] no reason to assume otherwise." *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). Drawing reasonable inferences in AAR's favor, it is simply not plausible that this statute will not imminently produce actual, physical occupations of railroad property.[3]

      b.    *Causation*. This imminent injury is also fairly traceable to the statute's enactment and enforcement. But for § 56-16.3, broadband providers could not occupy railroad property whenever they deem it necessary (limited only by the SCC's discretion on a narrow set of issues). Thus, physical invasions will imminently occur that would not occur if the statute is not enforced.

      c.    *Redressability*. For the same reasons, this injury is redressable by prospective relief against the statute's enforcement. If the SCC does not enforce the statute, railroads can again enforce their right to exclude, and providers will not be able to permanently invade railroad property.

      **B.**    **AAR's claims do not require the participation of individual members.**

Count III claims broadband expansion is not a public purpose. Compl. ¶ 161. If that is true—and for standing purposes, the Court must assume so—§ 56-16.3 is *never* valid. Nothing about that claim turns on the specifics of any parcel or crossing. Indeed, Defendants' individual-participation arguments conspicuously ignore Count III. *See* Doc. 72 at 7–8; Doc. 73 at 8.

Count II alleges that § 56-16.3 does not allow for just compensation. Compl. ¶ 158. Defendants say this claim is crossing-specific—and thus requires member participation—because the

---

[3] Defendants say a crossing "might just be a wire … on existing wire infrastructure," which "wouldn't be a physical invasion." Hr'g Tr. 23. The Supreme Court disagrees: "[P]ermanent occupations of land by such installations as telegraph and telephone lines … or wires are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere" with using the land. *Loretto v. Tel. Manhattan CATV Corp.*, 458 U.S. 419, 430 (1982). Nor does standing require "specific factual allegations" about "particular problems … at actual railroad crossings." Doc. 48 at 15. The imminent injury for standing is *the occupations themselves*, not any resulting safety or operational issues. And of course the Takings Clause applies whether or not a particular invasion causes practical "problems."

8

crossings' values will vary. Doc. 48 at 17; Doc. 72 at 7–8; Doc. 73 at 8. That is wrong.

To start, the fee for crossings in public rights-of-way—likely the most common type—is *zero dollars*. Va. Code § 56-16.3(K). This is not just a default; "in no case" is a fee allowed for such a crossing, so the SCC can never provide compensation. *See id.* § 56-16.3(G), (H), (K). And again, the statute comes into play only when railroads otherwise have a right to exclude. So *every* public-right-of-way crossing under § 56-16.3 infringes on that right and occupies railroad property—with no compensation at all. Whatever those rights are worth in a specific case, they are never worth nothing. *See Uzuegbunam*, 141 S. Ct. at 799. At a minimum, then, no member participation is needed in relation to crossings in public rights-of-way.

Nor is member participation needed for other crossings. Crossings of legally abandoned rail lines are capped at $1,000—which the SCC again cannot increase. But "abandonment" is a regulatory term of art for ending a railroad's common-carrier obligation over a line, *R.R. Ventures, Inc. v. STB*, 299 F.3d 523, 531 (6th Cir. 2002); it does not extinguish the railroad's ownership or prevent it from "convert[ing] the real estate to other uses," *Wisc. Cent. Ltd. v. STB*, 112 F.3d 881, 885 (7th Cir. 1997). So these crossings still infringe railroads' property rights. And while the net present value of such a permanent crossing may vary, it is not less than $1,000. *See* Compl. ¶ 106.

All other crossings are capped at $2,000, subject to the SCC's discretion. But "[g]enerally speaking, neither the market value nor the highest and best use of any crossing easement of railroad property is valued at $2,000 or less." *Id.* ¶ 105. This allegation is plausible, especially since these crossings are permanent—there is no way for railroads to remove or relocate them. Thus, the Court must assume that, in most or many cases, AAR's members could secure just compensation only by petitioning the Commission. And there will be hundreds of crossings. *See* Doc. 58 at 37.

9

This case thus triggers the rule that if "effective legal relief can be secured only by a multiplicity of actions"—*e.g.*, if the "plaintiff would be required to pursue damages each time plaintiff was injured"—equitable relief is appropriate. *PhRMA v. Williams*, 64 F.4th 932, 943 (8th Cir. 2023). *Williams* relied on a case holding that just "six actions constitute a 'multiplicity.'" *Equitable Life Assur. Soc. v. Wert*, 102 F.2d 10, 15 (8th Cir. 1939). Dozens or hundreds of suits do too.

Finally, Defendants point to the facial-challenge standard. Hr'g Tr. 16. But as they admit, "the facial challenge" question "is a 12(b)(6) issue"—a merits question. *Id.* at 19. And for standing, the Court must assume success on the merits. Beyond that, this argument depends on variation among crossings, *see id.*, so it fails for the reasons above: The statute comes into play only if railroads could otherwise exclude, so the statute always infringes the right to exclude.

In any event, "determinations that statutes are facially invalid properly occur only as logical outgrowths of rulings on whether statutes may be applied to particular litigants on particular facts," *PETA, Inc. v. N.C. Farm Bureau Fed'n*, 60 F.4th 815, 835 (4th Cir. 2023) (cleaned up), so the facial/as-applied distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint," *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). Thus, if AAR plausibly alleges Article III standing and a takings violation, the Court cannot dismiss the entire case just because the law might have some valid applications. Doc. 58 at 23; *Bruni v. Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016); *Doe v. Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012).[4]

## CONCLUSION

For these reasons, the Court should hold that AAR has standing.

---

[4] For all these reasons, the general principle that the "takings cases" should be decided in an "actual factual setting," Doc. 72 at 8 (quoting *Pennell v. San Jose*, 485 U.S. 1, 10 (1988)), does not control here. The statute's fatal across-the-board flaws—and the specific theories of Counts II and III—render any crossing-by-crossing variation immaterial.

| | |
|---|---|
| March 27, 2024 | Respectfully submitted,<br><br>/s/ Lucas W.E. Croslow<br>Lucas W.E. Croslow, VA Bar No. 97517<br>Gordon D. Todd<br>Raymond A. Atkins<br>Tobias S. Loss-Eaton<br>Chike B. Croslin<br>Stephen S. Laudone<br>Lakeisha F. Mays<br>SIDLEY AUSTIN LLP<br>1501 K Street, NW<br>Washington, D.C. 20005<br>(202) 736-8000<br>(202) 736-8711 (facsimile)<br>gtodd@sidley.com<br>ratkins@sidley.com<br>tlosseaton@sidley.com<br>ccroslin@sidley.com<br>lcroslow@sidley.com<br>slaudone@sidley.com<br><br>*Counsel for the Association of American Railroads* |