IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ASSOCIATION OF AMERICAN
RAILROADS,
      Plaintiff,

v.                                     Civil No. 1:23cv815 (DJN)

JEHMAL T. HUDSON, *et al.*,
      Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on Defendants Stephen Brich and Michael Rolband's ("Brich and Rolband") Motion to Dismiss the Amended Complaint, (ECF No. 47), and Defendant Jehmal T. Hudson's ("Hudson") Motion to Dismiss the Amended Complaint, (ECF No. 49). For the reasons set forth below, the Court will GRANT the Motions to Dismiss, (ECF Nos. 47 and 49). Specifically, the Court will dismiss Counts I–II for lack of standing, Counts III–IV for failure to state a claim on the merits and Counts V–VI as barred by sovereign immunity.

## I.      BACKGROUND

Plaintiff the Association of American Railroads ("Plaintiff" or "AAR") brings this action attacking the constitutionality of Virginia Code § 56-16.3, a state law that went into effect July 1, 2023, and which gives Internet broadband service providers access rights to railroad property. Plaintiff seeks (i) declaratory relief holding that the Commonwealth's law violates federal and state constitutional and statutory law, (ii) injunctive relief enjoining the Defendants in their official capacities from enforcing the law, and (iii) nominal damages and attorney fees against

the Defendants in their personal capacities.  The Court first examines the challenged statute, then overviews the Parties and six counts of the Amended Complaint.

At this stage, the Court must accept as true the facts set forth in the Amended Complaint (ECF No. 35).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving the instant motion.

### A.    Preexisting Processes and Regulations of Railroads

Railroads have maintained policies and procedures regarding the installation of broadband services before the enactment of Va. Code § 56-16.3.  AAR's two "Class I" members in Virginia — Norfolk Southern Railway Co. ("NSR") and CSX Transportation, Inc. ("CSXT") — maintain a process by which the relevant railroad or its outside contractors conducts an engineering and design review of any proposed broadband installation to ensure compliance with the railroad's engineering and safety requirements.  (Am. Compl. ¶¶ 21–22.)  Given that a broadband installation often requires railroad personnel to be onsite for safety and operational purposes, broadband providers generally reimburse the railroads for certain charges related to administrative, engineering review and inspection costs.  (*Id.*)  Railroads also require that broadband installation applicants agree to standard contractual terms regarding maintenance, the relocation of crossings if necessary for railroad operations, indemnification and insurance coverage.  (*Id.*)

The application process for a broadband installation takes substantial time, with applicants requiring several months on average to provide railroads with necessary information and then secure approval.  (*Id.* ¶¶ 24–25.)  Scheduling the installation of a broadband crossing of railroad property takes additional time, with railroads having to arrange flaggers, crossing site inspections, marking of utility lines and other logistical issues.  (*Id.* ¶ 26.)

2

Railroads also face federal oversight.  Since Congress' enactment of the Interstate

Commerce Commission Termination Act of 1995 ("ICCTA"), the Surface Transportation Board

("STB") has maintained exclusive jurisdiction over (1) "transportation by rail carriers . . . with

respect to rates, classifications, rules . . ., practices, routes, services, and facilities of such

carriers" and (2) "the construction, acquisition, operation, abandonment, or discontinuance of

[tracks] or facilities."  (*Id.* ¶¶ 31–32, citing 49 U.S.C. § 10501(b).)  ICCTA applies to any "yard,

property, facility, instrumentality, or equipment of any kind related to the movement of

passengers or property, or both, by rail, regardless of ownership or an agreement concerning

use," along with "the road used by a rail carrier" and any "switch, spur, track, terminal, terminal

facility, and a freight depot, yard, and ground, used or necessary for transportation."  49 U.S.C.

§ 10102(6), (9)(A).  The Amended Complaint notes that ICCTA provides that "a rail carrier

cannot lawfully 'abandon any part of its railroad lines' or 'discontinue operation of all rail

transportation over any part of its railroad lines' unless the STB 'finds that the present or future

public convenience and necessity' are satisfied."  (Am. Compl. ¶ 32, citing 49 U.S.C.

§ 10903(d).)

**B.     Va. Code § 56-16.3**

Enacted by Virginia's General Assembly in 2023 as part of a push to expand broadband

internet access in the Commonwealth, Va. Code § 56-16.3 extends a license to broadband service

providers to cross and occupy railroad property, including "tracks, bridges, facilities, and all . . .

rights of way or easements" for a one-time, default fee of $2,000 and direct expenses (which the

provider pays to the railroad) not to exceed $5,000.  Va. Code § 56-16.3(G), (I).  The statute

stipulates, in relevant part, that:

- "If a broadband service provider deems it necessary in the construction of its systems to
  cross the works of a railroad company, including its tracks, bridges, facilities, and all

3

railroad company rights of way or easements, then the broadband service provider shall submit an application for such crossing to the railroad company," *see id.* § 56-16.3(B);

- "The railroad company shall approve the broadband service provider's crossing application within 35 days after the application is received," *id.* § 56-16.3(C)(4); and

- "A broadband service provider that locates its fiber optic broadband line within a railroad right-of-way shall pay the railroad company for the right to make a crossing of the railroad company's works a license fee of $2,000 for each crossing." *Id.* § 56-16.3(G).

The statute sets a $1,000 fee if the applicant's railroad crossing lies at "a section of track that has been legally abandoned pursuant to an order of a federal or state agency," and "is not being used for railroad service." *Id.* § 56-16.3(I). The measure exempts broadband providers from paying a license fee for "a crossing of the railroad company's works within a public right-of-way." *Id.* § 56-16.3(K).

To secure the right to cross railroad property, a broadband provider must submit an application to the railroad with design and construction plans for the proposed crossing, including "bore plans, fraction mitigation plans, dewatering plans, rigging and lifting plans, and any other pertinent plans deemed necessary and prepared by a registered professional engineer." *Id.* § 56-16.3(C)(1). The provider's application must also disclose "the location of the crossing, including whether it is located in a public right-of-way;" (2) "the anticipated duration of the work in the crossing;" and (3) "the areas in which the project personnel will work.'" *Id.* Broadband providers "shall be responsible for all aspects of the implementation of the physical crossing," including compliance with "accepted industry standards," but a railroad company would bear responsibility "for flagging operations and other protective measures that it deems appropriate during the actual construction of fiber optic broadband lines." *Id.* § 56-16.3(F). The statute does not exempt broadband providers from any applicable state statutes and regulations

4

regarding roadway safety, environmental protection, storm or groundwater management or related approval or permitting requirements. (Am. Compl. ¶ 45.)

A railroad in receipt of a provider's application for a crossing "shall approve the broadband service provider's crossing application within 35 days after the application is received," unless the railroad petitions the Virginia State Corporation Commission ("SCC" or "the Commission") for relief. Va. Code § 56-16.3(C)(2)–(4). The railroad may only seek relief on three bases: (1) the license fee does not suffice as "adequate compensation" for a particular crossing, (2) a proposed crossing will impose "undue hardship" on the railroad company, or (3) a proposed crossing "will create the imminent likelihood of danger to public health or safety." *Id.* § 56-16.3(H). The SCC may then:

> make any necessary findings of fact and determinations related to the adequacy of compensation, the existence of undue hardship on the railroad company, or the imminent likelihood of danger to public health or safety, as well as any relief to be granted, including any amount to which the railroad company is entitled in excess of the [default] license fee.

*Id.* The railroad can appeal a decision of the SCC to the Supreme Court of Virginia. *Id.* § 12.1-39. In Plaintiff's telling, the statute does not permit railroads to rely on a proposed crossing's failure to comply with railroad safety requirements or failure to agree to a railroad's "other standard conditions" as bases for rejecting a proposed crossing. (Am. Compl. ¶ 48.)

## C. The Parties

Plaintiff, an industry trade association representing freight and passenger railroads that operate nationwide and in Virginia, brings this action in its representative capacity on behalf of its member railroads that operate in Virginia. (Am. Compl. ¶ 9.) Plaintiff argues that the Court has jurisdiction over its "associational claim," because: (1) AAR's "'members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose;

and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit.'" (*Id.*, quoting *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002).)

Plaintiff names as Defendants Jehmal Hudson, Commissioner of the SCC;[1] Michael Rolband, Director of the Virginia Department of Environmental Quality ("VDEQ"); and Stephen Brich, Commissioner of the Virginia Department of Transportation ("VDOT"). Plaintiff alleges that these Defendants either enforce Va. Code § 56-16.3 (in the case of Hudson) or grant permits or approvals that constitute a condition precedent for the exercise of broadband service providers' rights under the statute (in the cases of Rolband and Brich). (Am. Compl. ¶¶ 10–13.)

The SCC is a "department of government" that issues charters and licenses for corporations, including railroads, that conduct business in the Commonwealth. Va. Const. art. IX, § 2; Va. Code § 12.1-12. Plaintiff alleges that Hudson qualifies as a proper Defendant, because Va. Code § 56-16.3 tasks the SCC with enforcing the statute and with general enforcement authority over public service companies, such as railroads, through the levying of fines (and revocation of licenses as a penalty for unpaid fines). (Am. Compl. ¶ 10.)

Plaintiff names Rolband as a Defendant, because "VDEQ is charged with supervising regulations requiring prior review and approval for construction involving land-disturbing

---

[1]     On March 13, 2024, Plaintiff filed a Motion to Amend/Correct the Amended Complaint, requesting leave to file a Second Amended Complaint to add as defendants the two newly appointed State Corporation Commissioners Samuel Towell and Kelsey Bagot. (Mot. to Amend/Correct the Am. Compl. (ECF No. 76).) Towell took office March 20, 2024, and Bagot took office April 1, 2024. (Mem. in Supp. of Mot. to Amend/Correct the Am. Compl. (ECF No. 77) at 1.) As explained *infra*, the Court has decided to dismiss all counts in the instant lawsuit. Accordingly, because Plaintiff merely proposes adding Towell and Bagot as defendants for the same reasons that the Amended Complaint names Hudson (i.e., because they constitute Commissioners of the SCC), the Court's reasoning would apply equally to Towell and Bagot. The Court will therefore DENY AS MOOT Plaintiff's Motion to Amend/Correct the Amended Complaint, (ECF No. 76).

6

activities, such as excavation, and stormwater management, including dewatering — both of which are specifically contemplated in Va. Code § 56-16.3(C)(1)(ii)." (*Id.* ¶ 11.) Plaintiff also argues that VDEQ's Director qualifies as a proper Defendant based on the agency's enforcement of regulations concerning the installation of underground utility lines and its supervision of agreements regarding internal approvals of erosion or stormwater management plans. (*Id.*)

Plaintiff names Brich as a Defendant, because broadband providers "routinely coordinate permitting with VDOT as part of new and ongoing projects" and must obtain VDOT approval for state highway right-of-way projects. (*Id.* ¶ 12.) The challenged statute provides that the "Commonwealth shall grant a right-of-way to any broadband service provider seeking to" use the Commonwealth's property "for broadband deployment." Va. Code § 56-16.3(J).

### D.   Procedural History

Seeking a decision holding that Va. Code § 56-16.3 qualifies as invalid on constitutional and statutory grounds, Plaintiff filed this complaint for declaratory and injunctive relief (and nominal damages) on June 23, 2023. (ECF No. 1.) On August 31, 2023, the case was reassigned to the undersigned in the interest of judicial efficiency. (ECF No. 31.) Plaintiff filed an Amended Complaint as of right on September 1, 2023. (ECF No. 35).

The Amended Complaint alleges that: (i) a provision of ICCTA, 49 U.S.C. § 10501(b), preempts Va. Code § 56-16.3, and therefore the state law is void and unenforceable (Count I) (Am. Compl. ¶¶ 152–56.); (ii) Va. Code § 56-16.3 violates the Takings Clause of the U.S. Constitution's Fifth Amendment by failing to provide railroads with a mechanism for just compensation, "as measured by the market value of the property's highest and best use," for a crossing by broadband providers (Count II) (*id.* ¶ 158); (iii) the challenged statute separately violates the Takings Clause by allowing a taking of private property for *private* use, rather than

7

public use (Count III) (*id.* ¶ 161); (iv) Defendants deprived AAR member railroads of a protected property interest — i.e., their property right in the performance of a contract with the Commonwealth — by denying AAR member railroads adequate notice and an opportunity to challenge this property deprivation, in violation of the Due Process Clause of the U.S. Constitution's Fourteenth Amendment and 42 U.S.C. § 1983 (Count IV) (*id.* ¶¶ 163–171); (v) Defendants tortiously interfered with an existing contract between Plaintiff's members and the Commonwealth, thereby violating Art. I, § 11 of the Virginia Constitution (Count V) (*id.* ¶¶ 173–79); and (vi) Defendants tortiously interfered with AAR member railroads' contract expectancy, prospective business relationship or prospective economic advantage by inducing or causing broadband providers to "curtail or abandon" a longstanding practice of contracting with railroads regarding crossings (Count VI) (*id.* ¶¶ 180–86).

The Amended Complaint names the three Defendants in their official capacity for Counts I–III and in their individual capacities for Counts IV–VI.

On October 13, 2023, Defendants Brich and Rolband filed their Motion to Dismiss the Amended Complaint, (ECF No. 47), and Defendant Hudson separately filed his own Motion to Dismiss, (ECF No. 49). Both Motions argue that the Court should dismiss the Amended Complaint for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6).

The Court has also received and reviewed three amicus briefs in this matter: one from the VCTA-Broadband Association of Virginia ("VCTA") and the NCTA-Internet and Television Association ("NCTA"), (ECF No. 54); one from the Virginia, Maryland, and Delaware Association of Broadband Cooperatives ("VMDABC"), (ECF No. 57); and one from RailPros

Field Services, Inc. ("RailPros"), (ECF No. 71).  VCTA, NCTA and VMDABC support Defendants' Motions to Dismiss, while RailPros opposes the Motions.

On November 20, 2023, Plaintiff filed its response in opposition, (ECF No. 58), to the two Motions to Dismiss and responding to the two amicus briefs backing the Motions, and on December 19, 2023, Defendants replied, (ECF Nos. 72–73), rendering both Motions ripe for review.[2]

## II.    STANDARD OF REVIEW

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(l) challenges the court's jurisdiction over the subject matter of the complaint.   A defendant moving for dismissal for lack of subject matter jurisdiction may either attack the complaint on its face, asserting that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," or may attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *White v. CMA Const. Co., Inc.,* 947 F. Supp. 231, 233 (E.D. Va. 1996) (internal citations omitted).  In either case, the plaintiff bears the burden of proof to establish jurisdiction. *Richmond, Fredericksburg & Potomac R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991).  The Court must dismiss an action if it determines that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

---

[2]     On March 21, 2024, the Court held a hearing on the pending Motions to Dismiss.  (ECF No. 80.)  During the hearing, the Court invited all parties to submit supplemental briefing on standing as to Counts II and III, including the impact of the Supreme Court's decision in *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021).  (March 21, 2024 Hr'g Tr. at 31:10– 32:15.)  The Parties did so, with Brich and Rolband filing a supplemental brief arguing that Plaintiff lacks standing to bring Counts II and III, (ECF No. 87), and Hudson arguing the same, (ECF No. 88).  Plaintiff filed a supplemental brief asserting that standing exists for Counts II and III, (ECF No. 89), along with an exhibit containing a declaration from a CSXT employee who provided a notice that CSXT received from a broadband installer regarding its intent to complete a broadband installation on CSX's property in Virginia, (ECF Nos. 90, 90-1).

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court accepts the plaintiff's well-pleaded allegations in the complaint as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. The facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

10

### III.   ANALYSIS

Defendants lodge various jurisdictional and merits-based objections against the Amended Complaint.  Defendants allege that Plaintiff lacks standing to bring its claims, that sovereign immunity bars the claims and that the claims fail on the merits.  The Court first addresses Defendants' jurisdictional arguments before turning to the merits of any surviving claims.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction . . . the only function remaining to the court is that of announcing the fact and dismissing the cause.").

### A.   Subject Matter Jurisdiction

Defendants Brich and Rolband argue that the Court lacks jurisdiction to hear Plaintiff's claims for three reasons:  (1) AAR lacks standing; (2) sovereign immunity bars the claims; and (3) Brich and Rolband do not enforce Va. Code § 56-16.3 and therefore cannot be subject to a declaratory judgment pursuant to the Declaratory Judgment Act.  (Def. Brich and Rolband's Mem. in Supp. of Mot. to Dismiss ("Brich and Rolband Mem.") (ECF No. 48) at 6.)  Similarly, Defendant Hudson argues that the Court lacks jurisdiction because:  (1) the Amended Complaint fails to allege standing under either Article III or the Declaratory Judgment Act; and (2) the challenged statute gives the SCC "a purely judicial role," and therefore the Eleventh Amendment shields him from suit.  (Def. Hudson's Mem. in Supp. of Mot. to Dismiss ("Hudson Mem.") (ECF No. 50) at 2.)[3]  The Court starts by assessing Defendants' Article III challenges to ripeness and standing, then examines arguments regarding the Parties' sovereign immunity and the applicability of declaratory relief.

---

[3]      As explained *supra* at note 1, the Court applies these same arguments to the SCC's new Commissioners.

### 1.    Ripeness

Defendants argue that Plaintiff's claims are not justiciable, because they have not ripened. Ripeness is a "justiciability doctrine [that] determines when a case or controversy is fit for federal judicial review." *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 199 (4th Cir. 2019). "The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006) (quoting *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 584 (1947)). A claim stands ripe for adjudication "when the action in controversy is final and not dependent on future uncertainties." *In re Naranjo*, 768 F.3d 332, 347 (4th Cir. 2014). Conversely, a claim has not ripened "if the plaintiff has not yet suffered injury and any future impact remains wholly speculative" or "[w]here an injury is contingent upon a decision to be made by a third party that has not yet acted." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). "The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006) (quoting *Rescue Army v. Mun. Court of L.A.*, 331 U.S. 549, 584 (1947)).

In determining ripeness, courts must balance "the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002). A claim stands fit for judicial decision "when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013). Hardship is "measured by the immediacy of the threat and the burden imposed" on a plaintiff. *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208–09 (4th Cir. 1992).

12

Counts I–III of the Amended Complaint qualify as ripe for adjudication. While the Amended Complaint concerns the future impact of Va. Code § 56-16.3 — i.e., on crossings that have yet to occur — Plaintiff brings a *facial* challenge to the statute in Counts I–III, alleging that the statute violates federal law. (Am. Compl. ¶¶ 152–62.) A case that presents "purely legal" issues stands fit for adjudication, and facial challenges qualify as such. *See, e.g., Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534 (1992) (holding that a facial takings claim had ripened, because the claim did not turn on individual circumstances of particular property); *Clayland Farm Enters., LLC v. Talbot Cnty., Maryland*, 672 F. App'x 240, 244 (4th Cir. 2016) ("Facial takings challenges to a regulation are 'generally ripe the moment the challenged regulation or ordinance is passed'"); *Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1358 (Fed. Cir. 2002) ("[F]acial challenges to statutes or regulations are ripe as of the enactment of the rule"). Because Counts I–III bring a facial challenge to Va. Code § 56-16.3, they are ripe.

Likewise, as to Count IV, Plaintiff alleges that Defendants, "[i]n giving effect to Virginia Code Ann. § 56-16.3, . . . act to deprive Plaintiff of its due process rights under color of state law." (Am. Compl. ¶ 171.) Because the Amended Complaint alleges that the statute in *all* of its applications requires Defendants to deprive AAR member railroads of due process, the statute on its face allegedly compels a violation of the Fourteenth Amendment's Due Process Clause. Accordingly, Count IV has ripened as a facial challenge on Fourteenth Amendment grounds.[4]

---

[4]     As explained *infra*, the Court will dismiss Counts V and VI on sovereign immunity grounds. The Court therefore refrains from addressing whether Plaintiff has standing to bring those claims or whether they have ripened.

## 2.    Standing

Constitutional standing, like ripeness, is rooted in Article III's case-or-controversy requirement and requires a plaintiff to show:  (1) that the plaintiff has sustained an injury in fact; (2) that the injury is traceable to the defendants' actions; and (3) that the injury likely can be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).   To demonstrate an injury in fact, a plaintiff must suffer an invasion of a legally protected interest that is concrete and particularized, as well as being actual or imminent. *Id.*  A "conjectural or hypothetical" injury does not suffice. *Id.*  Plaintiff bears the burden of proving that it has standing. *Id.*

An association like AAR can satisfy constitutional standing in one of two ways:  (1) the association "may have standing in its own right" or (2) "the association may have standing as the representative of its members who have been harmed." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991).   AAR brings this action in a representational capacity on behalf of its member railroads that operate in Virginia.  (Am. Compl. ¶ 9.) Accordingly, the Court applies the Supreme Court's test for representational standing:  an organization must allege that "(1) its members would otherwise have standing to sue in their own right; (2) the interests [the organization] seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977*)*.  To show that its members would have standing, an organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).  An alleged "future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm

14

will occur." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018).  Further, to obtain declaratory and injunctive relief, a plaintiff "must establish an ongoing or future injury in fact." *Id.*

Applying the *Hunt* test, the Court first considers whether AAR has alleged that its own members would have standing to sue in their own right for Counts I–IV — i.e., whether Plaintiff has specifically alleged that at least one AAR member railroad has suffered or will suffer harm, *Summers*, 555 U.S. at 498 — and whether any of the claims in Count I–IV require the participation of individual members in this suit.[5]

### a.   Count I

Defendants allege that Plaintiff lacks standing to bring a preemption claim under Count I, because ICCTA does not confer a cause of action.  (Brich and Rolband Mem. at 13.).  But whether AAR possesses a cause of action constitutes a separate question from whether an individual railroad has suffered an injury in fact for standing purposes. *See Virginia Hosp. & Healthcare Ass'n v. Roberts*, 2023 WL 3132005, at *9 (E.D. Va. Apr. 27, 2023) (holding that because association members showed that they suffered a "concrete and particularized" injury, the members — and by extension, the association — had standing to sue on a statutory preemption claim).  Separate and apart from constitutional standing, a plaintiff must have a common law or "legislatively conferred cause of action encompass[ing] a particular plaintiff's claim" to proceed in court. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–27 (2014).  This constitutes a merits inquiry that requires "apply[ing] traditional principles of statutory interpretation." *Id.* at 128; *see also DiCocco v. Garland*, 52 F.4th 588, 591 (4th Cir.

---

[5]     Defendants do not contest the second prong of the representational-standing test, i.e., whether the interests that AAR seeks to protect are germane to the organization's purpose.  As a non-profit association representing and advocating on behalf of freight and passenger railroads, including railroads operating within Virginia, AAR clearly meets this prong. (Am. Compl. ¶¶ 7–8.)

2022) ("Standing does not turn on whether a plaintiff has definitively stated a valid cause of action.").

### i.    Individual Member Standing

As to standing, Plaintiff alleges that it suffers an injury-in-fact, because Va. Code § 56-16.3 regulates railroads in a manner facially preempted by ICCTA.  ICCTA provides, in relevant part, that state laws "with respect to *regulation* of rail transportation" are "preempt[ed]." 49 U.S.C. § 10501(b) (emphasis added).  The Fourth Circuit has "recognized that Congress 'narrowly tailored the ICCTA preemption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation." *Norfolk S. Ry. v. City of Alexandria*, 608 F.3d 150, 157 (4th Cir. 2010).  The Fourth Circuit also noted that state law which *does* regulate railroads may qualify as a "proper exercise of police power," but such a regulation must not "(1) discriminate against rail carriers or (2) "unreasonably burden rail carriage." *Id.* at 160.  Plaintiff alleges that Va. Code § 56-16.3 gives rise to a redressable injury under ICCTA, because the statute: (1)  discriminates against rail carriers by restricting their right to evaluate whether crossing applications conform with engineering and safety policies and whether a crossing will unreasonably interfere with rail operations; (2) authorizes uses of railroad property that would conflict with present or future use by the railroads by permitting broadband providers to permanently occupy railroad property; and (3) unreasonably burdens rail transportation by imposing a greater burden to protect against harmful crossings than the burden that ICCTA imposes.  (Am. Compl. ¶¶ 153–55.)

Defendants counter that AAR member railroads lack standing to bring an ICCTA preemption claim, because courts must evaluate ICCTA preemption on an as-applied basis, considering the particular details of proposed crossings.  (Brich and Rolband Mem. at 15.)

Accepting all well-pleaded allegations in the Amended Complaint as true and viewing the facts in the light most favorable to AAR, *Mylan Lab'ys*, 7 F.3d at 1134, Plaintiff has plausibly alleged that its members suffer an injury-in-fact, and thus has satisfied the first part of the *Hunt* test. Member railroads plausibly face a risk that at least *one* railroad will have a broadband crossing imposed on it under § 56-16.3 that conflicts with the railroad's operations, policies or planned future use — a different outcome than for a non-railroad property owner that could refuse the broadband provider access to its land. The conflict between ICCTA's statutory regime and (in the Amended Complaint's phrasing) the "quick-take easement" that the challenged statute contemplates, (Am. Compl. ¶¶ 55–59), establishes at this stage of the litigation "that at least one identified member ha[s] suffered or would suffer harm." *Summers*, 555 U.S. at 498. AAR thus meets the first prong of *Hunt* for Count I.

### ii.    Necessary Participation of Individual Members

However, Plaintiff fails to satisfy the third prong for representational standing:  the necessary participation of individual members.  Plaintiff argues that because it brings a facial challenge to Va. Code § 56-16.3, individual members do not need to participate in this suit. (Pl.'s Opp. to Defs.' Mot. to Dismiss (ECF No. 58) ("Pl.'s Opp.") at 21.)  The Parties dispute the impact of *United States v. Salerno*, in which the Supreme Court stated that "[a] facial challenge to a legislative [a]ct is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [a]ct would be valid."  481 U.S. 739, 745 (1987).  Plaintiff argues that *Salerno* does govern facial constitutional or statutory preemption challenges, relying on *PETA, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 834 (4th Cir. 2023).  In *PETA*, the Fourth Circuit concluded that *Salerno* did not constitute the proper test for a facial challenge in a First Amendment speech case, remarking that

"if courts have ever articulated a clear standard for facial challenges, it is not the *Salerno* formulation." *PETA*, 60 F.4th at 834 (collecting cases that applied "the relevant constitutional standard, not *Salerno*'s no-set-of-circumstances test" to facial challenges arising under the First, Second, Fourth and Fourteenth Amendments).

Unfortunately for Plaintiff, the Supreme Court weighed in four months after the Fourth Circuit's decision in *PETA*. *See United States v. Hansen*, 599 U.S. 762, 769 (2023) (citing *Salerno*, 481 U.S. at 745, and observing that "litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid'"). While *Hansen* noted an exception to the *Salerno* rule — the "overbreadth doctrine" — that doctrine primarily concerns the First Amendment. *Id.* at 769–70. And though the Fourth Circuit has yet to address how *Hansen* reemphasized *Salerno*'s application to facial challenges, multiple other circuits have done so. *See, e.g., Antonyuk v. Chiumento*, 89 F.4th 271, 386 (2d Cir. 2023) (approvingly citing *Hansen* and holding that a district court erred in enjoining a statute in all its applications after finding that "there was at least one set of circumstances in which the statute could be valid"); *L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 489 (6th Cir. 2023) (hereinafter "*Skrmetti*"), *cert. dismissed in part sub nom. Doe v. Kentucky*, 144 S. Ct. 389 (2023) (acknowledging *Hansen*, calling *Salerno*'s no-set-of-circumstances test a "strict standard" that the appellate court lacked "authority to dilute," and applying *Salerno* to reverse a preliminary injunction against enforcement of a state statute); *id.* ("We have many cases adhering to the *Salerno* test").

Reviewing *PETA* in light of *Hansen*, the Court concludes that to the extent that *PETA* remains relevant to properly interpreting *Salerno*, the case is inapposite here, as the Fourth Circuit's decision focused on the First Amendment. *See Hansen*, 599 U.S. at 769 (observing that

the "overbreadth doctrine," while "breaking from" the *Salerno* rule for facial challenges,

"provides breathing room for free expression" in First Amendment cases); *see also United States*

*v. Stevens*, 599 U.S. 460, 472 (2010) (noting that *Salerno* did not concern a First Amendment

speech case). Indeed, the Fourth Circuit itself has in recent years reiterated that "facial

challenges typically require 'a showing that no set of circumstances exists under which the [law]

would be valid, i.e., that the law is unconstitutional in all of its applications, or that the statute

lacks any plainly legitimate sweep.'" *See Edgar v. Haines*, 2 F.4th 298, 313 (4th Cir. 2021)

(noting that First Amendment "overbreadth" cases present an exception). As *Edgar* observed:

> Such facial challenges 'are disfavored' because they 'run contrary to the fundamental
> principle of judicial restraint that courts should neither anticipate a question of
> constitutional law in advance of the necessity of deciding it nor formulate a rule of
> constitutional law broader than is required by the precise facts to which it is to be
> applied.'

*Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).

Nonetheless, Plaintiff asserts, *Salerno* does not apply to a facial preemption challenge.

(Pl.'s Opp. at 23, citing *AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 600–01

(D. Md. 2007) for the proposition that "most courts do not invoke [*Salerno*] in the context of

preemption".) But in the District of Maryland case that Plaintiff cites, the court concluded that

"a finding of express or field preemption inherently means that there are no circumstances under

which the challenged statute or regulation could be valid," thereby *meeting* the *Salerno* standard.

*AES Sparrows Point LNG*, 470 F. Supp. 2d at 601; *see id.* (because "there are no circumstances

under which the [challenged law] could be constitutionally valid," plaintiff satisfied *Salerno*).

That case thus simply stands for the principle that where federal law *expressly* preempts state

action, a court does not need to conduct a further inquiry into the "no-set-of-circumstances" test,

because the state law would inherently clash with federal law.  In light of this case law, Plaintiff's out-of-circuit citations fail to persuade the Court to jettison *Salerno* here.

The question therefore becomes whether Plaintiff's facial challenge plausibly alleges that either (1) ICCTA expressly preempts Va. Code § 56-16.3 or (2) no set of circumstances exists in which Va. Code § 56-16.3 could operate without conflicting with ICCTA.  If the answer to both questions is no, then Plaintiff's facial challenge fails, and only as-applied challenges survive. And if that is the case, then AAR member railroads would necessarily have to participate in the suit to establish the "individualized proof" that ICCTA preempts the statute in an as-applied context. *Hanover Cnty. Unit of the NAACP v. Hanover Cnty.*, 461 F. Supp. 3d 280, 289 (E.D. Va. 2020).  Whether Plaintiff possesses standing to bring Count I thus requires considering the underlying merits of the facial ICCTA preemption challenge.

In support of its facial challenge, Plaintiff argues that Va. Code § 56-16.3 has "the effect of 'managing' or 'governing' rail transportation" and therefore falls subject to "express" or "categorical" preemption by ICCTA in *all* contexts.  (Pl.'s Opp. at 22.)  Plaintiff notes that the statute concerns proposed crossings of "the works of a railroad company, including its tracks, bridges, facilities, and all railroad company rights of way or easements," and contends that the statute targets rail facilities that fall within the STB's exclusive jurisdiction.  (*Id.* at 27, quoting Va. Code § 56-16.3(B).)  Because this statutory language overlaps with part of ICCTA's definition of "transportation,"[6] Va. Code § 56-16.3 applies to property that Congress precluded from state regulation, in AAR's view.  (Am. Compl. ¶ 32; Pl.'s Opp. at 27.)  Plaintiff contends

---

[6]     *See* 49 U.S.C. § 10102(9)(A) (defining "transportation" to include any "yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail").

that the Commonwealth's statute thus impermissibly "regulates" railroads by (1) restricting their right to exclude permanent occupants and (2) requiring railroads to facilitate flagging and construction on an insufficient timeline to conduct appropriate engineering and design reviews, prioritizing broadband operations over rail-related projects. (Am. Compl. ¶ 87.) Plaintiff asserts that by "regulating" railroads, the statute has "the effect of 'managing' or 'governing'" their facilities, thereby implicating express ICCTA preemption. (Pl.'s Opp. at 28, quoting *Skidmore v. Norfolk S. Ry.*, 1 F.4th 206, 214, 216 (4th Cir. 2021), which held that state quiet-title claims to deprive railroad of access to its property along a creek "effectively regulate rail transportation when brought against railroads".)

The Parties disagree over whether broadband crossings constitute "non-exclusive easements,"[7] and as the Court "must accept as true all of the allegations contained in a complaint," *Iqbal*, 556 U.S. at 678, the Court credits Plaintiff's argument that no equipment other than a broadband provider's could occupy the same, exact physical space (i.e., the air in which a wire would hang or the particular subterranean space where broadband equipment would lie underground) at a particular crossing. But AAR's attempt to extrapolate from this factual allegation that Va. Code § 56-16.3 therefore manages or governs rail transportation misconstrues *Skidmore*. There, the Fourth Circuit concluded that because a plaintiff sought to "exclude" a railroad from its land on the side of a creek, the claim had the effect of "managing or governing

---

[7]     Defendants characterize the broadband crossings as "nonexclusive," analogizing to cases where courts held that crossing disputes did not qualify for facial preemption. (Brich and Rolband Mem. at 19, citing *New Orleans & Gulf Coast Ry Co v. Barrois*, 533 F.3d 323, 333 (5th Cir. 2008).) AAR responds that easements under Va. Code § 56-16.3 cannot be "non-exclusive," because "[n]o other equipment can occupy the same physical space" as the broadband provider's equipment. (Pl.'s Opp. at 35 n.17.) Furthermore, Plaintiff rightly notes that *Barrois* concerned "a generally applicable state property law that does not specifically apply to railroad crossings," so this Fifth Circuit case carries limited persuasive value when analyzing Va. Code § 56-16.3, which directly concerns railroad crossings. (*Id.* at 29, citing *Barrois*, 533 F.3d at 325.)

rail transportation," whereas easements that "allow the railroad to access the property" enable the railroad to "still use the land for rail transportation" and therefore do not implicate ICCTA preemption. *Skidmore*, 1 F.4th at 215. The Amended Complaint fails to allege that railroads would be unable to access their property, i.e., that trains generally could not go under aerial broadband wires or over subterranean equipment and therefore that railroads could not "still use the land for rail transportation." *Id.* The Commonwealth would not, through enforcement of the challenged statute, bar railroads from accessing railroad property in the way that an adverse possession of railroad property would.

The Amended Complaint merely states that "[e]asements across railroad property that would grant exclusive control to a nonrailroad or conflict with present or future rail use of the property by the railroad are categorically preempted by ICCTA." (Am. Compl. ¶ 63.) AAR's argument regarding categorical preemption constitutes a legal conclusion that the Court does not need to adopt, *Iqbal*, 556 U.S. at 678, and Plaintiff does not allege that broadband equipment occupying railroad property rises to the level of adverse possession (presumably because railroads could continue to operate at broadband crossings and therefore do not suffer exclusion from their property). *Cf. Skidmore*, 1 F.4th at 213 (adverse possession would provide party with "exclusive control" of railroad property).

Notably, the Fourth Circuit has recently addressed whether ICCTA preempts certain SCC pre-condemnation actions concerning a railroad, holding that categorical preemption at such a stage does not apply. *See Zayo Group, LLC v. Norfolk S. Ry. Co.*, 2023 WL 8230499, at *5 (4th Cir. Nov. 28, 2023) (concluding that "in ruling on a petition seeking the authority to pursue condemnation in circuit court, the []SCC does not take action that 'manages rail transportation' or even immediately impacts the railroad"). Declining to apply categorical preemption to the

22

SCC merely deciding on a *petition* to bring a condemnation action in state court, the Fourth

Circuit posed the following hypothetical:

> Most simply put, what would happen to Norfolk Southern's property or business if [the petitioner for a condemnation action] obtained a certificate of public necessity and authority to seek condemnation but did not pursue a condemnation? Nothing. It is only in the condemnation proceeding itself that the railroad's property may be affected and thus potentially preempted by the ICCTA.

*Id.* The Fourth Circuit also noted that the parties disagreed (as they do here) about whether the

proposed condemnation there constituted a permanent "seizure" or simply a "nonexclusive

'utility' easement." *Id.* Accordingly, "there is no effect on the railroad nor can the scope of the

ICCTA preemption necessary to support jurisdiction in federal court be fully known," and

therefore "there is no complete preemption" when the SCC merely decided on a petition to

initiate a condemnation suit. *Id.*

So too here. Any preemptory force of ICCTA would only arise in the context of an

involuntary easement, upheld by the SCC, and executed by the broadband provider. A

broadband provider, pursuant to Va. Code § 56-16.3, may negotiate with a railroad to develop a

mutually agreed-upon crossing. This consensus-driven outcome would not "manage or govern"

rail transportation. *Cf. PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 219 (4th Cir.

2009) ("The history and purpose of the ICCTA support the view that Congress did not intend to

preempt all voluntary agreements concerning rail transportation."). A broadband provider may

propose a crossing but later abandon the project, or the railroad may object to the SCC, which

could determine that, pursuant to Va. Code § 56-16.3(H), the proposed crossing created "undue

hardship" or "imminent likelihood of danger to public health or safety" and therefore should not

23

proceed.[8]  In either circumstance, a railroad's property would remain unchanged; there would not even be an arguably "nonexclusive 'utility' easement." *Zayo*, 2023 WL 8230499, at \*5. The statute therefore does not categorically "regulate" railroad operations. *See Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001) (noting that ICCTA preemption is "narrowly tailored" to "displace only . . . those state laws that may reasonably be said to" manage or govern rail transportation, "while permitting the continued application of laws have a more remote or incidental effect on rail transportation"). The logic of *Zayo* refutes Plaintiff's categorical-preemption argument that the challenged statute "governs or manages rail transportation," particularly in light of the Supreme Court's caution that a facial challenge constitutes the "most difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745.

Plaintiff's argument that categorical ICCTA preemption applies on the basis that Va. Code § 56-16.3 "governs or manages" rail transportation by impeding *future* rail operations, (Am. Compl. ¶¶ 67, 154–55), also fails. While the STB has found that ICCTA preempts state law easements that will "unduly interfere with property that is, or may later be, needed for railroad purposes," *Jie Ao & Xin Zhou — Pet. for Decl. Order*, No. FD 35539, 2012 WL 2047726, at \*7 (S.T.B. served June 6, 2012), the challenged statute here stipulates that crossing installations must "not [] impair, impede, or obstruct, in any material degree, the works and operations of the railroad to be crossed" and allows railroads to petition the SCC when they believe hardship or safety concerns arise (and to appeal an adverse SCC ruling to the Supreme

---

[8]      *See* Va. Code § 56.1-16.3(H) (stipulating that "[t]he Commission may make any necessary findings of fact and determinations related to the adequacy of compensation, the existence of undue hardship on the railroad company, or the imminent likelihood of danger to public health or safety, **as well as any relief to be granted**" and giving the Commission the power to "reject[], approv[e], or modify[]" broadband installation plans and specifications) (emphasis added).

Court of Virginia). Va. Code § 56.1-16.3(D), (H); *see also id.* § 12.1-39.[9]  Plaintiff also does not

allege that conflict with future rail operations will arise with all crossings. To credit (even at the

motion-to-dismiss stage) AAR's allegation that ICCTA categorically preempts the

Commonwealth's statute by "governing" or "managing" rail transportation, i.e., that this statute

"directly regulates the rail transportation of passengers or property," *Delaware v. Surface*

*Transp. Bd.*, 859 F.3d 16, 22 (D.C. Cir. 2017), would be to blatantly disregard the statute's

express language that permits railroads to bring safety and hardship objections, among other

protections that the law affords to railroads. *See* Va. Code § 56-16.3(D) (requiring "[a]ny

proposed crossing" to be "located, constructed, and operated so as not to impair, impede, or

obstruct, in any material degree, the works and operations of the railroad to be crossed"). The

Court declines to dramatically expand the permissibility of traditionally disfavored facial

challenges with such a ruling. *Wash. State Grange*, 552 U.S. at 450.

　　　　Furthermore, Plaintiff's contention that ICCTA preempts Va. Code § 56-16.3 in all

contexts because the statute discriminates against railroads cannot support a facial challenge

here. As AAR itself acknowledges, whether a state law "discriminates against rail carriers"

invokes "implied" or "as-applied" preemption, rather than "categorical" or "express"

preemption. (Pl.'s Opp. at 22, citing *Delaware*, 859 F.3d at 19); *see also Alexandria*, 608 F.3d at

160 (observing that a state can exercise its police powers in a manner that regulates rail

transportation unless the regulation discriminates against rail carriers or unreasonably burdens

rail carriage). Plaintiff contends that the statute discriminates against all railroads by targeting

rail facilities. (Am. Compl. ¶¶ 55–62.) Notably, however, the STB has concluded that ICCTA

---

[9]　　　Moreover, the STB's view of ICCTA's preemptive force is not controlling. A court must "perform[] its own conflict determination, relying on the substance of state and federal law and not on agency proclamations of pre-emption." *Wyeth v. Levine*, 555 U.S. 555, 576 (2009).

does not facially preempt actions to secure non-exclusive easements for railroad crossings, such as for wires, sewers and roads. *Eastern Ala. Ry.—Pet. for Declaratory Ord.*, 2012 WL 758259, at *4 (STB Mar. 9, 2012); *see also Skidmore*, 1 F.4th at 215 (distinguishing between "nonexclusive prescriptive easements" and claims that seek to exclude railroads from their own property). To construe utility easements as not "discriminatory" against railroads and similarly situated broadband easements as facially "discriminatory" ignores STB findings and the Fourth Circuit's binding instruction.

Moreover, the Fourth Circuit has generally applied the "discriminatory" prong only *after* concluding that a state measure "regulated" rail transportation. *See Alexandria*, 608 F.3d at 158–60 (first concluding that a local ordinance "regulated 'transportation by a rail carrier,'" and only then observing that such regulations "[i]n order . . . to be a proper exercise of police power . . . must not (1) discriminate against rail carriers or (2) unreasonably burden rail carriage").

To be sure, the Fourth Circuit has observed that in certain circumstances, ICCTA can "produce both express and implied preemptive effects," as "state laws and actions may be *impliedly* preempted if, in application, they have the effect of 'unreasonably interfer[ing]' with railroad transportation." *Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 121 (4th Cir. 2020); *see also PCS Phosphate Co.*, 559 F.3d at 220 ("An express preemption clause does not bar a finding of implied preemption."). But *Edwards* and *PCS Phosphate* only examined "unreasonable interference" with railroads, not *discrimination*, so Plaintiff cannot rely on this duo of cases to plausibly allege that Va. Code § 56-16.3 facially discriminates against railroads in all circumstances. And in any event, plaintiffs can only bring "unreasonable interference" allegations on an as-applied basis, as the Fourth Circuit held in these two cases that determining whether a law or action constitutes "unreasonable interference" with railroad transportation

26

"requires a factual assessment of the effect of providing the claimed remedy." *PCS Phosphate Co.*, 559 F.3d at 221; *see id.* at 220–21 (describing "the generally accepted test for ICCTA implied or conflict preemption" as whether an enforcement action "unreasonably interfere[s] with rail transportation"); *see also Edwards*, 983 F.3d at 121 n.12 (observing that resolving the "unreasonable interference" prong involves "a fact-specific inquiry"). Indeed, the Fourth Circuit recently reaffirmed this rule, noting in *Zayo* that while "[c]laims that 'manage rail transportation' are categorically preempted . . . [t]hose that do not are only preempted if they 'unreasonably interfere' with railroad services, requiring a 'fact-intensive inquiry.'" *Zayo*, 2023 WL 8230499, at *4. The discrimination prong does not factor into this analysis.[10] Because Plaintiff has not

---

[10]     Plaintiff argues that "[t]he anti-discrimination prong is a separate bar that applies to any state law that 'touches on railway transportation.'" (Pl.'s Opp. at 25, citing *Am. Rocky Mountaineer v. Grand Cnty.*, 568 F. Supp. 3d 1231, 1238 (D. Utah 2021) (hereinafter "*Am. Rocky*") and *Gordon v. New England Cent. R.R.*, 2019 WL 5084160, at *9 (D. Vt. Oct. 10, 2019) ("*Gordon*").) These out-of-circuit opinions do not override the Fourth Circuit's instruction that "the generally accepted test for ICCTA implied or conflict preemption" constitutes whether an enforcement action "unreasonably interfere[s] with rail transportation." *PCS Phosphate Co.*, 559 F.3d at 220–21. In addition, these district court examinations of "discrimination" are distinguishable. *Am. Rocky* concerned the police-power context, in which a local government imposed onerous permit requirements on a railroad. *See* 568 F. Supp. 3d at 1239 (noting that the "police power exception to preemption is limited"). Similarly, the *Gordon* discussion of the discrimination prong cited to appellate court opinions that dealt with the police-power exception to ICCTA preemption. 2019 WL 5084160, at *9, citing *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 253 (3d Cir. 2007) (holding that "even pedestrian regulations . . . must be applied in a manner that does not discriminate against railroad operations"), and *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (holding that states "retain certain police powers and may apply non-discriminatory regulation to protect public health and safety"). Here, Va. Code § 56-16.3 does not appear similar to police-power "regulations" of railroad transportation. As Brich and Rolband note, Plaintiff "cites no cases supporting the application of the police power exception test — including the discrimination prong — to an exercise of eminent domain" to effectuate easements that allow railroads continued access to their property. (Brich and Rolband Reply Br. (ECF No. 72) ("Brich and Rolband Reply") at 13.) The Court declines to disregard the guidance that binding Fourth Circuit precedent provides here.

plausibly alleged that all applications of Va. Code § 56-16.3 "regulate" (i.e., manage or govern) rail transportation, the Court does not credit Plaintiff's allegation that the statute facially *discriminates* against railroads in all circumstances.

Nor can the Amended Complaint's argument that the challenged statute "unreasonably burdens" railroads sustain a facial challenge. (Am. Compl. ¶¶ 83–96.) Plaintiff contends that the "statutory process itself is inadequate," because Va. Code § 56-16.3 would entail a *cumulative* burden on railroads that would be unreasonable. (Pl.'s Opp. at 31–33.) According to this rationale, the Amended Complaint plausibly alleges a facial challenge to ICCTA based on the aggregate burden that the statute will impose on railroads, mooting the need for individual member railroads' participation in a suit. As noted above, however, the Fourth Circuit has repeatedly held that implied ICCTA preemption based on "unreasonable interference" with railroad transportation entails an intensive inquiry into the factual impact of the challenged action. *Zayo*, 2023 WL 8230499, at *4. A facial challenge claiming that Va. Code § 56-16.3 unreasonably interferes with railroad transportation in all circumstances runs headlong into this requirement of a fact-intensive inquiry. Given that Va. Code § 56.1-16.3 provides that the crossings shall be designed to "prevent damage to the works of the railroad and ensure the safety of its passengers," Va. Code § 56.1-16.3(D), and that the "broadband service provider shall be responsible for all aspects of the implementation of the physical crossing," *id.* § 56.1-16.3(F), this facial challenge fails to plausibly allege that enforcement of the statute would unreasonably interfere with railroad transportation in all circumstances.

And even, assuming arguendo, that an *aggregate* burden could suffice to show that ICCTA facially preempts the statute, nothing on the face of Va. Code § 56-16.3 demonstrates that it would unduly burden railroads in the aggregate. As noted above, § 56-16.3 stipulates that

28

proposed crossings cannot "impair, impede, or obstruct, in any material degree, the works and operations of the [a] railroad" and must "prevent damage to the works of the railroad and ensure the safety of its passengers," and provides for a petition process with the SCC when railroads have concerns about undue hardship and safety concerns. Va. Code § 56-16.3(D), (H). In other words, Plaintiff seeks a facial, pre-enforcement challenge on the speculative grounds that the statute will unreasonably burden rail transportation in the aggregate, ignoring that the statute itself provides explicit protections *against* undue burdens and safety risks while giving railroads a pathway to block broadband crossings via the SCC petition process (with a right of direct appeal to the Supreme Court of Virginia). *Cf. Alexandria*, 608 F.3d at 160 (requiring railroads to obtain local permits to operate unreasonably burdened rail carriage); *Zayo Grp., LLC v. Norfolk S. Ry. Co.*, 2022 WL 243897, at *3 (M.D. Pa. Jan. 25, 2022) (noting that "[w]hen the STB has found easements to be an unreasonable burden, it has relied on the easement having clear, present, and tangible effects on the railroad's operation, i.e., preventing construction of a necessary embankment, accessing a vital retaining wall, or blocking modernization of a signal structure").

While the Court must credit, at the pleading stage, Plaintiff's factual allegations that prior crossings have caused hardship for railroads, (Am. Compl. ¶ 29), permitting a facial challenge on the grounds that the statute could "unreasonably burden" railroads in the aggregate would vitiate the exacting standard of the *Salerno* "no set of circumstances" test.

Because Plaintiff fails to plausibly allege that ICCTA categorically preempts Va. Code § 56-16.3 or that no set of circumstances exists where Va. Code § 56-16.3 could coexist with ICCTA, Plaintiff may only raise ICCTA preemption on an as-applied basis. *Salerno*, 481 U.S. at 745. And in light of the need for a "fact-intensive inquiry" in an as-applied analysis, *Zayo*, 2023

29

WL 8230499, at *4, such challenges necessitate participation by individual member railroads. Due to the necessary participation of individual members, Plaintiff cannot satisfy the third prong of the representational-standing test. *Hunt*, 432 U.S. at 343. Accordingly, AAR lacks standing to bring Count I, and the Court will DISMISS this claim.

### b.      Count II

The Court next addresses standing for each of the two federal takings claims. Count II of the Amended Complaint alleges that Va. Code § 56-16.3 violates the Takings Clause by restricting the availability of just compensation. (Am. Compl. ¶ 158). Count III alleges a Takings Clause violation based on the taking of private property for private use. (Am. Compl. ¶ 161). The Court first considers standing for Count II.

The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The government's installation of any physical item on private property qualifies as a physical taking, giving rise to a *per se* takings claim, "without regard to other factors." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (cable television installation on a building constituted a physical taking); *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 152 (2021) (all "government-authorized invasions of property — whether by plane, boat, cable, or beachcomber — are physical takings requiring just compensation"). This claim becomes actionable at the moment "the government takes [] property without paying for it." *Knick v. Township of Scott*, 588 U.S. 180, 185 (2019). Because the relevant conduct here concerns allegedly forthcoming installations of broadband infrastructure on railroads' property, AAR has properly fashioned its takings claims as pertaining to a *per se* physical taking. (Am. Compl. ¶¶ 35, 98).

However, because AAR brings its claim on behalf of its members, the federal takings claims must satisfy *both* the *Hunt* representational-standing test *and* Article III's injury-in-fact requirement. As outlined above, *Hunt* requires that an association seeking representational standing establish that: "(1) its members would otherwise have standing to sue in their own right; (2) the interests [the organization] seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. Furthermore, the *Salerno* "no-set-of-circumstances" test applies to facial constitutional challenges, apart from the First Amendment. *See Hansen*, 599 U.S. at 769 (noting that *Salerno* generally applies to facial challenges outside a First Amendment context).[11] Here, as with Count I, Plaintiff fails the third prong of the *Hunt* test.

For railroads to suffer unjust compensation, the value of the crossed property must exceed the statutory default fees. As Defendants note, "[w]ithout identifying any actual railroad property . . . it is impossible to know whether the value of that property will exceed the default compensation." (Brich & Rolband Mem. at 16). The Supreme Court's ruling in *Summers* bears

---

[11]    Indeed, in recent years, district courts have applied *Salerno* to facial challenges arising under the federal Takings Clause. *See, e.g., WG Woodmere LLC v. Town of Hempstead*, 2022 WL 17359339, at *7 (E.D.N.Y. Dec. 1, 2022), *appeal withdrawn,* 2023 WL 2807276 (2d Cir. Mar. 30, 2023) (finding that "the bar to pleading a facial takings challenge is a high one" that plaintiffs did not meet where they "failed to plausibly allege that 'no set of circumstances exists under which the [challenged ordinance] would be valid'"); *Oregon Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 809 (D. Or. 2022), *appeal dismissed,* 2022 WL 18956023 (9th Cir. Dec. 12, 2022) ("Even if this Court were to consider Plaintiffs' facial takings claim, Plaintiffs must demonstrate that 'the mere enactment of [a state ballot measure] constituted a taking,' such that 'no set of circumstances exists under which [the ballot measure] would be valid.'"); *Rupp v. Becerra*, 2018 WL 2138452, at *8 (C.D. Cal. May 9, 2018) (finding that where a state law "does not *compel* conveyance" of private property and "offers a number of options" for property owners that did not result in permanent surrender of their property to the government, plaintiffs "have not, as a matter of law, pleaded a facial takings claim").

note here.  In *Summers*, an organization asserted standing based on a claim that one of its members planned to visit "several unnamed national forests in the future," which could be affected by regulations of the United States Forest Service.  555 U.S. 490, 495.  The Court rejected standing, because while there was "a chance" of harm, it was "hardly a likelihood" that the regulations would unlawfully touch a forest that the member planned to visit.  *Id.*  Likewise, railroad property comes in all shapes and sizes, subject to differing ownership rights and varying valuations across the thousands of miles of track that span the Commonwealth.  Plaintiff acknowledges as much.  (Am. Compl. ¶ 37 (explaining that AAR's members hold "various property interests including *inter alia* fee simple, leaseholds, and easements."))  And as an amicus supporting Plaintiff helpfully explains, "[g]enerally, railroads do not charge an 'occupancy' fee or 'license' fee for installations" over certain types of railroad property.  (Brief of Amicus Curiae RailPros Field Services Inc. (ECF No. 71) ("RailPros Amicus Brief") at 6.)  "Without further specification it is impossible to tell which [tracks] are (in [plaintiff's] view) unlawfully subject to" inadequate compensation.  *Summers*, 555 U.S. at 495.[12]

Individual railroads would thus have to demonstrate the unavailability of just compensation for particular crossings.  With railroad property in Virginia ranging from public rights-of-way to legally abandoned track to heavily used corridors with no existing rights-of-way, determining just compensation would necessarily qualify as a fact-specific inquiry.  *See Washington Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 850 (9th Cir. 2001)

---

[12]     Put another way, the track-specific inquiry necessary to show Plaintiff's unjust compensation injury "requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343; *see Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) (an "organization lacks standing to assert claims of injunctive relief on behalf of its members where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof,'") (quoting *Warth v. Seldin*, 422 U.S. 490, 515–16 (1975)).

(observing in a takings case that "determining what, if any, just compensation is due to the owner of the property taken," constitutes a fact-specific question that "necessarily requires the participation of the individual members").

Even accepting the Amended Complaint's well-pleaded facts as true, Plaintiff cannot show that Va. Code § 56-16.3 facially violates the Takings Clause's just-compensation requirement in all circumstances. *Salerno*, 481 U.S. at 745. Though the Court credits, at this stage of the suit, the Amended Complaint's allegations that "[g]enerally speaking," the statutory caps on compensation for the railroads will fall below crossings' market value, that allegation implicitly concedes that instances will arise where the statutory caps suffice to provide just compensation to railroads. (Am. Compl. ¶¶ 105–07.) And even where they do not, railroads can petition for greater compensation.

The Takings Clause requires the government to provide just compensation when it takes private property; it does not impose a particular procedural mechanism to vindicate that right. A state legislature remains free to set default fees or to require adjudication before a specialized tribunal.[13] In other words, nothing about the establishment of a presumptive licensing fee (pursuant to a statute that authorizes railroads to seek additional compensation) lies in inherent tension with the Takings Clause's just-compensation requirement. This remains true even with the statute's fixed caps for crossings at public rights of way and legally abandoned track, because the value of these types of crossings may amount to *less* than (or equal to) the statutory defaults

---

[13]    Indeed, "[a]t the time of the founding" "there were no general causes of action through which plaintiffs could obtain compensation for property taken for public use." *Knick*, 588 U.S. at 199; *see also Kohl v. United States*, 91 U.S. 367, 375 (1875) (noting that legislatures remain free to "prescribe[] in what tribunal or by what agents the taking and the ascertainment of [] just compensation should be accomplished," including "by a commission").

in certain circumstances, thereby again triggering the need for a property-specific inquiry. AAR member railroads would need to demonstrate the crossing-specific nature of inadequate compensation.[14]

The statutory structure contemplates this factual complexity by authorizing the SCC to, "in its discretion, employ expert engineers" to examine "the location, plans, specifications, and descriptions of appliances and the methods proposed to be employed" at a crossing and advise the SCC on modifying, approving or rejecting proposals. Va. Code § 56-16.3(H). Broadband providers also "shall be responsible for all aspects of the implementation of the physical crossing," mitigating potential costs for railroads. *Id.* § 56-16.3(F). Such a fact-intensive process for resolving broadband crossing proposals falls far from presenting no set of circumstances under which railroads would enjoy just compensation, *Salerno*, 481 U.S. at 745, hence necessitating AAR member railroads' participation to demonstrate the inadequacy of compensation.

Because Plaintiff's just-compensation theory requires the participation of individual members for the reasons set forth above, Plaintiff fails the *Hunt* representational-standing test for

---

[14]    The Court emphasizes its focus here lies with determining whether individual AAR member railroads would need to participate in the suit to demonstrate that enforcement of Va. Code § 56-16.3 denies just compensation to Plaintiff's members. In weighing this question of standing, the Court refrains from interrogating the factual adequacy of the Commonwealth's compensation remedy. This case stands in contrast to *PhRMA v. Williams*, 64 F.4th 932 (8th Cir. 2023), where insulin manufacturers possessed standing to bring a just-compensation takings claim challenging a state law that required them to provide free insulin. *Williams* dealt with a fixed, thirty-day supply of the *same* medical product (insulin), 64 F.4th at 937–38, whereas here, railroad crossings will necessarily differ, as the statute itself contemplates by distinguishing between legally abandoned track, public rights-of-way and other crossings. Determining adequate compensation will thus necessarily constitute a fact-intensive inquiry for particular crossings with varied market values, rather than litigation about the "same 'dollar-for-dollar' compensation." *Id.* at 946. Indeed, for certain crossings, railroads may receive compensation in excess of the crossing's market value, such as for crossings of little-used track. (RailPros Amicus Brief at 6).

Count II. The Court therefore finds that Plaintiff lacks standing to bring Count II and will thus DISMISS this claim.

### c.    **Count III**

Count III alleges a Takings Clause violation based on the taking of private property for private use. (Am. Compl. ¶ 161). Because this count alleges that the challenged statute permits broadband providers to take railroad property "for the private enterprise and private benefit of broadband providers" in *all* applications, Count III does not need the participation of individual member railroads. Accordingly, Count III clears the third prong of the *Hunt* test. The crucial question therefore becomes whether Plaintiff's members would have standing to sue in their own right, *Hunt*, 432 U.S. at 343, i.e., whether Plaintiff has made "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 498.

This prong therefore entails examining whether at least one member railroad: (1) has sustained an injury in fact; (2) that the injury qualifies as traceable to Defendants' actions; and (3) that a favorable judicial decision can likely redress the injury. *Lujan*, 504 U.S. at 560–61. Plaintiff offers two injury-in-fact theories: a future injury and a present injury. In Plaintiff's view, enactment of Va. Code § 56-16.3 gives rise to a concrete and particularized injury for the federal takings claims, because (1) railroads have suffered a present injury from the loss of their right to exclude broadband providers and (2) broadband crossings qualify as sufficiently imminent and (3) Section 56-16.3 exposes railroads to increased safety risks and administrative costs. (Pl. Supp. Br. on Standing (ECF No. 89) ("Pl. Supp.") at 3, 7.)

35

### i.     Present Injury

Va. Code § 56-16.3 limits the right of railroads operating in Virginia to exclude

broadband providers by giving the SCC the authority to approve a proposed broadband

installation over their objections. Va. Code § 56-16.3(H).  And courts have made clear that

plaintiffs possess standing to bring a takings claim even if other compensation remedies, such as

an inverse condemnation action in state court, remain available. *See Knick*, 588 U.S. at 191

("The fact that the State has provided a property owner with a procedure that may subsequently

result in just compensation cannot deprive the owner of his Fifth Amendment right to

compensation under the Constitution, leaving only the state law right.").

When courts within the Fourth Circuit have found standing for a takings claim, the

alleged injury in fact typically arises *during* or *after* a taking.[15]  Here, Plaintiff characterizes Va.

Code § 56-16.3's grant of a statutory right to cross AAR member railroads' property as wresting

*present* control of "a portion of Plaintiff's member railroads' right to exclude."  (Am. Compl.

¶ 143.)  The loss of this right to exclude can constitute a cognizable injury to railroads' property

rights. *See, e.g., Cedar Point Nursery*, 594 U.S. at 149 ("The right to exclude is 'one of the most

treasured' rights of property ownership."); *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82

---

[15]      *See, e.g., Albert v. Franchot*, 2023 WL 4058986, at *6–*8 (D. Md. June 16, 2023)
(finding that plaintiffs sufficiently pled a taking that constituted "injury in fact" where plaintiffs
alleged that they owned property that defendants *already* held in custody pursuant to a
challenged Maryland statute); *Roberts*, 2023 WL 3132005, at *9–12 (finding that trade
associations had standing to bring a takings claim to challenge a Virginia budgetary provision
that limited Medicaid reimbursements for health care providers, as "hospital associations'
members have shown they have suffered a 'concrete and particularized' injury in the alleged
denial of appropriate payment for services and supplies *after those services and supplies have
already been rendered*") (emphasis added); *cf. Ebersole v. Conover*, 2010 WL 3629581, at *10
(W.D. Va. Aug. 27, 2010), *report and recommendation adopted,* 2010 WL 3585833 (W.D. Va.
Sept. 13, 2010) (finding that plaintiff lacked standing to bring a takings claim related to the
collection of statutorily mandated fees, because he never paid the relevant fees).

n.6, (1980) ("The term 'property' as used in the Taking Clause includes the entire 'group of rights inhering in the citizen's [ownership].'"); *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979) (noting that "the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation").

Indeed, the Supreme Court has distinguished between a limited restriction on certain owners' right to exclude, which may not necessarily constitute a taking, and a permanent denial of this right, which does. *Compare PruneYard*, 447 U.S. at 82–86 (no taking where law required shopping mall to allow political leafletting on property) *with Dolan v. City of Tigard*, 512 U.S. 374, 384, 394 (1994) (concluding that a hypothetical public easement would, "[w]ithout question," qualify as a taking).

In determining which side of this line the instant suit falls on, the Court notes a recent district court opinion that grappled with an alleged injury to the right to exclude. *See Petworth Holdings, LLC v. D.C.*, 531 F. Supp. 3d 271, 280 (D.D.C. 2021) (quoting *Loretto*, 458 U.S. at 436, in observing that a "property 'owner suffers a special kind of injury' when a government mandate enables 'a *stranger* [to] directly invade[ ] and occup[y] the owner's property'"); *id.* at 281 (finding that a law prohibiting a property owner from discontinuing full-service gas station business on its property, and thereby preventing owner from converting the lot to another use, constituted a physical taking by forcing owner to permit ongoing public access to the property). In *Petworth*, the district court found that because the right to exclude has traditionally held substantial weight within the bundle of property rights, the "government-mandated physical occupation of private land" that a local ordinance imposed on a gas station owner required payment of just compensation. 531 F. Supp. 3d at 280–83. Here, because Plaintiff alleges that

37

Va. Code § 56-16.3 mandates physical occupations of railroad property unless the SCC blocks a proposed crossing, the alleged injury to the right to exclude appears closer to the fact patterns in *Dolan* and *Petworth* than to *PruneYard*.

Admittedly, however, Va. Code § 56-16.3 puts less direct pressure on the right to exclude than did the local ordinance in *Petworth*, which *compelled* property owners to permit ongoing public access to their lot's gas station business. *Petworth*, 531 F. Supp. 3d at 281. The challenged statute at issue here lays out a multistep petition-and-review process, providers railroads with a pathway to exclude broadband providers if the SCC (or, in the case of an appeal, the Supreme Court of Virginia) sides with them regarding a particular crossing. However, Va. Code § 56-16.3 puts the onus on railroads to object to a crossing with a specific set of reasons. In doing so, the statute plausibly presents a *present* injury to railroads by depriving them of the right to exclude broadband providers for any (or no) reason, as they previously could before the statute's enactment.

The statute's alleged deprivation of the right to exclude for railroads, which previously possessed wide leeway to set the terms and conditions of a crossing, thus bears some resemblance to *PEM Entities*, where a developer had standing to challenge a county plan changing water and sewage allocations as violative of a vested property right. *See PEM Entities*, 57 F.4th at 182 (plaintiff "has standing to raise its takings and due process claims," because its "inability to obtain water and sewer services *on terms to which it claims it is entitled* is an injury in fact that is fairly traceable to the challenged ordinance and would likely be remedied if [plaintiff] prevailed in this suit.") (emphasis added).

*PEM Entities* appears distinguishable in at least one key respect: there, the plaintiff claimed it had a vested property right in sewage and water terms from the county's 2005

38

subdivision plan, the 2019 ordinance took that vested right, and the plaintiff then submitted a water and sewage application to the county that was subject to the 2019 terms. Here, Defendants rightly note that railroads' property interests differ based on the specific property, so "the right to exclude will not be uniform." (Hearing Transcript (ECF No. 81) ("Hr. Tr.") at 15–17.) Nonetheless, the crossing-approval mechanisms of Va. Code § 56-16.3 only come into play where a railroad could not otherwise exclude broadband providers from crossing; otherwise, the broadband provider could cross railroad property *without* the statutory authorization. (Pl. Supp. at 6.)

Moreover, while Defendants correctly note that "[p]rivate property is always subject to . . . eminent domain," (Brich and Rolband Reply at 7; Hr'g Tr. 22), the fact that the Commonwealth could previously exercise general eminent-domain power over railroads does not dispel the reality that Va. Code § 56-16.3 changed the status quo. Because broadband providers now can avail themselves of the new statute's fast-track procedures for crossing railroad property, railroads' right to exclude stands in a different light than before the statute's enactment.

This alleged injury to railroads' right to exclude also qualifies as "fairly traceable" to the challenged statute, *Spokeo*, 578 U.S. at 338, because Va. Code § 56-16.3 gives broadband providers the pathway to intrude on railroad property. *See* (Decl. of Alex Saar (ECF No. 90)) (providing notice of a broadband provider's intent to install an underground fiber-optics cable on railroad property pursuant to the statute). Plaintiff further plausibly alleges redressability, as injunctive relief barring the SCC from implementing the statute would deny broadband providers the ability to use this law to enter railroad property without owners' consent.[16]

---

[16]     The Court finds *infra* that Defendants Brich and Rolband do not "enforce" Va. Code § 56-16.3, so the complained-of injury cannot be "fairly traceable" to those two Defendants. *See Disability Rights South Carolina v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022) (holding that

AAR member railroads' alleged loss of the right to exclude therefore qualifies as a sufficient injury in fact that would provide them with standing to sue in their own right for Count III. And as noted above, Plaintiff does not need the participation of individual member railroads for this claim, because the Amended Complaint alleges that *all* takings under Va. Code § 56-16.3 arise for a private use, thereby violating the Fifth Amendment's Takings Clause. Accordingly, Plaintiff has standing to bring Count III. The Court thus refrains from interrogating whether Plaintiff's other justification for standing on Count III — that *future* takings constitute a sufficiently imminent harm — suffices at this juncture. In reaching this decision regarding standing on the takings claims, however, the Court stresses that "the ultimate validity" of Plaintiff's claims does not "bear on its ability to bring them." *PEM Entities*, 57 F.4th at 182.

### d.    Count IV

Count IV alleges that Defendants have deprived Plaintiff's members of property without due process, in violation of the Fourteenth Amendment's Due Process Clause and 42 U.S.C. § 1983. AAR's theory goes like this. The Virginia Constitution — specially, its analog to the federal Takings Clause — creates a contractual relationship between the Commonwealth and AAR's member railroads as property owners. Virginia law also recognizes a property right in the performance of a contract. Defendants, in enforcing Va. Code § 56-16.3, interfere with the contract between the Commonwealth and AAR's members and deprive those members of their property interest in the contract. (Am. Compl. ¶¶ 165–69.) And "§ 56-16.3 provides no notice or opportunity to challenge the fairness or legality of that deprivation," thereby implicating Plaintiff's federal Due Process rights. (*Id.* ¶ 170.) *See Blessing v. Freestone*, 520 U.S. 329, 343

---

defendant's lack of an enforcement role means that "the plaintiff's injury allegedly caused by that law is not traceable to the defendant").

(1997) ("to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*") (emphasis in original).

Since interference in the performance of a contract allegedly constitutes violation of a property right under Virginia law, and as the Due Process Clause protects against property deprivations without due process, AAR member railroads would have a cognizable injury to a federal right. Focusing solely here on the existence of Article III standing while avoiding judgment on the merits of Plaintiff's § 1983 claim, AAR's individual members have standing to bring this claim. *See Davis v. United States*, 564 U.S. 229, 249 n.10 (noting that "standing does not 'depen[d] on the merits of a claim'"). The Amended Complaint alleges that contractual interference constitutes a violation of property rights under Virginia law, and the Due Process Clause requires due process of law before any such deprivation, which Plaintiff alleges railroads have not received. This alleged harm comprises the same due process deprivation for all AAR member railroads, obviating the need for individual members to participate in this litigation. For these reasons, Plaintiff has standing to pursue Count IV.

### 3. Sovereign Immunity

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." Though phrased in terms of a limit on federal jurisdiction, the Supreme Court has described the Eleventh Amendment as "enact[ing] a sovereign immunity from suit, rather than a nonwaivable limit on the federal judiciary's subject-matter jurisdiction." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997). As relevant here, "the Eleventh Amendment bars Fifth Amendment taking claims against States in

federal court when the State's courts remain open to adjudicate such claims." *Zito v. North Carolina Coastal Res. Comm'n.*, 8 F.4th 281, 286–87 (4th Cir. 2021).

Acting as an exception to the doctrine of sovereign immunity, *Ex parte Young* permits suits for injunctive and declaratory relief against individual officers or officials of a state or local government in their official capacity to remedy violations of federal law. *Ex parte Young*, 209 U.S. 123, 178 (1908); *Libertarian Party of Va. v. Va. State Bd of Elecs.*, 2020 WL 3732012, at *5 (E.D. Va. Sept. 16, 2010), *aff'd*, 434 F. App'x 174 (4th Cir. 2011). However, the Eleventh Amendment also immunizes states and those state entities that operate as "arms of the state." *Hutton v. S.C. Ret. Sys.*, 773 F.3d 536, 541 (4th Cir. 2014). An agency constitutes an "arm of the State" for Eleventh Amendment purposes and receives sovereign immunity when, "in its operations, the state is the real party in interest . . . [and] the named party [is] the alter ego of the state." *Ram Ditta ex rel. Ram Ditta v. Md. Nat 'l Cap. Park and Plan. Com'n*, 822 F.2d 456, 457 (4th Cir. 1987) (citations omitted).

For the *Ex parte Young* exception to sovereign immunity to apply to a particular state officer, a plaintiff must first prove that the state officer in question maintains a "special relation" with the contested statute, meaning that the officer has the authority to enforce the statute. *Ex parte Young*, 209 U.S. at 192; *Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021). This requirement limits plaintiffs to suing only those officers with the legal ability to remedy the alleged constitutional violation. *Ex parte Young*, 209 U.S. at 158. In turn, it ensures that "[any] federal injunction will be effective with respect to the underlying claim." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008). The statute at issue may expressly declare that the official possesses enforcement powers, or some other general law may vest the official with those powers. *Ex parte Young*, 209 U.S. at 158. "General authority to enforce the

42

laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001) (quoting *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996)). However, plaintiffs do not bear a particularly heavy burden on this prong. They can satisfy this requirement by simply showing that the state officer in question has "proximity to and responsibility for the challenged state action," as opposed to some "qualitatively special" relationship. *Limehouse*, 549 F.3d at 333 (alterations in original).

At the second step of this analysis, plaintiffs must demonstrate that they have suffered an ongoing violation of their constitutional rights. *Ex parte Young*, 209 U.S. at 159-60; *Gilmore*, 252 F.3d at 330. "The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent." *Gilmore*, 252 F.3d at 330.

All Defendants argue that sovereign immunity bars the state-law claims. (Brich and Rolband Mem. at 9; Hudson Mem. at 17.) Furthermore, each Defendant asserts that the *Young* exception to sovereign immunity does not apply to the federal-law claims here. (Brich and Rolband Mem. at 9; Hudson Mem. at 10.) The Court first addresses whether sovereign immunity bars the state-law claims, then considers whether the *Young* exception applies to each Defendant on the remaining federal-law claims.

### a.    State Law Claims (Counts V–VI)

*Ex parte Young*'s exception to sovereign immunity does not apply to actions against state officials seeking to compel compliance with *state* law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("*Young* . . . [is] inapplicable in a suit against state officials on the basis of state law"); *Bragg v. West Virginia Coal Ass'n.*, 248 F.3d 275, 293 (4th Cir.

2001) (observing that "sovereign immunity . . . bars a court's grant of any type of relief, whether retrospective or prospective, based upon a State official's violation of State law"). Because Count V arises from an alleged violation of Art. I, § 11 of the Virginia Constitution, and Count VI arises from an alleged state common law violation (i.e., tortious interference with a contract expectancy, prospective business relationship or prospective economic advantage), Plaintiff cannot rely on the *Young* exception to sovereign immunity for those claims.

Plaintiff does no dispute that *Young* is inapplicable to Counts V and VI but argues that sovereign immunity still does not bar these claims, because the Amended Complaint names Defendants on these counts in their individual capacities and the Court's supplemental jurisdiction covers these *personal-capacity* claims. (Pl.'s Opp. at 2, 8); *see Pennhurst*, 465 U.S. at 111 (distinguishing between suits seeking money damages against individual officers in tort and those seeking injunctive relief against officers in their official capacities, as cases in the former category "might not" seek relief against the sovereign). In Plaintiff's view, the Court could properly exercise supplemental jurisdiction over these state-law claims, because Counts V and VI do not involve an "unclear issue of state law" bearing on their resolution. (*Id.* at 48.)

As an initial matter, the Court expresses strong skepticism that Plaintiff can tack on a nominal-damages request with Counts V–VI to get around the Eleventh Amendment's bar on injunctive and declaratory relief against state officials for violations of state law. *See, e.g., Const. Party of W. Virginia v. Jezioro*, 2009 WL 10710235, at *6 (N.D.W. Va. Jan. 16, 2009) (observing that *Pennhurst* makes clear that the Eleventh Amendment bars claims for violations of state law "to the extent that plaintiffs seek injunctive or declaratory relief"). Exercising supplemental jurisdiction over nominal damages claims arising under *state* law involving unresolved issues of state law does not strike the Court as sound reasoning. Nonetheless, the

Court considers whether these claims can survive as personal-capacity suits, as the Eleventh Amendment does not bar personal-capacity suits against government officials. *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 229 (4th Cir. 1997).

"[T]he mere incantation of the term 'individual capacity' is not enough to transform an official capacity action into an individual capacity action," *Adams v. Ferguson*, 884 F.3d 219, 225 (4th Cir. 2018), or else constructive pleading would "undermine the principle . . . that Eleventh Amendment immunity represents." *Martin v. Wood*, 772 F.3d 192, 195 (4th Cir. 2014). Instead, the Court looks to various factors to determine whether the individual-capacity, state-law claims amount to a pleading artifice, including whether (i) Defendants "committed the complained-of conduct in the course of performing their official duties, or whether they acted *ultra vires* or in pursuit of private interests," *Cunningham v. Lester*, 990 F.3d 361, 366–67 (4th Cir. 2021); (ii) the "effect of the relief sought" would be to invalidate state law, *id.*; (iii) Plaintiff seeks damages from Defendants personally or refers to relief from a state, *Adams*, 884 F.3d at 225; (iv) Defendants were allegedly acting in accordance with a government policy or custom, *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995); and (v) a plaintiff seeks compensatory or punitive damages, *id.* And in a case concerning the Fair Labor Standards Act ("FLSA"), the Fourth Circuit articulated a "five-factor test synthesizing *Pennhurst* and its offspring into a structured inquiry" as follows:

> (1) [W]ere the alleged unlawful actions of the state officials tied inextricably to their official duties; (2) if the state officials had authorized the desired relief at the outset, would the burden have been borne by the State; (3) would a judgment against the state officials be institutional in character, such that it would operate against the State; (4) were the actions of the state officials taken to further personal interests distinct from the State's interests; and (5) were the state officials' actions *ultra vires*.

*Martin*, 772 F.3d at 196. While the extent to which the *Martin* test applies to contexts beyond the FLSA appears to be an open question with the Fourth Circuit,[17] the Court finds that the above factors, regardless of the exact weight that the *Martin* test deserves, indicate that the Commonwealth qualifies as the real "party in interest" for purposes of Counts V and VI.

*First*, to the extent that Defendants have committed any conduct giving rise to the Amended Complaint, these actions arise out of their official duties. *Cunningham*, 990 F.3d at 366. In terms of Defendant Hudson, Va. Code § 56-16.3(H) authorizes the SCC to "make any necessary findings of fact and determinations related to the adequacy of [railroads'] compensation, the existence of undue hardship on the railroad company, or the imminent likelihood of danger to public health or safety, as well as any relief to be granted . . . ." Similarly, the Amended Complaint names Rolband, because his agency "is charged with supervising regulations requiring prior review and approval for construction involving land-disturbing activities . . . which [is] specifically contemplated in Va. Code § 56-16.3(C)(1)(ii)." (Am. Compl. ¶ 11.) Brich's inclusion in this suit stems from his leadership of VDOT, which must approve state highway right-of-way projects, including broadband installations. (*Id.* ¶ 12.) Any alleged unlawful actions therefore tie "inextricably to their official duties." *Martin*, 772 F.3d at 196.

*Second*, the *ultra vires* doctrine is inapplicable where the source of purported illegality consists exclusively of *state* law, as with Counts V–VI. Plaintiff contends that Defendants'

---

[17]     *Compare Cunningham*, 990 F.3d at 366–67 (applying the *Martin* test to a different statutory context from the FLSA and characterizing *Martin* as embodying a "well-established tradition") with *Adams*, 884 F.3d at 226 (declining to apply the *Martin* factors to claims arising under 42 U.S.C. § 1983, because the factors arose "for use in considering claims under a very different statute").

actions are *ultra vires* and therefore unattributable to the Commonwealth. (Pl.'s Opp. at 46, citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90 (1949) for the rule that "an unconstitutional act is 'beyond the officer's powers and is, therefore, not the conduct of the sovereign.'"). In *Larson*, the Supreme Court discussed two situations in which suits alleging an official's *ultra vires* conduct do not qualify as suits against the sovereign. The first arises when a statute limits an official's powers, but the officer acts beyond those limitations and "is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden." *Larson*, 337 U.S. at 689–90. The second situation arises when a party challenges the constitutionality of the statute or order enabling the officer's actions in the sovereign's name. *Id. Larson* thus teaches that officers may face liability for their actions that (1) go beyond their statutory grants of authority or (2) fall within their scope of purported authority but are constitutionally void. *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022). Importantly, though, *Pennhurst* made clear that "a state officer may be said to act *ultra vires* only when he acts 'without any authority whatever.'" *Pennhurst*, 465 U.S. at 101 n.11; *id.* at 114 n.25 (calling the *ultra vires* doctrine "a very narrow exception" to Eleventh Amendment immunity).

Here, the Amended Complaint contends only that Defendants' actions violate the Virginia Constitution and breach state common law duties. Plaintiff asserts that *Larson* permits personal-capacity suits in federal court against state officials (acting pursuant to their statutory authority) for alleged violations of *state constitutional* law. But that runs contrary to the Supreme Court's admonition in *Pennhurst* that the *ultra vires* doctrine constitutes "a very narrow exception" to Eleventh Amendment immunity. *Pennhurst*, 465 U.S. at 114 n.25. Indeed, the Court expressly cautioned federal courts not to "grant [] relief . . . whether prospective or

47

retroactive . . . against state officials on the basis of state law," because "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.* at 106. That intrusion would be even greater here, as Plaintiff would have this Court hold that the duties expressly assigned to state officials under one source of state law (Va. Code § 56-16.3) conflict with the duties assigned under another source of state law (the Virginia Constitution). In sum, permitting AAR to use the "narrow and questionable exception" of the *ultra vires* doctrine to proceed on its state law claims would allow any plaintiff to simply "produce some state [law] that has been violated" to circumvent the protections afforded by the Eleventh Amendment. *Id.* at 116.

Third, because Plaintiff's sought-after relief effectively targets the Commonwealth and seeks to invalidate state law, Plaintiff's sate-law claims qualify as an official-capacity suit. *See Larson*, 337 U.S. at 687 (explaining that "the crucial question is whether the relief sought . . . is relief against the sovereign"). Plaintiff seeks injunctive relief prohibiting Defendants from enforcing Va. Code § 56-16.3 and a declaration that the statute violates § 11 of Article I of the Virginia Constitution. (Am. Compl. ¶¶ 179, 186; *id.*, Prayer for Relief ¶¶ C–E.) *Pennhurst* squarely forecloses that relief. *See Pennhurst*, 465 U.S. at 114 n.25 ("To say that injunctive relief against State officials acting in their official capacity does not run against the State is to resort to the fictions" characterizing the dissent's theories).

Fourth, Plaintiff's money damages claim only seeks *nominal* damages, rather than the types — compensatory and punitive damages — that the Fourth Circuit has identified as available in personal-capacity suits. *Biggs*, 66 F.3d at 611; *see also Suarez*, 125 F.3d at 229 (interpreting a "request for compensatory and punitive damages as an indication that these state actors are being sued in their personal capacities"). To salvage Plaintiff's otherwise-barred claim

on the basis of nominal damages would be to exercise the sort of "empty formalism" that the Supreme Court has warned cannot be used to "undermine . . . th[e] Eleventh Amendment." *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 270.

*Fifth*, the Amended Complaint frames Defendants' relevant conduct as the enforcement of a state statute, so the complained-of actions flow from a government policy: a statute that the General Assembly passed and that the Governor of Virginia signed into law. Plaintiff also does not allege that Defendants have taken actions "to further personal interests distinct from the [Commonwealth's] interests." *Martin*, 772 F.3d at 196. To the contrary, the Amended Complaint names Defendants on account of their alleged roles in enforcing the statute.

In sum, Plaintiff's purportedly individual-capacity state claims are in substance official-capacity claims barred by state sovereign immunity. The Court will therefore DISMISS Counts V and VI. The sovereign-immunity analysis next proceeds to Plaintiff's federal law claims.

### b.      Federal-Law Claims (Counts II–IV)

The Court considers whether the *Young* exception to sovereign immunity applies to Defendants on the surviving federal-law claims, looking first at Brich and Rolband and then at Hudson.

### i.      Defendants Brich and Rolband

Defendants Brich and Rolband contend that the *Young* exception to sovereign immunity does not apply to the federal-law claims, because neither Brich nor Rolband enforce the challenged statute. (Brich and Rolband Mem. at 8–9.)

Brich and Rolband argue that neither of them play any role in enforcing Va. Code § 56-16.3, so *Ex parte Young* does not apply to Plaintiff's federal claims against them. (Brich and Rolband Mem. at 9.) As noted above, Plaintiff must show that Defendants have "*proximity to*

and *responsibility for* the challenged state action," as opposed to some "*qualitatively* special"

relationship, *Limehouse,* 549 F.3d at 333 (alterations in original), to clear the "special relation"

prong of *Young*. Brich and Rolband contend that the Amended Complaint fails to do so, because

Plaintiff only points to (1) the general statutory requirement that broadband providers, like any

other entity, must obtain VDOT's permission to perform work on VDOT property and

(2) VDEQ's general regulatory authority over construction projects' environmental impact.

(Brich and Rolband Mem. at 10.)

In response, Plaintiff argues that Defendants need only have "some connection with the

enforcement of the act," (Pl.'s Opp. at 15, citing *Young*, 209 U.S. at 157), and notes that the

required "connection" between the officer and act can come from "'a more general law providing

enforcement authority, or the general duties of the officer.'" (*Id.* at 9, quoting *Doyle*, 1 F.4th at

255.) Because general Virginia law requires Defendants Brich and Rolband to review and issue

permits for wireline construction, this authority necessarily extends to approving permits for

broadband installations under Va. Code § 56-16.3. (*Id.* at 15–16.) In Plaintiff's telling, Va.

Code § 56-16.3 "would be a dead letter in most, if not all, of its applications" if the Court were to

enjoin Brich and Rolband from reviewing and approving broadband crossings, thereby

illustrating that both officials play a "key role" in enforcing the challenged statute. (*Id.*)

To support its argument, Plaintiff draws attention to this Court's decision in *Goldman v.

Northam*, which allowed *Young* claims arising from outdated electoral maps in the

Commonwealth despite the fact that defendants there did not create the maps or regulate election

timing, because the defendants otherwise "facilitate[d] the state's elections." 566 F. Supp. 3d

490, 506–07 (2021). Plaintiff also highlights the Fourth Circuit's conclusion that a clerk who

issued marriage licenses qualified as a proper *Young* defendant in a challenge to the

Commonwealth's now-invalidated ban on same-sex marriage. (Pl.'s Opp. at 16, citing *Bostic v. Schaefer*, 760 F.3d 352, 371 & n.3 (4th Cir. 2014).)

While a "general 'supervisory' role" does not suffice to trigger the *Young* exception, *Doyle*, 1 F.4th at 256, Brich and Rolband maintain greater "proximity to" this suit's challenged statute by virtue of supervising their agencies' grants of permits for projects that include broadband crossings. At the same time, "the officer sued must be able to enforce, if he so chooses, the specific law the plaintiff challenges." *Doyle*, 1 F.4th at 255. Governors and state attorneys general, for instance, often fail to qualify as proper *Young* defendants. *See id.* at 255–56 (rejecting application of *Young* to governor and state attorney general based on their general authority to enforce laws or issue advisory opinions). Though this case presents a closer question than did *Doyle* for the applicability of *Young*, Plaintiff's primary cited authority — *Bostic*, *Goldman* and *Limehouse* — do not support a finding that Brich and Rolband have the special relation necessary to be proper defendants. (Pl.'s Opp. at 16.)

*Bostic* held that a circuit court clerk qualified as a proper defendant under *Young*, because the clerk bore the requisite connection to the enforcement of Virginia's then-ban on same-sex marriages "due to his role in granting and denying applications for marriage licenses." *Bostic*, 760 F.3d at 371 n.3. The injury suffered by the plaintiff — the denial of a marriage license — was a direct result of the clerk's conduct pursuant to the challenged statute. Here, Brich and Rolband take no actions under Va. Code § 56-16.3 that cause injury to railroads. Broadband providers' obtainment of permits from Brich and Rolband may frequently be necessary, but never qualifies as sufficient to kickstart a crossing. This fact pattern contrasts with the marriage

51

process, where individuals can just go "down to the courthouse," and an official's grant of a license will generally "put it all to rest."[18]

Similarly, while this Court in *Goldman* held that the Governor did not qualify as a proper defendant under *Young*, the members and Commissioner of Virginia's Board of Elections did, because they oversaw and administered the Commonwealth's electoral process. *Goldman*, 566 F. Supp. 3d at 506. The Court observed that even though only the General Assembly could "set and regulate the timing and conduct of an election," the Board members and Commissioner oversaw "the execution of the General Assembly's enactments." *Id.* at 506–07. Here, AAR does not dispute the independent legality of VDOT's and VDEQ's permits, the administrative processes by which VDOT and VDEQ issue permits or the agencies' enabling laws. *Goldman*, like *Bostic*, is thus inapposite to showing the requisite "special relation."[19]

---

[18]   *See* Bruce Springsteen, "The River" (https://brucespringsteen.net/track/the-river/) [perma: https://perma.cc/JGS5-J3JQ] ("And for my nineteenth birthday I got a union card and a wedding coat / We went down to the courthouse / and the judge put it all to rest / No wedding day smiles no walk down the aisle / No flowers no wedding dress"); *see also* City of Richmond Circuit Court Clerk, *Marriages* (https://www.rva.gov/office-circuit-court-clerk/marriages-licenses), [perma: https://perma.cc/5UF8-LZGU] (noting that the only official step after obtainment of the marriage license comprises the marriage celebrant returning the executed license to a circuit court clerk's office for recordkeeping).

[19]   In further support of their position, Plaintiff cites to a Tenth Circuit opinion that applied *Young* where defendants, "although not specifically empowered to ensure compliance with the statute at issue, clearly . . . assisted . . . in giving effect to the law." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007). That case, which neither the Fourth Circuit nor this Court has previously cited, concerned a Native American tribe's challenge to Kansas officials' refusal to recognize motor vehicle registrations and titles that the tribe had issued. *Id.* at 820. The Tenth Circuit concluded that *Young* applied to defendants — the state director of vehicles, state secretary of revenue and superintendent of the state highway patrol — because they possessed "a particular duty to 'enforce' the statute in question and a demonstrated willingness to apply that duty." *Id.* at 828. Here, again, Plaintiff relies on a case where the defendants directly enforced the law at issue, as they "manage[d] vehicle registrations and titles and supervise[d] vehicle reciprocity . . . decided to deny the validity of the Tribe's registrations . . . and enforce[d] traffic and other laws of the State related to highways." *Id.* To extrapolate from this close nexus between defendants and the challenged state action a general principle that

To be sure, the challenged law itself does not have to serve as the source of the officials' "special relation" to enforcing the statute.[20]  And Plaintiff characterizes Brich and Rolband as "gatekeepers" for the statute, given that a broadband provider's statutory "first step" shall be submitting construction plans that must include engineering, design and dewatering plans, among other details.  (Pl.'s Opp. at 17, citing Va. Code § 56-16.3(C)(1).)  The Court therefore considers whether this "gatekeeping" role, which applies early in a broadband provider's development of certain crossing proposals, satisfies the "special relation" prong of *Young*.

Reviewing and issuing permits for wireline construction (including for broadband installations) on and off public rights-of-way falls within the purview of Defendants Brich and Rolband, as they acknowledge in their declarations.  (Decl. of Stephen C. Brich (ECF No. 48-1) at ¶¶ 7–8; Decl. of Michael Rolband (ECF No. 48-2) at ¶¶ 3–4, 14–15.)  Their gatekeeping role therefore bears at least a passing resemblance to the facts in *Limehouse*, where environmental groups sued state agency directors (among others) for alleged violations of federal law arising out of the proposed construction of a bridge. *Limehouse*, 549 F.3d at 327. The Fourth Circuit held that the director of South Carolina's Department of Transportation ("SCDOT") qualified for the *Young* exception's "special relation" prong, because he had "supervisory authority over the state's participation in" the process of drafting an

---

*Young* simply requires but-for causation is offtrack.  Such a rule runs counter to the Fourth Circuit's emphasis that state officials must have "proximity to and responsibility for the challenged state action." *Limehouse*, 549 F.3d at 333.

[20]     Brich and Rolband place too much weight on *McBurney v. Cuccinelli*, 616 F.3d 393 (4th Cir. 2010). As Plaintiff correctly notes, *McBurney* did *not* hold that *Young* requires an official to have a "specific statutory duty to enforce" a challenged statute. (Pl.'s Opp. at 17.)  Rather, *McBurney* simply rejected plaintiffs' argument that the Attorney General of Virginia held such a duty in that case. *McBurney*, 616 F.3d at 399–400. Indeed, state attorneys general frequently fail to clear the "special relation" prong. *See id.* at 401–02 (collecting cases).

environmental impact statement that plaintiffs alleged the state had improperly issued. *Id.* at 333 (adding that the agency director and his department were "deeply involved in the preparation of the challenged" impact statement "and the procurement of permits to proceed with construction on the basis of the" statement).  The Fourth Circuit observed:

> Under the Director's supervision, the SCDOT has participated in planning the [bridge], in the process of applying to other state agencies for the permits necessary for construction, and in the [challenged environmental impact statement] process. . . .  And the SCDOT will be the agency eventually charged with the actual construction of the Connector.  As the administrative head of the agency with responsibility for carrying out its policies and representing the agency in its dealings with the federal government, the Director possesses a sufficient connection to the alleged violation of federal law.

*Id.* (internal citations omitted).

*Limehouse* thus applied *Young* to a state transportation agency director based on his organization's central role in the challenged state construction process.  Among the director's myriad of connections to the challenged conduct was his involvement in securing necessary permits.  But Plaintiff cannot isolate this fact from its broader context to support the claims here.  Defendants' general granting of permits — some of which could be for crossings — does not constitute the real crux of railroads' concerns.  The facts of *Limehouse* thus appear to create only surface-level similarities with this suit.

Brich and Rolband neither apply for broadband crossings, nor lead organizations "charged with the actual construction" of a crossing.  *Limehouse*, 549 F.3d at 333; *see also S.C. Elec. & Gas Co. v. Randall*, 331 F. Supp. 3d 485, 500 (D.S.C. 2018) (finding that state utility commissioners bore a special relation to challenged utility rate cap, because commissioners were "expressly necessary to the implementation" of the rate cap, with the power "to supervise and regulate the rates and service of every public utility").  VDOT and VDEQ do not implement the

petition-and-review process whereby broadband providers could override railroads' objections and install crossings.

And while AAR dismisses the relevance of the fact that some crossings may not require VDOT or VDEQ approval, its cited case for this point once again features an official with closer proximity to the challenged government action. *See Grabarczyk v. Stein*, 2020 WL 2441418, at *2 (E.D.N.C. May 12, 2020) (finding that *Young* applied to a county district attorney who had authority to prosecute plaintiff for violating an allegedly unconstitutional state policy, even though other class members resided outside his county). Plaintiff repeatedly relies on cases where more proximately situated defendants had a "particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty." *Wagnon*, 476 F.3d at 828. Brich and Rolband possess no comparable authority.

Indeed, Plaintiff's argument runs contrary to the entire purpose of the "special relation" prong, which "ensures that a federal injunction will be effective with respect to the underlying claim." *Limehouse*, 549 F.3d at 333. VDOT and VDEQ's incidental roles — granting permits whose lawfulness Plaintiff does not contest — merely allow broadband providers to complete an *initial* step toward certain crossings. Brich and Rolband can do nothing to affect railroads' petitions before the SCC for redress, nor would their agencies engage with the SCC in resolving disputes over a particular crossing. An injunction can "restrain only unlawful conduct and the persons responsible for conduct of that character." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 924 n.67 (1982). Yet the relief sought by Plaintiff would merely "interfere with the lawful discretion of state officials" in applying environmental regulations and managing VDOT property, while doing nothing to remedy AAR's "underlying claim" regarding the eminent-

domain procedures of the challenged statute.  (Brich and Rolband Mem. at 12, quoting

*Limehouse*, 549 F.3d at 333–34.)

Accordingly, because Brich and Rolband do not bear a "special relation" to Va. Code

§ 56-16.3, the *Young* exception does not apply to them.  As these two Defendants do not

"enforce" Va. Code § 56-16.3, the complained-of injury cannot be "fairly traceable" to them.

*See McMaster*, 24 F.4th at 901 (holding that "the plaintiff's injury allegedly caused by that law is

not traceable to the defendant" when a defendant lacks an enforcement role for the challenged

statute).  Brich and Rolband therefore do not constitute proper parties, and the Court must

dismiss Plaintiff's claims against them.[21]

For the same reasons, the Court will dismiss any unidentified John Doe defendants who

constitute subordinates of Defendants Brich and Rolband.  Sweeping in subordinates of Brich

and Rolband would be futile, because their agencies lack sufficient proximity to and

responsibility for the challenged state action.

### ii.    Defendant Hudson

Defendant Hudson similarly argues that sovereign immunity bars AAR's federal-law

claims against him, because (1) *Young* does not apply to state courts and state judges, and he

plays such a role under Va. Code § 56-16.3 and (2) Plaintiff fails to allege that he has adjudicated

any dispute under the statute.

As an initial matter, Hudson rightly observes the Supreme Court's edict that *Young* "does

not include the power to restrain a court from acting in any case brought before it."  (Hudson

---

[21]    Because the Court finds that Brich and Rolband bear no special relation to the eminent-
domain procedures challenged here, the Court will not discuss the prong of the test that addresses
ongoing violations of constitutional law.  *Gilmore*, 252 F.3d at 330.

Mem. at 11, quoting *Whole Women's Health v. Jackson*, 142 S. Ct. 522, 532 (2021).)  Hudson

argues that the SCC acts as a state court when exercising a judicial function, noting that in 1970,

this Court referred to the SCC as "undeniably a court." (Hudson Mem. at 11, citing *Virginia*

*Nat. Bank v. Com. of Va. ex rel. State Corp. Comm'n.*, 320 F. Supp. 260, 262 (E.D. Va. 1970).)

The SCC stands as a unique entity.  It has the duty to "administer[] the laws made for the

regulation and control of corporations" and the power to "regulat[e] the rates, charges, services,

and facilities of all public service companies" in the Commonwealth.  Va. Code § 12.1-12.  Like

any run-of-the-mill administrative agency, the Commission can hold hearings, issue decisions,

impose fines, promulgate regulations, revoke licenses and enforce its orders.  *Id.* § 12.1-13.  In

our federal system, these mixed duties — though taking "'legislative' and 'judicial' forms" —

constitute "exercises of [] the 'executive Power.'"  *City of Arlington, Tex. v. F.C.C.*, 569 U.S.

290, 304–05 n.4 (2013).  But states remain free to experiment with alternative structures; they

can create a "*de facto* fourth branch of Government," which blends the powers of the other three.

*Seila L. LLC v. CFPB*, 140 S. Ct. 2183, 2212 (2020) (Thomas, J., concurring); *see Dreyer v.*

*Illinois*, 187 U.S. 71, 84 (1902) ("Whether the legislative, executive, and judicial powers of a

state shall be kept altogether distinct and separate. . . is for the determination of the state").

Virginia has done precisely this.  The Virginia Constitution created the SCC and vested it

with executive power to "administer[] the laws," legislative power to "regulat[e]  rates . . .  and

services," and judicial power to act as "a court of record" "[i]n all matters within the jurisdiction

of the Commission."[22]  Va. Const. art. IX §§ 1–3; *see Prentis v. Atl. Coast Line Co.*, 211 U.S.

210, 224, 226 (1908) (citing *Norfolk & P. Belt Line R. Co. v. Com.*, 49 S.E. 39, 41 (Va. 1904))

---

[22]     A "court of record" is any court established by the General Assembly and vested with the
judicial power of the Commonwealth.  Va. Const. art. VI § 1.

(acknowledging that the SCC is "clothed with legislative, judicial, and executive powers"); W. Hamilton Bryson, *Judicial Independence in Virginia*, 38 U. Rich. L. Rev. 705, 720 n.1 (2004) (describing the SCC as a "fourth branch of the government").[23]

In its capacity as a court, the SCC may administer oaths, compel the attendance of witnesses and the production of documents, punish contempt, issue injunctions and enforce its orders through penalties authorized by law. Va. Code § 12.1-13; Va. Const. art. IX § 3. At least one commissioner must satisfy the qualifications for judges of courts of record, and all commissioners are subject to impeachment and removal by the same procedures that apply to state judges. Va. Const. art. IX § 1; *id.* art. VI § 10. The SCC holds adjudications in which parties are given an opportunity to be heard and present evidence before the entry of a finding, order, or judgment, which is then subject to appeal to the Supreme Court of Virginia. *Id.* art. IX §§ 3–4; *see Commonwealth v. Atl. Coast Line R. Co.*, 55 S.E. 572, 573 (Va. 1906) (noting that the SCC must first summon a party and "hear[] what it has to say in its defense" before "passing judgment thereon judicially; in other words, giving the [party] a fair trial as in any other court"); *Winchester & S.R. Co. v. Commonwealth*, 55 S.E. 692, 695 (Va. 1906) (acknowledging that railroads before the SCC have the right "to be represented by counsel, to examine and cross-

---

[23] Courts in this District and the Commonwealth have repeatedly affirmed that the SCC may be a court for some purposes but not for others. *Compare Croatan Books, Inc. v. Virginia*, 574 F. Supp. 880, 885 (E.D. Va. 1983) (recognizing that the Virginia Constitution "empowers the Commission to function as a judicial tribunal"); *Zayo Grp., LLC v. Norfolk S. Ry. Co.*, 2022 WL 3273906, at *4 (E.D. Va. March 22, 2022) (finding that the SCC "is a state court" for purposes of removal), *rev'd on other grounds*, 2023 WL 8230499 (4th Cir. Nov. 28, 2023); *Nat'l Home Ins. Co. v. State Corp. Comm'n of Com. of Va.*, 838 F. Supp. 1104, 1106, 1116 (E.D. Va. 1993) (finding the SCC is a court for purposes of the federal Product Liability Risk Retention Act) *with Va. Nat'l Bank*, 320 F. Supp. at 262 (holding that when the SCC initiates litigation in another court, "it sheds its judicial robes"); *Am. Bankers Life Assur. Co. of Fla. v. Div. of Consumer Couns., Off. of Atty. Gen.*, 263 S.E.2d 867, 875 & n.8 (Va. 1980) (contrasting the procedures due when the SCC acts in a legislative capacity and adjudicative capacity).

examine witnesses, to produce any and all legal evidence in their behalf, and to be fully heard in their own behalf on all matters of law or fact which they may desire to allege or put forward in their own defense."). SCC proceedings are subject to the same rules of evidence as in state court, and the Commission's seal has the force and effect of a seal of a court of record. Va. Code §§ 12.1-3, 12.1-30.

But the Commission can also go beyond its judicial role. It administers laws regulating corporations in the Commonwealth, issues corporate charters and licenses, and regulates rates, charges, services, and facilities of public service companies. Va. Const. art. IX § 2, Va. Code § 12.1-12. Whether the SCC is exercising judicial or non-judicial power thus turns on "the character of the proceedings" before it. *Prentis*, 211 U.S. at 226. As the Supreme Court explained in *Prentis*, a "judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist," in contrast to legislation, which "looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power." *Id.* at 226–27. Thus, the question for this Court becomes whether the SCC's role under Va. Code § 56-16.3 qualifies as judicial.

The Court concludes that it does not. While Hudson is correct that the *Young* exception generally does not apply to state courts, *Jackson*, 142 S. Ct. at 532, Plaintiff's sovereign-immunity argument with respect to the SCC Commissioner is more on track. The challenged statute's plain text mentions the SCC fifteen times, closely entwining the Commissioner with implementing the allegedly unconstitutional law. Va. Code § 56-16.3(C)(4), (G)–(H); *see Young*, 209 U.S. at 157 (requiring a "special relation" to the challenged state action). And as Plaintiff observes, both the Supreme Court and this Court have applied *Young* to suits against

state public-service commissioners, including those in Virginia.  *See Verizon Md. Inc. v. Pub. Serv. Comm'n.*, 535 U.S. 635, 645–46 (2002) (hereinafter "*Verizon*") (permitting a phone carrier to sue under *Young* in attempting to enjoin the enforcement of Maryland public service commission's orders resolving an inter-carrier dispute and requiring payment for the same); *MCI Telecomms. Corp. v. Bell Atlantic-Virginia Inc.*, 1997 WL 1133714, at *1–2 (E.D. Va. Dec. 24, 1997) (hereinafter "*MCI*") (holding that Virginia's SCC Commissioners constituted "proper [d]efendants" in a suit challenging the SCC's arbitration decisions in a dispute between phone companies, "because *Young* authorizes suits against state officers in their official capacity" for prospective relief under federal law).

Hudson replies that *Verizon* and *MCI* are inapposite, because:  (1) the relevant statute in *Verizon* "specifically gave the commission non-judicial functions, and it specifically granted judicial review of the commission's decisions in federal district court"; (2) the parties in *Verizon* did not litigate "the judicial function of the commissioners"; (3) *MCI* was "silent on the statute in question there and short on analysis"; and (4) on appeal in *MCI*, the Fourth Circuit did not address *Young*.  (Def. Hudson's Reply Br. in Supp. of Mot. to Dismiss ("Hudson Reply") (ECF No. 73) at 4.)

These counterpoints fail.  Hudson's conclusory characterization of the Maryland commissioners in *Verizon* as carrying out "non-judicial functions" ignores the degree of similarity between that case and the instant suit.  In *Verizon*, the Maryland commissioners resolved inter-carrier complaints regarding compensation rights under an agreement — a similar fact pattern to a railroad and broadband provider bickering over the proper amount of compensation for a proposed crossing.  *Verizon*, 535 U.S. at 639–40; *see id.* at 645 (plaintiff's request "that state officials be restrained from enforcing an order in contravention of controlling

federal law . . . clearly satisfies" *Young*).  To be sure, *Verizon* did not turn on whether the

Maryland commissioners exercised a "judicial function."  But the Supreme Court nonetheless

held that *Young* applied to a closely analogous fact pattern concerning a state's public-service

commissioners, in which an aggrieved party challenged the commission's ruling regarding its

contractual obligations to provide compensation to another carrier.  *Id.* at 640.  Likewise,

although this Court in *MCI* did not make an extensive inquiry into the statute in question there,

the case nonetheless constitutes a clear precedent for applying *Young* to the SCC's members.

*See MCI*, 1997 WL 1133714, at \*2 (concluding that "Defendant Commissioners' view of *Young*

would serve as a complete evisceration" of the doctrine).

Hudson also misconstrues this Court's opinion in *Va. Nat'l Bank*.  As Plaintiff notes, that

opinion did not concern Eleventh Amendment immunity, and the opinion's characterization of

the SCC as "undeniably a court" qualifies as dicta, because in *Va. Nat'l Bank*, the Court was

simply weighing how much value to give to the SCC's perspective as "a party litigant" on a

banking-law question.  (Pl.'s Opp. at 13, citing 320 F. Supp. at 262, 264, 266.)  And even in *Va.*

*Nat'l Bank*, the Court noted that the Commission can "shed[] its judicial robe" by engaging in

non-judicial functions.  320 F. Supp. at 262–63.  If anything, that case underscored that the

SCC's commissioners can wear multiple hats.  *See id.* at 264 (referring to the SCC as "an

administrative agency").  *Va. Nat'l Bank* stands utterly inapposite to the question of whether

sovereign immunity applies to the SCC in this specific statutory context.

Here, the SCC can hear objections and reject, approve or modify broadband crossing

proposals, Va. Code § 56-16.3(H), but construing these activities as judicial misses the mark.

*See Prentis*, 211 U.S. at 226–27 (1908) (noting that "the character of the proceedings"

determines whether they qualify as "judicial," even if "hearings and investigations" are

involved). *Cf. Jackson*, 142 S. Ct. at 530, 532 (noting that the plaintiff sought to enjoin "all state-court judges from hearing" certain "civil actions" between private parties in the state's trial courts, which would "culminat[e] in injunctions and statutory damages awards").

Regulatory agencies frequently conduct adjudications that affect the rights and privileges of private parties. This conduct does not automatically transport them out of the executive branch of government. *Arlington*, 569 U.S. at 304–05 n.4. Plaintiff's analogizing to *Jackson* fails to persuade. There, the Supreme Court rejected applying the *Young* exception to state court judges and clerks, because "[u]sually, those individuals do not enforce state laws as executive officials might; instead, they work to resolve disputes between parties." *Jackson*, 142 S. Ct. at 530, 532.

Here, the Court does not confront litigation in state courts, but rather a hybrid agency that exercises both judicial *and* administrative functions. Undaunted, Hudson draws the Court's attention to two other cases referring to the SCC as a "court." (Hudson Mem. at 12, citing *Zayo Grp.*, 2022 WL 3273906, at *4 and *Nat'l Home Ins. Co.*, 838 F. Supp. at 1114.)

In the first case, the Court considered "whether an action in front of an administrative agency" (the SCC) qualified as removable for the federal removal statute, 28 U.S.C. § 1441. 2022 WL 3273906, at *4. The Court concluded that the SCC indeed qualified as "a state court for the purposes of removal under § 1441." *Id.* And in *National Home Insurance Co.*, the Court discussed what evidentiary procedures the SCC must follow "when sitting as a court of record" for purposes of the federal Risk Retention Act. *Nat'l Home Ins. Co.*, 838 F. Supp. at 1116.

These cases fail to establish that Hudson enjoys sovereign immunity here. First, as Plaintiff highlights, both cases examined specific statutory language to discern Congress' intent for those statutory contexts, and neither case involved the *Young* exception. (Pl.'s Opp. at 14

n.5.) In his reply brief, Hudson does not counter this point and does not mention either case. Second, in *Zayo*, the Court nonetheless referred to the SCC as "an administrative agency." *Zayo*, 2022 WL 3273906, at *4. Indeed, in reversing the Court on other grounds, the Fourth Circuit noted that "[t]he question of whether and under what circumstances removal under § 1441(a) can extend to proceedings **before administrative agencies** has split" the circuits. *Zayo*, 2023 WL 8230499, at *1 n.2 (emphasis added).

While the SCC does not constitute a federal administrative agency, the Fourth Circuit's commentary in *Zayo* still confirms its nature as a *state* administrative agency that exercises judicial functions in certain contexts, but not others. *Zayo*, 2023 WL 8230499, at *1 n.2. And though *MCI* and *Verizon* involved disputes that perhaps could be "adjudicatory," both cases nonetheless applied *Young* to agencies playing a colorable "adjudicatory" role. *Verizon*, 535 U.S. at 639–40; *MCI*, 1997 WL 1133714, at *2.

With its fifteen textual references to the SCC, Va. Code § 56-16.3 makes clear that the SCC constitutes the key administrative agency with respect to the challenged statute's implementation. As with other federal and state administrative agencies that engage in fact-finding hearings involving expert testimony and then issue regulatory decisions based on the administrative record, the SCC "may, in its discretion, employ expert engineers" to advise the SCC in "(a) examining the location, plans, specifications, and descriptions of appliances and the methods proposed to be employed; (b) hearing any objections and considering any modifications that the railroad company desires to offer; and (c) . . . rejecting, approving, or modifying such plans and specifications." Va. Code § 56-16.3(H). As noted above, the challenged statute explicitly empowers the SCC to:

> make any necessary findings of fact and determinations related to the adequacy of
> compensation, the existence of undue hardship on the railroad company, or the imminent

> likelihood of danger to public health or safety, as well as any relief to be granted, including any amount to which the railroad company is entitled in excess of the [default] license fee . . . .

*Id.* In this specific context, the SCC thus qualifies as the conductor that *implements* the statutory regime, a conclusion that the Court draws by examining the character of the proceedings. *Prentis*, 211 U.S. at 226–27. The Court emphasizes the narrowness of this ruling, which only concerns the specific question of whether the SCC's statutory role under Va. Code § 56-16.3 comprises a judicial or administrative function for this particular statutory regime. In concluding that the SCC acts as the agency implementing the challenged statute, the Court observes that the SCC plays judicial functions in other statutory contexts. But this legal reality does not alter the Court's conclusion that the character of *these* proceedings means that the SCC implements the statute, thereby meeting the "special relation" prong of *Young* for this specific statutory context.

An injunction against Defendant Hudson would also bring proper *Young* relief by allowing railroads to be free of (1) the SCC implementing the will of broadband providers by deciding that challenged crossings can proceed and (2) the threat of fines and penalties that the SCC could otherwise impose if railroads resisted broadband crossings whose applications the SCC had granted. As Plaintiff notes, even if broadband providers did not lodge a petition with the SCC pursuant to Va. Code § 56-16.3(H), the SCC, through its jurisdictional authority over railroads operating in the Commonwealth, could crack down on a railroad's lack of compliance with the statute. (Pl.'s Opp. at 10.) For example, if a railroad simply refused to permit broadband providers access to railroad property, the SCC could presumably levy fees pursuant to its general authority over public-service companies. *See* Va. Code § 12.1-13 (stipulating that the SCC possesses the power "to impose and collect . . . fines or other penalties").

Without passing on the merits of AAR's claims, the Court therefore finds that Hudson meets the "special relation" prong of the *Young* doctrine. *See Verizon*, 535 U.S. at 636–37 ("The inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim.").

Defendant Hudson also meets the "threatened-enforcement" prong of *Young*. "The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent." *Gilmore*, 252 F.3d at 330. The Amended Complaint certainly alleges that enforcement is "threatened." (*See* Am. Compl. ¶ 10, stating that "[t]he SCC is charged with enforcing Virginia Code Ann. § 56-16.3 and disposing of issues raised in a petition by a railroad or broadband service provider under the statute."); (*id.* ¶ 169, stating that Defendants are "openly offering or making available review and approval processes for crossings"); *see also Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 164 (4th Cir. 2023) (concluding that the threatened-enforcement prong of *Young* does not involve analyzing the merits of the claims, but merely requires properly *alleging* an ongoing or continuing violation). Here, other than requesting nominal damages, Plaintiff focuses on prospective relief to prevent enforcement of the statute. (Am. Compl. ¶¶ 156, 159, 162.) Accordingly, Hudson falls within the bounds of the *Young* exception, and sovereign immunity does not apply to him.

### 4.    Declaratory Judgment Act

The federal Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "Actual controversy" denotes a "definite and

concrete" dispute that "touch[es] the legal relations of parties having adverse legal interests." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).  Importantly, a declaratory judgment must have a "conclusive" effect on future action by the parties.  *Id.*  Without an actual controversy, a litigant lacks standing to pursue declaratory relief.  *Id.*

Defendants argue that the Court lacks jurisdiction to provide declaratory relief here pursuant to the Declaratory Judgment Act.  (Brich and Rolband Mem. at 12–13; Hudson Mem. at 18.)  The Court has decided to dismiss all claims as against Brich and Rolband, so Plaintiff cannot seek declaratory judgment against them.  But because sovereign immunity does not shield Hudson, the Court briefly addresses its authority to issue a declaratory judgment against him.  As the Ninth Circuit has recognized, parties seeking "declaratory and injunctive relief against [a defendant] in his official capacity . . . do not need a statutory cause of action," because the *Young* exception "permits courts of equity to enjoin enforcement of state statutes that violate the Constitution or conflict with other federal laws."  *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018).  Federal courts' ability to provide this relief lies "beyond dispute." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).  Furthermore, federal courts possess jurisdiction to hear declaratory relief claims in claims alleging that federal constitutional or statutory law preempts a state measure.  *Verizon*, 535 U.S. at 642.  Plaintiff may also seek declaratory relief for its § 1983 claim.  *See, e.g., Young v. Nickols*, 413 F.3d 416, 420 (4th Cir. 2005) (acknowledging that claims for declaratory relief qualify as "cognizable under § 1983").  Accordingly, the Court possesses jurisdiction to enter a declaratory judgment as to Hudson.

**B.    The Merits**

Because the Court will dismiss Counts I–II on standing grounds, Counts III–IV on sovereign immunity grounds as to Defendants Brich and Rolband, and Counts V–VI on sovereign immunity grounds as to all Defendants, the Court now considers whether the remaining claims (Counts III–IV, as to Defendant Hudson) survive Defendants' Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court concludes that they do not. Moreover, for the reasons set forth below, the Court declines to exercise supplemental jurisdiction over Counts V–VI even if sovereign immunity did not bar those state-law claims.

### 1.    Count III

Count III alleges that Va. Code § 56-16.3 allows a taking of private property for private use, in violation of the Fifth Amendment's Takings Clause's stipulation that only a public use may justify takings. (Am. Compl. ¶¶ 117, 161–62.) The Court therefore considers whether Count III plausibly alleges that Va. Code § 56-16.3 permits the seizure of private property for a "private use." The Court concludes that it does not.

The Supreme Court has explained that "[t]he definition [of public use] is essentially the product of legislative determinations addressed to the purposes of government," and that "[s]ubject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive." *Berman v. Parker*, 348 U.S. 26, 32 (1954).) A taking need only be "rationally related to a conceivable public purpose" to comply with the Fifth Amendment's constitutional limitation. *Presley v. City of Charlottesville*, 464 F.3d 480, 486 (4th Cir. 2006) (citing the Supreme Court's instruction in *Kelo v. City of New London*, 545 U.S. 469, 480 (2005) that public use equates to "serv[ing] a 'public purpose'"). Indeed, "[t]he role of the courts in second-guessing the legislature's judgment of what constitutes

a public use is extremely narrow." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1014 (1984). And "where the exercise of the eminent domain power is rationally related to a conceivable public purpose," the Supreme Court has cautioned against deploying the Public Use Clause to block state action. *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984).

Plaintiff relies heavily on a different Virginia statutory provision:  Va. Code § 55.1-306.1, which states that it is "in the public interest" to use existing utility easements "to provide or expand broadband or other communications services"— but "[n]othing in this section shall be deemed to make the use of an easement for broadband . . . a public use for the purposes of § 1-219.1, or other applicable law."  (Pl.'s Opp. at 34, quoting Va. Code § 55.1-306.1(B)(2), (6).) The relevant cross-referenced provision, Va. Code § 1.219.1, enacts "[l]imitations on eminent domain" pursuant to the Virginia Constitution, and defines "[t]he term 'public uses' mentioned in Article I, Section 11 of the Constitution of Virginia . . . to embrace only the acquisition of property" for six specified purposes, not including broadband expansion.[24]  In turn, Art. I § 11 of

---

[24] Va. Code § 1-219.1(A) states in full:

> "The right to private property being a fundamental right, the General Assembly shall not pass any law whereby private property shall be taken or damaged for public uses without just compensation.  The term "public uses" mentioned in Article I, Section 11 of the Constitution of Virginia is hereby defined as to embrace only the acquisition of property where: (i) the property is taken for the possession, ownership, occupation, and enjoyment of property by the public or a public corporation; (ii) the property is taken for construction, maintenance, or operation of public facilities by public corporations or by private entities provided that there is a written agreement with a public corporation providing for use of the facility by the public; (iii) the property is taken for the creation or functioning of any public service corporation, public service company, or railroad; (iv) the property is taken for the provision of any authorized utility service by a government utility corporation; (v) the property is taken for the elimination of blight provided that the property itself is a blighted property; or (vi) the property taken is in a redevelopment or conservation area and is abandoned or the acquisition is needed to clear title where one of the owners agrees to such acquisition or the acquisition is by agreement of all the owners."

the Virginia Constitution, reflecting a notable 2012 amendment in the wake of *Knick*, provides that "[t]he General Assembly shall make no law" taking private property "except for public use," adding that "a taking or damaging of private property is not for public use if the primary use is for private gain, private benefit, private enterprise, increasing jobs, increasing tax revenue, or economic development, except for the elimination of a public nuisance existing on the property." Va. Const. art. I, § 11.

Reading these provisions holistically reveals, in Plaintiff's view, that the General Assembly has excluded broadband access as a permissible "public use." (Pl.'s Opp. at 34–35.) But Plaintiff's theory conflates Virginia's more restrictive public use doctrine with that of the Fifth Amendment.  Even assuming that easements for purposes of expanding broadband qualify as *per se* not public use as a matter of *Virginia* law, that does not speak to whether the challenged statute violates the federal standard.

As the Supreme Court stressed in *Midkiff*, a government action satisfies the Fifth Amendment's public-use requirement "where the exercise of the eminent domain power is rationally related to a conceivable public purpose." *Midkiff*, 467 U.S. at 240–41. Here, the General Assembly stipulated that Va. Code § 56-16.3 comprised "an exercise of [the Commonwealth's] stated policy to promote the rapid deployment of broadband throughout the Commonwealth." Va. Code § 56-16.3(G). The scheme that Section 56-16.3 subsequently enacts is rationally related to a conceivable public purpose: rapid expansion of telecommunications access to residents of the Commonwealth.

Crucially, Plaintiff brings Count III as a *federal* takings claim, but principally relies on an unsettled interpretation of *state* law. Plaintiff offers no federal authority supporting its argument

that broadband expansion falls outside the bounds of a "conceivable public purpose." And under

binding Supreme Court authority, the Court lacks any basis to reach such a determination here,

as the Court fails to see that "no set of circumstances" exist such that Va Code § 56-16.3 serves a

conceivable public purpose on a facial challenge. *See Hansen*, 599 U.S. at 769 (noting that

*Salerno* test "normally" applies to facial challenges); *Ruckelshaus*, 467 U.S. at 1014 (cautioning

courts against second-guessing legislative judgments on public use); *Wash. State Grange*, 552

U.S. at 451 (observing that "facial challenges threaten to short circuit the democratic process by

preventing laws embodying the will of the people from being implemented in a manner

consistent with the Constitution"). The Court will therefore DISMISS Count III for failing to

state a claim.

### 2.    Count IV

Count IV alleges that because (1) Virginia law recognizes a property right in the

performance of a contract and (2) AAR railroad members possess a contractual relationship with

the Commonwealth under Art. I, § 11 of the Virginia Constitution, Va. Code § 56-16.3 violates

the Due Process Clause of the Fourteenth Amendment to the United States Constitution by

depriving AAR railroad members of notice or an opportunity to challenge the fairness or legality

of a deprivation of property. (Am. Compl. ¶¶ 163–72.) Plaintiff brings this claim pursuant to 42

U.S.C. § 1983, which authorizes suit related to a party's deprivation of a right secured by federal

law by a defendant acting under color of state law. (*Id.* ¶ 164.)

Defendants argue that Count IV merits dismissal on two grounds. First, Defendants

contend that the Virginia Constitution does not qualify as a "contract" between railroads and the

Commonwealth, either in an express or implied-in-fact manner. (Brich and Rolband Mem. at

26–27; Hudson Mem. at 26.) Second, Defendants argue that the Amended Complaint fails to

plausibly allege a denial of procedural due process, because the challenged statute provides for notice and an opportunity for railroads to challenge a physical taking. (Brich and Rolband Mem. at 28; Hudson Mem. at 27.) Plaintiff responds that settled Virginia state court precedent establishes that "Virginia Constitution's takings protections form an 'implied contract' between the Commonwealth and its property owners," and that the Va. Code § 56-16.3 lacks constitutionally sufficient procedures to safeguard this alleged contractual right. (Pl.'s Opp. at 38, 40.) The Court addresses both key points of dispute in turn.

To state a cognizable claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The Due Process Clause applies when government action deprives an individual of a legitimate liberty or property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). Thus, the first step in analyzing a procedural due process claim calls for identifying whether the alleged conduct affects a protected interest. *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997). A liberty interest may arise from the Constitution itself, or from state laws and policies. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

In support of its allegation that Article I, § 11 of the Virginia Constitution comprises a "contract" (and that the statute's alleged interference with this contract qualifies as a violation of Plaintiff's property right), Plaintiff highlights (i) the Fourth Circuit's holding that "[t]he existence of a 'constitutionally protected property right is a question of state law,'" (Pl.'s Opp. at 38, quoting *Garraghty v. Va. Dep't of Corr.*, 52 F.3d 1274, 1279 (4th Cir. 1995)), and (ii) that Virginia recognizes a property right in the performance of a contract, (Pl.'s Opp. at 38, citing *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 320 (Va. 2014)). Indeed, the

71

Supreme Court of Virginia stressed in *Dunlap* that this judicially cognizable property right includes "the right to performance of a contract and to reap profits and benefits not only from the contract but also from expected future contracts or otherwise advantageous business relationships." *Id.* at 321. The key question therefore consists of whether Plaintiff has plausibly alleged that Virginia's Constitution qualifies as a "contract" with private property owners.

Plaintiff argues that the Virginia's Constitution's takings clause creates an "implied contract" between the Commonwealth and Virginia property owners, pointing to *Nelson Cnty. v. Coleman*, 101 S.E. 413 (Va. 1919). There, the Supreme Court of Virginia considered whether a landowner could sue a county for developing a road on her property, and held that "[w]hile there can be no doubt" that the county could not be liable in tort, "it is also generally true that, where a tort is committed which involves an injury to personal property, the plaintiff may waive the tort and *sue upon an implied contract* to pay for the property which has been wrongfully taken . . . ." *Coleman*, 101 S.E. at 414 (emphasis added); *see also Burns v. Bd. of Supervisors of Fairfax Cnty.*, 238 S.E.2d 823, 825 (Va. 1977) (holding that when a county takes property for public use, landowners have "a right to waive all other remedies and to sue upon an implied contract . . . for such amount as would have been awarded if the property had been condemned under the eminent domain statute").

While Plaintiff "gets an 'A' for creativity," *Wilson v. Wolf*, 2021 WL 268642, at *1 (E.D. Pa. Jan. 27, 2021), in portraying a Virginia constitutional provision as a "contract," Plaintiff confuses a judicially cognizable remedy in inverse-condemnation claims with the underlying nature of the Commonwealth's constitution. *See id.*, 2021 WL 268642, at *8 (rejecting argument that Pennsylvania's constitution qualifies as an "enforceable contract" and instead characterizing the state constitution as "an organizational document" for its government). Plaintiff cites no

federal judicial precedent holding that a state constitution can qualify as a contract. *Cf. Church
v. Kelsey*, 121 U.S. 282, 283–84 (1887) ("A state constitution is not a contract within the
meaning of that clause of the constitution of the United States which prohibits the states from
passing laws impairing the obligation of contracts."). And while this case does not concern the
U.S. Constitution's Contracts Clause, Plaintiff presents no case law establishing that the
Supreme Court of Virginia has ruled that Article I, § 11 of the Virginia Constitution *itself*
qualifies as a contract. Rather, in *Coleman*, the Supreme Court of Virginia *analogized* to an
implied-contract theory for inverse-condemnation claims to recognize that governmental entities
that take private property must pay just compensation to property owners. *Coleman*, 101 S.E. at
414.[25] *Coleman*'s reference to the "self-executing" nature of Virginia's takings clause, *id.*, came
in the jurisdictional context of holding that the courts of the Commonwealth could hear inverse-
condemnation claims. So too with *Burns*, which simply reiterated *Coleman* in concluding that
property owners who had suffered a taking could sue based upon an "implied-contract" theory.
*Burns*, 238 S.E.2d at 825; *see also Kitchen v. City of Newport News*, 657 S.E.2d 132, 140 (Va.
2008) (holding that sovereign immunity does not bar an inverse-condemnation action, because

---

[25]     The Supreme Court of Virginia's full explanation illuminates that its analysis goes to the
nature of remedies for inverse condemnation claims, rather than a sweeping constitutional
interpretation of Article I, § 11 of the Virginia Constitution as an "implied contract":

> Having taken the property without authority and converted it to the public use, no reason
> is perceived in this case for denying to the plaintiff the right to waive all of her other
> remedies for the protection of her private property, and to sue as upon an implied contract
> to pay therefor such amount as would have been awarded therefor if the property had
> been condemned under the eminent domain statutes.  The constitutional provisions which
> prohibit the taking or damaging of private property for public uses without compensation
> are self–executing.

*Coleman*, 101 S.E. at 414.

such a claim comprises a "contract action"); *Richmeade, L.P. v. City of Richmond*, 594 S.E.2d 606, 608 (Va. 2004) ("[W]hen the government failed to condemn private land taken for public purposes, the landowner's recourse was to file an action for inverse condemnation based on the implied contract between the government and the landowner.").

The Supreme Court of Virginia's characterization of Article I, § 11 as "self-executing" does nothing to buttress Plaintiff's case. Courts use the phrase "self-executing" to refer to federal constitutional provisions (including the Fifth Amendment's Takings Clause). *See, e.g., Knick*, 588 U.S. at 192 ("Because of 'the self-executing character' of the Takings Clause 'with respect to compensation,' a property owner has a constitutional claim for just compensation at the time of the taking."); *Zito*, 8 F.4th at 287 n.5 (4th Cir. 2021) (noting that the Fourth Circuit has "likewise recognized the self-executing nature of the Takings Clause"). Despite the "self-executing" nature of the U.S. Constitution's protections, the Constitution does not qualify as a contract. *See Steltz v. United States*, 2019 WL 4121085, at *1 (Fed. Cl. Aug. 29, 2019) (holding that "the constitution is not a contract with the United States"); *Asmussen v. United States*, 2015 WL 351611, at *2 (Fed. Cl. Jan. 27, 2015) (observing that the Constitution cannot "be considered an express or implied-in-fact contract concerning which a breach action may be maintained in our court"). Just as an alleged violation of the federal Takings Clause does not give a property owner a right to bring a breach-of-contract claim, Plaintiff cannot refashion a state constitutional provision to engineer a § 1983 claim arising from interference in the performance of a "contract" between the Commonwealth and railroads.

As the Supreme Court of Virginia clarified in 2017, inverse condemnation claims constitute "'a contract action' based upon an implied constitutional promise of compensation." *AGCS Marine Ins. Co. v. Arlington Cnty.*, 800 S.E.2d 159, 163–64 (Va. 2017). The "implied

74

constitutional promise" that permits property owners to initiate inverse-condemnation

proceedings does not transform Article I, § 11 into a contract *itself*. And here, Plaintiff does not

bring an inverse-condemnation claim. Allowing Plaintiff to bring a § 1983 procedural due

process claim arising from the "breach" of an "implied contract" that a constitutional provision

supposedly creates with Virginia property owners would leap into uncharted jurisdictional

terrain. Indeed, accepting the logical premise of Plaintiff's legal conclusion — that every alleged

deprivation of property by a governmental entity creates a breach-of-contract claim under

Virginia's Constitution — could sweep countless inverse-condemnation claims into federal court

on Fourteenth Amendment grounds. By extension, if every violation of the Virginia Constitution

amounted to a breach of contract and therefore a deprivation of property under the Due Process

Clause, then federal courts would see an endless litany of § 1983 suits for damages against state

officials based solely on *state* constitutional violations. Such a result does not comport with the

spirit of the Eleventh Amendment.

Furthermore, "a procedural due process claim 'is not complete when the deprivation

occurs'" but "only when 'the State fails to provide due process.'" *Reed v. Goertz*, 598 U.S. 230,

236 (2023). To circumvent this procedural bar, Plaintiff argues that "[t]he protection afforded to

parties for intentional interference with the right to performance under a contract is a suit for

tortious interference with contract or business expectancy," and that therefore Va. Code § 56-

16.3 provides inadequate procedural safeguards by merely creating a petition-and-review process

involving the SCC. (Pl.'s Opp. at 41.) But the Supreme Court of Virginia has made clear that

the "implied contract" theory of suit for inverse-condemnation claims does not lie in tort. *See*

*Kitchen*, 657 S.E.2d at 140 (holding that although Article I, § 11 allows property owners to

enforce their right to "just compensation in a common law action . . . such an action is not a tort

action; rather, it is a contract action and, therefore, is not barred by the doctrine of sovereign immunity"); *Coleman*, 101 S.E. at 414 ("*While there can be no doubt*" that the Commonwealth cannot "be sued in tort, it is also generally true that, where a tort is committed which involves an injury to personal property, the plaintiff may waive the tort and *sue upon an implied contract* to pay for the property which has been wrongfully taken") (emphases added).  The fact that railroads must petition the SCC when they allege unjust compensation rather than bring tortious interference claims against state officials does not plausibly deprive railroads of "due process." And railroads remain free to initiate inverse-condemnation claims under an "implied contract" theory in Virginia state courts.

Finally, the Court again notes *Presley*, where the Fourth Circuit concluded that "when the alleged deprivation is effectively a physical taking, procedural due process is satisfied so long as private property owners may pursue meaningful postdeprivation procedures to recover just compensation." *Presley*, 464 F.3d at 490.  Va. Code § 56-16.3 authorizes such meaningful procedures, permitting railroads to receive fast-track review from the SCC regarding allegations of inadequate compensation.  Where "Virginia law provides an adequate procedure for obtaining compensation for a taking — a procedure readily available to [plaintiff] — [plaintiff] has alleged no denial of procedural due process." *Id.*  Such is the case here, especially since "takings cases . . . ought not be decided except in an actual factual setting." *Pennell*, 485 U.S. at 10.

### 3.   Counts V and VI

As decided *supra*, the Court has decided to dismiss Counts V–VI on sovereign immunity grounds.  But even if sovereign immunity did *not* bar these state-law claims, the Court declines to exercise supplemental jurisdiction over them, given the dismissal of all federal claims.  *See Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[W]hen the federal-law claims have

dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."); *see also Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 356 (4th Cir. 2011) (noting that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished."); *Shanaghan v. Cahill,* 58 F.3d 106, 110 (4th Cir.1995) (same). *Pennhurst* makes clear that the Eleventh Amendment bars state-law claims "to the extent that plaintiffs seek injunctive or declaratory relief." *Jezioro*, 2009 WL 10710235, at *6. And permitting AAR's nominal damages request to survive here when all federal claims have failed would disregard clear directives from the Supreme Court and Fourth Circuit. Even were the Court to set aside its conclusion on sovereign immunity for Counts V–VI, the Court therefore declines to exercise supplemental jurisdiction over these claims.

## IV.   CONCLUSION

For the reasons set forth above, the Court will dismiss Counts I–II for lack of standing, Counts III–IV for failure to state a claim and Counts V–VI as barred by sovereign immunity.

Accordingly, the Court will dismiss Counts I, II, V and VI WITHOUT PREJUDICE pursuant to Federal Rule of Civil Procedure 12(b)(1) and Counts III–IV WITH PREJUDICE pursuant to Rule 12(b)(6).[26]

The Court will therefore GRANT the Motions to Dismiss, (ECF Nos. 47, 49).

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date:  April 15, 2024

---

[26]     A "dismissal for lack of standing — or any other defect in subject matter jurisdiction — must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits." *Ali v. Hogan*, 26 F.4th 587, 600 (4th Cir. 2022).